# 23-301

## United States Court of Appeals
### for the
## Second Circuit

Qi Mi,

             Plaintiff - Appellant,

Sidney Sandoz,

             Plaintiff,

v.

Waterdrop Inc., Peng Shen, Kangping Shi, Nina Zhou, Kai Huang, Guang Yang, Collen A. De Vries, Cogency Global Inc., Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC, BofA Securities, Inc., China Merchants Securrities (HK) Co., Limited, CLSA Limited, Haitong International Securities Company Limited, Yao Hu, Haiyang Yu,

             Defendants - Appellees.

On Appeal From The United States District Court
For The Southern District of New York

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

Kim E. Miller
Kahn Swick & Foti, LLC
250 Park Avenue, 7th Floor
New York, New York 10177

Craig J. Geraci, Jr.
Kahn Swick & Foti, LLC
1100 Poydras Street, Suite 960
New Orleans, Louisiana 70163

*Counsel for Plaintiff - Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Plaintiff-Appellant Qi Mi is an individual, and Rule 26.1 of the Federal Rules of Appellate Procedure is thus inapplicable to him.

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED FOR REVIEW ..................................................1

STATEMENT OF THE CASE................................................................2

  I.   Nature of the Case and Relevant Procedural History.....................2

  II.  Factual Background.........................................................................5

      A. Overview of Waterdrop's Business...........................................5

      B. The Cessation of the Mutual Aid Platform ..............................5

      C. Waterdrop's Initial Public Offering .........................................7

      D. Waterdrop's Q1:21 Financial Results .....................................8

  III.  The District Court's Opinion.........................................................10

SUMMARY OF THE ARGUMENT ....................................................11

STANDARD OF REVIEW ..................................................................15

ARGUMENT ........................................................................................16

  I.   Section 11 Imposes a Minimal Pleading Burden on Plaintiff.......16

      A. The District Court Erred in Finding a Company Never Has an Obligation to Disclose "Quarterly Financial Results Before They Have Been Finalized"..................................................17

         1. The District Court's Holding Contravened "Well-Settled" Law Regarding the Disclosure of Interim Financial Results ......................18

         2. Having Spoken About the Q1:21 Results, Waterdrop Assumed and Violated a Duty to Tell the Whole Truth ....................................20

      B. Waterdrop's Omitted Q1:21 Financial Results Were Material..............24

         1. A Meaningful Financial Analysis Could Not Be Performed Without Waterdrop's Omitted Q1:21 Costs and Expenses................24

         2. The Evidentiary Allegations Support the Materiality of Waterdrop's Omitted Q1:21 Financial Results...................25

      C. The Complaint Plausibly Alleges that Waterdrop's Q1:21 Results Were "Finalized" ........................................................29

i

D. The District Court Also Created a New, Erroneous Test for Whether Statements Are Material Based on "Promises" ........................................ 30

II. The District Court Erroneously Held That Waterdrop Adequately Warned Investors About the Omitted Q1:21 Results .................................. 31

    A. The District Court Erroneously Applied Bespeaks Caution to Omissions of Present/Historical Fact ....................................... 31

    B. Defendants' Cautionary Language Was Not Meaningful Because It Was Generic and Misleading ................................................ 33

III. Defendants Failed to Disclose the True Reason for the Cessation of Mutual Aid ....................................................................................... 38

IV. The Complaint Adequately Alleges Claims Under Section 15 of the Securities Act ..................................................................................... 43

V. The District Court Erred in Denying Plaintiff at Least One Opportunity to Amend the Complaint .................................................................. 43

CONCLUSION .......................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Asay v. Pinduoduo Inc.*, No. 18-cv-7625,
  2020 U.S. Dist. LEXIS 56179 (S.D.N.Y. Mar. 30, 2020)....................................30

*Asay v. Pinduoduo Inc.*, No. 20-1423,
  2021 U.S. App. LEXIS 26176 (2d Cir. Aug. 31, 2021) ................... 12, 18, 23, 30

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)........................................................................................46

*Campbell v. Transgenomic, Inc.*,
  916 F.3d 1121 (8th Cir. 2019) .......................................................................25

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) ..........................................................................15

*Christine Asia Co. v. Yun Ma*,
  718 F. App'x 20 (2d Cir. 2017) ......................................................................27

*DeMaria v. Andersen*,
  318 F.3d 170 (2d Cir. 2003) .................................................... 12, 13, 18, 19, 31

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000...........................................................................25

*Guozhang Wang v. Cloopen Grp. Holding Ltd.*, No. 21-cv-10610,
  2023 U.S. Dist. LEXIS 44788  (S.D.N.Y. Mar. 16, 2023)................................22

*Herman & Maclean v. Huddleston*,
  459 U.S. 375 (1983)................................................................................ 16, 17

*In re Bemis Co. Sec. Litig.*,
  512 F. Supp. 3d 518 (S.D.N.Y. 2021) .............................................................36

*In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-cv-8557,
  2013 U.S. Dist. LEXIS 171110 (S.D.N.Y. Dec. 2, 2013) ..................................22

*In re Hudson Techs., Inc. Sec. Litig.*, No. 98-cv-1616,
  1999 U.S. Dist. LEXIS 15032 (S.D.N.Y. Sep. 26, 1999) ..................................25

*In re Insys Therapeutics, Inc. Sec. Litig.*, No. 17-cv-1954,
  2018 U.S. Dist. LEXIS 100000 (S.D.N.Y. June 12, 2018) ................................27

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) .............................................................. 11, 17, 21, 23

*Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*,
620 F.3d 137 (2d Cir. 2010) ......................................................................... 32, 33

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
14 F.4th 141 (2d Cir. 2021) ..................................................................................35

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011) ..................................................... 16, 17, 23, 28, 29

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ................................................................................44

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)................................................................................................18

*Mendell v. Greenberg*,
927 F.2d 667, 670 (2d Cir. 1990) ........................................................................45

*Meyer v. Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) ........................................................... 20, 25, 33, 42

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, No. 21-2524,
2022 U.S. App. LEXIS 35103 (2d Cir. Dec. 20, 2022).......................... 22, 23, 38

*Moshell v. Sasol Ltd.*,
481 F. Supp. 3d 280 (S.D.N.Y. 2020) ..................................................................38

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
709 F.3d 109 (2d Cir. 2013) ................................................................................43

*Noto v. 22nd Century Grp., Inc.*,
35 F.4th 95 (2d Cir. 2022) ............................................................ 11, 20, 23, 25, 39

*P. Stolz Family P'ship L.P. v. Daum*,
355 F.3d 92 (2d Cir. 2004) ..................................................................................32

*Plumber & Steamfitters Local 773 Pension Fund, Bos. Ret. Sys. v. Danske Bank*,
11 F.4th 90 (2d Cir. 2021) ...................................................................................22

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ........................................................... 16, 33, 38, 41

*Shimon v. Equifax Info. Servs. LLC*,
994 F.3d 88 (2d Cir. 2021) ..................................................................................15

iv

*Slack Technologies, LLC v. Pirani*, No. 22-220,
  slip opinion (June 1, 2023) ............................................................... 12, 16

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) ...................................................... 36, 37, 38

*Stadnick v. Vivint Solar, Inc.*,
  861 F.3d 31 (2d Cir. 2017 ......................................................... 12, 18, 20

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ............................................................................... 29

*United States v. Ferguson*,
  676 F. 3d 260 (2d Cir. 2011) .................................................................. 28

*United States v. Schiff*,
  602 F.3d 152 (3d Cir. 2010) ................................................................... 28

**Statutes**

15 U.S.C. § 77k .............................................................................. 16, 19

15 U.S.C. § 77v ....................................................................................... 1

15 U.S.C. § 77z ..................................................................................... 36

17 C.F.R. § 230.408 .............................................................................. 19

17 C.F.R. § 210.3-12 ............................................................................ 19

28 U.S.C. § 1291 .................................................................................... 1

28 U.S.C. § 1331 .................................................................................... 1

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................ 15

Fed. R. Civ. P. 15(a)(2) ........................................................................ 44

## JURISDICTIONAL STATEMENT

The United States District Court for the Southern District of New York (the "District Court") had subject matter jurisdiction over this action under 28 U.S.C. § 1331 and Section 22 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77v. On February 3, 2023, the District Court issued an Opinion and Order (the "Order"), JA-192, SA-001, dismissing with prejudice the Amended Class Action Complaint for Violations of the Securities Act (the "Complaint" or "FAC"), JA-011 (ECF No. 52), and the Clerk entered final judgment (the "Judgment") on that same day. JA-222, SA-031.[1] Plaintiff filed a timely notice of appeal on March 6, 2023. JA-223. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.    Whether the District Court erred in holding that the Complaint did not plausibly allege that Waterdrop's Registration Statement contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading where:

   a) Waterdrop failed to disclose unfavorable information concerning costs, expenses, and losses for the first quarter of 2021 ("Q1:21");

   b) Waterdrop voluntarily disclosed favorable interim information for Q1:21 about growth in first year premiums ("FYP"), a key metric relating to revenue, but omitted all reference to the related unfavorable information concerning Q1:21 costs, expenses, and losses; and

---

[1] Citations herein to pages in the Special Appendix and Joint Appendix are referred to as "SA___" and "JA___," respectively. Citations to "¶__" refer to the FAC.

1

    c) Waterdrop failed to disclose the true reason behind the discontinuation of Mutual Aid, a key segment of its business, and the resulting impact thereof.

2.    Whether the District Court erred in dismissing Plaintiff's Securities Act "control person" claims under Section 15 of the Securities Act, 15 U.S.C. § 77o.

3.    Whether the District Court erred in denying Plaintiff at least one opportunity to amend the Complaint to cure any pleading deficiencies.

## STATEMENT OF THE CASE

### I.    Nature of the Case and Relevant Procedural History

This is a securities class action on behalf of all who purchased or acquired Waterdrop Inc.'s ("Waterdrop" or the "Company") American Depositary Shares ("ADSs") pursuant or traceable to the Company's registration statement and prospectus, as amended (collectively, the "Registration Statement"), issued in connection with Waterdrop's May 2021 initial public offering (the "IPO"). JA-013, ¶ 1.[2] The Complaint brings claims under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and o, against Waterdrop, certain of its officers, directors, representatives, and the underwriters of the IPO (collectively, "Defendants"). *Id*.

Despite choosing to speak about favorable aspects of its Q1:21 interim

---

[2] As used herein, the term "Registration Statement" refers, collectively, to the Registration Statement on Form F-1 that was filed by the Company on April 16, 2021, all amendments thereto, and the Prospectus filed on Form 424B4 on May 7, 2021, which was incorporated into and formed a part of the Registration Statement that became effective on May 6, 2021. JA-031, ¶ 1.

financial results in the "Recent Development" section of the Registration Statement, Waterdrop omitted all references to any related unfavorable information for that same quarter, including costs and expenses, which had already increased at an unexpected rate for Q1:21 (and had further accelerated halfway into Q2:21), resulting in considerable operating losses for both quarters. JA-043, ¶¶ 96-98. The omission of this information was material as it created a misleading impression that the Company's financial position was better than it was, as evidenced by investors' and analysts' surprised reactions to the release of the Q1:21 results and the resulting drop in Waterdrop's stock price. *See* JA-037, ¶ 78; JA-039-40, ¶¶ 85-86; JA-163, Pls. Opp. to MTD at 13 (ECF No. 56).

With respect to the cessation of Mutual Aid, the Registration Statement failed to disclose the true reason behind its shutdown was intense Chinese regulatory pressure, and instead obliquely told investors that the Company discontinued its Mutual Aid business due to "recent industry environment changes" and "latest market development"—statements that could literally mean anything. JA-047-48, ¶¶ 111-115. For investors considering whether to invest in Waterdrop's IPO, the omission of this information about Mutual Aid was material because it obscured the true extent of the severe regulatory risk facing the Company. *Id.* Indeed, a September 15, 2021 *Seeking Alpha* article linked the later steep price decline of Waterdrop's

ADSs in part to the increasing regulatory scrutiny described in the Complaint, further evidencing the materiality of this omitted information. JA-039, ¶ 86.

As the full truth about both subjects was revealed to the market, the price of Waterdrop's ADSs reacted swiftly, and ultimately cratered from $12 at the start of the IPO to well below $2 less than a year later at the time of the filing of the Complaint. JA-035, ¶ 75; JA-040, ¶ 87.

The initial complaint in this action, originally assigned to the Honorable Vernon S. Broderick, was filed on September 14, 2021. *See* JA-004, ECF No. 1. After being appointed Lead Plaintiff by Judge Broderick, *see* JA-008, ECF No. 45, Plaintiff filed the operative Complaint, JA-011, and thereafter, Defendants filed a Rule 12(b)(6) motion to dismiss. JA-063. After full briefing on Defendants' motion to dismiss, the action was reassigned to the Honorable Denise L. Cote. JA-009. On February 3, 2023, without oral argument, Judge Cote dismissed the Complaint with prejudice, finding Plaintiff failed to allege any actionable misleading statements or omissions, and denied Plaintiff's request for leave to amend based on futility. *See Sandoz v. Waterdrop Inc.*, No. 21-cv-7683, 2023 U.S. Dist. LEXIS 18745 (S.D.N.Y. Feb. 3, 2023); *see also* JA-192, SA-001. The Clerk entered final Judgment closing the action that same day. JA-222, SA-031. Plaintiff timely filed a Notice of Appeal on March 6, 2023. JA-223.

## II.    Factual Background

### A.    Overview of Waterdrop's Business

Based in China, Waterdrop operates an insurance technology platform that historically had three interdependent business segments: 1) a mutual aid platform ("Mutual Aid"), where individuals paid small amounts and the collective fund would be used to pay the medical expenses of eligible beneficiaries; 2) a medical crowd-funding platform, like the U.S. site "GoFundMe"; and 3) an insurance platform that matches consumers with insurance products. JA-014, ¶ 2; JA-025-26, ¶¶ 44-47.

Waterdrop earns most of its revenues from commissions received from insurance companies for insurance products sold on the Waterdrop platform. JA-014, ¶ 2; JA-025-26, ¶ 46. The Company did not derive significant profits from its crowdfunding and Mutual Aid platforms; rather, these segments provided free advertising and data collection, significantly lowering Waterdrop's customer acquisition costs. *Id*. As one Chinese technology columnist explained: "After users have experienced crowdfunding and mutual aid, they will have more knowledge about and a stronger desire for insurance products… This is fundamental to Waterdrop's ecosystem and a high barrier to entry for other players in the industry." JA-026, ¶ 47.

### B.    The Cessation of the Mutual Aid Platform

On March 26, 2021, Waterdrop announced that it would be voluntarily discontinuing Mutual Aid starting on March 31, 2021. JA-027, ¶ 50. While

5

Defendant Peng Shen, founder, chairman, and CEO of Waterdrop, openly conveyed that the cessation was an "upgrade [to Waterdrop's] business"; in truth, two confidential witnesses interviewed in this matter both stated that the cessation was due to new regulations imposed by the China Banking and Insurance Regulatory Commission ("CBIRC"). JA-026, ¶¶ 52-53.[3] In late 2020, the CBIRC began to "crack down on illegal commercial insurance activities" by instituting new rules meant to regulate many different aspects of internet insurance companies, including online mutual aid platforms, to decrease the risk of fraud and illegal activity. JA-028-31, ¶¶ 55-60. In response to this crackdown, almost all of China's mutual aid platforms ceased operations, and internet insurance companies began to pull other products off the market. JA-029, ¶ 56; JA-031, ¶ 61. One analyst predicted that, due to the increasingly strict regulatory environment, small and medium-sized insurance companies would be "restricted from selling life insurance products online in the future." JA-031-32, ¶ 62. In other words, to ensure it could continue to operate as an internet-based insurance broker, Waterdrop needed to rapidly gain more customers and grow its business into one that was essentially too large to fail. JA-032, ¶ 63. To this end, even before the cessation of Waterdrop's Mutual Aid platform (but much more so after the fact when Mutual Aid could no longer act as a source of cheaper

---

[3] The District Court cited to these confidential witness allegations, apparently rejecting Defendants' criticisms of them. *See* JA-195-96, SA-004-5, Order at 4-5.

customer leads), the Company began heavily spending on more expensive third-party marketing to drive traffic to its site. *Id*.

### C. Waterdrop's Initial Public Offering

Waterdrop initially began planning its IPO in August 2020; however, according to an April 12, 2021 *Reuters* article, the IPO progress was delayed by Chinese regulators because Waterdrop's "business model is seen as risky." JA-032-33, ¶¶ 65-66. Regardless of this pushback, Waterdrop proceeded with its offering, filing its Registration Statement on Form F-1 with the SEC on April 16, 2021, which, after an amendment, was declared effective on May 6, 2021. JA-033, ¶ 68.

In the Registration Statement, Waterdrop vaguely stated that it ceased its Mutual Aid platform "in order to focus on our core businesses," and that contributing factors to the decision were "increased recognition of our brand," "latest market development," and "recent industry environment changes." JA-033-34, ¶ 69. However, the Registration Statement did not reveal the true reason behind the cessation of Mutual Aid: increasing regulation of the insurance industry in China. *Id*. Further, while the Registration Statement did disclose some risks associated with the cessation of the Mutual Aid program, it failed to discuss the significant risk that, without the cheaper customer leads generated by the platform, Waterdrop would have to spend considerably more to acquire customers to maintain the growth of its commercial insurance platform. JA-034, ¶ 71.

Additionally, the Registration Statement disclosed, under the heading "Recent Development," certain favorable financial results for Q1:21, which had ended over a month before the IPO. JA-043, ¶ 96; JA-235, Prospectus at 8. For example, Waterdrop disclosed that "[t]he FYP generated through Waterdrop Insurance Marketplace reached RMB4,469 million for the first quarter of 2021, demonstrating a 14.4% increase from the fourth quarter of 2020 or a 42.7% increase from the same period of 2020." *Id*. It also painted Waterdrop's overall Q1:21 results in a positive light: "We achieved a solid business growth in the first quarter of 2021." *Id*.

Despite disclosure of these positive results, Waterdrop did not disclose any unfavorable results for Q1:21, including that related operating costs and expenses had already skyrocketed during Q1:21, which led to a significant net operating loss for the quarter. JA-043-44, ¶¶ 97-98. Instead, even though Waterdrop had already incurred the costs, expenses, and losses for Q1:21 at the time of the IPO, the Registration Statement provided only generic, hypothetical warnings that costs, expenses, and losses *"may* continue in the future." JA-045, ¶ 105.

On the shoulders of its positive Registration Statement, Waterdrop sold 30 million Waterdrop ADSs at $12 per ADS to the investing public in its IPO, generating $360 million USD in gross offering proceeds. JA-035, ¶ 75.

### D. Waterdrop's Q1:21 Financial Results

On June 17, 2021, five weeks after the IPO, Waterdrop issued a press release

announcing the Company's financial results for the first quarter ended March 31, 2021. JA-036-37, ¶ 77. The Company reported that its operating costs and expenses had ballooned by RMB579.1 million, or ***75.7% year over year***, to RMB1,343.9 million. *Id*. (emphasis added). Sales and marketing expenses increased 67% year over year in the first quarter (and were increasing to a further 52% quarter over quarter in Q2:21 or 160.5% year over year). *Id*. As a result, the Company suffered an operating loss for the quarter of RMB460.6 million, compared with operating loss of RMB111.1 million for the same period of 2020—***a more than 400% increase***. *Id*. Once this unexpected information was disclosed to investors, the price of Waterdrop's ADSs fell 11% from $7.84 at closing on June 16, 2021, to $6.95 at closing on June 17, 2021, on unusually heavy trading volume. JA-163, Pls. Opp. to MTD at 13.

Analysts expressed surprise at the unexpected news. JA-037, ¶ 78. An analyst from Bank of America ("BofA") wrote, under the heading "Cons: still a long way to go to control acquisition cost," that Waterdrop's "sales and marketing expenses [increased] by 68% YoY, faster than our FY21 forecast at 49%." *Id*. Similarly, an analyst from Morgan Stanley wrote: "The product mix shift to long term insurance and further expansion in operating third party traffic have increased both its operating costs (up 68% even excl. one-off shutdown costs of mutual aid platform)

9

and sales & marketing costs (up 67% excl. SBC). As such, net losses for 1Q were slightly higher than our expectation." *Id*.[4]

## III.  The District Court's Opinion

On February 3, 2023, the District Court issued its Order dismissing the Complaint in its entirety. The District Court dismissed claims relating to Waterdrop's Q1:21 financial results for two reasons. First, the District Court held, as a matter of law, that "a company has no obligation to report its quarterly financial results before they have been finalized," and that "the FAC has not plausibly alleged that the 1Q21 financial results were finalized by the date of the IPO." JA-214-15, SA-023-24, Order at 23-24.[5] Second, the District Court found that "the Registration Statement made robust disclosures about its operating expenses…. [and] made no promises about Waterdrop's 1Q21 financial condition, stated that operating costs had been increasing over the past three years, and warned that they were likely to increase[,]" so "[t]he FAC has not plausibly alleged that a reasonable investor would

---

[4] On September 8, 2021, Waterdrop issued a press release announcing its Q2:21 financial results. JA-039, ¶ 84. The release revealed that operating losses continued to accelerate (to RMB815.4 million) due to sharp increases in operating costs and expenses (which increased 160.5% year over year) and sales and marketing increases (which increased 270.3% year over year). *Id*. On September 15, 2021, *Seeking Alpha* reported that Waterdrop's "shares are down more than 75% since their April IPO due to a combination of widening losses and regulatory concerns. JA-039-40, ¶ 86.

[5] The District Court did not define the term "finalized." For example, can it include results later subject to revision? Does it mean audited? Or does it mean something altogether different?

be misled about Waterdrop's financial condition given these disclosures." JA-215, SA-024, Order at 24.

With respect to the allegations about the cessation of Mutual Aid, the District Court dismissed these claims because "[t]he FAC fails to plead how any omission from the Registration Statement of a further explanation of Waterdrop's reasons for closing Mutual Aid significantly altered the mix of information available to a reasonable investor." JA-219, SA-028, Order at 28.

Lastly, the District Court rejected Plaintiff's Section 15 claims "[b]ecause there was no § 11 violation," JA-220, SA-029, Order at 29, and also denied Plaintiff's first request for leave to amend, holding that "[t]he Lead Plaintiff has not identified how further amendment would address the deficiencies in the FAC[,]" and that "[t]he statements included in the FAC fail to state a claim under the Securities Act, and as such, amendment would be futile." JA-221, SA-030, Order at 30.

## SUMMARY OF THE ARGUMENT

The law has always been clear: companies cannot speak in half truths. *See Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 105 (2d Cir. 2022). They can't selectively disclose the good and omit the bad. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016). Once they choose to speak, they must speak accurately and completely. *See Noto*, 35 F.4th at 105. Defendants didn't do that here. Very simply, they chose to speak about the good (Q1:21 FYP and revenue) and

11

omitted the bad (Q1:21 costs and expenses). This is especially true in a registration statement, where "detailed information about the firm's business and financial health" is necessary "so prospective buyers may fairly assess whether to invest." *Slack Technologies, LLC v. Pirani*, No. 22-220, slip op. at 3 (June 1, 2023) (citation omitted). By focusing on whether Defendants had an affirmative duty to "report its quarterly financial results before they have been finalized," the District Court failed to analyze this foundational tenet of securities law. JA-215, SA-024, Order at 24.

Even if a duty to disclose was somehow not triggered by Waterdrop's decision to speak about its Q1:21 results, the District Court's holding nonetheless contravened "well settled" Second Circuit law. The Second Circuit test for whether interim financial data is required to be disclosed in a registration statement has nothing to do with "finality." Rather, this Court has held in three separate cases that the test is still simply "whether the [omitted] information was material in light of the financial information already disclosed to investors"—*i.e.*, "whether there is 'a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (internal citation omitted); *see also Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 37 (2d Cir. 2017) (reaffirming *DeMaria* test); *Asay v. Pinduoduo Inc.*, No. 20-1423, 2021 U.S. App. LEXIS 26176, at *12 (2d Cir. Aug. 31, 2021) (describing

*DeMaria*'s test as "well settled").

Here, the Complaint passes that test. It plausibly alleges that in light of the positive revenue and FYP information revealed in the Registration Statement, both investors and sophisticated analysts were surprised by the rate at which the Q1:21 costs and expenses increased and by the sizable net loss that the Company incurred as a result. These allegations, along with the fact that the price of Waterdrop's ADSs tumbled when the truth was revealed, demonstrate that the omitted information was material, or, put differently, that there was "'a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *DeMaria*, 318 F.3d at 180 (citation omitted).

The District Court also erred in finding Waterdrop adequately warned investors about its omitted Q1:21 financial results. Initially, because the Complaint's allegations specify omissions of historical or present fact, to which the bespeaks caution doctrine does not apply, the District Court's application of that doctrine to these omissions is error. Moreover, Waterdrop's warnings about *future* risks—*e.g.*, losses "*may* continue in the future" (*see* JA-045, ¶ 105)—cannot legally insulate Defendants from liability here, because Waterdrop's expenses and losses for Q1:21 *had already* been incurred at the time of these "warnings." *See*, *e.g.*, JA-043, ¶ 98.

13

And even putting aside the erroneous application of bespeaks caution, the Complaint alleges that, despite Waterdrop's disclosure of its historical results and purported cautionary language, sophisticated analysts still materially underestimated the rate at which expenses and losses would increase in Q1:21. JA-036, ¶ 78; JA-039, ¶ 85; JA-044, ¶ 99. Investors were surprised too. JA-163, Pls. Opp. to MTD at 13. These allegations, although left unanalyzed by the District Court, are direct evidence that reasonable investors were not adequately warned that Q1:21 costs and expenses would increase at the rate they did.

Additionally, the District Court erred in holding that Waterdrop's failure to disclose the true reasoning behind the shutdown of Mutual Aid was not a material omission because the Registration Statement adequately warned about the general regulatory environment in China and its accompanying risks. Like with the Q1:21 financial results, the District Court's application of bespeaks caution to an omission of historical fact is error. Nor did Waterdrop's generic warnings address the *existing* fact that the cessation of the Mutual Aid platform was due to regulatory pressure and not, as vaguely represented, due to a voluntary choice made only in the interests of strengthening Waterdrop's business. This omission left investors in the dark about the severity of the regulatory risk facing the Company when deciding whether to invest in the IPO; it is therefore material and actionable.

14

Based on the foregoing, the District Court erroneously dismissed Plaintiff's Section 11 claims, and the Order should be reversed. Since the District Court erred in dismissing the Section 11 claims, and the sole reason that the District Court dismissed Plaintiff's Section 15 claims was lack of a primary violation, the dismissal of the Section 15 claims should be reversed as well.

Finally, the District Court erred in denying Plaintiff leave to amend due to futility because some purported deficiencies identified by the District Court could be cured with additional facts. For example, where the District Court found that "the FAC has not plausibly alleged that the 1Q21 financial results were finalized," JA-215, SA-024, Order at 24, if this holding is upheld by this Court, Plaintiff could potentially supply these very facts and cure the deficiency. Thus, the District Court's refusal to grant Plaintiff at least one opportunity to amend based on futility is error.

## STANDARD OF REVIEW

This Court reviews the District Court's dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6) de novo, "accepting the complaint's factual allegations as true and drawing all reasonable inferences in the plaintiff's favor." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). This Court "generally review[s] denials of leave to amend for abuse of discretion, [but] in cases in which the denial is based on futility [as here], we review de novo." *Shimon v. Equifax Info. Servs. LLC*, 994 F.3d 88, 91 (2d Cir. 2021).

## **ARGUMENT**

### I.     **Section 11 Imposes a Minimal Pleading Burden on Plaintiff**

"[Section] 11 places a relatively minimal burden on a plaintiff." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 382 (1983). "The law imposes strict liability on issuing companies when their registration statements contain material misstatements or misleading omissions." *Slack Technologies*, slip op. at 3 (citing 15 U.S.C. § 77K, *Huddleston*, 459 U.S. at 380). "Fraud is not an element or a requisite to a claim under Section 11." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). And here, because Plaintiff's claims do not allege fraud or sound in fraud, "plaintiffs' claims are not subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b)." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011), *cert. denied* 565 U.S. 878 (2011). Therefore, "this is an ordinary notice pleading case, subject only to the 'short and plain statement' requirements of Federal Rule of Civil Procedure 8(a)." *Id*.

Section 11 imposes liability on certain participants in a registration statement if (1) the statement "contained an untrue statement of a material fact," (2) the statement "omitted to state a material fact required to be stated therein," or (3) the omitted information was "necessary to make the statements therein not misleading." *Litwin*, 634 F.3d at 715 (citing 15 U.S.C. § 77k(a)). Once a plaintiff establishes one

of these three bases for liability, then "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Huddleston*, 459 U.S. at 382.

"[W]hen a district court is presented with a Rule 12(b)(6) motion, 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Litwin*, 634 F.3d at 717 (citations omitted).

Here, the Complaint plausibly alleges that, in violation of Section 11, the Registration Statement contained materially misleading statements and omissions about: (1) the extent of Waterdrop's Q1:21 costs, expenses, and losses and the unexpected rate at which they were increasing, and (2) the true reason for the shutdown of Mutual Aid. The District Court's findings to the contrary are reversible error for the reasons discussed below.

## I. The District Court Erred in Dismissing the Allegations Concerning Waterdrop's Omitted Q1:21 Financial Results

### A. The District Court Erred in Finding a Company Never Has an Obligation to Disclose "Quarterly Financial Results Before They Have Been Finalized"

A duty to disclose can arise (1) from "statutes or regulations that obligate a party to speak" and (2) from a company's decision to speak about an issue or topic. *Vivendi*, 838 F.3d at 239 n.8 (citations omitted). In this case, Waterdrop's duty arose from both. Instead of analyzing whether such a duty arose under either prong, the

17

District Court applied a blanket rule whereby neither prong could ever apply to the disclosure of quarterly financial results unless they have been "finalized": "[A] company has no obligation to report its quarterly financial results before they have been finalized." JA-215, SA-024, Order at 24. While there might exist situations where a company isn't obligated to disclose unfinalized quarterly financial results, no such situation exists here.[6]

### 1. The District Court's Holding Contravened "Well-Settled" Law Regarding the Disclosure of Interim Financial Results

First, the District Court's legal holding that a company never has an "obligation to report its quarterly financial results before they have been finalized," JA-215, SA-024, Order at 24, contravenes "well-settled" Second Circuit law regarding materiality in the context of the disclosure of interim financial results. *See DeMaria*, 318 F.3d at 180; *Stadnick*, 861 F.3d at 37; *Asay*, 2021 U.S. App. LEXIS 26176, at *12. In *DeMaria*, plaintiffs alleged defendants violated Section 11 by failing to disclose interim financial results in a prospectus for a quarter that ended more than a month before an IPO, but that were not yet published by the company. *See* 318 F.3d at 173, 179. There, the district court held (like here) that defendants were insulated from liability, because there was no legal obligation to disclose

---

[6] For example, if a company chose not to speak about a topic, such an omission might not give rise to liability under Section 10(b). *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).

interim results until the financial data disclosed in the registration statement became stale under SEC Regulation S-X. *Id*. at 179-80.[7]

This Court rejected that reasoning (although ultimately affirmed dismissal on other grounds), noting "[Regulation S-X] is not the only operative SEC regulation," and held that, because SEC Item 408 also applies to registration statements, the proper question is simply "***whether the [omitted] information was material in light of the financial information already disclosed to investors***." *Id*. at 180 (citing 17 C.F.R. § 230.408) (emphasis added).[8] To answer this question, "we engage in the familiar inquiry of whether there is 'a substantial likelihood that the disclosure of the omitted [interim information] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Id*. (citation omitted).[9]

Accordingly, under *DeMaria* and its progeny, Waterdrop had a duty to disclose the omitted Q1:21 results—regardless of finality—if those results were

---

[7] Regulation S-X provides, in pertinent part, for the disclosure of certain interim financial data where the financial statements in a Registration Statement become stale (either 130 or 135 days old, depending on the filer). *See* 17 C.F.R. § 210.3-12.

[8] Item 408 provides that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading." 17 C.F.R. § 230.408.

[9] Like under *DeMaria*, Waterdrop was statutorily obligated to speak, pursuant to Section 11 itself, if it omitted to state a material fact necessary to make the statements it made about its results not misleading. *See* 15 U.S.C. § 77k(a).

material (which, as set forth below, Plaintiff adequately alleges they were). The District Court's finding that "a company has no obligation to report its quarterly financial results before they have been finalized" not only directly conflicts with *DeMaria*, because even stale results would not need to be updated unless "finalized," but it also eschewed the Second Circuit's "well settled" test for determining when omitted interim financial data must be disclosed. JA-215, SA-024, Order at 24.[10]

## 2. Having Spoken About the Q1:21 Results, Waterdrop Assumed and Violated a Duty to Tell the Whole Truth

Second, the law has always been clear that companies cannot speak in half-truths. Thus, "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Noto*, 35 F.4th at 105 (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)). "The rule against half-truths, or statements that are misleading by omission, comports with the common-law tort of fraudulent misrepresentation, according to which 'a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false

---

[10] Even Defendants stopped short of embracing the District Court's position that a company never has an obligation to report unfinalized quarterly financial results: "[A] duty to accelerate reporting (even if possible) arises only where a reasonable investor would view the omission as significantly alter[ing] the total mix of information made available." JA-088, Defs. MTD at 20 (ECF No. 54) (citing *Stadnick*, 861 F.3d at 36) (internal quotations omitted).

representation as if all the facts stated were untrue.'" *Vivendi*, 838 F.3d at 240 (citation omitted).

Here, Waterdrop told a clear half-truth: the Company revealed the positive half of their yet unpublished Q1:21 financial results (increase in Q1:21 FYP and revenue) and omitted the corresponding negative half (increase in Q1:21 costs and expenses). Although the District Court acknowledged Waterdrop spoke about its Q1:21 results, it nevertheless narrowly focused on whether the results were final, finding "a company has no obligation to report its quarterly financial results before they have been finalized." JA-215, SA-024, Order at 24. This newly minted, hardline rule directly conflicts with this Court's precedent and should be reversed.[11]

At the time of the IPO, Q1:21 had ended more than 30 days prior, and the Company was already about halfway into Q2:21. JA-015, ¶ 5. While the Company had not yet issued its Q1:21 earnings release, Waterdrop nonetheless chose to speak in detail about favorable Q1:21 revenue-related results—regardless of whether those results were final. *See* JA-043, ¶ 96. As a result, even if no independent duty to disclose existed prior to speaking, "[h]aving chosen to speak about their [Q1:21

---

[11] For reasons unknown, the District Court downplayed Waterdrop's statements about Q1:21 as just "some general statements about growth in Waterdrop's business in 1Q21." JA-215, SA-024, Order at 24. Waterdrop's disclosures, however, were material and concrete, disclosing an exact dollar amount for Q1:21 FYP, along with the exact percentages for the sources of that FYP in terms of both consumer acquisition channels and product offerings. JA-043, ¶ 96.

results], Defendants had a duty to speak accurately, giving *all* material facts in addressing those issues to permit investors to evaluate the potential risks." *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, No. 21-2524, 2022 U.S. App. LEXIS 35103, at *8 (2d Cir. Dec. 20, 2022) (emphasis added); *see also Guozhang Wang v. Cloopen Grp. Holding Ltd.*, No. 21-cv-10610, 2023 U.S. Dist. LEXIS 44788, at *23-25 (S.D.N.Y. Mar. 16, 2023) (finding omission actionable where company chose to speak about a topic occurring after Q3:20 in a "Subsequent Events" section even though the financial data in the registration statement was limited to the end of Q3:20); *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-cv-8557, 2013 U.S. Dist. LEXIS 171110, at *62 (S.D.N.Y. Dec. 2, 2013) ("A corporation's duty to disclose is especially obvious … where the corporation chooses to selectively reveal positive information on a specific topic while concealing closely-related negative information.").[12] Waterdrop, however, did not speak completely when it put forth "a statement that contain[ed] only favorable matters and omit[ed] all reference to unfavorable matters[.]" *Vivendi,* 838 F.3d at

---

[12] *Cf. Plumber & Steamfitters Local 773 Pension Fund, Bos. Ret. Sys. v. Danske Bank A/S*, 11 F.4th 90, 103 n.4 (2d Cir. 2021) (finding an "omission-based theory is strained because the connection between the topic Danske chose to discuss (a new anonymous reporting system) and the allegedly omitted information (Wilkinson's allegations [which were not reported through that new system]) is fairly attenuated"). Unlike in *Danske Bank A/S*, the link between the topic Waterdrop chose to discuss (Q1:21 FYP and revenue) and the omitted information (Q1:21 costs and expenses) is inextricable, as one cannot calculate net income or evaluate financial condition without both revenue and expenses.

240. And when the Company issued its Q1:21 earnings release shortly after the IPO, only then did the market learn the other material half of the truth: the increase in FYP for Q1:21 was undercut by related costs and expenses that had risen at unexpected rates. *Id*.

In sum, whether this case is analyzed under *DeMaria* or *Noto*/*Moab Partners*, the decisive question remains whether "a reasonable investor would attach importance to [the omitted Q1:21 results] when making a decision," *Noto*, 35 F.4th at 105, or, at this stage, whether the omitted Q1:21 results were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Litwin*, 634 F.3d at 717. In broadly holding "a company has no obligation to report its quarterly financial results before they have been finalized," JA-215, SA-024, Order at 24, the District Court did not perform the requisite materiality analysis, nor did it consider whether Waterdrop gave "all material facts in addressing those issues to permit investors to evaluate the potential risks." *Moab Partners,* 2022 U.S. App. LEXIS 35103, at *8-9.[13]

---

[13] In *DeMaria*, *Stadnick*, and *Asay*, this Court ultimately affirmed that the omitted interim data was not material. But unlike in those cases where the companies "avoided mentioning or reporting the [interim] Q2 financial results in the Registration Statement," *Asay*, 2021 U.S. App. LEXIS 26176, at *12, Waterdrop here chose to speak about favorable revenue-related interim results, while omitting all unfavorable related results for that same quarter. This key fact immediately differentiates the case at hand from those cases.

### B. Waterdrop's Omitted Q1:21 Financial Results Were Material

#### 1. A Meaningful Financial Analysis Could Not Be Performed Without Waterdrop's Omitted Q1:21 Costs and Expenses

Under the heading "Recent Development," Defendants leveraged the Registration Statement to selectively disclose that Waterdrop's FYP for the Q1:21 had reached RMB4,469 million (representing a 14.4% increase from 4Q:20 and a 42.7% increase year-over-year), while entirely omitting countervailing increases in Q1:21 operating costs and expenses. JA-034-35, ¶¶ 72-73. The Registration Statement also framed Waterdrop's overall Q1:21 results to potential investors in a positive light: "We have achieved a solid business growth in the first quarter 2021." JA-043, ¶ 96. Then, *after* the IPO closed, Defendants revealed the other half of the story—that Waterdrop's operating costs and expenses for Q1:21 totaled some RMB1,343.9 million, representing a *75.7%* year-over year increase, while its sales and marketing expenses for the quarter totaled RMB837.2 million, representing a *67.7%* year-over-year increase. JA-037, ¶ 77; JA-043, ¶ 97. Both led to a net operating loss for the quarter that was *400% greater* than the same period of the prior year. *Id*.[14]

---

[14] It is not difficult to imagine how disclosing only positive information on the eve of an IPO, while omitting related negative information, would help promote investor interest in the offering and more positively spin the offering price.

The materiality of Waterdrop's omitted operating costs and expenses to a meaningful financial analysis cannot be overstated, as it is impossible to calculate "net income" or to evaluate a company's current financial condition without these types of figures. *See*, *e.g.*, *In re Hudson Techs., Inc. Sec. Litig.*, No. 98-cv-1616, 1999 U.S. Dist. LEXIS 15032, at *1 (S.D.N.Y. Sep. 26, 1999) (recognizing that information which affects net income significantly alters the "total mix" of information available to a reasonable investor); *Campbell v. Transgenomic, Inc.,* 916 F.3d 1121, 1125 (8th Cir. 2019) (finding omission of expenses and net income/loss was not immaterial as a matter of law). On this basis alone, the Complaint plausibly alleges that the omitted information was material. Indeed, the disclosure of the omitted Q1:21 costs and expenses importantly would have confirmed or dispelled expectations about Waterdrop's existing Q1:21 costs and expenses vis á vis the disclosed Q1:21 FYP. A reasonable investor thus would have "attach[ed] importance to it when making a decision" whether to invest or not in the IPO. *Noto*, 35 F.4th at 105; *see also Meyer*, 761 F.3d at 251 ("[T]he omission must be of facts that a reasonable investor would consider important."); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) ("[I]t is not necessary to assert that the investor would have acted differently if an accurate disclosure was made.").

### 2. The Evidentiary Allegations Support the Materiality of Waterdrop's Omitted Q1:21 Financial Results

Moreover, unlike in many cases where a district court, in an evidentiary vacuum, must make the fact-intensive determination of whether a hypothetical reasonable investor would have found omitted information material, the Complaint here supplies key evidentiary allegations to aid in that determination.

The Complaint alleges that sophisticated financial analysts were tracking and were surprised by the *rate* at which costs and expenses increased in Q1:21. JA-036, ¶ 78; JA-044, ¶ 99. For example, based on the Registration Statement, BofA published a report initiating coverage on June 1, 2021 (*i.e.*, after the IPO but before the Q1:21 earnings release), in which it projected—based on figures in the Registration Statement—that Waterdrop's sales and marketing expenses would rise approximately 49% year-over-year. JA-035, ¶ 76; JA-036, ¶ 78. Just 12 business days later, Waterdrop's earning release revealed it was on-track to exceed BofA's projection for sales and marketing expenses in 2021 by *19%*. JA-036-37, ¶ 77. To that end, on June 17, 2021 (the day Waterdrop issued its Q1:21 earnings release), BofA published a follow-up report explaining that "growth of the most costly third party traffic continued to outgrow natural traffic, leading to the increase of its sales and marketing expenses by 68% YoY, *faster than our FY21 forecast at 49%*." JA-037, ¶ 78 (emphasis added). Similarly, the following day, a Morgan Stanley analyst issued a report titled, "In Line Revenue Growth; Cost Worse Than Expected," wherein it stated that Waterdrop's "product mix shift to long term

26

insurance and further expansion in operating third party traffic have increased both its operating costs…and sales & marketing costs" above expectations. *Id*.

Without the benefit of the omitted Q1:21 costs and expenses, analysts, particularly from BofA, materially underestimated the rate at which these figures would increase. And judging by the market's reaction to the release of the Q1:21 results, so too did investors. *See* JA-163, Pls. Opp. to MTD at 13. Thus, regardless of how Defendants spin what possibly could be gleaned about Q1:21 from Waterdrop's historical results, the Complaint's allegations are proof that the omitted information was considered important and would have significantly altered the "total mix" of information made available at the time of the IPO.

Once this unexpected information was disclosed to investors in Waterdrop's Q1:21 earning release, the price of Waterdrop's ADSs fell 11% from $7.84 at closing on June 16, 2021, to $6.95 at closing on June 17, 2021, on unusually heavy trading volume. JA-163, Pls. Opp. to MTD at 13; *see Christine Asia Co. v. Yun Ma*, 718 F. App'x 20, 22 (2d Cir. 2017) ("The importance of this information to investors is illustrated by the fact that, when it was revealed . . . Alibaba's stock dropped 13% in two days."); *see also In re Insys Therapeutics, Inc. Sec. Litig.*, No. 17-cv-1954, 2018 U.S. Dist. LEXIS 100000, at *13 (S.D.N.Y. June 12, 2018) (finding investor reaction with "heavy trading volume" to be "empirical evidence of materiality"). This price drop, combined with the allegations that analysts tracked and underestimated the rate

27

of increasing expenses and loss, are "substantial" evidence that the omitted information was highly material. *See United States v. Ferguson*, 676 F. 3d 260, 274-75 n.10 (2d Cir. 2011) (finding testimony from stock analysts and investment manager about the importance of information was "substantial"); *see also United States v. Schiff*, 602 F.3d 152, 171 n.26 (3d Cir. 2010) (noting other "effective" "evidentiary methods" for proving materiality include analyst testimony, and finding "analyst . . . reports discussing [relevant topics] are themselves probative of this issue"). At the very least, Plaintiff's evidentiary allegations demonstrate that the omitted information was not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Litwin*, 634 F.3d at 717.

Although the District Court noted that "[t]he FAC points to financial analysts' reports and the drop in Waterdrop's share price after the announcement of the 1Q21 financial results to demonstrate the impact this omission had on investors," it inexplicably stopped there, with no further analysis of the fact. JA-214, SA-023, Order at 23. The District Court made no attempt to reconcile these evidentiary allegations with its conclusion that the omitted information was immaterial and did not need to be disclosed in connection with the IPO. In effect, the District Court elevated its own immateriality determination over this objective evidence of materiality—a determination more appropriately left to the trier of fact. *See Litwin*,

28

634 F.3d at 717 (the "'determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.'" (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976))).

### C. The Complaint Plausibly Alleges that Waterdrop's Q1:21 Results Were "Finalized"

In the alternative, even if the materiality of Waterdrop's Q1:21 omitted results somehow depends on their finality, the Complaint plausibly alleges facts from which such "finality" can be reasonably inferred.[15] First, the Complaint alleges that Q1:21 ended over a month before the IPO and that the Company was already about halfway into Q2:21. Considering the amount of time that passed since the end of the quarter, this fact alone renders it plausible that the Q1:21 results were "finalized" by the time of the IPO. Second, on top of that timing, Waterdrop was able to disclose the exact amount of FYP for Q1:21, including the specific sources of that FYP in terms of percentages. JA-034-35, ¶ 72; JA-043, ¶ 96. And when Waterdrop issued its Q1:21 earnings release five weeks later, the amount of FYP previously disclosed did not

---

[15] Nevertheless, once Waterdrop chose to speak on this topic, it became obligated to disclose the related Q1:21 costs and expenses at whatever level of finalization they existed at that time. In other words, whether the results were "finalized" is, in effect, irrelevant here, because Waterdrop, by choice, accelerated the timing of the disclosure of those results in whatever form they existed at that time.

change. *Compare id*. with JA-124, Q1:21 Press Release (ECF No. 55-2). Thus, if Waterdrop was able to disclose its "finalized" FYP figures as part of the IPO, it is not implausible that it also could have disclosed its "finalized" cost and expense figures. While each of these allegations alone allows for the reasonable inference that the Q1:21 results were "finalized" by the time of the IPO, when considered together, they leave little room for doubt. The District Court's finding otherwise is erroneous. JA-215, SA-024, Order at 24.[16]

### D. The District Court Also Created a New, Erroneous Test for Whether Statements Are Material Based on "Promises"

Adopting Defendants' argument that the Registration Statement did not "promise" expenses would decline as a proportion of revenues in Q1:21 or Q2:21, JA-090, MTD at 22, the District Court also effectively created a novel requirement whereby statements are inactionable if a company makes no affirmative promises about its financial results. *See* JA-215, SA-024, Order at 24 ("The Registration Statement made no promises about Waterdrop's 1Q21 financial condition[.]"). But the proper test for whether the Registration Statement contained an actionable

---

[16] Notably, this Court in *Asay* did not parrot that district court's (finality-like) reasoning that those results didn't need to be disclosed, in part, because the complaint did not allege whether the results "were audited or were later subject to significant revision." *Asay v. Pinduoduo Inc.*, No. 18-cv-7625, 2020 U.S. Dist. LEXIS 56179, at *27 (S.D.N.Y. Mar. 30, 2020). Rather, this Court analyzed only, as *DeMaria* instructs, whether the omitted interim financial information was material. *See Asay*, 2021 U.S. App. LEXIS 26176, at *14.

omission is not whether the Company made any "promises about Waterdrop's 1Q21 financial condition." *Id*. Such a standard would obliterate the federal securities laws. For example, a drug company could repeatedly tout a developmental drug, omit that it caused life-threatening effects to everyone in the drug trial, but still escape liability so long as the company didn't make any "promises" about its efficacy and safety. As explained above, the proper test is simply "whether the [omitted] information was material in light of the financial information already disclosed to investors." *DeMaria*, 318 F.3d at 180.

## II. The District Court Erroneously Held That Waterdrop Adequately Warned Investors About the Omitted Q1:21 Results

Next, the District Court erred in finding that the Registration Statement adequately warned investors about the risks relating to the omitted Q1:21 financial results. JA-209, SA-018, Order at 18. In doing so, the District Court erroneously applied the bespeaks caution doctrine to omissions of historical and present fact, rather than forward-looking statements, and found generic warnings about risks that had already transpired were meaningful, when they were not.

### A. The District Court Erroneously Applied Bespeaks Caution to Omissions of Present/Historical Fact

The District Court compounded its legal error by applying the bespeaks caution doctrine to omissions of historical or present fact about Waterdrop's Q1:21 results, finding such omissions were accompanied by sufficient cautionary language

31

to render them inactionable. *See* JA-209, SA-018, Order at 18; *see also id*. (citing bespeaks caution doctrine).

"The bespeaks-caution doctrine is a corollary of 'the well-established principle that a statement or omission must be considered in context.'" *Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010). "Under the bespeaks caution doctrine, 'alleged misrepresentations in a stock offering are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." *Rombach*, 355 F.3d at 173 (citation omitted). "It is settled that the bespeaks-caution doctrine applies only to statements that are forward-looking." *MF Glob.*, 620 F.3d at 142. The doctrine does not apply to "an omission of present fact." *Id*.; *see also P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) (adopting limitation that "misrepresentation of present or historical facts ***cannot*** be cured by cautionary language") (emphasis added).

As the District Court recognized, "[t]he FAC alleges … it was a material omission for the Registration Statement to omit that in 1Q21, operating costs and expenses ***had increased*** more than 75%, when measured year over year, and that the company ***experienced*** an operating loss." JA-214, SA-023, Order at 23 (emphasis added). These allegations specify "omission[s] of present fact, to which bespeaks caution does not apply: [The Q1:21 costs, expenses, and losses were] ascertainable

when the challenged statements were made. It was therefore error for the district court to rely on the bespeaks-caution doctrine to dismiss that claim." *MF Glob.,* 620 F.3d at 142.

### B. Defendants' Cautionary Language Was Not Meaningful Because It Was Generic and Misleading

Even if the District Court properly considered whether Waterdrop's cautionary language could cure its omissions of present and historical fact, "[t]he bespeaks caution doctrine does not serve if it is abused or gamed." *Rombach*, 355 F.3d at 173. "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Id*. Nor will generic risk warnings "suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Meyer*, 761 F.3d at 251.

The District Court found "the Registration Statement made robust disclosures about [Waterdrop's] operating expenses[,]" holding because "[t]he Registration Statement made no promises about Waterdrop's 1Q21 financial condition, stated that operating costs had been increasing over the past three years, and warned that they were likely to increase[,] [t]he FAC has not plausibly alleged that a reasonable investor would be misled about Waterdrop's financial condition given these disclosures." JA-215, SA-024, Order at 24. And "[t]he Registration Statement did not say nor suggest that operating costs would decrease in 2021 either absolutely or

33

as a percentage of net operating revenue." JA-211, SA-020, Order at 20. This conclusion is also error and warrants reversal.

To start, the Complaint's theory is not, and has never been, that investors were misled into believing "that operating costs would decrease in 2021." JA-211, SA-020, Order at 20. Rather, the omitted information concealed that Waterdrop's costs and expenses had increased at a higher-than-expected _rate_. *See*, *e.g.*, JA-037, ¶ 78. Indeed, the Complaint alleges sophisticated analysts tracked and materially underestimated the rate at which expenses and losses would increase, even in the face of Waterdrop's disclosed historical results and "robust disclosures." *Id*. Thus, if these analysts could not anticipate the rate of increase with the "robust disclosures" and historical results provided, a less sophisticated reasonable investor couldn't either and shouldn't be held to a more formidable standard. *See* JA-163, Pls. Opp. to MTD at 13. The District Court failed to grapple with this reasoning.

Additionally, the Registration Statement *did* assure investors that "we expect our operating costs as a percentage of our net operating revenue will decrease in the foreseeable future," despite operating costs as a percentage of revenue having already increased in Q1:21 (to 152% from 133% in Q4:20) and being well on its way in Q2:21 to increasing to its highest percentage ever (186%) compared to any other quarter listed in the Registration Statement. JA-044-45, ¶¶ 102-104. Yet the District Court found no reasonable investor could have interpreted references to "the

foreseeable future" as including 2021—even though Merriam Webster defines this phrase as meaning "soon." *See* JA-166, Pls. Opp. to MTD at 16.[17]

At worst, both inferences are plausible, in which case the District Court was "required to credit the plaintiffs' plausible theory when evaluating a Rule 12(b)(6) motion." *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146 (2d Cir. 2021). In fact, *IWA Forest* concerned this District Court's interpretation of a similar temporal statement to the case at hand. There, the District Court found that the term "older" only referred to snowmobiles model year 2016 and earlier, despite plaintiffs' plausible allegations that "older" also referred to model year 2017. *Id*. This Circuit reversed, explaining that the District Court's inference, "although not unreasonable, 'is entitled to little weight at this stage of the litigation.'" *Id*. (citation omitted). Likewise, at this stage, the District Court should have credited Plaintiff's plausible theory that a reasonable investor could have interpreted the phrase "foreseeable future" to include 2021.

The District Court also found that the statements about the "foreseeable future" were forward-looking and accompanied by the following "meaningful cautionary language [that] renders [them] immaterial":

---

[17] Defendants did not even go so far as to argue that the "foreseeable future" could not have included any part of 2021. *See* JA-090, MTD at 22 ("'foreseeable future' cannot be read, as of May 7, 2021, to promise such a decline in 1Q21—which was already complete—or in 2Q21, which was ongoing.").

> This prospectus contains forward-looking statements that reflect our current expectations and views of future events. . . . Known and unknown risks, uncertainties and other factors, including those listed under "Risk Factors," may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements.... These forward-looking statements involve various risks and uncertainties. Although we believe that our expectations expressed in these forward-looking statements are reasonable, our expectations may later be found to be incorrect. Our actual results could be materially different from our expectations.

JA-211, SA-020, Order at 20.[18]

Contrary to the District Court's conclusion, nearly identical language was held not meaningful (under the related PSLRA safe harbor) by the Second Circuit in *Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010).[19] There, defendants' "Form 10-Q warned that it 'contain[ed] forward-looking statements, which are subject to risks and uncertainties'" and that '[f]actors that could cause actual results to differ materially from these forward-looking statements include . . . potential deterioration in the high-yield sector, which could result in further losses in AEFA's investment portfolio.'" *Id.* at 764. This Court held that "defendants have failed to demonstrate that the [] statement is protected by the cautionary meaningful language prong of the

---

[18] The District Court *sua sponte* raised this "cautionary language," as Defendants did not argue below that this language was meaningful, nor was it included anywhere in the Complaint or in the excerpts of the Registration Statement attached to their motion to dismiss. *See* JA-102, Defs. Ex. A, Prospectus Excerpts (ECF No. 55-1).

[19] Although the PSLRA safe harbor does not apply to IPOs, *see* 15 U.S.C. § 77z-2(b)(2)(D), "[t]he 'bespeaks caution' doctrine contemplates a similar inquiry as the PSLRA's safe harbor." *In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 537 n.6 (S.D.N.Y. 2021).

statutory safe harbor." *Id*. at 773. In fact, this Court held that even the more specific language "referencing the deterioration of in the high-yield sector generally, is vague," and "verges on the mere boilerplate, essentially warning that 'if our portfolio deteriorates, then there will be losses in our portfolio.'" *Id*. at 772.

Similarly, Waterdrop's so-called cautionary language is so general that it could apply to any company, in any industry, and could apply to a thriving business just as equally as one on the precipice of bankruptcy. As a result, the language was meaningless to investors, and the District Court's holding that this language was sufficient to entitle Defendants to protection under the bespeaks caution doctrine warrants reversal.

In addition, Waterdrop's warnings that costs "were ***likely*** to increase," as the District Court summarized (JA-215, SA-024, Order at 24), or that net losses "***may*** continue in the future" (JA-045, ¶¶ 105-106), were not only boilerplate (as it is always possible that a loss may or may not continue in the future), but also were misleading because they omitted the material information that Waterdrop *had already* incurred increased costs, expenses, and a net loss for Q1:21, and these expenses were accelerating in the first half of Q2:21, indicating it was likely to incur an even larger net loss in Q2:21. JA-045, ¶ 106; *see Slayton*, 604 F.3d at 770 ("cautionary language that is misleading in light of historical fact cannot be meaningful"). Thus, even if Defendants' cautionary words were not mere boilerplate

37

risk disclosures, Defendants are still not insulated from liability because their "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *See Rombach*, 355 F.3d at 173; *see also Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 289 (S.D.N.Y. 2020) ("[Because] Sasol's public cost estimates and projected schedules totally failed to account for already existing cost overruns and delays[,] [t]his renders the defendants' cautionary statements that their announced budgets and schedules 'may be affected by delays or cost overruns' misleading because, among other things, the risk they warned of 'had already transpired.'") (quoting *Slayton*, 604 F.3d at 770).

In closing, even assuming cautionary language could legally cure omissions of present or historical fact, the alleged omissions here were not cured by the boilerplate disclosures Waterdrop did make—including those about historical results and the cautionary language about future risks that had already transpired—because they "did not reveal the information necessary for the investing public to make a proper assessment of the alleged risks." *Moab Partners,* 2022 U.S. App. LEXIS 35103, at *8-9.

### III. Defendants Failed to Disclose the True Reason for the Cessation of Mutual Aid

With respect to Waterdrop's discontinuation of Mutual Aid, the Registration Statement vaguely stated that the Company ceased this platform "in order to focus on our core businesses and offer enhanced protection to our users," and that

38

contributing factors to the decision were "increased recognition of our brand," "latest market development," and "recent industry environment changes." JA-033, ¶ 69. These statements created the misleading impression that the discontinuation was a voluntary choice made only in the interests of strengthening Waterdrop's business, when in truth, the shutdown was allegedly due to regulatory pressure from the Chinese government. JA-047-49, ¶¶ 112-16; *see also* JA-023, ¶ 40 ("CW1 stated that the shutdown of Waterdrop's mutual aid platform was due to regulations put in place by the CBIRC."); JA-023, ¶ 41 ("CW2 stated that the cessation of Waterdrop Mutual Aid was due to the CBIRC's new regulatory requirements in early 2021."). Thus, although the shutdown itself was disclosed prior to IPO, nowhere in the Registration Statement did Waterdrop mention or even allude to the fact that the reason behind the cessation of the Mutual Aid platform was regulatory pressure. To say otherwise was patently false or misleading. As a result, investors were misled regarding the severity of the regulatory risk confronting the Company at the time of the IPO. *See Noto*, 35 F.4th at 105 (finding omission of SEC investigation material because it "would directly bear on the reasonable investor's assessment of the severity of the reported accounting weaknesses.").[20]

---

[20] Describing the cessation as voluntary also misleadingly implied that the Company could unilaterally revive this key business segment at a later time. And, even if one were to accept as true that Waterdrop ceased Mutual Aid, perhaps in part, due to any of the vague reasons it disclosed, the Company still violated its duty to tell the whole

The American media began reporting on the CBIRC's increased regulatory pressure on internet-based insurance companies in August 2021. JA-038, ¶¶ 80-81. For example, a *Bloomberg* story entitled "China Goes After Online Insurance in Widening Crackdown" reported that that "[r]egulators have [] moved to shutter some operations including mutual aid healthcare platforms operated by Waterdrop" and "[t]he latest move will stymie growth in an industry that had been expected to grow to 2.5 trillion yuan ($385 billion) in a decade." *Id*. As with the increasing operating expenses, the materiality of this revelation is not merely hypothetical; analysts from BofA and investment website *Seeking Alpha* both noted regulatory concerns as reasons why the stock price had dropped since the IPO and was likely to continue to decrease. JA-039-40, ¶¶ 85-86. Regarding the cessation of the Mutual Aid program, *Seeking Alpha* noted, "Waterdrop was forced to jettison one of its biggest referral sources for new insurance business, which may partly explain its current heavy reliance on costly third-party channels as a source for finding new customers." JA-039-40, ¶ 86.

Nevertheless, the District Court dismissed these claims because it found the Registration Statement "describes the regulatory environment in China in considerable detail," "warns investors of the risks to Waterdrop's business stemming

---

truth by omitting that the shutdown was also due to regulatory pressure. *See Noto*, 35 F.4th at 105.

from that environment," "explains that the online insurance industry is highly regulated in China and describes the enhanced supervision of the CBIRC," "adds that [Waterdrop] already had been subject to regulatory investigations and may be subject to penalties," and "information about the government regulations was publicly available to investors." JA-219, SA-028, Order at 28. But, even putting aside that the bespeaks caution doctrine legally cannot apply to this omission of *historical* fact, none of these purported warnings inform investors that Mutual Aid was shuttered due to intense regulatory pressure, and not, as represented, "in order to focus on our core businesses and offer enhanced protection to our users," or due to "increased recognition of our brand," "latest market development," and "recent industry environment changes." JA-033-34, ¶ 69. And the mere fact that investors may have been informed about the general regulatory environment in China or about potential *future* risks stemming from that environment, does not absolve the Company from omitting the specific, *historical* fact that the regulatory pressure had already increased to such a level that Waterdrop jettisoned a key component of its business. *See Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").[21]

---

[21] Waterdrop also counterbalanced its generic risk statements with favorable statements about how "the growth of health insurance section has been supported by the Chinese government in recent years" and how "recent regulatory developments are expected to have positive impacts on China's health insurance industry." JA-049, ¶ 118. The District Court deemphasized these statements as only "a description of

Finally, although the District Court held that "[t]he FAC fails to plead how any omission from the Registration Statement of a further explanation of Waterdrop's reasons for closing Mutual Aid significantly altered the mix of information available to a reasonable investor," JA-219, SA-028, Order at 28, the Complaint specifies exactly how this information was highly material to investors: "The fact that regulators could essentially shut down an entire industry in the matter of a few months was critical information to understanding the risks inherent in Waterdrop's business." JA-047, ¶ 113. Indeed, at the time the Registration Statement was filed, Waterdrop was being actively investigated by the CBIRC for misleading advertising practices, which resulted in the Company incurring an RMB1 million fine, a precarious position for a company that had not yet achieved profitability. JA-052, ¶ 126.[22]

---

the health insurance sector generally," but the statements are nevertheless applicable to Waterdrop because the online insurance industry is encompassed by the broader health insurance sector, a fact which the District Court did not address. JA-216, SA-025, Order at 25.

[22] Waterdrop also omitted this fact from its Registration Statement, but the District Court found it to be immaterial. JA-217, SA-026, Order at 26. Despite the many similarities between this case and *Meyer*, where this Circuit reversed the dismissal of a complaint where the company explained in its prospectus that it was subject to China's harsh environmental regulations but did not disclose that it was in violation of those regulations, which ultimately led to fines, *see* 761 F.3d at 249, the District Court nonetheless concluded that *Meyer* is distinguishable. *See* JA-218, SA-027, Order at 27.

As described above, *Seeking Alpha* and BofA both subsequently linked the severe price decline of Waterdrop's ADSs in part to the increasing regulatory scrutiny described in the Complaint, further evidencing the materiality of this omitted information. JA-039-40, ¶¶ 85, 86 ("Waterdrop's 'shares are down more than 75% since their April IPO due to a combination of widening losses and regulatory concerns.'"). If the Registration Statement had adequately disclosed the true reason behind Waterdrop's cessation of its Mutual Aid program, namely increased regulatory pressure, the ongoing effects of this regulation on Waterdrop's business likely would not have come as such a surprise to investors and led to such a severe price decline. Therefore, the District Court's holding warrants reversal.

## IV. The Complaint Adequately Alleges Claims Under Section 15 of the Securities Act

The District Court dismissed Plaintiff's claims under Section 15 of the Securities Act solely "[b]ecause there was no § 11 violation[.]" JA-220, SA-029, Order at 29. For the reasons stated herein, that finding is erroneous. As such, the District Court's dismissal of Plaintiff's claims under Section 15 was likewise in error. *See New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 120 n.4 (2d Cir. 2013) (vacating decision to dismiss Section 15 claims upon reversing dismissal of Section 11 and 12(a)(2) claims).

## V. The District Court Erred in Denying Plaintiff at Least One Opportunity to Amend the Complaint

In opposing Defendants' motion to dismiss, Plaintiff requested leave to amend the Complaint to address any pleading deficiencies identified by the District Court. JA-220, SA-029, Order at 29. The District Court denied this request, and dismissed the Complaint with prejudice, because "Lead Plaintiff has not identified how further amendment would address deficiencies in the FAC," and because "[t]he statements included in the FAC fail to state a claim under the Securities Act, and as such, amendment would be futile." JA-221, SA-030, Order at 30. If this Court agrees that the Complaint fails to plausibly allege misleading statements or omissions, the District Court's denial of leave to amend should be reversed for two reasons.

First, this Circuit has held that requiring plaintiffs to preemptively state their grounds for amendment prior to receiving a dismissal order is grounds for reversal, as it fails to "hew to the liberal standard set forth in Rule 15, which states that '[t]he court should freely give leave [to amend] when justice so requires.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (quoting FED. R. CIV. P. 15(a)(2)).

Second, some of the deficiencies identified by the District Court could be cured with additional alleged facts. For example, the District Court found that "the FAC has not plausibly alleged that the 1Q21 financial results were finalized by the date of the IPO," JA-215, SA-024, Order at 24, and that "[t]he FAC fails to plead how any omission from the Registration Statement of a further explanation of

44

Waterdrop's reasons for closing Mutual Aid significantly altered the mix of information available to reasonable investors," JA-219, SA-028, Order at 28. If this Court agrees with that reasoning, Plaintiff could potentially cure these deficiencies by alleging more explicitly the Q1:21 financial results were final by the date of the IPO, and by alleging additional facts detailing how a reasonable investor would have found the undisclosed information about the cessation of Mutual Aid to be important to the assessment of the severity of the regulatory risk facing the Company when deciding whether to invest. Because amendment would not be futile, the District Court's refusal to grant Plaintiff at least one opportunity to amend the Complaint is error and should be reversed.

## **CONCLUSION**

"Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement [like a registration statement] is to put all one's cards on the table face-up." *Mendell v. Greenberg*, 927 F.2d 667, 670 (2d Cir. 1990). "In this case only some of the cards were exposed; the others were concealed." *Id*. If allowed to stand, the District Court's Order will promote a poker-like policy of concealment, emboldening some issuers to fortify their offering prices by disclosing only favorable financial results on the eve of an IPO, while simultaneously concealing related, unfavorable data until after the IPO, using non-finality as an excuse. When deciding whether to invest in IPOs, investors thus will be left to unfairly guess, based

45

mainly on historical results alone, the existing unfavorable financial information being concealed, while companies stack their registration statements with favorable information. Such a policy would frustrate the "fundamental purpose" of the Securities Act: "a philosophy of full disclosure" instead of "caveat emptor." *Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988).

For the foregoing reasons, Plaintiff-Appellant respectfully submits that the Order and Judgment be reversed and that this matter be remanded for further proceedings.

DATED: June 7, 2023                         Respectfully submitted,

                                            **KAHN SWICK & FOTI, LLC**

                                            */s/ Kim E. Miller*
                                            Kim E. Miller
                                            250 Park Avenue, 7th Floor
                                            New York, New York 10177
                                            Telephone: (212) 696-3730
                                            Facsimile: (504) 455-1498
                                            Email: kim.miller@ksfcounsel.com

                                            -and-

                                            Craig J. Geraci, Jr.
                                            1100 Poydras Street, Suite 960
                                            New Orleans, Louisiana 70163
                                            Telephone: (504) 455-1400
                                            Facsimile: (504) 455-1498
                                            Email: craig.geraci@ksfcounsel.com

                                            *Counsel for Lead Plaintiff-Appellant*
                                            *Qi Mi and the Class*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the Second Circuit Local Rule 32.1(a)(4) which requires that the principal brief contain no more than 14,000 words, because it contains 11,221 words, exclusive of the sections that do not count towards the limitation pursuant to Fed. R. App. P. 32(f). This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

*/s/ Kim E. Miller*
Kim E. Miller

SPECIAL APPENDIX

# <u>**TABLE OF CONTENTS**</u>

**Page**

Opinion and Order of the Honorable Denise L. Cote
    Appealed From, dated February 3, 2023 ..............................................SA-001

Judgment of the United States District Court for the
    Southern District of New York, dated February 3, 2023 .....................SA-031

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                       :       21cv7683 (DLC)

SIDNEY SANDOZ, individually and on   :
behalf of all others similarly     :
situated,                          :      OPINION AND ORDER
                                         :
                      Plaintiff,     :
                                         :
                -v-             :
                                         :
WATERDROP INC. et al.,            :
                                         :
                    Defendants.    :
                                       :
------------------------------------ X

APPEARANCES:

For Lead Plaintiff:
Kahn Swick & Foti, LLC
Kim Elaine Miller
250 Park Avenue
Suite 2040
New York, NY 10177

For the defendants Waterdrop Inc., Cogency Global Inc., and
Colleen A. DeVries:
Quinn Emanuel
Michael Barry Carlinsky
51 Madison Avenue, 22nd Floor
New York, NY 10010

For defendants Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co
LLC, and BofA Securities, Inc.:
O'Melveny & Myers LLP
Jonathan Rosenberg
Abby F. Rudzin
7 Times Square
New York, NY 10036

DENISE COTE, District Judge:

    In this putative securities class action, investors in

Waterdrop Inc. ("Waterdrop"), a Chinese insurance company,

allege that there were material omissions in Waterdrop's registration statement and prospectus (collectively, the "Registration Statement") associated with its initial public offering in May 2021 ("IPO"). The crux of the plaintiff's claims are that Waterdrop failed to warn investors of the risks associated with the regulatory environment in China, disclose the extent of the costs and expenses Waterdrop was incurring at the time of its IPO, and disclose certain information about its decision to close a segment of its business.

The defendants who have appeared have moved to dismiss the complaint under Rule 12(b)(6), Fed. R. Civ. P. The motion is granted.

## Background

The following facts are drawn from the first amended complaint ("FAC") and documents on which it relies. For the purposes of deciding this motion, the Lead Plaintiff's factual allegations are accepted as true, and all reasonable inferences are drawn in the Lead Plaintiff's favor.

I.  Waterdrop

Waterdrop -- "Shuidi" in Chinese -- is a Chinese insurance technology platform. Prior to the events giving rise to this action, Waterdrop consisted of three different segments: a mutual aid platform ("Mutual Aid"), a medical crowdfunding platform, and an insurance marketplace.

2

SA-002

Waterdrop launched Mutual Aid in 2016. Through the Mutual Aid platform, individuals would contribute small amounts of money to Mutual Aid monthly. The Mutual Aid fund would pay medical expenses of eligible beneficiaries. Mutual Aid did not generate significant revenue for Waterdrop, but it allowed Waterdrop to educate its users about health insurance and to market insurance products to them.

Later in 2016, Waterdrop started a crowdfunding platform and acquired a commercial insurance company. The crowdfunding platform allowed users to make donations to cover others' medical expenses. Like Mutual Aid, this platform did not generate much revenue for Waterdrop, but it generated customer leads for its marketing of commercial insurance.

Through its commercial insurance company, Waterdrop sold insurance to consumers and earned revenue through commissions on the products it sold. The interaction of the three segments of Waterdrop was critical to its business model: it used Mutual Aid and the crowdfunding platform to drive customers to its commercial insurance company.

China has regulated online insurance companies such as Waterdrop more heavily in recent years. They are regulated by the China Banking and Insurance Regulatory Commission ("CBIRC"). On September 3, 2020, the CBRIC published a study that raised concerns about online mutual aid platforms and concluded that

3

the CBIRC had to "crack down on illegal insurance activities." The study specifically cited Waterdrop as an example. On December 7, the CBIRC issued Regulatory Measures for the Supervision of Internet Insurance Business ("Regulatory Measures"). The Regulatory Measures included a license requirement for insurance businesses.

Some days later, on December 18, the CBIRC published a circular on Cases of Infringement of Consumer Rights and Interests ("December Circular"). The December Circular announced a CBIRC investigation of online insurance companies that advertised discounted first month premiums when that premium's cost was actually distributed over later premiums. The December Circular identified Waterdrop as a company that employed this practice.

On January 11, 2021, the CBIRC published the Draft Circular on Further Regulating Online Life Insurance Business ("January Draft Circular"). If enacted, the January Draft Circular would have imposed more requirements on online insurance companies. Violations of those requirements were to be investigated and pursued through enforcement actions by the CBIRC.

Following these regulatory changes, in March 2021, Waterdrop discontinued the Mutual Aid platform. Almost all other mutual aid platforms in China also ceased operations. Two confidential witnesses ("CW") employed at Waterdrop stated that

4

SA-004

the cessation of Mutual Aid was due to the increased regulatory scrutiny. CW1 was a customer service staff member from November 2019 to October 2021, and CW2 was a Finance Business Partner from April 2020 to March 2021.

Around the same time, Waterdrop was preparing its IPO. It was reported in the media that the CBIRC opposed Waterdrop going public and that this had delayed Waterdrop's IPO. Waterdrop denied those claims.

On April 16, 2021, Waterdrop filed its registration statement on Form F-1, which was amended and declared effective on May 6. On May 7, Waterdrop filed a prospectus on Form 424B4, which incorporated and formed part of the registration statement. The documents are referred to collectively as the Registration Statement. Waterdrop sold 30 million American Depository Shares ("ADS") at $12 per ADS in its IPO.

On June 17, 2021, Waterdrop issued a press release reporting its financial results for the first quarter of 2021 ("1Q21"). Waterdrop reported that costs and expenses had increased 75% year to year and that the company had suffered an operating loss. Later, in August, media reported a regulatory "crack down" on Chinese technology companies across a variety of sectors, especially those that had completed U.S. IPOs. Waterdrop was expected to be a target of the crackdown.

On September 8, Waterdrop announced its financial results for the second quarter of 2021, which stated that operating costs continued to accelerate. On September 13, the price of Waterdrop's ADSs decreased to $3 per share. When this action was commenced on September 14, Waterdrop's ASDs were priced at $1.54 per share.

On November 3, the CBIRC announced that Waterdrop was being fined RMB1 million[1] for the advertising activities detailed in the December Circular. Later that month, Waterdrop announced its financial results from the third quarter of 2021. Thereafter, analysts lowered the price targets for Waterdrop ADSs and noted the impact that increased regulatory scrutiny and higher marketing expenses were having on Waterdrop.

II. The Registration Statement

The claims rest on the adequacy of the disclosures in the Registration Statement. Pertinent material from the Registration Statement is quoted below. The statements upon which the plaintiff relies are highlighted in bold.[2] Any emphasis from the FAC is indicated by underlining. The statements principally appear in the following sections of the Registration Statement: Prospectus Summary; Risk Factors; and

---

[1] Renminbi ("RMB") is the official currency of China.

[2] When the same statement is repeated within the Registration Statement, the statement is recited only once in this Opinion.

Management's Discussion and Analysis of Financial Condition and Results of Operations ("Analysis of Financial Condition"). The statements upon which the plaintiff relies that appear in other sections are indicated accordingly.

A.   Prospectus Summary

The Registration Statement begins with a summary of Waterdrop's business model, risks associated with the IPO, and recent developments in Waterdrop's finances. Waterdrop notes that it "face[d] uncertainties relating to the change of regulatory regime."

The Registration Statement also describes certain 1Q21 results. It states:

**We have achieved a solid business growth in the first quarter of 2021. The [first year premium ("FYP")] generated through Waterdrop Insurance Marketplace reached RMB4,469 million for the first quarter of 2021, demonstrating a 14.4% increase from the fourth quarter of 2020 or a 42.7% increase from the same period of 2020.**

We continued to diversify our customer acquisition channels. In the first quarter of 2021, 54.5% of the FYP generated via Waterdrop Insurance Marketplace was sourced from third-party traffic channels, while 34.4% and 11.0% of the FYP generated via Waterdrop Insurance Marketplace was sourced from natural traffic and repeat purchase, and internal traffic, respectively.

The Registration Statement's summary also refers to the end of Mutual Aid:

**In light of our expanded business and prospect [sic], the increased recognition of our brand, and the latest market development, we have decided to focus on our**

SA-007

**core businesses and offer enhanced protection to our users.** Our Waterdrop Mutual Aid service historically served as a scenario for educating and familiarizing millions of users with the importance of insurance coverage. In March 2021, we ceased the operation of the Waterdrop Mutual Aid business, offering to migrate all mutual aid participants as insurance policyholders of our Waterdrop Insurance Marketplace service.

Lastly, the summary includes financial data that explained that operating costs and expenses had increased from RMB426,313 in 2018, to RMB1,705,445 in 2019, to RMB3,524,194 in 2020. A significant portion of the increased costs and expenses came from increases in sales and marketing expenses, which increased from RMB184,943 in 2018, to RMB1,056,494 in 2019, to RMB2,130,535 in 2020.

    B.   Risk Factors

Waterdrop details several risks in the Registration Statement. First, it addresses risks related to its operating losses:

> **We have a history of net losses and negative cash flows from operating activities, which <u>may</u> continue in the future.**
>
> **. . . We <u>anticipate</u> that our operating costs and expenses will increase in the foreseeable future as we continue to grow our business,** acquire new users, invest and innovate in our technology infrastructure and further develop our product and service offering and increase brand recognition. **Any of these efforts <u>may</u> incur significant capital investment and recurring costs, have different revenue and costs structures, and take time to achieve profitability.**

(Underlining reflects emphasis added by plaintiff.)

SA-008

The Registration Statement then explains the risks stemming from the regulatory environment in China[3]:

**We face uncertainties relating to the change in regulatory regime.**

**We operate in a highly regulated industry in China, and the regulatory regime continues to evolve. The China Banking and Insurance Regulatory Commission, or the CBIRC, has extensive authority to supervise and regulate the insurance industry in China. Since the online insurance industry in China is evolving rapidly, the CBIRC has been enhancing its supervision over this industry in recent years, and new laws, regulations and regulatory requirements have been promulgated and implemented from time to time. We face challenges brought by these new laws, regulations and regulatory requirements, as well as significant uncertainties in the interpretation and application thereof. Moreover, there exist uncertainties as to how the regulatory environment might change.**

**On December 14, 2020, the CBIRC published the Regulatory Measures for Online Insurance Business, or the Regulatory Measures, which became effective on February 1, 2021. Shuidi Insurance Brokerage conducts online insurance brokerage business in the [People's**

---

[3] A separate section of the Registration Statement titled Industry discusses the health insurance sector in China:

**[The] growth of health insurance sector has been supported by the Chinese government in recent years.** In an announcement made in January 2020, the CBIRC has set the 2025 total health insurance premium target of RMB2 trillion (compared with RMB707 billion in 2019). A series of regulatory policies have been introduced since 2014, aiming to promote the commercial health insurance development from multiple dimensions. According to the iResearch report, the following **recent regulatory developments are expected to have positive impacts on China's health insurance industry[, including a]ccelerating the growth of the health insurance industry, and encouraging the growth of charitable medical donations and medical mutual aid.**

Republic of China ("PRC")] and is subject to the Regulatory Measures.  The Regulatory Measures significantly changes regulatory regime for online insurance business in various aspects.

After detailing the requirements in the Regulatory Measures, the Registration Statement continues:

It might be costly for us to stay in compliance with the heightened requirements and standards in the Regulatory Measures.  The Regulatory Measures sets out a ramp-up process allowing market participants to achieve full compliance in phases until February 1, 2022; we, however, cannot assure you that we can timely adjust our current business operations to achieve and maintain full compliance. . . .

The regulatory framework in China's insurance industry is evolving and undergoing significant changes. Further development of regulations applicable to us may result in additional restrictions on our business operations.  We may have to adjust our business practice and operations to comply with the continuously changing regulatory requirements.  For example, in January 2021, the CBIRC published the draft Circular on Further Regulating Certain Issues on Internet Life Insurance Business, or the Draft Circular, for comment among insurance industry participants.  The Draft Circular requires that each installment of premium of certain insurance products less than one year term, such as accident insurance and health insurance shall be equal.  We provide our consumers the option of monthly payments and the first month payment of premium of certain insurance products is typically lower than subsequent installments.  We may be required to change such payment regime to comply with the Draft Circular, if the Draft Circular is enacted.

The Registration Statement goes on to say:

As of the date of this prospectus, the Draft Circular is still pending approval and has not come into effect.  It remains uncertain when and how the Draft Circular would come into effect, and whether and how CBIRC would promulgate relevant rules related to us.

SA-010

The attention of our management team could be diverted
to these efforts to cope with an evolving regulatory
or competitive environment.  Meanwhile, staying
compliant with the restriction may result in
limitation to our business scope, limitation to our
product and service offerings, and reduction in our
attraction to consumers.  As a result, our business
and results of operations might be materially and
adversely affected.

Expanding on the regulatory environment, the Registration

Statement cautions:

> **The administration, interpretation and enforcement of
> the regulations applicable to us are evolving and
> involve uncertainties.  We may not be able to stay in
> constant compliance with the rapidly evolving
> regulations.**
>
> **. . .  [W]e have from time to time been subject, and
> are likely again in the future to be subject to PRC
> regulatory inquiries, inspections and investigations.
> If any non-compliance incidents in our business
> operation are identified, we may be required to take
> certain rectification measures in accordance with
> applicable laws and regulations, or we may be subject
> to other regulatory actions such as administrative
> penalties.**

Under a different subheading in the Risk Factors section,

the Registration Statement explains the risks associated with

ending Mutual Aid:

> We face reputational, monetary, and legal risks in
> relation to our discontinuation of the Waterdrop
> Mutual Aid business.
>
> **In March 2021, we ceased the operation of our
> Waterdrop Mutual Aid platform in order to focus on our
> core businesses and offer enhanced protection to our
> users.**  We have offered to migrate all mutual aid
> participants as insurance policyholders of our
> Waterdrop Insurance Marketplace service. . . .
> Despite our good intention, our mutual aid

SA-011

participants or general public may view our action as
adversely affecting the actual or expected interests
of mutual aid participants, which may in turn harm our
reputation.  In the worst scenario, participants may
choose to bring complaints and lawsuits against us.
Although we were contractually permitted to terminate
the mutual aid plans any time in our discretion,
lawsuits may nevertheless be time consuming and
costly, and distract our management's attention.

The Registration Statement also warns of risks relating to
rising third-party advertising costs:

We leverage third-party user acquisition channels to
bring in some of new users to our platforms and may
incur significant costs on paying our user acquisition
channels service fees.

. . .  [W]e have incurred significant expenses on
paying third-party user acquisition channels marketing
fees.  If certain of existing third-party user
acquisition channels require higher rates of marketing
fees or we fail to negotiate favorable terms with them
or find new third-party user acquisition channels, our
cost of user acquisition may increase, and our results
of operations may be adversely affected.

C.   Analysis of Financial Condition

Under the subheading titled Expansion of Consumer Base, the
Registration Statement speaks to Waterdrop's history of consumer
acquisition:

Our insurance consumers mainly come from three
sources.  Firstly, **our medical crowdfunding operation
direct [sic] substantial traffic to our insurance
marketplace.  Approximately 46.5%, 23.0% and 13.0% of
the FYP generated through Waterdrop Insurance
Marketplace for 2018, 2019 and 2020, respectively, was
sourced from traffic from our medical crowdfunding
platform.  Historically, our mutual aid operation also
directed traffic to our insurance marketplace.  We see
the internal source of consumer traffic as an
important and unique consumer acquisition resource to**

**us,** and in addition we consider this cohort of consumers with stronger awareness of insurance protection and stronger interest in the content and product offerings on our platforms, and more loyal to our services.

**In order to continuously diversify our consumer acquisition channels, we also cooperate with other third-party traffic channels to grow our insurance consumer base. In 2018, 2019 and 2020, approximately 1.9%, 34.8% and 44.9% of the FYP generated through Waterdrop Insurance Marketplace was sourced from third-party traffic channels, respectively. We expect third-party traffic channels to play an important role in the future to support the rapid growth of our business.**

The Registration Statement also addresses Waterdrop's operating costs:

**We have incurred significant costs and expenses in building our platform, growing our consumer base and developing capabilities in data analysis and technology. Our business model is highly scalable and our platform is built to support our continued growth. We expect our operating costs and expenses to decrease as a proportion of our revenues as we improve the operating efficiency of our platform and achieve more economies of scale. . . .**

**We expect our operating costs to increase in absolute terms as our scale of business grows. However, as we improve the operating efficiency of our platform and achieve more economies of scale, we expect our operating costs as a percentage of our net operating revenue will decrease in the foreseeable future.**

(Underlining reflects emphasis added by plaintiff.)

Lastly, the Registration Statement elaborates on Waterdrop's decision to terminate Mutual Aid.[4] It states, "**We**

---

[4] With respect to Mutual Aid, the index attached to the Registration Statement also states, "**The Group has assessed and**

SA-013

operated Waterdrop Mutual Aid between May 2016 and March 2021,

under which we generated management fee income as an operator."

Discussing this management fee income, it continues:

> Starting from March 2021, with the cessation of the
> Waterdrop Mutual Aid operation, the corresponding
> management fee income which accounted for 3.6% of
> total operating revenue in 2020, will no longer be a
> revenue stream for us in 2021.

> On March 26, 2021, we announced the termination of the
> Waterdrop Mutual Aid business by the end of March
> 2021. In connection with this business adjustment, we
> voluntarily undertook to cover mutual aid
> participants' medical expenses arising from medical
> conditions diagnosed by March 31, 2021 that would have
> been covered by the ceased mutual aid plan, subject to
> certain procedural requirements and eligibility
> criteria. In addition, we also offered a one-year
> complementary health insurance policy to each
> participant with a similar coverage as the
> participant's original mutual aid plan. . . .

> The estimated cost of medical expense coverage is
> RMB15.0 million (US$2.3 million) and the estimated
> cost of one-year health insurance coverage is RMB81.7
> million (US$12.5 million). RMB19.9 million (US$3.0
> million) will be accounted for as a reduction of
> management fee revenue previously recognized for each
> participant to the extent of the cumulative amount
> earned until March 26, 2021.RMB76.8 million (US$11.8
> million) will be recorded as an expense.

III. Procedural History

This action was filed on September 14, 2021, as a putative

class action. It brought securities fraud claims against

---

concluded that the cessation of the mutual aid platform
operation is a non-recognized subsequent event given the
cessation decision is made in 2021 following recent industry
environment changes."

Waterdrop and certain of its officers and directors[5]; Cogency Global Inc. ("Cogency"), Waterdrop's authorized U.S. representative at the time of the IPO; Colleen DeVries, a senior vice president at Cogency; and six underwriters of Waterdrop's IPO: Goldman Sachs (Asia) LLC, Morgan Stanley & Co LLC, BofA Securities, Inc., China Merchants Securities (HK) Co. Limited, CLSA Limited, and Haitong International Securities Company Limited (the "Underwriter Defendants"). The putative class is composed of investors who purchased Waterdrop ADSs pursuant to the Registration Statement.

On December 8, Qi Mi was appointed Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PLSRA"), 15 U.S.C. § 78u-4(a)(3). The Lead Plaintiff filed the FAC on February 21, 2022. The FAC alleges that (1) the defendants violated § 11 of the Securities Act of 1933 ("Securities Act"), id. § 77k, and (2) all defendants except the Underwriter Defendants and DeVries violated § 15 of the Securities Act, id. § 77o. The defendants who have been served moved to dismiss the FAC on April 22.[6] The motion became fully

---

[5] The individual defendants include Peng Chen, Waterdrop's CEO and Chairman; Kangping Shi, Waterdrop's CFO; and Waterdrop directors Nina Zhou, Kai Huang, Haiyang Yu, Yao Hu, and Guang Yang.

[6] As of the date of this Opinion, defendants China Merchants Securities (HK) Co. Limited, CLSA Limited, and Haitong

submitted on July 21.  This case was reassigned to this Court on August 17.

## Discussion

To survive a motion to dismiss for failure to state a claim, the complaint "must plead enough facts to state a claim to relief that is plausible on its face." Green v. Dep't of Educ. of the City of New York, 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In securities fraud actions, a court may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted).

"Section 11 imposes absolute liability on the issuer of a registration statement if: (1) the statement contained an untrue statement of a material fact, (2) the statement omitted to state a material fact required to be stated therein, or (3) the omitted information was necessary to make the statements therein not misleading." Set Capital LLC v. Credit Suisse Group AG, 996 F.3d 64, 84 (2d Cir. 2021) (citation omitted).  "[A] plaintiff

International Securities Company Limited and the individual defendants except for DeVries have not been served.

bringing a claim under Section 11 need not allege scienter, reliance, or loss causation." Id. (citation omitted). "Section 15, in turn, creates liability for individuals or entities that control any person liable" under § 11. In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010) (citation omitted). "[T]he success of a claim under [S]ection 15 relies, in part, on a plaintiff's ability to demonstrate primary liability" under § 11. Id.

A statement or omission "is material if a reasonable investor would view it as significantly altering the total mix of information made available." Set Capital LLC, 996 F.3d at 84 (citation omitted). This is an "objective, totality-of-the-circumstances inquiry." Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85, 146 (2d Cir. 2017). Courts must read registration statements "cover-to-cover" and "consider whether the disclosures and representations, taken together and in context, would have misled a reasonable investor about the nature of the securities." In re ProShares Trust Sec. Litig., 728 F.3d 96, 103 (2d Cir. 2013) (citation omitted). The context "includes, for example, all facts related to the statement or omission, its surrounding text, the offering documents, the securities, the structure of the transaction, and the market in which the transaction occurs." Nomura Holding Am., Inc., 873 F.3d at 151.

17

"[W]hen a registration statement warns of the exact risk that later materialized, a Section 11 claim will not lie as a matter of law." In re Proshares, 728 F.3d at 102 (citation omitted). "Under the bespeaks caution doctrine, alleged misrepresentations in a stock offering are immaterial as a matter of law if it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004) (citation omitted).

The FAC alleges that the Registration Statement was misleading for failing to disclose (1) the extent of Waterdrop's expected operating losses in 2021, (2) the impact of the Chinese regulatory environment on Waterdrop's business, and (3) the motivation behind and financial consequences of Waterdrop's decision to close Mutual Aid. Each category of omissions will be discussed in turn. The defendants contend that the statements to which the Lead Plaintiff points are accurate and that the Registration Statement accurately discloses the risks of investing in Waterdrop and the company's financial condition.

Read in context, the Registration Statement adequately warned investors of the risks associated with Waterdrop and its IPO, including the increase in operating costs, the regulatory regime, and the closure of Mutual Aid. The FAC has failed to plead that any of the statements in the Registration Statement

18

SA-018

were materially misleading or that there were material omissions from the Registration Statement.

## I.    Operating Losses in 2021

The FAC alleges that the Registration Statement omitted material information about Waterdrop's operating losses.  It alleges that the Registration Statement failed to adequately disclose the increase in operating costs and expenses and that the increases were in large part due to the discontinuation of Mutual Aid and the rise in third-party marketing expenses.  The FAC alleges that the Registration Statement was also misleading for failing to disclose the operating costs and losses from 1Q21.  Each claim will be discussed in turn.

### A.    Operating Expenses

The Lead Plaintiff alleges that the Registration Statement's stated expectation that operating costs would decrease as a percentage of Waterdrop's net operating revenue "in the foreseeable future" as Waterdrop improved its "operating efficiency," was misleading because costs and expenses had already increased in 1Q21 and continued to increase in the second quarter.  The FAC further alleges that the Registration Statement's statements that a "history of net losses and negative cash flows from operating activities . . . may continue in the future" and that Waterdrop "anticipate[s] that [its]

19

SA-019

operating costs and expenses will increase in the foreseeable future" were misleading for the same reason.

The claim that Waterdrop failed to accurately describe its increase in operating expenses fails. Repeatedly, the Registration Statement states that operating costs and expenses had increased and were expected to continue to increase "in the foreseeable future" as Waterdrop worked to expand its business. The Registration Statement did not say nor suggest that operating costs would decrease in 2021 either absolutely or as a percentage of net operating revenue.

The Registration Statement also included a section entitled Special Note Regarding Forward-Looking Statements in which it noted:

> This prospectus contains forward-looking statements that reflect our current expectations and views of future events. . . . Known and unknown risks, uncertainties and other factors, including those listed under "Risk Factors," may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements. . . . These forward-looking statements involve various risks and uncertainties. Although we believe that our expectations expressed in these forward-looking statements are reasonable, our expectations may later be found to be incorrect. Our actual results could be materially different from our expectations.

This warning regarding forward-looking statements specifically identified "financial conditions, and results of operations." This meaningful cautionary language

SA-020

renders immaterial the statements about expectations for the future to which the FAC points.

In opposing this motion, the Lead Plaintiff concedes that these statements are forward-looking but argues that they were not accompanied by meaningful cautionary language. This argument fails. Explicitly stating that the company anticipated operating costs to increase in the foreseeable future along with the warnings about forward-looking statements were more than enough to caution investors about Waterdrop's financial condition.

B. Increase in Third-Party Marketing Expenses

The FAC alleges that the Registration Statement failed to warn investors that Waterdrop had increased spending on third-party marketing. It points to statements about Mutual Aid's historical role in "direct[ing] traffic to [the] insurance marketplace" and its expectation that "third-party traffic channels" would "play an important role in the future to support the rapid growth of our business" and alleges that these statements are misleading for omitting that Waterdrop needed to increase its spending on third-party marketing because of the closure of Mutual Aid.

The Registration Statement specifically advises investors of the increase in third-party marketing expenses. Under Risk Factors, the Registration Statement explains that Waterdrop

21

"leverage[s] third-party user acquisition channels to bring in some of new users [sic] to our platforms and may incur significant costs on paying our user acquisition channels service fees."  The Registration Statement adds that Waterdrop had "incurred significant expenses on paying third-party user acquisition channels marketing fees" and warns that these costs "may increase."

The financial data recited in the Registration Statement for the years 2018, 2019, and 2020 demonstrated the dramatic growth in third-party marketing expenses each year. Additionally, the Registration Statement data also showed how internal traffic to the insurance marketplace had been driven by third-party channels in recent years rather than Mutual Aid.

In opposition to this motion, the Lead Plaintiff ignores these ample disclosures in the Registration Statement.  Instead, the Lead Plaintiff maintains that the statements about third-party marketing were materially misleading because they did not include a discussion of the economic impact of Waterdrop's closure of Mutual Aid.  This argument ignores the description of Mutual Aid in the Registration Statement, including the description of its historical role in educating millions of Chinese consumers about the importance of insurance coverage. The Registration Statement explained that Waterdrop had closed Mutual Aid and that an increase in third-party marketing

SA-022

expenses was well underway even before it closed Mutual Aid in March 2021.  In sum, investors were sufficiently warned about the increase in third-party marketing expenses and their potential impact on Waterdrop's financial condition.

C.   1Q21 Financial Results

Finally, the FAC alleges that the Registration Statement was materially misleading for failing to disclose Waterdrop's first quarter financial results, specifically its operating losses in 1Q21.  The FAC alleges that because the Registration Statement included some information about the 1Q21 -- specifically, that Waterdrop had "achieved a solid business growth in the first quarter of 2021" -- it was a material omission for the Registration Statement to omit that in 1Q21, operating costs and expenses had increased more than 75%, when measured year over year, and that the company experienced an operating loss.  The FAC points to financial analysts' reports and the drop in Waterdrop's share price after the announcement of the 1Q21 financial results to demonstrate the impact this omission had on investors.

This claim fails.  First, a company has no obligation to report its quarterly financial results before they have been finalized.  The first quarter ended on March 31, 2021, and the

23

Registration Statement was effective May 6, 2021.[7]  Waterdrop's 1Q21 financial results were announced five weeks later, on June 17, 2021.  While the Lead Plaintiff notes that Waterdrop included some general statements about the growth in Waterdrop's business in 1Q21, the FAC has not plausibly alleged that the 1Q21 financial results were finalized by the date of the IPO.

Significantly, as already described, the Registration Statement made robust disclosures about its operating expenses.  The Registration Statement made no promises about Waterdrop's 1Q21 financial condition, stated that operating costs had been increasing over the past three years, and warned that they were likely to increase.  The FAC has not plausibly alleged that a reasonable investor would be misled about Waterdrop's financial condition given these disclosures.

II.  Regulatory Environment in China

The FAC alleges that Registration Statement contained misleading statements and omissions regarding China's regulatory environment for companies like Waterdrop.  The FAC points to statements in the Registration Statement that "the growth of the health care insurance sector has been supported by the Chinese government" and that "recent regulatory developments are

---

[7] The Registration Statement includes the prospectus, which was filed on May 7, 2021 and incorporated into the registration statement.

SA-024

expected to have positive impacts on China's health insurance industry." The FAC alleges that these statements painted a misleadingly positive picture of the regulatory environment. Additionally, the FAC asserts that the Registration Statement's description of the regulatory regime was misleading for failing to mention the December Circular; to give a more detailed discussion of the January Circular; and to explain that Waterdrop was being investigated pursuant to the December Circular at the time of the IPO.

These claims fail. The statement about the health insurance regulations to which the FAC points is a description of the health insurance sector generally, and not a description of the online insurance industry in which Waterdrop operates. The Registration Statement repeatedly advises investors of the risks to Waterdrop's business posed by the Chinese regulatory regime. For example, it states, "We face uncertainties relating to the change in regulatory regime." It describes the Regulatory Measures and the January Draft Circular in detail and warns that Waterdrop cannot ensure that it will be able to comply with new regulations in a timely manner. As to potential regulatory investigations into Waterdrop, the Registration Statement also discloses that Waterdrop has been and expects to be subject to regulatory action, which could result in penalties. These disclosures notified investors of the risks

25

SA-025

stemming from the regulatory environment.  The FAC fails to plead that these statements are false, misleading, or that more needed to be said to adequately warn of the regulatory challenges to Waterdrop's business.

The Lead Plaintiff argues that it was a material omission for the Registration Statement to fail to disclose that Waterdrop was under investigation pursuant to the December Circular, which ultimately led to Waterdrop being fined in November 2021.  This argument fails.  First, the Registration Statement explicitly warned investors that Waterdrop had been under investigation by CBIRC and likely would be again. Furthermore, "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."  Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 98 (2d Cir. 2021) (citation omitted).

In further support of this argument, the Lead Plaintiff relies on Meyer v. Jinkosolar Holdings Co., Ltd., 761 F.3d 245 (2d Cir. 2014).  In Meyer, the Second Circuit held that, on a motion to dismiss, a reasonable investor may find a company's assertion in a registration statement that it was taking steps to comply with environment regulations misleading when, less than a month later, the company submitted a report to the regulatory body detailing its existing problems and deficiencies in complying with the relevant regulations.  761 F.3d at 251.

26

SA-026

_Meyer_ is distinguishable. The FAC fails to plead that Waterdrop knew in May 2021 that its advertising practices would result in it being fined in November 2021, six months after its IPO.

III. Termination of Mutual Aid

In a final category of claims, the FAC alleges that the Registration Statement failed to disclose that the closure of Mutual Aid was due to the Chinese regulatory regime. The FAC also alleges that the Registration Statement included misleading statements about the financial impact on Waterdrop of terminating Mutual Aid. Neither allegation succeeds in stating a claim.

A. Motivation Behind Termination of Mutual Aid

The FAC alleges that the Registration Statement failed to disclose that Waterdrop terminated Mutual Aid because of the increasingly strict regulatory environment in China. It cites a September 15, 2021 article in the publication _Seeking Alpha_ that connects the heightened regulatory scrutiny to Waterdrop's decision to end Mutual Aid ("September 2021 Article"). The FAC also asserts that the Registration Statement's descriptions of Waterdrop's reasons for discontinuing Mutual Aid were materially misleading in light of this omission. It points to the Registration Statement linking the closure of Mutual Aid to Waterdrop wanting to "focus on [its] core businesses," the

SA-027

"latest market development," and "recent industry environment changes."

This claim fails. To begin with, the Registration Statement describes the regulatory environment in China in considerable detail and warns investors of the risks to Waterdrop's business stemming from that environment. It explains that the online insurance industry is highly regulated in China and describes the enhanced supervision of the CBIRC. It adds that it already had been subject to regulatory investigations and may be subject to penalties.

Of course, information about the government regulations was publicly available to investors. The FAC fails to plead how any omission from the Registration Statement of a further explanation of Waterdrop's reasons for closing Mutual Aid significantly altered the mix of information available to a reasonable investor.

B. Financial Impact of Termination of Mutual Aid

The FAC also alleges that the Registration Statement included misleading statements about the financial impact of Mutual Aid's closure. The Lead Plaintiff alleges that the Registration Statement's description of the consequences from the termination of Mutual Aid should have included a discussion of customer leads and data. The FAC alleges that Waterdrop had

SA-028

to increase its spending on third-party marketing because of this loss.

This claim fails. It is interwoven with several of the claims that have already been dismissed. It is noteworthy that the Registration Statement warns specifically that "We face reputational, monetary, and legal risk in relation to our decision to discontinue" Mutual Aid. It also noted that the Mutual had "historically served as a scenario for educating and familiarizing millions of users with the importance of insurance coverage" and that Mutual Aid had "directed traffic to [the] insurance marketplace." Furthermore, as previously described, the Registration Statement describes its increases in third-party marketing expenses. Read as a whole, the Registration Statement adequately warns of the impact that ending Mutual Aid had on the business of Waterdrop.

In sum, the FAC has failed to plead that the defendants violated § 11 of the Securities Act. Because there was no § 11 violation, the FAC's § 15 claims also fail.

IV. Request for Leave to Amend

The Lead Plaintiff requests that, if the defendants' motion to dismiss is granted, he be given leave to amend the FAC. In general, leave to amend should be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend may be denied, however, "for good reason, including futility, bad

29

SA-029

faith, undue delay, or undue prejudice to the opposing party."
Eastman Kodak Co. v. Henry Bath LLC, 936 F.3d 86, 98 (2d Cir.
2019) (citation omitted). Additionally, a plaintiff "need not
be given leave to amend if it fails to specify . . . how
amendment would cure the pleading deficiencies in its
complaint." TechnoMarine SA v. Giftports, Inc., 758 F.3d 493,
505 (2d Cir. 2014).

The Lead Plaintiff's request for leave to amend is denied.
The Lead Plaintiff has not identified how further amendment
would address the deficiencies in the FAC. The statements
included in the FAC fail to state a claim under the Securities
Act, and as such, amendment would be futile.

### Conclusion

The defendants' April 22 motion to dismiss is granted. The
claims against the remaining defendants will also be dismissed.
There is no basis to find that the claims against the remaining
defendants, who have yet to be served, are distinguishable and
would survive. The Clerk of Court shall close the case.

Dated:    New York, New York
          February 3, 2023

DENISE COTE
United States District Judge

30

SA-030

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
SIDNEY SANDOZ, individually and on behalf
of all others similarly situated,

                      Plaintiff,

       -against-                              21 **CIVIL** 7683 (DLC)

                                             **JUDGMENT**

WATERDROP INC. et al.,

                      Defendants.
------------------------------------------------------------X

       It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated February 3, 2023, the defendants' April 22 motion

to dismiss is granted. The claims against the remaining defendants will also be dismissed. There

is no basis to find that the claims against the remaining defendants, who have yet to be served,

are distinguishable and would survive; accordingly, the case is closed.

**Dated:** New York, New York

      February 3, 2023

                                   **RUBY J. KRAJICK**

                                _____
                                  **Clerk of Court**

           **BY:**         K. Mango

                                  _____
                                  **Deputy Clerk**