# 23-301

## United States Court of Appeals
### for the
### Second Circuit

---

QI MI,

                *Plaintiff - Appellant,*

SIDNEY SANDOZ,

                *Plaintiff,*

v.

WATERDROP INC., PENG SHEN, KANGPING SHI, NINA ZHOU, KAI HUANG, GUANG YANG, COLLEN A. DE VRIES, COGENCY GLOBAL INC., GOLDMAN SACHS (ASIA) L.L.C., MORGAN STANLEY & CO. LLC, BOFA SECURITIES, INC., CHINA MERCHANTS SECURRITIES (HK) CO., LIMITED, CLSA LIMITED, HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, YAO HU, HAIYANG YU,

          *Defendants - Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**JOINT APPENDIX**
**VOLUME I of II (PAGES JA-001–JA-224)**

---

KIM E. MILLER
KAHN SWICK & FOTI, LLC
250 Park Avenue, 7th Floor
New York, New York 10177

CRAIG J. GERACI, JR.
KAHN SWICK & FOTI, LLC
1100 Poydras Street, Suite 960
New Orleans, Louisiana 70163

*Counsel for Plaintiff - Appellant*

# **TABLE OF CONTENTS**

<u>**Volume I**</u>

District Court Docket Sheet, 1:21-cv-07683-DLC ...........................................JA-001

Amended Class Action Complaint for Violations of Federal
    Securities Laws, ECF No. 52.......................................................................JA-011

Defendants' Notice of Motion to Dismiss the Amended
    Complaint, ECF No. 53 ...............................................................................JA-063

Memorandum of Law in Support of Defendants' Motion
    to Dismiss the Amended Complaint, ECF No. 54......................................JA-065

Declaration in Support of Defendants' Motion to Dismiss
    the Amended Complaint, ECF No. 55.........................................................JA-100

Declaration in Support of Defendants' Motion to Dismiss,
    Exhibit A, *Excerpts of the Prospectus filed by Waterdrop*
    *on Form 424(b)4, dated May 6, 2021*, ECF No. 55-1 ...............................JA-102

Declaration in Support of Defendants' Motion to Dismiss,
    Exhibit B, *Waterdrop Press Release announcing its 1Q:21*
    *Financial Results, dated June 17, 2021*, ECF No. 55-2 .............................JA-123

Declaration in Support of Defendants' Motion to Dismiss,
    Exhibit C, *Waterdrop Press Release announcing its 2Q:21*
    *Financial Results, dated September 8, 2021*, ECF No. 55-3......................JA-132

Declaration in Support of Defendants' Motion to Dismiss,
    Exhibit D, *Protocol Article, dated April 16, 2021*, ECF No. 55-4.............JA-140

Plaintiff's Memorandum in Opposition to Defendants' Motion to
    Dismiss the Amended Complaint, ECF No. 56..........................................JA-146

Reply in Support of Defendants' Joint Motion to Dismiss,
    ECF No. 57 ..................................................................................................JA-177

Opinion and Order Granting Defendants' Motion to Dismiss,
ECF No. 58 ...................................................................................JA-192

Clerk's Judgment Entering Grant of Defendants' Joint Motion to Dismiss,
ECF No. 59 ...................................................................................JA-222

Notice of Appeal, ECF No. 61 ......................................................JA-223

## **Volume II**

Full Copy of Prospectus filed by Waterdrop on Form 424(b)4,
dated May 6, 2021 .......................................................................JA-225

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:21−cv−07683−DLC

Sandoz v. Waterdrop Inc. et al

Assigned to: Judge Denise L. Cote

Cause: 15:77 Securities Fraud

Date Filed: 09/14/2021

Date Terminated: 02/03/2023

Jury Demand: Plaintiff

Nature of Suit: 850 Securities/Commodities

Jurisdiction: Federal Question

**Lead Plaintiff**

**Qi Mi**                                     represented by **Kim Elaine Miller**
Kahn Swick & Foti, LLC
250 Park Avenue
Suite 2040
New York, NY 10177
212−696−3732
Fax: 504−455−1498
Email: kim.miller@ksfcounsel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sidney Sandoz**                             represented by **Sidney Sandoz**
*Individually and on Behalf of All Others*    PRO SE
*Similarly Situated,*

**Samuel Howard Rudman**
Robbins Geller Rudman & Dowd LLP (LI)
58 South Service Road
Suite 200
Melville, NY 11747
(631) 367−7100
Fax: (631) 367−1173
Email: srudman@rgrdlaw.com
*TERMINATED: 12/14/2021*
*LEAD ATTORNEY*

V.

**Movant**

**On Tsang**                                  represented by **On Tsang**
PRO SE

**David Avi Rosenfeld**
Robbins Geller Rudman & Dowd LLP (LI)
58 South Service Road
Suite 200
Melville, NY 11747
631−367−7100
Fax: 631−367−1173
Email: drosenfeld@rgrdlaw.com
*TERMINATED: 12/14/2021*

**Movant**

**Drew Bahl**                                 represented by **Phillip C. Kim**
The Rosen Law Firm
275 Madison Avenue
40th Floor
New York, NY 10016

JA-001

212−686−1060
Fax: 212−202−3827
Email: pkim@rosenlegal.com
*ATTORNEY TO BE NOTICED*

**Movant**

**William Gallo**                     represented by **James Michael LoPiano**
Pomerantz LLP
600 Third Ave, 20th Floor
New York, NY 10016
631−903−9356
Email: jlopiano@pomlaw.com
*ATTORNEY TO BE NOTICED*

**Jeremy Alan Lieberman**
Pomerantz LLP
600 Third Avenue, 20th Floor
New York, NY 10016
(212)−661−1100
Fax: (212)−661−8665
Email: jalieberman@pomlaw.com
*ATTORNEY TO BE NOTICED*

**Joseph Alexander Hood , II**
Pomerantz LLP
600 Third Avenue
New York, NY 10016
(212)−661−1100
Email: ahood@pomlaw.com
*ATTORNEY TO BE NOTICED*

**Lesley Frank Portnoy**
Glancy Prongay & Murray LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
310−201−9150
Fax: 310−201−9160
Email: lesley@portnoylaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Waterdrop Inc.**                     represented by **Michael Barry Carlinsky**
Quinn Emanuel
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849−7000
Fax: (212) 849−7100
Email: michaelcarlinsky@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Peng Shen**

**Defendant**

**Kangping Shi**

**Defendant**

**Nina Zhou**

JA-002

**Defendant**

**Kai Huang**

**Defendant**

**Haiyang Yu**

**Defendant**

**Yao Hu**

**Defendant**

**Guang Yang**

**Defendant**

**Colleen A. De Vries**　　　　　represented by　**Michael Barry Carlinsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cogency Global Inc.**　　　　　represented by　**Michael Barry Carlinsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Goldman Sachs (Asia) L.L.C.**　　represented by　**Jonathan Rosenberg**
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
212−326−2000
Fax: 212−326−2061
Email: jrosenberg@omm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Abby Faith Rudzin**
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
(212)−326−2033
Fax: (212)−326−2061
Email: arudzin@omm.com
*ATTORNEY TO BE NOTICED*

**Michael Barry Carlinsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Morgan Stanley & Co. LLC**　　represented by　**Jonathan Rosenberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Abby Faith Rudzin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Barry Carlinsky**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA-003

**Defendant**

**BofA Securities, Inc.**                                    represented by   **Jonathan Rosenberg**
                                                                              (See above for address)
                                                                              *LEAD ATTORNEY*
                                                                              *ATTORNEY TO BE NOTICED*

                                                                              **Abby Faith Rudzin**
                                                                              (See above for address)
                                                                              *ATTORNEY TO BE NOTICED*

                                                                              **Michael Barry Carlinsky**
                                                                              (See above for address)
                                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**China Merchants Securities (HK) Co.,
Limited**

**Defendant**

**CLSA Limited**

**Defendant**

**Haitong International Securities
Company Limited**

**ADR Provider**

**Harold Weber**                                           represented by   **Laurence Jesse Hasson**
                                                                              Bernstein Liebhard, LLP
                                                                              10 East 40th Street
                                                                              New York, NY 10016
                                                                              (212)−779−1414
                                                                              Fax: (212)−779−3218
                                                                              Email: lhasson@bernlieb.com
                                                                              *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/14/2021 | 1 | COMPLAINT against BofA Securities, Inc., CLSA Limited, China Merchants Securities (HK) Co., Limited, Cogency Global Inc., Colleen A. De Vries, Goldman Sachs (Asia) L.L.C., Haitong International Securities Company Limited, Yao Hu, Kai Huang, Morgan Stanley & Co. LLC, Peng Shen, Kangping Shi, Waterdrop Inc., Guang Yang, Haiyang Yu, Nina Zhou. (Filing Fee $ 402.00, Receipt Number ANYSDC−25061013)Document filed by Sidney Sandoz..(Rudman, Samuel) (Entered: 09/14/2021) |
| 09/14/2021 | 2 | CIVIL COVER SHEET filed..(Rudman, Samuel) (Entered: 09/14/2021) |
| 09/14/2021 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to Waterdrop Inc., Peng Shen, Kangping Shi, Nina Zhou, Kai Huang, Haiyang Yu, Yao Hu, Guang Yang, Colleen A. De Vries, Cogency Global Inc., Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC, BofA Securities, Inc., China Merchants Securities (HK) Co., Limited, CLSA Limited and Haitong International Securities Company Limited, re: 1 Complaint,. Document filed by Sidney Sandoz..(Rudman, Samuel) (Entered: 09/14/2021) |
| 09/15/2021 |  | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above−entitled action is assigned to Judge Vernon S. Broderick. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district−judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf−related−instructions..(gp) (Entered: 09/15/2021) |

| | | |
|---|---|---|
| 09/15/2021 | | Magistrate Judge Sarah L. Cave is designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018−06/AO−3.pdf. (gp) (Entered: 09/15/2021) |
| 09/15/2021 | | Case Designated ECF. (gp) (Entered: 09/15/2021) |
| 09/15/2021 | 4 | ELECTRONIC SUMMONS ISSUED as to BofA Securities, Inc., CLSA Limited, China Merchants Securities (HK) Co., Limited, Cogency Global Inc., Colleen A. De Vries, Goldman Sachs (Asia) L.L.C., Haitong International Securities Company Limited, Yao Hu, Kai Huang, Morgan Stanley & Co. LLC, Peng Shen, Kangping Shi, Waterdrop Inc., Guang Yang, Haiyang Yu, Nina Zhou..(gp) (Entered: 09/15/2021) |
| 09/28/2021 | 5 | SUMMONS RETURNED EXECUTED. BofA Securities, Inc. served on 9/23/2021, answer due 10/14/2021. Service was accepted by Robin Huttbanks, Service of Process Intake Clerk. Document filed by Sidney Sandoz..(Rudman, Samuel) (Entered: 09/28/2021) |
| 09/28/2021 | 6 | SUMMONS RETURNED EXECUTED. Waterdrop Inc. served on 9/23/2021, answer due 10/14/2021. Service was accepted by Fidan Hasanbayli, Service of Process Intake Clerk. Document filed by Sidney Sandoz..(Rudman, Samuel) (Entered: 09/28/2021) |
| 09/28/2021 | 7 | SUMMONS RETURNED EXECUTED. Morgan Stanley & Co. LLC served on 9/23/2021, answer due 10/14/2021. Service was accepted by Daisy Montenegro, Service of Process Intake Clerk. Document filed by Sidney Sandoz..(Rudman, Samuel) (Entered: 09/28/2021) |
| 09/28/2021 | 8 | SUMMONS RETURNED EXECUTED. Goldman Sachs (Asia) L.L.C. served on 9/23/2021, answer due 10/14/2021. Service was accepted by Daisy Montenegro, Service of Process Intake Clerk. Document filed by Sidney Sandoz..(Rudman, Samuel) (Entered: 09/28/2021) |
| 10/13/2021 | 9 | PROPOSED STIPULATION AND ORDER. Document filed by Cogency Global Inc., Colleen A. De Vries, Waterdrop Inc...(Carlinsky, Michael) (Entered: 10/13/2021) |
| 10/14/2021 | 10 | STIPULATION AND ORDER ADJOURNING DEFENDANTS' TIME TO RESPOND TO THE COMPLAINT. IT IS HEREBY STIPULATED AND AGREED, by and between Plaintiff and the Served Defendants, by and through their undersigned counsel, as follows: 1. The Served Defendants, and any Defendants that may be served with the complaint going forward, have no current obligation to respond to the complaint in this action. 2. No more than 14 days after lead counsel for plaintiff and lead plaintiff are chosen, lead counsel for plaintiff and counsel for the Served Defendants and any Defendants that may be served with the complaint going forward shall jointly submit to the Court a proposed schedule for the filing of a consolidated or amended complaint and for briefing of any motion to dismiss that consolidated or amended complaint. IT IS SO ORDERED. (Signed by Judge Vernon S. Broderick on 10/14/21) (yv) (Entered: 10/15/2021) |
| 10/20/2021 | 11 | SUMMONS RETURNED EXECUTED. Colleen A. De Vries served on 10/20/2021, answer due 11/10/2021. Service was accepted by Jacob J. Waldman, Attorney for Defendant. Document filed by Sidney Sandoz..(Rudman, Samuel) (Entered: 10/20/2021) |
| 10/20/2021 | 12 | SUMMONS RETURNED EXECUTED. Cogency Global Inc. served on 10/14/2021, answer due 11/4/2021. Service was accepted by Jolita Quinadara, Service of Process Intake Clerk. Document filed by Sidney Sandoz..(Rudman, Samuel) (Entered: 10/20/2021) |
| 10/25/2021 | 13 | NOTICE OF APPEARANCE by Jonathan Rosenberg on behalf of BofA Securities, Inc., Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC..(Rosenberg, Jonathan) (Entered: 10/25/2021) |
| 10/25/2021 | 14 | NOTICE OF APPEARANCE by Abby Faith Rudzin on behalf of BofA Securities, Inc., Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC..(Rudzin, Abby) (Entered: 10/25/2021) |

| | | |
|---|---|---|
| 10/25/2021 | 15 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent NB Holdings Corporation, Other Affiliate Bank of America Corporation, Other Affiliate Berkshire Hathaway Inc. for BofA Securities, Inc.. Document filed by BofA Securities, Inc...(Rudzin, Abby) (Entered: 10/25/2021) |
| 10/25/2021 | 16 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent The Goldman Sachs Group, Inc. for Goldman Sachs (Asia) L.L.C.. Document filed by Goldman Sachs (Asia) L.L.C...(Rosenberg, Jonathan) (Entered: 10/25/2021) |
| 10/25/2021 | 17 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Morgan Stanley Domestic Holdings, Inc., Other Affiliate Morgan Stanley Capital Management, LLC, Other Affiliate Morgan Stanley, Other Affiliate Mitsubishi UFJ Financial Group, Inc. for Morgan Stanley & Co. LLC. Document filed by Morgan Stanley & Co. LLC..(Rosenberg, Jonathan) (Entered: 10/25/2021) |
| 11/15/2021 | 18 | MOTION to Appoint Qi Mi to serve as lead plaintiff(s) ., MOTION to Appoint Counsel . Document filed by Qi Mi..(Miller, Kim) (Entered: 11/15/2021) |
| 11/15/2021 | 19 | MEMORANDUM OF LAW in Support re: 18 MOTION to Appoint Qi Mi to serve as lead plaintiff(s) . MOTION to Appoint Counsel . . Document filed by Qi Mi..(Miller, Kim) (Entered: 11/15/2021) |
| 11/15/2021 | 20 | DECLARATION of Kim E. Miller in Support re: 18 MOTION to Appoint Qi Mi to serve as lead plaintiff(s) . MOTION to Appoint Counsel .. Document filed by Qi Mi. (Attachments: # 1 Exhibit A − PSLRA Certification, # 2 Exhibit B − Loss Chart, # 3 Exhibit C − Statutory Notice, # 4 Exhibit D − Mi Declaration, # 5 Exhibit E − KSF Resume).(Miller, Kim) (Entered: 11/15/2021) |
| 11/15/2021 | 21 | PROPOSED ORDER. Document filed by Qi Mi. Related Document Number: 18 ..(Miller, Kim) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 11/15/2021) |
| 11/15/2021 | 22 | MOTION to Appoint On Tsang to serve as lead plaintiff(s) ., MOTION to Appoint Counsel . Document filed by On Tsang..(Rosenfeld, David) (Entered: 11/15/2021) |
| 11/15/2021 | 23 | MEMORANDUM OF LAW in Support re: 22 MOTION to Appoint On Tsang to serve as lead plaintiff(s) . MOTION to Appoint Counsel . . Document filed by On Tsang..(Rosenfeld, David) (Entered: 11/15/2021) |
| 11/15/2021 | 24 | DECLARATION of David A. Rosenfeld in Support re: 22 MOTION to Appoint On Tsang to serve as lead plaintiff(s) . MOTION to Appoint Counsel . Document filed by On Tsang. (Attachments: # 1 Exhibit A − PSLRA Notice, # 2 Exhibit B − Certification, # 3 Exhibit C − Estimate of losses, # 4 Exhibit D − Mr. Tsang's Declaration).(Rosenfeld, David) (Entered: 11/15/2021) |
| 11/15/2021 | 25 | PROPOSED ORDER. Document filed by On Tsang. Related Document Number: 22 ..(Rosenfeld, David) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 11/15/2021) |
| 11/15/2021 | 26 | MOTION to Appoint DREW BAHL to serve as lead plaintiff(s) ., MOTION to Appoint Counsel . Document filed by Drew Bahl. (Attachments: # 1 Proposed Order).(Kim, Phillip) (Entered: 11/15/2021) |
| 11/15/2021 | 27 | MEMORANDUM OF LAW in Support re: 26 MOTION to Appoint DREW BAHL to serve as lead plaintiff(s) . MOTION to Appoint Counsel . . Document filed by Drew Bahl. (Attachments: # 1 Exhibit 1 − PSLRA Early Notice, # 2 Exhibit 2 − PSLRA Cert., # 3 Exhibit 3 − Loss Chart, # 4 Exhibit 4 − Firm Resume).(Kim, Phillip) (Entered: 11/15/2021) |
| 11/15/2021 | 28 | NOTICE OF APPEARANCE by James Michael LoPiano on behalf of William Gallo..(LoPiano, James) (Entered: 11/15/2021) |
| 11/15/2021 | 29 | NOTICE OF APPEARANCE by Lesley Frank Portnoy on behalf of William Gallo..(Portnoy, Lesley) (Entered: 11/15/2021) |
| 11/15/2021 | 30 | NOTICE OF APPEARANCE by Joseph Alexander Hood, II on behalf of William Gallo..(Hood, Joseph) (Entered: 11/15/2021) |

| 11/15/2021 | 31 | NOTICE OF APPEARANCE by Jeremy Alan Lieberman on behalf of William Gallo..(Lieberman, Jeremy) (Entered: 11/15/2021) |
|---|---|---|
| 11/15/2021 | 32 | MOTION to Appoint William Gallo to serve as lead plaintiff(s) . Document filed by William Gallo..(Lieberman, Jeremy) (Entered: 11/15/2021) |
| 11/15/2021 | 33 | PROPOSED ORDER. Document filed by William Gallo. Related Document Number: 32 ..(Lieberman, Jeremy) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 11/15/2021) |
| 11/15/2021 | 34 | MEMORANDUM OF LAW in Support re: 32 MOTION to Appoint William Gallo to serve as lead plaintiff(s) . . Document filed by William Gallo..(Lieberman, Jeremy) (Entered: 11/15/2021) |
| 11/15/2021 | 35 | MOTION to Appoint HAROLD WEBER to serve as lead plaintiff(s) *AND APPROVAL OF COUNSEL*. Document filed by Harold Weber..(Hasson, Laurence) (Entered: 11/15/2021) |
| 11/15/2021 | 36 | DECLARATION of Jeremy A. Lieberman in Support re: 32 MOTION to Appoint William Gallo to serve as lead plaintiff(s) .. Document filed by William Gallo. (Attachments: # 1 Exhibit A − Loss Chart, # 2 Exhibit B − Press Release, # 3 Exhibit C − Certification, # 4 Exhibit D − Movant Declaration, # 5 Exhibit E − Pomerantz Firm Resume).(Lieberman, Jeremy) (Entered: 11/15/2021) |
| 11/15/2021 | 37 | MEMORANDUM OF LAW in Support re: 35 MOTION to Appoint HAROLD WEBER to serve as lead plaintiff(s) *AND APPROVAL OF COUNSEL*. . Document filed by Harold Weber. (Attachments: # 1 Declaration of Lauren Hasson, # 2 Exhibit A− Early Notice, # 3 Exhibit B− Certification, # 4 Exhibit C− Loss Chart, # 5 Exhibit D− Assignment, # 6 Exhibit E− Firm Resume).(Hasson, Laurence) (Entered: 11/15/2021) |
| 11/15/2021 | 38 | PROPOSED ORDER. Document filed by Harold Weber. Related Document Number: 35 ..(Hasson, Laurence) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 11/15/2021) |
| 11/16/2021 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 21 Proposed Order was reviewed and approved as to form. (dt)** (Entered: 11/16/2021) |
| 11/16/2021 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 25 Proposed Order was reviewed and approved as to form. (dt)** (Entered: 11/16/2021) |
| 11/16/2021 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 33 Proposed Order was reviewed and approved as to form. (dt)** (Entered: 11/16/2021) |
| 11/16/2021 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 38 Proposed Order was reviewed and approved as to form. (dt)** (Entered: 11/16/2021) |
| 11/16/2021 | 39 | NOTICE of Withdrawal re: 26 MOTION to Appoint DREW BAHL to serve as lead plaintiff(s) . MOTION to Appoint Counsel .. Document filed by Drew Bahl..(Kim, Phillip) (Entered: 11/16/2021) |
| 11/24/2021 | 40 | NOTICE of of Withdrawal re: 22 MOTION to Appoint On Tsang to serve as lead plaintiff(s) . MOTION to Appoint Counsel .. Document filed by On Tsang..(Rosenfeld, David) (Entered: 11/24/2021) |
| 11/29/2021 | 41 | NOTICE of Non−Opposition of William Gallo to Competing Motions for Appointment as Lead Plaintiff and Approval of Lead Counsel re: 32 MOTION to Appoint William Gallo to serve as lead plaintiff(s) .. Document filed by William Gallo..(Lieberman, Jeremy) (Entered: 11/29/2021) |
| 11/29/2021 | 42 | MEMORANDUM OF LAW in Support re: 18 MOTION to Appoint Qi Mi to serve as lead plaintiff(s) . MOTION to Appoint Counsel . *And in Opposition to Competing Motions*. Document filed by Qi Mi..(Miller, Kim) (Entered: 11/29/2021) |
| 11/29/2021 | 43 | NOTICE of NON−OPPOSITION OF HAROLD WEBER TO COMPETING MOTIONS FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD COUNSEL. Document filed by Harold Weber..(Hasson, Laurence) (Entered: 11/29/2021) |

JA-007

| | | |
|---|---|---|
| 12/06/2021 | 44 | REPLY MEMORANDUM OF LAW in Support re: 18 MOTION to Appoint Qi Mi to serve as lead plaintiff(s) . MOTION to Appoint Counsel . . Document filed by Qi Mi..(Miller, Kim) (Entered: 12/06/2021) |
| 12/08/2021 | 45 | ORDER GRANTING MOTION OF QI MI FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD PLAINTIFFS SELECTION OF LEAD COUNSEL terminating 26 Motion to Appoint ; terminating 26 Motion to Appoint Counsel ; terminating 32 Motion to Appoint ; terminating 35 Motion to Appoint ; granting 18 Motion to Appoint ; granting 18 Motion to Appoint Counsel ; terminating 22 Motion to Appoint ; terminating 22 Motion to Appoint Counsel. Having considered the motion of Mr. Qi Mi for Appointment as Lead Plaintiff and Approval of his Selection of Lead Counsel (the "Motion"), and good cause appearing therefore, IT IS HEREBY ORDERED THAT: 1. The Motion is GRANTED; 2. The Court, having considered the provisions of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78z−1(a)(3)(B), appoints Mr. Qi Mi as Lead Plaintiff; and 3. Pursuant to 15 U.S.C. § 77zu−1(a)(3)(B)(v), the Court approves Kahn Swick & Foti, LLC as Lead Counsel for the Class. SO ORDERED.. (Signed by Judge Vernon S. Broderick on 12/8/2021) (kv) (Entered: 12/08/2021) |
| 12/13/2021 | 46 | NOTICE OF VOLUNTARY DISMISSAL pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, the plaintiff(s) and or their counsel(s), hereby give notice that the above−captioned action is voluntarily dismissed, without prejudice and without costs against the defendant(s) All Defendants. Document filed by Sidney Sandoz. **Proposed document to be reviewed and processed by Clerk's Office staff (No action required by chambers)...**(Rosenfeld, David) (Entered: 12/13/2021) |
| 12/13/2021 | 47 | MOTION for David A. Rosenfeld to Withdraw as Attorney . Document filed by On Tsang..(Rosenfeld, David) (Entered: 12/13/2021) |
| 12/13/2021 | 48 | PROPOSED ORDER. Document filed by On Tsang. Related Document Number: 47 ..(Rosenfeld, David) **Proposed Order to be reviewed by Clerk's Office staff.** (Entered: 12/13/2021) |
| 12/14/2021 | | ***NOTICE TO COURT REGARDING NOTICE OF VOLUNTARY DISMISSAL Document No. 46 Notice of Voluntary Dismissal was reviewed and referred to Judge Vernon S. Broderick for approval for the following reason(s): the plaintiff(s) filed their voluntary dismissal and it did not dismiss all of the parties or the action in its entirety. (km)** (Entered: 12/14/2021) |
| 12/14/2021 | | ***NOTICE TO COURT REGARDING PROPOSED ORDER. Document No. 48 Proposed Order was reviewed and approved as to form. (km)** (Entered: 12/14/2021) |
| 12/14/2021 | 49 | ORDER GRANTING MOTION FOR LEAVE TO WITHDRAW AS COUNSEL granting 47 Motion to Withdraw as Attorney. Upon consideration of the Motion for Leave to Withdraw as Counsel, and for good cause shown, it is HEREBY ORDERED THAT Samuel H. Rudman and David A. Rosenfeld of Robbins Geller Rudman & Dowd LLP are hereby withdrawn as counsel of record. The Clerk of the Court is directed to remove the above−named attorneys and law firm from the docket as well as the ECF Service List. IT IS SO ORDERED. Attorney David Avi Rosenfeld and Samuel Howard Rudman terminated. (Signed by Judge Vernon S. Broderick on 12/14/2021) (vfr) (Entered: 12/14/2021) |
| 12/21/2021 | 50 | PROPOSED STIPULATION AND ORDER. Document filed by Waterdrop Inc...(Carlinsky, Michael) (Entered: 12/21/2021) |
| 12/22/2021 | 51 | STIPULATION AND ORDER REGARDING TIME TO FILE AMENDED COMPLAINT AND MOTION TO DISMISS: NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, subject to theCourts approval:1. Lead Plaintiff shall file an amended complaint (the "Amended Complaint") on or before February 21, 2022; 2. The Served Defendants shall answer or otherwise respond to Lead Plaintiff's Amended Complaint by April 22, 2022; 3. Lead Plaintiff shall file any opposition to such motion on or before June 21, 2022; and, 4. The Served Defendants shall file any reply in support of such motion on or before July 21, 2022. SO ORDERED. ( Amended Pleadings due by 2/21/2022., Responses due by 6/21/2022, Replies due by 7/21/2022.) (Signed by Judge Vernon S. Broderick on 12/22/2021) (tg) (Entered: 12/22/2021) |

| | | |
|---|---|---|
| 02/21/2022 | 52 | AMENDED COMPLAINT amending 1 Complaint, against BofA Securities, Inc., CLSA Limited, China Merchants Securities (HK) Co., Limited, Cogency Global Inc., Colleen A. De Vries, Goldman Sachs (Asia) L.L.C., Haitong International Securities Company Limited, Yao Hu, Kai Huang, Morgan Stanley & Co. LLC, Peng Shen, Kangping Shi, Waterdrop Inc., Guang Yang, Haiyang Yu, Nina Zhou with JURY DEMAND.Document filed by Qi Mi. Related document: 1 Complaint,. (Attachments: # 1 Exhibit A, Mi Certificate).(Miller, Kim) (Entered: 02/21/2022) |
| 04/22/2022 | 53 | MOTION to Dismiss *the Amended Class Action Complaint*. Document filed by BofA Securities, Inc., Cogency Global Inc., Colleen A. De Vries, Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC, Waterdrop Inc...(Carlinsky, Michael) (Entered: 04/22/2022) |
| 04/22/2022 | 54 | MEMORANDUM OF LAW in Support re: 53 MOTION to Dismiss *the Amended Class Action Complaint*. . Document filed by BofA Securities, Inc., Cogency Global Inc., Colleen A. De Vries, Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC, Waterdrop Inc.. (Attachments: # 1 Appendix).(Carlinsky, Michael) (Entered: 04/22/2022) |
| 04/22/2022 | 55 | DECLARATION of Michael B. Carlinsky in Support re: 53 MOTION to Dismiss *the Amended Class Action Complaint*.. Document filed by BofA Securities, Inc., Cogency Global Inc., Colleen A. De Vries, Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC, Waterdrop Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D).(Carlinsky, Michael) (Entered: 04/22/2022) |
| 06/21/2022 | 56 | MEMORANDUM OF LAW in Opposition re: 53 MOTION to Dismiss *the Amended Class Action Complaint*. . Document filed by Qi Mi..(Miller, Kim) (Entered: 06/21/2022) |
| 07/21/2022 | 57 | REPLY MEMORANDUM OF LAW in Support re: 53 MOTION to Dismiss *the Amended Class Action Complaint*. . Document filed by BofA Securities, Inc., Cogency Global Inc., Colleen A. De Vries, Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC, Waterdrop Inc...(Carlinsky, Michael) (Entered: 07/21/2022) |
| 08/17/2022 | | NOTICE OF CASE REASSIGNMENT to Judge Denise L. Cote. Judge Vernon S. Broderick is no longer assigned to the case. (aea) (Entered: 08/17/2022) |
| 02/03/2023 | 58 | OPINION AND ORDER re: 53 MOTION to Dismiss *the Amended Class Action Complaint*. filed by Goldman Sachs (Asia) L.L.C., Waterdrop Inc., Morgan Stanley & Co. LLC, Colleen A. De Vries, Cogency Global Inc., BofA Securities, Inc. The defendants' April 22 motion to dismiss is granted. The claims against the remaining defendants will also be dismissed. There is no basis to find that the claims against the remaining defendants, who have yet to be served, are distinguishable and would survive. The Clerk of Court shall close the case. (Signed by Judge Denise L. Cote on 2/3/2023) (vfr) Transmission to Orders and Judgments Clerk for processing. (Entered: 02/03/2023) |
| 02/03/2023 | 59 | CLERK'S JUDGMENT re: 58 Memorandum & Opinion in favor of BofA Securities, Inc., CLSA Limited, China Merchants Securities (HK) Co., Limited, Cogency Global Inc., Goldman Sachs (Asia) L.L.C., Haitong International Securities Company Limited, Morgan Stanley & Co. LLC, Waterdrop Inc., Colleen A. De Vries, Guang Yang, Haiyang Yu, Kai Huang, Kangping Shi, Nina Zhou, Peng Shen, Yao Hu against Sidney Sandoz. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated February 3, 2023, the defendants' April 22 motion to dismiss is granted. The claims against the remaining defendants will also be dismissed. There is no basis to find that the claims against the remaining defendants, who have yet to be served, are distinguishable and would survive; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 2/3/2023) (Attachments: # 1 Right to Appeal) (km) (Entered: 02/03/2023) |
| 02/21/2023 | 60 | ORDER: Accordingly, it is hereby ORDERED that the plaintiff's submission regarding its compliance with Rule 11(b) is due March 14, 2023. Any response by the defendants is due March 28, 2023. (Signed by Judge Denise L. Cote on 2/21/2023) (vfr) (Entered: 02/21/2023) |
| 03/06/2023 | 61 | NOTICE OF APPEAL from 58 Memorandum & Opinion,, 59 Clerk's Judgment,,,. Document filed by Qi Mi. Filing fee $ 505.00, receipt number ANYSDC−27431558. Form C and Form D are due within 14 days to the Court of Appeals, Second |

| | | |
|---|---|---|
| | | Circuit..(Miller, Kim) Modified on 3/7/2023 (nd). (Entered: 03/06/2023) |
| 03/07/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: <u>61</u> Notice of Appeal,..(nd) (Entered: 03/07/2023) |
| 03/07/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for <u>61</u> Notice of Appeal, filed by Qi Mi were transmitted to the U.S. Court of Appeals..(nd) (Entered: 03/07/2023) |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| SIDNEY SANDOZ, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | Case No. 1:21-cv-07683-VSB |
| ) | |
| vs. ) | CLASS ACTION |
| ) | |
| WATERDROP INC., PENG SHEN, KANGPING SHI, NINA ZHOU, KAI HUANG, HAIYANG YU, YAO HU, GUANG YANG, COLLEEN A. DE VRIES, COGENCY GLOBAL INC., GOLDMAN SACHS (ASIA) L.L.C., MORGAN STANLEY & CO. LLC, BOFA SECURITIES, INC., CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, CLSA LIMITED and HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, ) ) ) ) ) ) ) ) ) ) ) | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933** DEMAND FOR JURY TRIAL |
| Defendants. ) | |

_____

1

JA-011

## TABLE OF CONTENTS

Page

OVERVIEW ................................................................................................................. 1

JURISDICTION AND VENUE ................................................................................... 5

PARTIES ...................................................................................................................... 6

    A.  Lead Plaintiff ................................................................................................. 6

    B.  Corporate Defendant ..................................................................................... 6

    C.  Individual Defendants ................................................................................... 6

    D.  Cogency Global Defendants ......................................................................... 7

    E.  Underwriter Defendants ................................................................................ 8

CONFIDENTIAL WITNESSES .............................................................................. 11

FACTUAL BACKGROUND .................................................................................... 12

    A.  About Waterdrop ........................................................................................ 12

    B.  Increasing Regulations Force Waterdrop to Discontinue its Mutual Aid Platform ........... 15

    C.  Waterdrop's Initial Public Offering ........................................................... 20

    D.  Events Following the IPO Reveal the Truth about Waterdrop's Registration Statement .. 24

MATERIALLY FALSE AND MISLEADING STATEMENTS ................................ 31

AND OMISSIONS IN THE REGISTRATION STATEMENT ................................ 31

    A.  First Quarter 2021 Financial Results .......................................................... 31

    B.  Waterdrop's Operating Costs and Expenses .............................................. 32

    C.  Discontinuation of Mutual Aid ................................................................... 35

    D.  Increasing Chinese Regulatory Scrutiny ..................................................... 37

CLASS ACTION ALLEGATIONS .......................................................................... 41

THE STATUTORY SAFE HARBOR DOES NOT APPLY ...................................... 43

CLAIMS FOR RELIEF ............................................................................................. 43

PRAYER FOR RELIEF ............................................................................................. 46

JURY TRIAL DEMANDED ..................................................................................... 46

i

JA-012

## AMENDED COMPLAINT
## FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Lead Plaintiff Qi Mi, by and through Lead Counsel, and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters. This investigation included, but was not limited to, a review and analysis of: (i) court records; (ii) public filings of Waterdrop Inc. ("Waterdrop" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (iii) transcripts and investor presentations; (iv) Waterdrop's press releases; (v) analyst reports and independent media reports regarding Waterdrop, its stock price movement, pricing, and volume data; (vi) other publicly available material and data; and (vii) interviews of persons with knowledge of the allegations contained herein, including former employees of Waterdrop and relevant third parties. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants and/or are exclusively within their custody or control. Lead Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after further investigation and after a reasonable opportunity to conduct discovery.

## OVERVIEW[1]

1.      This is a securities class action litigation on behalf of all individuals and entities that purchased or acquired Waterdrop American Depositary Shares ("ADSs") pursuant or traceable to the Company's false and misleading registration statement and prospectus, as amended

---

[1] Unless otherwise indicated, original source emphasis (bolding, underlines, and/or italics) has been removed, and all emphasis in this Complaint has been added by undersigned counsel. Any Chinese language websites were translated using Google Translate.

JA-013

(collectively, the "Registration Statement"),[2] issued in connection with Waterdrop's May 2021 initial public offering (the "IPO"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") against Waterdrop, certain of its officers, directors, representatives, and the underwriters of the IPO (collectively, "Defendants").

2.     Based in China, Waterdrop has historically operated three segments: (i) an insurance marketplace that matches consumers with life insurance products; (ii) a medical crowdfunding platform which enables people to provide donations to people with significant medical costs; and (iii) a mutual aid platform, which enabled people suffering from over 100 types of critical illness to spread their medical cost burdens. Waterdrop earns the vast majority of its revenues from commissions received from insurance companies for insurance products sold on the Waterdrop platform. The Company did not derive significant profits from its crowdfunding and mutual aid platforms; rather, these segments provided free advertising and data collection, significantly lowering Waterdrop's customer acquisition costs. The crowdfunding and mutual aid platforms also allowed Waterdrop to present itself as having a "positive social impact," an image which resonated with customers, even though Waterdrop operated as a for-profit company. The Company discontinued its mutual aid segment in March 2021, shortly before its IPO.

3.     In late 2020, the China Banking and Insurance Regulatory Commission ("CBIRC") began closely scrutinizing internet-based insurance companies, including online mutual aid platforms. The CBIRC determined these platforms had a high risk for fraud and began implementing regulations that essentially forced most online mutual aid programs to shut down in

---

[2] As used herein, the term "Registration Statement" refers to, collectively, the Registration Statement on Form F-1 that was filed by the Company on April 16, 2021, all amendments thereto, and the Prospectus filed on Form 424B4 on May 7, 2021, which was incorporated into and formed a part of the Registration Statement that became effective on May 6, 2021.

JA-014

late 2020 and early 2021. The regulatory environment was so hostile to internet-based insurance companies that industry experts predicted most small and medium-sized companies would not survive to see the end of 2022.

4.     In response to the regulatory scrutiny, Waterdrop announced on March 26, 2021 that it would cease operating its mutual aid segment on March 31, 2021, the last day of the first quarter of 2021 ("Q1:21"). The CBIRC also publicly criticized other aspects of Waterdrop's insurance business, such as a policy that fraudulently advertised "3 yuan for the first month" but did not disclose the costs of the remaining 11 months of the policy. Reuters even reported that Chinese regulators discussed preventing Waterdrop's IPO due to the risky nature of its business. Defendant Shen, however, denied these reports.

5.     On May 7, 2021, over a month after the close of Q1:21 and into the second quarter of 2021 ("Q2:21"), Waterdrop began trading publicly on the NYSE, raising $360 million. The Registration Statement disclosed the cessation of Waterdrop's mutual aid platform, but it obscured the true reasoning behind the cessation, thus also downplaying the effects that the hostile regulatory environment in China was having and would continue to have on the Company. Instead, Waterdrop vaguely disclosed that the purpose of the discontinuation was "to focus on our core business" in light of "increased recognition of our brand," "latest market development," and "recent industry environment changes."

6.     Further, even though the CBIRC was closely monitoring the internet insurance industry and was actively investigating Waterdrop, the Registration Statement only contained a few hypothetical and generic risk statements (that were misleading in their own right) regarding increased regulatory scrutiny in China. The Registration Statement did not indicate that such risks were already occurring or had already materialized. For example, the Registration Statement stated

JA-015

that "[f]urther development of regulations applicable to us may result in additional restrictions on our business operations," yet it did not mention that increased regulatory scrutiny was the reason Waterdrop ceased its mutual aid program, or that most other Chinese mutual aid programs had been similarly forced to shut down. Nor did the Registration Statement mention a September 20, 2020 study, which referred to Waterdrop's mutual aid program as a risk which "cannot be ignored," or a December 18, 2020 Circular, in which the CBIRC stated it would be investigating certain companies for the illegal practice of advertising a low first monthly rate, but not disclosing that the remainder of the policy would require a higher payment. This December 18, 2020 Circular specifically named Waterdrop as a company that the CBIRC was actively investigating, and noted that it would be subject to fines if it was found to have engaged in illegal activities. Waterdrop later was found to have violated CBIRC policy, and was fined RMB1 million.

7.      Moreover, although Q1:21 ended over a month *before* the IPO, the Registration Statement neglected to disclose that operating costs and expenses had rapidly skyrocketed during the quarter, increasing by more than 75% year over year, which led to a significant net operating loss for the quarter. This increase in costs was due, in large part, to the Company's spending on third-party marketing expenses, which increased 67% year over year in the first quarter. Sales and marketing expenses increased a further 52% quarter over quarter in Q2:21 (or 160.5% year over year), after Waterdrop's mutual aid program closed and could no longer be used as a source for cheap customer leads and data.

8.      Instead of disclosing the rapidly accelerating costs and expenses, the Registration Statement selectively disclosed *only* some positive aspects of the Q1:21 financial results, such as an increase in First Year Premiums ("FYP") and "solid business growth in the first quarter of

4

JA-016

2021," thus creating a materially misleading impression of Waterdrop's actual financial condition for that quarter.

9.    The true reasons Waterdrop discontinued its mutual aid program, the increasing pressure from Chinese regulators, the significant increase in costs and expenses in the months leading up to the filing of the Registration Statement, and the true Q1:21 financial results were all facts that were omitted from the Registration Statement, but were necessary to make the statement not misleading. Based on the misleading Registration Statement, Plaintiff, and other members of the Class, purchased Waterdrop ADSs in advance of the IPO and were damaged thereby.

## JURISDICTION AND VENUE

10.    The claims alleged herein arise under sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and o.

11.    This Court has jurisdiction over the subject matter of this action pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

12.    This Court has personal jurisdiction over each Defendant, and venue is proper in this District pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. 191(b), as Defendants conducted the IPO in this District, drafted the Registration Statement in substantial part in this District, disseminated the statements alleged to be false and misleading herein into this District, and solicited purchasers of Waterdrop ADSs in this District. The Waterdrop ADSs issued in the IPO also trade in this District, and Waterdrop's Authorized U.S. Representative for the purposes of the IPO is headquartered in this District.

13.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

5

JA-017

United States mail, interstate telephone communications, and the facilities of the NYSE, a national securities exchange.

## PARTIES

### A. Lead Plaintiff

14.  Lead Plaintiff Qi Mi, as set forth in the certification attached hereto as Exhibit A, purchased Waterdrop ADSs pursuant or traceable to the Company's Registration Statement issued in connection with the Company's IPO, and has been damaged thereby.

### B. Corporate Defendant

15.  Defendant Waterdrop operates an insurance technology platform and is incorporated in the Cayman Islands and headquartered in Beijing, China. The Company's ADSs trade in New York on the New York Stock Exchange ("NYSE") under ticker symbol "WDH." Each Waterdrop ADS represents ten Class A ordinary shares of the Company. The Company maintains a dual class share structure designed to concentrate control over the Company in the hands of Waterdrop insiders out of proportion with their economic stake. Holders of Class A shares (the shares owned by public investors) are entitled to one vote per share. By contrast, holders of Class B shares (the shares owned by Company insiders) are entitled to nine votes per share.

### C. Individual Defendants

16.  Defendant Peng Shen ("Shen") founded Waterdrop and serves as Waterdrop's Chief Executive Officer ("CEO") and Chairman. Defendant Peng beneficially owned and controlled approximately 70% of Waterdrop's voting shares through his ownership of Class A and Class B shares at the time of the IPO. The Registration Statement stated that Waterdrop was a "controlled company" controlled by Defendant Shen. Defendant Shen signed the Registration Statement on his own behalf and as "attorney-in-fact" for several other signatories.

6

JA-018

17. Defendant Kangping Shi ("Shi") served as Waterdrop's Chief Financial Officer ("CFO") at the time of the IPO. Defendant Shi signed the Registration Statement.

18. Defendant Nina Zhou ("Zhou") served as a Waterdrop director at the time of the IPO. Defendant Shen, as attorney-in-fact, signed the Registration Statement on behalf of Defendant Zhou.

19. Defendant Kai Huang ("Huang") served as a Waterdrop director at the time of the IPO. Defendant Shen, as attorney-in-fact, signed the Registration Statement on behalf of Defendant Huang.

20. Defendant Haiyang Yu ("Yu") served as a Waterdrop director at the time of the IPO. Defendant Shen, as attorney-in-fact, signed the Registration Statement on behalf of Defendant Yu.

21. Defendant Yao Hu ("Hu") served as a Waterdrop director at the time of the IPO. Defendant Shen, as attorney-in-fact, signed the Registration Statement on behalf of Defendant Hu.

22. Defendant Guang Yang ("Yang") served as a Waterdrop director at the time of the IPO. Defendant Shen, as attorney-in-fact, signed the Registration Statement on behalf of Defendant Yang.

23. Defendants Shen, Shi, Zhou, Huang, Yu, Hu, and Yang are referred to herein as the "Individual Defendants." Each of the Individual Defendants reviewed and helped prepare the Registration Statement and, as directors and executive offices of the Company, participated in the solicitation and sale of Waterdrop ADSs to investors in the IPO for their own benefit and the benefit of Waterdrop as directors, executive officers and/or major shareholders of the Company.

**D. Cogency Global Defendants**

24. Defendant Colleen A. De Vries ("De Vries") served as Waterdrop's Authorized U.S. Representative at the time of the IPO in her position as the Senior Vice President of defendant

Cogency Global Inc. Defendant De Vries, as Senior Vice President of Cogency Global Inc., signed the Registration Statement.

25.     Defendant Cogency Global Inc. ("Cogency Global"), headquartered in New York, was Waterdrop's Authorized U.S. Representative for purposes of the IPO, and defendant De Vries signed the Registration Statement on her own behalf and on behalf of Cogency Global. Defendant Cogency Global is additionally liable for the securities law violations alleged herein to have been committed by defendant De Vries as it controlled defendant De Vries at the time of the IPO.

26.     Defendant De Vries and Cogency Global are referred to herein as the "Cogency Global Defendants."

### E.  Underwriter Defendants

27.     Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") underwrote the Company's IPO and assisted in the preparation and dissemination of Waterdrop's Registration Statement.

28.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") underwrote the Company's IPO and assisted in the preparation and dissemination of Waterdrop's Registration Statement.

29.     Defendant BofA Securities, Inc. ("BofA") underwrote the Company's IPO and assisted in the preparation and dissemination of Waterdrop's Registration Statement.

30.     Defendant China Merchants Securities (HK) Co., Limited ("China Merchants") underwrote the Company's IPO and assisted in the preparation and dissemination of Waterdrop's Registration Statement.

31.     Defendant CLSA Limited ("CLSA") underwrote the Company's IPO and assisted in the preparation and dissemination of Waterdrop's Registration Statement.

JA-020

32.     Defendant Haitong International Securities Company Limited ("Haitong International") underwrote the Company's IPO and assisted in the preparation and dissemination of Waterdrop's Registration Statement.

33.     Defendants Goldman Sachs, Morgan Stanley, BofA, China Merchants, CLSA, and Haiton International are collectively referred to herein as the "Underwriter Defendants."

34.     Below is a chart showing the firm number[3] of ADSs each Underwriter Defendant agreed to purchase in the IPO:

| Underwriter | Firm Number of ADSs |
|---|---:|
| Goldman Sachs | 15,300,000 |
| Morgan Stanley | 7,500,000 |
| BofA | 6,300,000 |
| China Merchants | 300,000 |
| CLSA | 300,000 |
| Haiton International | 300,000 |
| **TOTAL:** | **30,000,000** |

35.     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared over $25 million in fees collectively for their services. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to solicit purchases of Waterdrop ADSs in the IPO. Each of the Underwriter Defendants designated personnel to the IPO working group, including investment bankers, analysts, associates, and

---

[3] The underwriters had an option to purchase up to an aggregate of 4,500,000 additional ADSs from Waterdrop, subject to certain conditions. One ADS granted the bearer the right to receive ten Class A ordinary shares after the IPO.

JA-021

counsel, to market Waterdrop ADSs, and those personnel worked on and approved the content of Waterdrop's Registration Statement and other offering materials.

36.     Representatives of the Underwriter Defendants also assisted Waterdrop and the Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of Waterdrop, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Waterdrop's most up-to-date operational and financial results and prospects.

37.     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Waterdrop's management, top executives, and outside counsel and engaged in "drafting sessions" in advance of the IPO. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price range at which Waterdrop ADSs would be sold; (iii) the language to be used in the Registration Statement; and (iv) what disclosures about Waterdrop would be made in the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Waterdrop's management and top executives, such as the Individual Defendants, the Underwriter Defendants knew, or should have known, of Waterdrop's existing problems as detailed herein.

38.     The Underwriter Defendants solicited and sold Waterdrop ADSs to Lead Plaintiff and other members of the Class. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

JA-022

39. Thus, pursuant to the Securities Act, the Underwriter Defendants are liable for the materially false or misleading statements in the Registration Statement.

**CONFIDENTIAL WITNESSES**

40. Confidential Witness ("CW") 1 was employed by Waterdrop as a customer service staff member from November 2019 to October 2021. CW1 stated that Waterdrop Mutual Aid was an independent segment of Waterdrop, but was well integrated into Waterdrop's overall business. The information of mutual aid customers was stored in the centralized database system of Waterdrop, which could be accessed by Waterdrop's other business teams. CW1 stated that the shutdown of Waterdrop's mutual aid platform was due to regulations put in place by the CBIRC, but that the CEO sent out a letter explaining that it was an "upgrade," and that mutual aid customers would be given a new insurance product that would function "identical to Waterdrop's mutual aid." While CW1 did not know exact numbers, CW1 stated that the increased customer acquisition costs noted in the Q1:21 financial reports were at least partially due to the cessation of the mutual aid platform.

41. CW2 was employed by Waterdrop as a Finance Business Partner (a managerial financial planning and analysis position) from April 2020 through March 2021. CW2 stated that the cessation of Waterdrop Mutual Aid was due to the CBIRC's new regulatory requirements in early 2021. It was definitely not a "sudden" shutdown. CW2 explained that the market began discussing the CBIRC's regulations in 2020, and some mutual aid platforms ceased their operation in later 2020 or early 2021, before Waterdrop. By March, many more mutual aid platforms, including Waterdrop, had shut down. In early 2021, after Waterdrop employees returned from the Chinese New Year break in February, a few senior staff and the company's executives discussed a cessation plan for the mutual aid platform. Mutual aid service leaders, finance, and some industry

analysts also assisted in preparing the cessation plan. CW2 stated that the shutdown of the mutual

aid platform impacted Waterdrop both internally and externally, but did not elaborate on the nature

of these impacts.

## FACTUAL BACKGROUND

### A.  About Waterdrop

42.     Based in China, Waterdrop, known as "Shuidi" in Chinese, operates an insurance

technology platform purportedly focused on providing "a positive social impact." Waterdrop takes

its name from a Chinese proverb, which essentially translates to "many little drops of water make

the ocean." The name has a double meaning, because "water" is also a Chinese slang term for

money. The Company began in May 2016 as a mutual aid platform, where individuals could pay

small amounts — around $1 USD per month — and the collective fund would be used to pay the

medical expenses of eligible beneficiaries. This idea was immensely popular among those without

the means to procure a commercial insurance policy or who wished to supplement existing

policies. Within just 100 days of launch, Waterdrop had attracted over a million users.[4]

43.     In the following years, online mutual aid programs became increasingly popular in

China. A white paper published in May 2020 by the Alibaba-affiliated Ant Group found that 150

million users had enrolled in online mutual aid programs in China as of the end of 2019, and

estimated that the number of users would triple by 2025.[5] At the time, Ant Group operated the

largest online mutual aid platform, Xiang Hu Bao, which had over 100 million users. Chinese

public health insurance is capped at 60% of medical expenses for critical illnesses, so individuals

---

[4] *See* https://www.protocol.com/china/china-health-insurance

[5] *See* https://www.businesswire.com/news/home/20200507005383/en/Chinas-Online-Mutual-Aid-Market-Expected-to-Triple-to-450-Million-Users-by-2025

who cannot afford a commercial insurance policy were previously forced to pay additional costs out-of-pocket. Mutual aid might cover an additional 20% of expenses, drastically reducing these out-of-pocket costs. The white paper found that 70% of online mutual aid participants surveyed said they were not covered by commercial health insurance, but over 42% said they intended to purchase insurance products in the future.

44.    While Waterdrop derived a small amount of revenue in management fees from its mutual aid platform, the main benefit of the platform was that it educated users about health insurance and generated cheap customer leads, as Waterdrop could easily market and sell products to mutual aid users that wished to make the switch to commercial insurance. This data significantly lowered Waterdrop's customer acquisition costs in comparison to competitors.

45.    In July 2016, Waterdrop started a crowdfunding platform, similar to the popular site "GoFundMe" in the United States, which enabled individuals to donate money to cover the medical expenses of other individuals in need. The Company does not earn any revenues from its crowdfunding operations, but, as with the mutual aid platform, the service generates cheaper customer leads and lowers Waterdrop's customer acquisition costs. Due to the nature of the crowdfunding and mutual aid platforms, Waterdrop also built a reputation as a charitable company among consumers, further contributing to the Company's success.

46.    In September 2016, Waterdrop acquired a commercial insurance company, Baoduoduo Insurance Broker Co. Ltd., along with its operating license. This allowed the Company to commence selling commercial insurance products. Due to its integrated technological platform and the wide variety of insurance products Waterdrop offers, it has found moderate success, especially among young, lower income, and semi-rural users. Waterdrop earns the vast majority

13

of its revenue from this commercial insurance brokerage business by charging insurance companies commissions on the products it sells.

47.     These three interdependent segments made Waterdrop's business model unique. Waterdrop's low customer acquisition costs allowed the Company to compete with much larger insurance companies, and the revenue from the commercial insurance allowed it to continue the philanthropic branches of the business. Zhu Rui, director of the Social Innovation and Business for Good Centre at Cheung Kong Graduate School of Business, explained: "If you separate (the charity activities and the business activities at Waterdrop), the originally profitable insurance business will lose its referral traffic and become uncompetitive; a purely philanthropic Waterdrop Crowdfunding platform isn't likely to survive, either." Additionally, Chinese tech columnist Lan Xi explained: "After users have experienced crowdfunding and mutual aid, they will have more knowledge about and a stronger desire for insurance products… This is fundamental to Waterdrop's ecosystem and a high barrier to entry for other players in the industry."

48.     As Waterdrop explained in the Registration statement:

> Our user-centric platforms enhance user engagement through network effects. Based on comprehensive data accumulated across demographics, medical and health status, behaviors, and social activities, we derive unique consumer insights and develop deep understanding of consumer needs. Leveraging our data insights, big data analytics, and artificial intelligence, we have developed measures that enable effective consumer conversion and continuously provide customized insurance and healthcare solutions to users acquired from our crowdfunding and mutual aid platforms as well as through external marketing efforts.

49.     In recent years, however, Waterdrop relied less on its crowdfunding and mutual aid platforms and more heavily on third party traffic to expand its consumer base, with such channels increasing from just 1.9% of all customer traffic in 2018 to 44.9% of all customer traffic by 2020. Then, in March 2021, Waterdrop announced it would be ceasing its mutual aid platform altogether.

14

**B. Increasing Regulations Force Waterdrop to Discontinue its Mutual Aid Platform**

50.     On March 26, 2021, Waterdrop announced that it would be discontinuing its mutual

aid platform starting March 31, 2021.

51.     In an open letter to Waterdrop employees, Defendant Shen wrote:

> We believe it is time to adjust and upgrade our business. To provide users with
> more comprehensive, more stable and more valuable services! To this end, we will
> terminate the [mutual aid plans] currently operated by the water drop mutual aid
> platform, and replace the mutual aid plan with more cost-effective commercial
> health insurance services.
>
> . . .
>
> Waterdrop has always been committed to providing users with better protection.
> [This] is the original intention of this adjustment and upgrade. For [those] currently
> still under protection of Waterdrop Mutual Aid members, after obtaining the
> member's consent, we will insure these members more than Waterdrop Mutual Aid.

52.     Despite the attempt to frame the cessation of the mutual aid platform as an

"upgrade," the Confidential Witnesses in this case stated that the platform was shut down to

increased regulatory scrutiny. For example, CW1 stated that the shutdown of Waterdrop's mutual

aid platform was due to regulations put in place by the CBIRC, but that the CEO sent out a letter

explaining that it was an "upgrade," and that mutual aid customers would be given a new insurance

product that would function "identical to Waterdrop's mutual aid."

53.     Similarly, CW2 stated that the cessation of Waterdrop Mutual Aid was due to the

CBIRC's new regulatory requirements in early 2021. CW2 explained that the market began

discussing the CBIRC's regulations in 2020, and in response, some mutual aid platforms ceased

their operation in late 2020 or early 2021, before Waterdrop. In early 2021, CW2 attended a

meeting in which the Company's executives discussed a cessation plan for their mutual aid

platform, and eventually, in March 2021, Waterdrop ceased operating its mutual aid platform.

54.     Media reports and documents published by the CBIRC support the CWs'

statements. A June 2020 article in Nikkei Asia reported that, while the Ant Group white paper

expected the number of mutual aid users to triple by 2025, a lack of governmental regulation could spell problems for the industry in the future.[6] The article noted that there were already several "collapsed mutual aid programs that had more claims than healthy members remaining in the group" and therefore "couldn't pay the claims." Other problems included programs which enticed members with the promise of large payouts, then changed the contracts once members signed on, and a lack of legal basis on how to resolve claim disputes. The article noted that further regulatory oversight would be necessary, quoting an expert's recommendation that the "CBIRC should establish an innovative regulatory approach to the emerging industry."

55. On September 3, 2020, the CBIRC published a study titled "Analysis of Illegal Commercial Insurance Activities and Countermeasures and Suggestions" (the "Study").[7] The Study found:

> The number of illegal commercial insurance activities is huge and increasing year by year, involving a large amount of money and many consumers, which has caused serious social impact. In the name of insurance, some illegal institutions and personnel conduct fraud, illegal fund-raising, and pyramid schemes, which seriously damage the interests of the masses. Some seriously erode the interests of the industry and affect the stable operation of insurance institutions. The existence of illegal commercial insurance activities not only destroys the credibility of the insurance market, but also affects consumers' confidence in purchasing insurance products, and also causes bad money to drive out good money.

Specifically, the Study noted that "the online mutual aid platforms that have grown rapidly in recent years have the characteristics of commercial insurance in essence, but there is currently no clear regulatory body and regulatory standards," and that "Xiang Hu Bao, *Waterdrop Mutual Aid* and other online mutual aid platforms, which are unlicensed operations, have a large number of

---

[6] https://asia.nikkei.com/Spotlight/Caixin/China-s-new-mutual-aid-platforms-fill-hole-in-health-care-coverage

[7] *See* https://tech.sina.com.cn/roll/2020-09-08/doc-iivhvpwy5588409.shtml

members, and ***the stakeholder risks cannot be ignored***." The study concluded that it was necessary for the CBIRC to "***crack down on illegal commercial insurance activities*** in a timely and accurate manner, to ensure the healthy and stable development of the insurance market, and to effectively safeguard the legitimate rights and interests of insurance consumers."

56.     About a week later, on September 9, 2020, tech company Baidu ceased operating its mutual aid program, reportedly "to protect the rights and interests of users," because it had only been able to attract about 500,000 users, so dues were not enough to cover claims.[8]

57.     On December 7, 2020, the CBIRC issued a set of "Regulatory Measures for the Supervision of Internet Insurance Business," (the "Regulatory Measures") to go into effect on February 1, 2021.[9] The Regulatory Measures instituted a number of new rules meant to regulate many different aspects of internet insurance companies, including online mutual aid platforms, in order to decrease the risk of fraud and illegal activity. For example, once the laws went into effect, any internet-based insurance businesses would need a license to operate, would need increased cybersecurity, and all financial activities would be overseen by the CBIRC. While many internet-based commercial insurance platforms already conformed to some of the Regulatory Measures, most mutual aid platforms did not, and the adjustments would be costly to make for the relatively low-revenue businesses.

58.     Then, on December 18, 2020, the CBIRC published a circular on "Cases of Infringement of Consumer Rights and Interests," (the " Dec. 18, 2020 Circular") announcing the investigation of several online insurance companies for illegally promoting policies with offers such as "0 yuan for the first month" or "0.1 yuan for the first month," when actually, the first

---

[8] *See* https://kr-asia.com/baidu-shuts-mutual-aid-platform-after-disappointing-growth

[9] *See* http://www.gov.cn/zhengce/zhengceku/2020-12/14/content_5569402.htm

JA-029

month's premiums were evenly distributed to the later premiums, or the first month's premiums were overcharged.[10] Waterdrop was one of the companies cited in the Dec. 18, 2020 Circular for a policy that was advertised as "3 yuan for the first month," but the cost of the remaining 11 months was not disclosed. The Company was later fined RMB1 million, and Defendant Yang was personally fined RMB100,000.[11] Xinhuanet News stated that these fines were a sign of increasing internet insurance industry regulation and speculated that these regulations would lead to a "reshuffling" of the Chinese insurance industry in the near future.[12]

59. On January 11, 2021, the CBIRC published the Draft Circular on Further Regulating Online Life Insurance Business (the "Jan. 11, 2021 Draft Circular").[13] The Jan. 11, 2021 Draft Circular, if enacted, would impose a number of requirements on internet insurance companies, for example, in order to obtain a license to operate, internet insurance companies would need to meet certain solvency and credit/risk rating requirements, would need to have certain online operational capabilities, and would be subject to a pricing review mechanism enforced by the CBIRC. Additionally, if the Jan. 11, 2021 Draft Circular was enacted and a Company was found in violation of the policies therein:

> [The] CBIRC will initiate inquiry, investigation, inspection and other regulatory procedures against illegal and non-compliant issues, and under special circumstances may also notify the board of directors of the relevant risks, publicly inform the whole industry, and at the same time pursue the direct liability of the chief actuary as well as the management liability of the main person in charge of the company and the person in charge of the online channel.

---

[10] *See* https://www.cbirc.gov.cn/cn/view/pages/ItemDetail.html?docId=950243&itemId=4099&generaltype=0

[11] *See* https://www.cbirc.gov.cn/cn/view/pages/ItemDetail.html?docId=1017043&itemId=4113&generaltype=9

[12] *See* http://www.news.cn/fortune/2021-12/01/c_1128118154.htm

[13] *See* http://jtnfa.com/en/booksdetail.aspx?type=06001&keyid=00000000000000005441&PageUrl=majorbook &getPageUrl=booksdetail&Lan=EN

60.     In a press conference on January 22, 2021, the week before the aforementioned Regulatory Measures went into effect, a reporter asked representatives of the State Council Information Office of the CBIRC, "how will the regulatory authorities supervise network mutual assistance in the future?"[14] Xiao Yuanqi, Chief Risk Officer, replied that, in addition to Baidu's mutual aid program, Meituan Mutual Aid had ceased operating in January 2021 due to increasing risks. Like Baidu, Meituan was a prominent Chinese tech and e-commerce ("fintech") company. Yuanqi continued, "going forward, we will pay more attention to the mutual assistance business of network companies, understand their operation mode and risk situation, and then take corresponding measures according to the situation."

61.     In the next few months, almost all of China's mutual aid platforms announced that they would be ceasing operations, including Qingsongchou (March 24, 2021); Hukong Mutual Aid (March 30, 2021); Xiaomi Mutual Aid (April 30, 2021); 360 Mutual Aid (May 18, 2021); and Defendant Waterdrop (announced on March 26, 2021 that the mutual aid program would cease on March 31, 2021). Tech industry news site Protocol explained:

> Online mutual aid started during the golden years of Chinese fintech, when regulations were loose and venture capitalists were placing big bets on digital transformation. But those days are over. China's financial regulators have largely caught up with technological change, and less profitable products like mutual aids are being discarded as the market retrenches to focus on higher-profit opportunities.[15]

62.     Xinhuanet News noted that the cessation was not limited to mutual aid programs – internet insurance companies pulled a number of other insurance products off the market in

---

[14] *See* https://www.cbirc.gov.cn/cn/view/pages/ItemDetail.html?docId=961829&itemId=915&generaltype=0

[15] *See* https://www.protocol.com/china/china-health-insurance

JA-031

response to the Regulatory Measures, and that these regulations may spell the end of some internet insurance companies. The article states:

> Tianfeng Securities analyst Xia Changsheng believes that **small and medium-sized insurance companies will be restricted from selling life insurance products online in the future**, wealth management insurance with aggressive yields will be removed from the shelves, and follow-up long-term insurance products will return to offline operations.

63.     In other words, in order to ensure it could continue to operate as an internet-based insurance broker, Waterdrop needed to rapidly gain more customers and grow its business into one that was essentially "too large to fail." To this end, even before the cessation of Waterdrop's mutual aid platform, the Company began heavily spending on third party marketing to drive traffic to its site. After the cessation of mutual aid, Waterdrop was forced to further increase this spending to make up for the absence of cheaper customer leads driven by that platform.

64.     Despite the increasingly strict regulatory environment, and the uncertain future of internet-based insurance companies in China, and the fact that the Company was spending more and more on customer acquisition, Defendants decided to take their company public in May 2021.

### C. Waterdrop's Initial Public Offering

65.     After completing a successful round of financing in August 2020, Waterdrop began planning its United States IPO.[16] However, the IPO process was delayed by Chinese regulators.

66.     On April 12, 2021, Reuters reported that, according to inside sources, "Waterdrop had aimed to go public by end-2020 but is now looking to list in the second quarter," and that the delays were due to "pushback" from Chinese regulators because the Company's "business model

---

[16] *See* https://www.pymnts.com/news/ipo/2020/chinese-insurer-waterdrop-plans-united-states-ipo-after-230-million-dollar-fundraise/

is seen as risky."[17] The article stated, according to one source, that the CBIRC "told founder Shen Peng this month that it would not suggest that Waterdrop go public at this point." While regulatory approval was not necessary for the IPO, as Waterdrop is incorporated offshore, the article notes that the "CBIRC's reservations about the IPO do not bode well for such companies' share sale plans in general." Waterdrop denied that Chinese regulators were opposed to its IPO plans.

67.    This would not have been the first time regulators interfered in a Chinese company's US debut. In November 2020, regulators halted the planned IPO of Chinese fintech company Ant Group (administrators of Xiang Hu Bao, the largest Chinese mutual aid program, among other businesses) just days before the company planned to go public.[18] While the Chinese government claimed the halting of the IPO was to protect investors, the New York Times reported that it was, in fact, retaliation for a speech made by Ant Group founder Jack Ma criticizing the increased regulatory oversight of the financial industry.

68.    Regardless of regulatory warnings, Waterdrop proceeded with going public. On April 16, 2021, the Company filed its Registration Statement on Form F-1 with the SEC, which, after an amendment, was declared effective on May 6, 2021. On May 7, 2021, the Company filed a prospectus on Form 424B4, which incorporated and formed part of the Registration Statement.

69.    In the Registration Statement, the Company vaguely stated that it ceased its mutual aid platform "in order to focus on our core businesses and offer enhanced protection to our users," and that contributing factors to the decision were "increased recognition of our brand," "latest

---

[17] *See* https://www.reuters.com/world/china/tencent-backed-waterdrop-faces-pushback-ipo-chinese-regulators-sources-2021-04-13/

[18] *See* https://www.nytimes.com/2020/11/06/technology/china-ant-group-ipo.html#:~:text=China%20Halts%20Ant%20Group's%20Blockbuster,of%20the%20financial%20technology%20giant.&text=Ant%20Challenged%20Beijing%20and%20Prospered,Now%20It%20Toes%20the%20Line

JA-033

market development," and "recent industry environment changes." Waterdrop did not, however,

reveal the true reason behind the cessation of the platform, namely, increased regulatory scrutiny.

While the statement mentioned the Regulatory Measures, it did not make any connection between

the implementation of the measures and the cessation of the mutual aid program, nor did it mention

the CBIRC's September 2020 Study that particularly cited risks with Waterdrop Mutual Aid.

70.     The Registration Statement did warn that there were certain risks associated with

the cessation of the mutual aid plan:

> Despite our good intention, our mutual aid participants or general public may view
> our action as adversely affecting the actual or expected interests of mutual aid
> participants, which may in turn harm our reputation. In the worst scenario,
> participants may choose to bring complaints and lawsuits against us.

The Registration Statement also alluded to the fact that Waterdrop may face "monetary" risks from

the cessation of the mutual aid platform, and stated, "with the cessation of the Waterdrop Mutual

Aid operation, the corresponding management fee income which accounted for 3.6% of total

operating revenue in 2020, will no longer be a revenue stream for us in 2021."

71.     These statements did not fully and adequately describe the risks surrounding the

cessation of Waterdrop's mutual aid platform. The main benefit the Company derived from mutual

aid was not the revenue from management fees, but was the cheaper customer leads the platform

generated. Without these leads, Waterdrop would have to spend considerably more to acquire

customers in order to maintain the growth of its commercial insurance platform. These risks were

not adequately disclosed in the Registration Statement.

72.     Additionally, because Q1:21 ended over a month *before* the IPO, the Registration

Statement disclosed certain financial results for that quarter. As a result, the Company disclosed

positive results from the quarter, such as it "achieved a solid business growth in the first quarter

of 2021," and that "[t]he FYP generated through Waterdrop Insurance Marketplace reached

22

RMB4,469 million for the first quarter of 2021, demonstrating a 14.4% increase from the fourth quarter of 2020 or a 42.7% increase from the same period of 2020."

73.     But Waterdrop notably did not disclose that operating costs and expenses had skyrocketed during Q1:21, increasing by more than 75% year over year, which led to a significant net operating loss for the quarter, or that the increase in costs was due, in large part, to the Company's spending on third-party marketing expenses. Instead of disclosing the rapidly accelerating costs, expenses, and losses for Q1:21, the Registration Statement selectively disclosed only some positive aspects of the Q1:21 financial results," thus creating a materially misleading impression of Waterdrop's actual financial condition for that quarter.

74.     Nor did Waterdrop disclose in the Registration Statement that, after Waterdrop's mutual aid program closed and could no longer be used as a source for cheap customer leads and data, these operating costs and expenses were continuing to rise exponentially in Q2:21, increasing more than 50% quarter-over-quarter and 160% year-over-year, even though at the time of the IPO, the Company was approximately halfway through Q2:21, and had been ramping up third party marketing spending for several months.

75.     The Registration Statement was used to sell 30 million Waterdrop ADSs at $12 per ADS to the investing public. Defendants generated US$360 million in gross offering proceeds from their sale of Waterdrop ADSs in the IPO.

76.     On June 1, 2021, in the wake of the IPO, several analysts initiated coverage of Waterdrop. For example, BofA initiated with a "buy" rating, citing the burgeoning market for health insurance in China and stating, "Waterdrop is well positioned for the future growth with its client acquisition and product mix strategies." CLSA analyst Edwin Liu initiated coverage of Waterdrop with a "Buy" rating and a price target of $15.80, stating "[w]ith established brand

JA-035

recognition and superior customer acquisition abilities, Waterdrop is well positioned to ride on the online life & health insurance boom . . . Regulatory uncertainties remain, but we expect the company to navigate potential challenges." Morgan Stanley initiated coverage on the same day, calling WDH "attractive," and setting a price target of $11.80 (current price was $8.28), noting that a "key feature that differentiates Waterdrop from peers is its crowdfunding business," which "serves as a low-cost traffic portal for insurance sales." The report also noted "[o]ngoing regulatory headwinds in China's internet space and ADR delisting risks are major causes for its share price decline since listing."

### D. Events Following the IPO Reveal the Truth about Waterdrop's Registration Statement

77.     On June 17, 2021, Waterdrop issued a press release announcing the Company's financial results for the first quarter ended March 31, 2021 – *i.e.*, the quarter that concluded over a month before the Registration Statement became effective. The Company reported that its operating costs and expenses had ballooned over 75%, or RMB579.1 million, to RMB1,343.9 million (US $205.1 million). As a result, the Company suffered an operating loss for the quarter of RMB460.6 million (US $70.3 million), compared with operating loss of RMB111.1 million for the same period of 2020 – ***a more than 400% increase***. The release broke down the rapid rise in Waterdrop's expenses in pertinent part as follows:

- Operating costs and expenses increased by RMB579.1 million, or 75.7%, to RMB1,343.9 million (US$205.1 million) for the first quarter of 2021 from RMB764.9 million for the same period of 2020.

- Operating costs increased by 125.5% year-over-year to RMB300.6 million (US$45.9 million) for the first quarter of 2021, compared with RMB133.3 million for the first quarter of 2020, which was mainly due to (i) the cost of RMB76.8 million that incurred in relation to the cessation of the Waterdrop Mutual Aid business, (ii) RMB30.8 million increase in personnel cost as our consultants and insurance agents team rapidly expanded to support the business growth, and (iii) RMB44.3 million increase in professional and outsourced customer service fees.

24

- Sales and marketing expenses increased by 67.7% year-over-year to RMB837.2 million (US$127.8 million) for the first quarter of 2021, compared with RMB499.2 million for the first quarter of 2020. The increase was primarily due to (i) a RMB247.8 million increase in marketing expenses to third-party traffic channels as a result of our business expansion and branding promotions, and (ii) a RMB100.7 million increase in outsourced sales and marketing service fees to third parties.

78. Analysts were surprised by the increased costs. For example, Michael Li of BofA wrote, under the heading "Cons: still a long way to go to control acquisition cost":

> The company reported that its client acquisition based on FYP increased by 65%, 52% and 48% via internal conversion, third party traffic and natural traffic/repeat purchases. The growth of the most costly third party traffic continued to outgrow natural traffic, leading to the increase of its sales and marketing expenses by 68% YoY, faster than our FY21 forecast at 49%.

Similarly, Jenny Jiang of Morgan Stanley wrote:

> The product mix shift to long term insurance and further expansion in operating third party traffic have increased both its operating costs (up 68% even excl. one-off shutdown costs of mutual aid platform) and sales & marketing costs (up 67% excl. SBC). As such, net losses for 1Q were slightly higher than our expectation.

Both BofA and Morgan Stanley maintained their price targets of $11.50 and $11.80, respectively.

79. Then, in early August 2021, Chinese media began reporting a "crack down" on tech companies across various sectors, especially targeted at companies that had completed IPOs in the United States, which regulators viewed as a security risk. On August 2, 2021, media outlet SupChina published an article aimed at explaining the situation to Westerners, stating, "[s]ince the suspension of Ant Group's IPO in November [2020], Beijing has embarked on an unprecedented clampdown of its technology sector."[19] The article further explained, "China's regulators are worried about personal data being leaked to foreign adversaries" and "fear that the U.S. might gain some leverage on U.S.-listed Chinese companies."

---

[19] *See* https://supchina.com/2021/08/02/chinas-big-tech-crackdown-a-guide/

80.     On August 11, 2021, multiple news sources reported that the CBIRC had issued an order directing insurance companies to cease improper marketing and pricing practices rampant in the industry and enhance their user privacy protections. Failure to comply would reportedly result in the offenders being "severely punished" by Chinese authorities.

81.     For example, a Bloomberg story entitled "China Goes After Online Insurance in Widening Crackdown" stated that the "sweeping order goes beyond the targeted action that's hit a few listed online platforms including Waterdrop Inc. . . . since China began a broad crackdown on its fintech sector this year."[20] The article confirmed that "[r]egulators have since moved to shutter some operations including mutual aid healthcare platforms operated by Waterdrop." It continued: "The latest move will stymie growth in an industry that had been expected to grow to 2.5 trillion yuan ($385 billion) in a decade." The article continued in pertinent part as follows:

> "In recent years, online insurance has moved into a fast lane. At the same time, transgressions have been rampant," according to the notice, which cited offenses including some internet platforms illegally operating in insurance, mispricing risks or illicitly using client information. It called for "immediate rectification and regulation."
>
> . . .
>
> The overhang presents multiple challenges for Waterdrop, which was one of a few Chinese fintechs to have pulled off an initial public offering this year.

82.     Reuters reported that, due to this "crackdown," the share price of online insurance companies on the Hong Kong Stock Exchange, such as Zhong An (one of the leading online insurance platforms co-invested by Ant Group), Tencent Holdings (affiliated with Waterdrop), and Ping An Insurance Group "tumbled as much as 9% in the morning session."[21]

---

[20] *See* https://www.bloomberg.com/news/articles/2021-08-11/china-regulators-go-after-online-insurance-in-widening-crackdown

[21] *See* https://www.reuters.com/world/china/china-step-up-scrutiny-online-insurance-sector-media-2021-08-12/

JA-038

83.     Michael Li of BofA Securities picked up on the news, writing:

[T]he China Banking and Insurance Regulatory Commission (CBIRC) will soon launch a campaign, targeting the recent issues in online insurance sector, including misleading sales, bundled sales, mis-pricing, illegal operation and user data breaches. We expect major online insurers will be the targets, including Zhong An (6060 HK) and Waterdrop (WDH US). We will gauge the impact on their operation and growth when details are available.

84.     On September 8, 2021, Waterdrop issued a press release announcing the Company's financial results for the second quarter ended June 30, 2021. The release stated that Waterdrop's operating losses had continued to accelerate, totaling RMB815.4 million (US$126.3 million) for the quarter, compared with an operating profit of RMB7.2 million for the same period of 2020. This was once again due to a sharp increase in the Company's operating costs and expenses during the quarter, which increased by RMB1,081.1 million, or 160.5% year over year, to RMB1,754.7 million (US$271.8 million) from RMB673.6 million for the same period of 2020. specifically, the Company noted, "Sales and marketing expenses increased by 270.3% year over year to RMB1,244.9 million (US$192.8 million) for the second quarter of 2021, compared with RMB336.2 million for the second quarter of 2020" primarily due to an "RMB734.6 million increase in marketing expenses to third-party traffic channels."

85.     On the same day, CLSA analyst Edwin Liu lowered the price target on Waterdrop to $7.00 (from $14.20) while maintaining a "Buy" rating. BofA dropped their price target to $9.58 (from $11.50), citing tightening regulations and the fact that "operating expenses rose by 115% YoY due to the rapid growth of sales and marketing expenses, which surged by 149% YoY."

86.     On September 15, 2021, Seeking Alpha reported that Waterdrop's "shares are down more than 75% since their April IPO due to a combination of widening losses and regulatory concerns." The article explained:

Sales and the marketing expenses also more than tripled during the quarter, as the company spent heavily on third-party channels to acquire new users and promote

its brand. One might wonder why Waterdrop, often hailed as one of China's leading insuretech companies, would pay huge sums to third parties to gain potential new customers rather than simply grow organically through its own channels and marketing efforts. To answer this question, we need to step back and look at Waterdrop's development.

. . .

Waterdrop thrived partly by channeling its huge crowdfunding user base, which had positioned the company as a sort of charitable organization, into its more lucrative insurance brokering business. Founder and CEO Shen Peng once told media that premiums derived from users of the mutual aid platform accounted for a sizable 20% of the company's total.

. . .

Sensing imminent regulatory scrutiny, Waterdrop shut down its mutual aid platform at the end of March, a move widely seen as pre-emptive to avoid any uncertainty ahead of its IPO plans that were already underway. Media reports even hinted that the insurance regulator wanted the listing postponed, but Waterdrop went ahead anyway. Thus Waterdrop was forced to jettison one of its biggest referral sources for new insurance business, which may partly explain its current heavy reliance on costly third-party channels as a source for finding new customers.

87.     On September 13, 2021, Waterdrop ADSs dropped to a low of just $3 per ADS – **75% below** the price at which Waterdrop ADSs were sold to the investing public just four months previously. At the time of the filing of the initial complaint in this matter, the price of Waterdrop ADSs was significantly below the IPO price and currently sits at $1.54 per ADS.[22]

88.     Over the next few months, analysts and media outlets continued to report about the effects of regulatory scrutiny on Waterdrop. For example, on October 11, 2021, Equal Ocean published an article titled, "As Crackdown Looms, Chinese Insurtech Waterdrop Enters Next Growth Phase," stating, "Despite a great deal of attention from investors, Waterdrop has been performing poorly" due to rising costs, policy crackdowns, and industry overhauls.

89.     On November 3, 2021, the CBIRC announced that, after the conclusion of a trial, Waterdrop would be fined RMB1 million for the illegal activities described in the Dec. 18, 2020

---

[22] As of close of market on Friday, February 18, 2022.

Circular, which was published months prior to Waterdrop's IPO. Defendant Yang was also personally fined RMB100,000.

90.    On November 30, 2021, after Waterdrop issued a press release announcing the Company's financial results for the third quarter 2021 (Q3:21), BofA Securities lowered its price target to $8.75, noting that "China's crackdown on the whole internet sector this year and tightening rules on online insurance in August made expansion more difficult and less efficient." Further, the analyst report noted, "We cut our 2021 adjusted net income by 49% due to higher than expected marketing expenses." However, the high marketing expenses in the second and third quarters were largely due to the loss of customer leads generated by Waterdrop's mutual aid program, which ceased operating on March 31, 2021– more than a month before Waterdrop's IPO.

91.    On December 2, 2021, CLSA analyst Edwin Liu downgraded Waterdrop from Buy to Outperform with a price target of $1.76 (from $7.00). The analyst commented: "Amid more regulatory scrutiny on online insurance, Waterdrop has changed its strategic focus from revenue to profit by spending less on customer acquisition via third-party channels. The company reported a slowdown in 3Q21 operating revenue, although net loss narrowed. We downgrade from BUY to Outperform, cut our target price from US$7.00 to US$1.76, and reduce our growth forecasts."

92.    On December 6, 2021, Seeking Alpha published an article titled, "Waterdrop Goes Back To The Well, Cutting Losses By Lowering Costs." The article stated:

> Shen established the company in 2016 as a crowdfunding platform providing mutual aid services to patients seeking financing for expensive medical treatments. He wanted to acquire a large user base with the platform first, which he could then cash in on by building up an insurance brokering business. But Chinese regulators had other ideas and believed that companies like his needed official licensing to provide commercial insurance services. Shen was quick to note the risks and shut down the Waterdrop Mutual Aid platform in March this year, costing him a promotion channel for his new insurance business. He then started to search for new promotional outlets after the IPO, pinning his hopes on expensive third-party channels.

JA-041

. . .

But Waterdrop couldn't stay above the fray as Beijing rolled out a series of measures to crack down on tech companies, sending the company's stock price into a tailspin.

93.    The main factors that media articles and analyst reports agreed led to the massive decline in the price of Waterdrop's ADSs were: 1) the increase in unexpected costs and expenses, particularly third-party marketing expenses, which led the Company to recognize a significant net loss in Q1:21 and Q2:21; and 2) uncertainty surrounding the Company due to increasing regulatory scrutiny of internet-based insurance companies in China. There was ample evidence available to Defendants long before the IPO that both factors were impacting and would impact Waterdrop's business; however, the Registration Statement neglected to adequately disclose or describe the risks the Company was facing, and it failed to disclose the true financial condition of the Company at the time of the IPO. Investors relied on the misleading Registration Statement when purchasing Waterdrop's ADSs in or traceable to the IPO, and were damaged when the Company began trading publicly, the truth was revealed, and the value of the ADSs decreased significantly.

94.    Below is a timeline of the relevant events:



JA-042

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## AND OMISSIONS IN THE REGISTRATION STATEMENT

95.     The Registration Statement contained a number of untrue statements of material

fact and omitted material facts necessary to make the statements contained therein not misleading.

### A.  First Quarter 2021 Financial Results

96.     The first quarter of 2021 ended on March 31, 2021, over a month before the

Registration Statement became effective. The Registration contained only positive details about

the Q1:21 financial results. For example, it stated:

> We have achieved a solid business growth in the first quarter of 2021. The FYP
> generated through Waterdrop Insurance Marketplace reached RMB4,469 million
> for the first quarter of 2021, demonstrating a 14.4% increase from the fourth quarter
> of 2020 or a 42.7% increase from the same period of 2020. (pp. 8, 112).

97.     This statement was materially misleading because Waterdrop had already

experienced a substantial operating loss – not growth – in Q1:21. Indeed, WaterDrop's Q1:21

Form 6-K revealed:

> Operating costs and expenses increased by RMB579.1 million, or **75.7%**, to
> RMB1,343.9 million (US$205.1 million) for the first quarter of 2021 from
> RMB764.9 million for the same period of 2020 . . . Sales and marketing expenses
> **increased by 67.7% year-over-year** to RMB837.2 million (US$127.8 million) for
> the first quarter of 2021, compared with RMB499.2 million for the first quarter of
> 2020 . . . **Operating loss for the first quarter of 2021 was RMB460.6 million
> (US$70.3 million)**, compared with operating loss of RMB111.1 million for the
> same period of 2020.

98.     The Registration Statement also did not disclose that operating costs and expenses

had already skyrocketed during Q1:21, increasing by over 75% year over year, or that the increase

in costs was due, in large part, to the Company's spending on third-party marketing expenses, costs

which continued to rise exponentially during Q2:21, after Waterdrop's mutual aid program ceased

and could no longer be used as a source for customer leads and data. Instead of disclosing the

rapidly accelerating costs, expenses, and losses for the already completed first quarter of 2021, the

Registration Statement selectively disclosed only some positive aspects of the Q1:21 financial results, thus creating a materially misleading impression of Waterdrop's actual financial condition for that quarter.

99.    Analysts expressed surprise when the increase in costs was revealed. Both Michael Li of BofA Securities and Jenny Jiang of Morgan Stanley noted that costs for the first quarter were higher than anticipated, despite the fact that BofA and Morgan Stanley acted as underwriters for Waterdrop's IPO. The increasing costs were also named by several analysts as a catalyst for the post-IPO decline of the stock price.

### B.  Waterdrop's Operating Costs and Expenses

100.    The Registration Statement made a number of statements regarding Waterdrop's operating costs and expenses, however these statements were false or misleading or omitted material information necessary to make them not misleading.

101.    Most notably, the Registration Statement never revealed what Waterdrop's operating costs and expenses actually were for Q1:21, even though the quarter had already ended over month before the IPO.

102.    The Registration Statement stated:

- We have incurred significant costs and expenses in building our platform, growing our consumer base and developing capabilities in data analysis and technology. Our business model is highly scalable and our platform is built to support our continued growth. ***We expect our operating costs and expenses to decrease as a proportion of our revenues*** as we improve the operating efficiency of our platform and achieve more economies of scale. (p. 94).

- We ***expect*** our operating costs to increase in absolute terms as our scale of business grows. However, as we improve the operating efficiency of our platform and achieve more economies of scale, ***we expect our operating costs as a percentage of our net operating revenue will decrease in the foreseeable future***. (p. 97).

103.    However, these statements were materially false or misleading. Costs and expenses had already increased for Q1:21, and were ***increasing***, not ***decreasing,*** as a percentage or

32

JA-044

proportion to revenue. For the year ending December 31, 2020, costs and expenses were approximately 116% of revenue. For Q1:21, which concluded more than a month prior to the time the Registration Statement became effective, revenue was RMB883.4 million and costs were RMB1343.9 million, so costs were approximately *152%* of revenue. With the cessation of mutual aid, Waterdrop needed to increase spending on third party marketing expenses, which would drive costs even higher. Indeed, for Q2:21, which was well under way at the time the Registration Statement became effective, revenue was RMB939.4 million and costs were RMB1754.7 million, so costs were approximately *186%* of revenue.

104.    Additionally, looking at past quarters, as the scale of Waterdrop's business grew, costs and expenses as a proportion of revenue did not decrease, as reflected in the table below:

| Quarter | Costs as % of Rev. | Quarter | Costs as % of Rev. | Quarter | Costs as % of Rev. |
|---------|--------------------|---------|--------------------|---------|--------------------|
| Q1:19 | 149% | Q1:20 | 116% | Q1:21 | 152% |
| Q2:19 | 90% | Q2:20 | 98% | Q2:21 | 186% |
| Q3:19 | 99% | Q3:20 | 113% | | |
| Q4:19 | 129% | Q4:20 | 133% | | |

105.    Additionally, the Registration Statement stated:

- We have a history of net losses and negative cash flows from operating activities, which *may* continue in the future. (pp. 7, 21).

- We *anticipate* that our operating costs and expenses will increase in the foreseeable future as we continue to grow our business . . . these efforts *may* incur significant capital investment and recurring costs, have different revenue and cost structures, and take time to achieve profitability. (p. 21).

106.    However, these boilerplate risk factors were phrased as hypothetical – losses "*may* continue in the future," Waterdrop "*may* incur . . . recurring costs" – and omitted the material information that Waterdrop *had* already incurred such costs during Q1:21 and was *continuing* to incur increasing costs in first half of Q2:21.

JA-045

107.    Under the heading "Expansion of Customer Base," the Registration Statement said:

[O]ur medical crowdfunding operation direct [*sic*] substantial traffic to our insurance marketplace. Approximately 46.5%, 23.0% and 13.0% of the FYP generated through Waterdrop Insurance Marketplace for 2018, 2019 and 2020, respectively, was sourced from traffic from our medical crowdfunding platform. Historically, our mutual aid operation also directed traffic to our insurance marketplace. We see the internal source of consumer traffic as an important and unique consumer acquisition resource to us. (p. 93).

108.    This statement implied that the traffic derived from the mutual aid platform was minimal. Unlike with the crowdfunding, it did not include figures of percentage of FYP generated through the platform. Further, it gave no indication that, after the discontinuation of mutual aid, Waterdrop would be forced to drastically increase spending on third party marketing to make up for the loss of cheaper customer leads.

109.    The statement continued:

In order to continuously diversify our consumer acquisition channels, we also cooperate with other third-party traffic channels to grow our insurance consumer base. In 2018, 2019 and 2020, approximately 1.9%, 34.8% and 44.9% of the FYP generated through Waterdrop Insurance Marketplace was sourced from third-party traffic channels, respectively. We expect third-party traffic channels to play an important role in the future to support the rapid growth of our business. (p. 93).

110.    This statement is materially misleading because it neglects to warn investors that, at the time, Waterdrop was consistently and drastically increasing its spending on these third-party traffic channels. Primarily driven by third-party marketing costs, sales and marketing expenses increased by 67.7% year-over-year to RMB837.2 million (US$127.8 million) for Q1:21 (which ended over a month before the Registration Statement became effective) and a staggering *270.3%* year over year to RMB1,244.9 million (US$192.8 million) for Q2:21, the first quarter after the mutual aid platform ceased operating. The statement also omits that Waterdrop was attempting to add as many customers as possible in advance of regulatory crackdowns in China, after which it was predicted that only the largest insurance companies would survive.

### C. Discontinuation of Mutual Aid

111.    The Registration Statement also contained multiple misleading statements about the discontinuation of Waterdrop's mutual aid program:

- In light of our expanded business and prospect, the increased recognition of our brand, and the latest market development, we have decided to focus on our core businesses and offer enhanced protection to our users. (p. 9).

- In March 2021, we ceased the operation of our Waterdrop Mutual Aid platform in order to focus on our core businesses and offer enhanced protection to our users. (p. 25).

- In light of our expanded business and prospect, the increased recognition of our brand, and the latest market development, we have decided to focus on our core businesses and offer enhanced protection to our users. (p. 83).

112.    These statements are materially false or misleading, because Waterdrop did not cease operating its mutual aid program to "focus on [its] core businesses," in light of "increased recognition of [its] brand," or due to the "latest market developments," the shut down was due to increased regulatory pressure, including the implementation of the CBIRC's Regulatory Measures, and did not disclose the impact the cessation was having or would have on Waterdrop.

113.    The Registration Statement contained a specific section titled "Regulations on Mutual Aid Business," which discussed a 2016 ordinance, but this section made no mention whatsoever of the Regulatory Measures or any other post-2016 regulations. The Registration Statement also neglected to mention that Waterdrop was not the only Chinese company to discontinue its mutual aid program. In fact, in response to the Regulatory Measures, almost all other Chinese mutual aid platforms had ceased operating. The fact that regulators could essentially shut down an entire industry in the matter of a few months was critical information to understanding the risks inherent in Waterdrop's business. However, Waterdrop instead misleadingly framed the discontinuation as a voluntary action it chose to take in the interests of strengthening its business.

35

114.    In the indexes at the end of the Registration Statement, Waterdrop said:

The Group has assessed and concluded that the cessation of the mutual aid platform operation is a nonrecognized subsequent event given the cessation decision is made in 2021 following recent industry environment changes. (p. F-54).

However, this reference to "recent industry environment changes" was misleadingly vague because it did not include any mention of the Regulatory Measures, the CBIRC, or anything else that would indicate that Waterdrop's mutual aid program was shut down in response to regulatory scrutiny in China.

115.    Moreover, the Registration Statement contains several other misleading statements regarding the financial effects of the discontinuation of the mutual aid platform:

- We operated Waterdrop Mutual Aid between May 2016 and March 2021, under which we generated management fee income as an operator. (p. 92).

- Starting from March 2021, with the cessation of the Waterdrop Mutual Aid operation, the corresponding management fee income which accounted for 3.6% of total operating revenue in 2020, will no longer be a revenue stream for us in 2021. (p. 96).

- In connection with this business adjustment, we voluntarily undertook to cover mutual aid participants' medical expenses arising from medical conditions diagnosed by March 31, 2021 that would have been covered by the ceased mutual aid plan, subject to certain procedural requirements and eligibility criteria. In addition, we also offered a one-year complementary health insurance policy to each participant with a similar coverage as the participant's original mutual aid plan… The estimated cost of medical expense coverage is RMB15.0 million (US$2.3 million) and the estimated cost of one-year health insurance coverage is RMB81.7 million (US$12.5 million). RMB19.9 million (US$ 3.0 million) will be accounted for as a reduction of management fee revenue previously recognized for each participant to the extent of the cumulative amount earned until March 26, 2021. RMB76.8 million (US$11.8 million) will be recorded as an expense. (p. 96, similar statements on pp. 25, 83, F-54).

116.    These statements are materially misleading because the most significant financial repercussion of discontinuing the mutual aid platform was neither the loss of the management fee income nor the one-time costs recognized in Q1:21 of the medical expenses and one-year policies; it was the loss of the cheaper customer leads and data the mutual aid platform provided. Without

36

JA-048

these leads, Waterdrop was forced to massively increase its spending on third-party marketing expenses in Q2:21 – a quarter that was nearly halfway over at the time the Registration Statement became effective. Waterdrop did not adequately disclose the increase in these expenses in the Registration Statement.

### D. Increasing Chinese Regulatory Scrutiny

117. The Registration Statement also contained misleading statements about the regulatory environment in China, and it severely downplayed the impact that this environment was having and would have on the Company.

118. For example, it said: "the growth of health insurance sector has been supported by the Chinese government in recent years" and "recent regulatory developments are expected to have positive impacts on China's health insurance industry" including "[a]ccelerating the growth of the health insurance industry, and encouraging the growth of charitable medical donations and medical mutual aid." (p. 122).

119. However, in late 2020 and early 2021, publications by the CBIRC demonstrated the opposite – that the Chinese Government was cracking down on the health insurance industry, especially medical mutual aid. For example, on September 3, 2020, the CBIRC published an "Analysis of Illegal Commercial Insurance Activities and Countermeasures and Suggestions," which found that the "number of illegal commercial insurance activities is huge and increasing year by year, involving a large amount of money and many consumers, which has caused serious social impact." Specifically, the study noted that "Xiang Hu Bao, Waterdrop Mutual Aid and other online mutual aid platforms, which are unlicensed operations, have a large number of members, and the stakeholder risks cannot be ignored." The study concluded that it was necessary for the CBIRC to "crack down on illegal commercial insurance activities in a timely and accurate manner,

JA-049

to ensure the healthy and stable development of the insurance market, and to effectively safeguard the legitimate rights and interests of insurance consumers."

120.　Then, on December 7, 2020, the CBIRC published the Regulatory Measures, which instituted a number of new rules meant to regulate many different aspects of internet insurance companies, including online mutual aid platforms, in order to decrease the risk of fraud and illegal activity. In response to the Regulatory Measures, almost every online mutual aid platform shut down, including Waterdrop's mutual aid platform. If the Chinese government was, in fact, "encouraging the growth" of mutual aid platforms, the CBIRC would not have published measures which caused nearly all the platforms to cease operations.

121.　A few weeks later, the CBIRC published the Dec. 18, 2020 Circular, announcing the investigation of several online insurance companies for illegally promoting policies with offers such as "0 yuan for the first month" but misleading customers regarding the costs of the remaining months of the policy. Waterdrop was specifically cited in the Dec. 18, 2020 Circular as one of the companies being investigated. Shortly after that, the CBIRC published the Jan. 11, 2021 Draft Circular, which, if enacted, would impose a number of restrictions on online insurance companies, including giving the CBIRC a pricing review mechanism and the power to investigate and publicly name companies found in violation of the policies.

122.　These publications indicated that the CBIRC was *increasing* its regulatory scrutiny of the insurance industry, which would inhibit, not support, the growth of the industry.

123.　The Registration Statement did contain several risk statements regarding the regulatory regime in China; however, these statements omitted material information necessary to make them not misleading. One risk statement, under the subheading "We face uncertainties relating to the change of regulatory regime," stated, in pertinent part:

We operate in a highly regulated industry in China, and the regulatory regime continues to evolve. The China Banking and Insurance Regulatory Commission, or the CBIRC, has extensive authority to supervise and regulate the insurance industry in China. Since the online insurance industry in China is evolving rapidly, the CBIRC has been enhancing its supervision over this industry in recent years, and new laws, regulations and regulatory requirements have been promulgated and implemented from time to time. We face challenges brought by these new laws, regulations and regulatory requirements, as well as significant uncertainties in the interpretation and application thereof. Moreover, there exist uncertainties as to how the regulatory environment might change. On December 14, 2020, the CBIRC published the Regulatory Measures for Online Insurance Business, or the Regulatory Measures, which became effective on February 1, 2021. Shuidi Insurance Brokerage conducts online insurance brokerage business in the PRC and is subject to the Regulatory Measures. The Regulatory Measures significantly changes regulatory regime for online insurance business in various aspects.

. . .

It might be costly for us to stay in compliance with the heightened requirements and standards in the Regulatory Measures. The Regulatory Measures sets out a ramp-up process allowing market participants to achieve full compliance in phases until February 1, 2022; we, however, cannot assure you that we can timely adjust our current business operations to achieve and maintain full compliance. (p. 21-22).

124.    This statement did not indicate that the Regulatory Measures were the reason Waterdrop was forced to shut down its mutual aid program. Indeed, almost every other Chinese mutual aid platform shut down in response to the Measures.

125.    The risk statement continued:

The regulatory framework in China's insurance industry is evolving and undergoing significant changes. Further development of regulations applicable to us may result in additional restrictions on our business operations. We may have to adjust our business practice and operations to comply with the continuously changing regulatory requirements. For example, in January 2021, the CBIRC published the draft Circular on Further Regulating Certain Issues on Internet Life Insurance Business, or the Draft Circular, for comment among insurance industry participants. The Draft Circular requires that each installment of premium of certain insurance products less than one year term, such as accident insurance and health insurance shall be equal. We provide our consumers the option of monthly payments and the first month payment of premium of certain insurance products is typically lower than subsequent installments. We may be required to change such payment regime to comply with the Draft Circular, if the Draft Circular is enacted. (p. 22-23).

JA-051

126.     This statement is misleading for several reasons. First, it did not mention the prior Dec. 18, 2020 Circular, which had announced that the CBIRC was beginning an investigation into companies that sold products which advertised a low/no payment first month, but misled customers about the costs of the subsequent months, and that companies found in violation of the policy could be fined. Notably, the problem described in the December 18, 2020 Circular was not the general practice of having a lower first month premium, but the practice of misleading customers about the costs of the remainder of the policy. Additionally, the risk statement did not mention that Waterdrop had been specifically cited by the Dec. 18, 2020 Circular and, at the time the Registration Statement was filed, was being actively investigated by the CBIRC. This investigation eventually led to Waterdrop incurring an RMB1 million fine, and Defendant Yang personally incurring a fine of RMB100,000.

127.     Second, the Registration Statement failed to mention that the Jan. 11, 2021 Draft Circular, if enacted, would impose a number of other requirements on internet insurance companies, for example, in order to obtain a license to operate, internet insurance companies would need to need certain solvency and credit/risk rating requirements, would need to have certain online operational capabilities, and would be subject to a pricing review mechanism enforced by the CBIRC. Additionally, if the Draft Circular was enacted and a Company was found in violation of the policies therein:

> [The] CBIRC will initiate inquiry, investigation, inspection and other regulatory procedures against illegal and non-compliant issues, and under special circumstances may also notify the board of directors of the relevant risks, publicly inform the whole industry, and at the same time pursue the direct liability of the chief actuary as well as the management liability of the main person in charge of the company and the person in charge of the online channel.

40

The Registration Statement did not warn of risks related to any of these other provisions of the Jan. 11, 2021 Draft Circular.

128.     The next risk statement, under the heading "The administration, interpretation and enforcement of the regulations applicable to us are evolving and involve uncertainties. We may not be able to stay in constant compliance with the rapidly evolving regulations," stated:

> [W]e have from time to time been subject, and are likely again in the future to be subject to PRC regulatory inquiries, inspections and investigations. If any non-compliance incidents in our business operation are identified, we may be required to take certain rectification measures in accordance with applicable laws and regulations, or we may be subject to other regulatory actions such as administrative penalties. (p. 24).

129.     Once again, this statement omitted that Waterdrop was ***currently*** being investigated for its practice of advertising policies for "3 yuan for the first month" but misleading customers about the costs of the remaining months, an illegal practice described in the Dec. 18, 2020 Circular.

130.     Neither of these risk statements mentioned the September 3, 2020 Study in which the CBIRC promised to "crack down on illegal commercial insurance activities" and called Waterdrop's mutual aid program a "stakeholder risk" that "cannot be ignored."

131.     These statements materially misled investors regarding the regulatory environment in China and the effects of recent regulatory actions on Waterdrop's business. If the Registration Statement had accurately described these risks, investors would not have been surprised by further regulatory crackdowns in the summer of 2021, one of the main factors to which analysts attributed the crash in the price of Waterdrop's ADSs.

## CLASS ACTION ALLEGATIONS

132.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all individuals and entities that purchased or acquired Waterdrop ADSs pursuant or traceable to the Company's Registration Statement, seeking to

JA-053

pursue remedies under Sections 11 and 15 of the Securities Act. Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

133.    The members of the Class are so numerous that joinder of all members is impracticable. Waterdrop ADSs are actively traded on the NYSE and millions of ADSs were sold in the IPO. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Waterdrop or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice like that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

134.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

135.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

136.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

(a)      whether Defendants violated the Securities Act;

(b)      whether statements made by Defendants to the investing public in the Registration Statement misrepresented material facts about the business, operations, and risks of investing in Waterdrop; and

JA-054

(c)     to what extent the members of the Class have sustained damages and the proper
measure of damages.

## THE STATUTORY SAFE HARBOR DOES NOT APPLY

137.    Defendants are liable for any false and misleading forward-looking statements
issued in connection with the IPO. The safe harbor provision of § 27A of the Securities Act, 15
U.S.C. § 77z-2(b)(2)(D), specifically excludes those statements "made in connection with an initial
public offering," which includes all of the false and misleading statements made in connection
with the IPO alleged herein.

## CLAIMS FOR RELIEF

## COUNT I

**For Violation of Section 11 of the Securities Act
Against All Defendants**

138.    Lead Plaintiff repeats and realleges each and every allegation contained above as if
fully set forth herein.

139.    This claim is brought under § 11 of the Securities Act, 15 U.S.C. §77k, on behalf
of the Class, against all Defendants.

140.    This claim does not allege, and does not intend to allege, scienter, fraud, or
fraudulent intent, which is not a required element of § 11, and any implication of scienter, fraud,
or fraudulent intent is hereby expressly disclaimed. This claim is based solely on strict liability
and negligence.

141.    The Registration Statement for the IPO contained inaccurate and misleading
statements of material fact, omitted facts necessary to render statements therein non-misleading,
and omitted to state material facts required to be stated therein.

43

JA-055

142.    Waterdrop is the registrant for the IPO. Defendants were responsible for the contents and dissemination of the Registration Statement. The Individual Defendants signed or authorized the signing of the Registration Statement on their behalf. The Underwriter Defendants marketed and underwrote the IPO and sold the Waterdrop ADSs issued in the IPO to Lead Plaintiff and the Class.

143.    As the issuer of the shares, Waterdrop is strictly liable to Lead Plaintiff and the Class for the Registration Statement's material misstatements and omissions. Signatories of the Registration Statement, and possibly other defendants, may also be strictly liable to Lead Plaintiff and the Class for such material misstatements and omissions. None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Registration Statement were complete, accurate or non-misleading.

144.    Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. Each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements in the Registration Statement inaccurate. Because Defendants failed to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, the Registration Statement contained misrepresentations and/or omissions of material fact. As such, Defendants are strictly liable to Lead Plaintiff and the Class

145.    By reason of the conduct alleged herein, Defendants violated § 11 of the Securities Act. Lead Plaintiff and the Class members purchased common stock pursuant and/or traceable to the Registration Statement and have sustained damages as a result. The value of the stock has declined substantially subsequent and due to Defendants' violations. At the time of their purchases,

JA-056

Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein

146.    Because of the foregoing, Lead Plaintiff and the members of the Class are entitled to damages under Section 11 of the Securities Act.

## COUNT II

### For Violation of Section 15 of the Securities Act
### Against All Defendants, Except the Underwriter Defendants and Defendant De Vries

147.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

148.    This claim is brought under § 15 of the Securities Act, 15 U.S.C. §77o, against all Defendants, except the Underwriter Defendants and Defendant DeVries.

149.    The Individual Defendants controlled Waterdrop at the time of the IPO by virtue of their dominant voting power and status as the Company's controlling shareholders, directors and/or senior officers. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Waterdrop.

150.    Defendant Waterdrop controlled the Individual Defendants and all of its employees.

151.    Defendant Cogency Global controlled Defendant De Vries and all of its employees, and served as the authorized U.S. representative for the Company.

152.    The Defendants named herein each were culpable participants in the violations of § 11 of the Securities Act alleged in the Count above, based on their participation in the Company's reporting on financial and operational results to investors, having signed or authorized the signing

of the Registration Statement, selling Waterdrop ADSs in the IPO and/or having otherwise participated in the process that allowed the IPO to be successfully completed.

153.     By reason of the conduct alleged herein, these Defendants violated § 15 of the Securities Act, and Lead Plaintiff and the Class have suffered harm as a result.

## PRAYER FOR RELIEF

154.     **WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED: February 21, 2022                    Respectfully Submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ Kim E. Miller*
Kim E. Miller (KM-6996)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

JA-058

-and-

Lewis S. Kahn
Craig J. Geraci, Jr.
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com
Email: craig.geraci@ksfcounsel.com

*Lead Counsel for Lead Plaintiff Qi Mi*
*and the Class*

JA-059

# EXHIBIT A

## CERTIFICATION PURSUANT TO SECURITIES LAWS

<u>Qi Mi</u> ("Plaintiff") declares, as to the claims asserted under the federal securities law, that:

1. Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws, and retains the firm of Kahn Swick and Foti, LLC to pursue such action on a contingent fee basis.

2. Plaintiff did not purchase securities of <u>Waterdrop Inc.</u> at the direction of Plaintiff's counsel or in order to participate in a private action under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. During the Class Period, Plaintiff has executed transactions in the securities of <u>Waterdrop Inc.</u> The transactions in the attached Schedule set forth all of the transactions of Plaintiff in <u>Waterdrop Inc.</u> securities during the Class Period specified in the complaint(s).

5. In the last three years, Plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6. Plaintiff will not accept payment for serving as a representative beyond his/her/its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: <u>11/15/2021</u>

DocuSigned by:

CC9A7FC8BC7F42A...
_____
Signature

Qi Mi
_____
Printed Name

Qi Mi
_____
Plaintiff

JA-061

**Waterdrop Inc. Securities Litigation**
**Transactions of Qi Mi in ADSs of Waterdrop Inc. (NYSE: "WDH")**

| Date | Transaction | Quantity | Price |
|---|---|---|---|
| 5/10/2021 | Purchase | 8,000 | $ 8.58 |
| 5/10/2021 | Purchase | 10,000 | $ 9.58 |
| 6/9/2021 | Purchase | 12,000 | $ 8.18 |
| 8/10/2021 | Purchase | 10,000 | $ 3.88 |
| 9/3/2021 | Purchase | 10,000 | $ 3.58 |
| 9/9/2021 | Purchase | 10,000 | $ 3.48 |
| 9/10/2021 | Purchase | 10,000 | $ 3.18 |
| 9/10/2021 | Purchase | 10,000 | $ 3.28 |
| 9/14/2021 | Purchase | 10,000 | $ 2.98 |

JA-062

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SIDNEY SANDOZ, Individually And On Behalf of All Others Similarly Situated,<br><br>               Plaintiffs,<br><br>   vs.<br><br>WATERDROP INC., PENG SHEN, KANGPING SHI, NINA ZHOU, KAI HUANG, HAIYANG YU, YAO HU, GUANG YANG, COLLEEN A. DE VRIES, COGENCY GLOBAL INC., GOLDMAN SACKS (ASIA) L.L.C., MORGAN STANLEY & CO. LLC, BOFA SECURITIES, INC., CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, CLSA LIMITED and HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED,<br><br>               Defendants. | Case No. 1:21-cv-07683-VSB |

## NOTICE OF MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT ON BEHALF OF WATERDROP INC., THE UNDERWRITER DEFENDANTS, COGENCY GLOBAL, INC., AND COLLEEN DEVRIES

PLEASE TAKE NOTICE that, upon the Amended Class Action Complaint, filed February 21, 2022 (ECF No. 52); the Memorandum of Law, dated April 22, 2022, submitted herewith; the Declaration of Michael B. Carlinsky, dated April 22, 2022, and exhibits thereto, submitted herewith; and upon all prior papers and proceedings herein, Defendants Waterdrop Inc. ("Waterdrop" or the "Company"), Cogency Global, Inc. ("Cogency"), Colleen DeVries, and the Underwriter Defendants (as defined in the accompanying Memorandum of Law) will move this Court, before the Honorable Vernon S. Broderick, United States District Judge, at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007, on a date and at a time designated by the Court, pursuant to Federal Rule of Civil Procedure 12(b)(6), for an

1

JA-063

Order dismissing the Amended Class Action Complaint in its entirety with prejudice and granting such other and further relief as this Court may deem just and proper.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Court-ordered briefing schedule (ECF No. 51), entered December 22, 2021, Plaintiff's memorandum of law in opposition, if any, must be served on the undersigned counsel by June 21, 2022.

Dated: New York, New York
     April 22, 2022

Respectfully submitted,

| | |
|---|---|
| By: */s/ Michael B. Carlinsky* | By: */s/ Jonathan Rosenberg* |
| Michael B. Carlinsky | Jonathan Rosenberg |
| Xiao Liu | Abby F. Rudzin |
| Jacob J. Waldman | **O'MELVENY & MYERS LLP** |
| **QUINN EMANUEL URQUHART** | 7 Times Square |
| **& SULLIVAN, LLP** | New York, NY 10036 |
| 51 Madison Avenue, 22nd Floor | Telephone: 212/408-2409 |
| New York, NY 10010 | jrosenberg@omm.com |
| Telephone: (212) 849-7000 | arudzin@omm.com |
| michaelcarlinsky@quinnemanuel.com | |
| xiaoliu@quinnemanuel.com | |
| jacobwaldman@quinnemanuel.com | |
| | |
| *Attorneys for Waterdrop Inc., Cogency Global Inc., and Colleen DeVries* | *Attorneys for Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC, and BofA Securities, Inc* |

JA-064

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SIDNEY SANDOZ, Individually And On Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br> vs.<br><br>WATERDROP INC., PENG SHEN, KANGPING SHI, NINA ZHOU, KAI HUANG, HAIYANG YU, YAO HU, GUANG YANG, COLLEEN A. DE VRIES, COGENCY GLOBAL INC., GOLDMAN SACKS (ASIA) L.L.C., MORGAN STANLEY & CO. LLC, BOFA SECURITIES, INC., CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, CLSA LIMITED and HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED,<br><br>     Defendants. | Case No. 1:21-cv-07683-VSB |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**
**THE AMENDED CLASS ACTION COMPLAINT**
**ON BEHALF OF WATERDROP INC., THE UNDERWRITER DEFENDANTS,**
**COGENCY GLOBAL, INC., AND COLLEEN DEVRIES**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND ................................................................................................5

I.      PARTIES ...............................................................................................5

II.     WATERDROP'S IPO ............................................................................6

III.    ALLEGATIONS AND DISCLOSURES REGARDING MUTUAL AID ......6

        A.      Plaintiff Alleges Operators Ceased Mutual Aid for Economic Reasons ................6

        B.      Investors Were Aware of the Potential Economic Impact of Waterdrop's
                Pre-IPO Decision to Discontinue Mutual Aid .........................................7

IV.     THE REGISTRATION STATEMENT DISCLOSED INCREASING EXPENSES .........8

        A.      Waterdrop's Financials Disclosed Losses and Increasing Expenses ....................8

        B.      Waterdrop's Post-IPO Results Indicated Strong Growth, and Expenses
                That Were Consistent with Its Registration Statement Disclosures .....................10

V.      THE AMENDED COMPLAINT AND REGISTRATION STATEMENT
        INCLUDE MYRIAD DISCLOSURES ABOUT THE REGULATORY
        ENVIRONMENT ...................................................................................11

        A.      Plaintiff Pleads That The Regulatory Environment Was Well-Known ................11

        B.      The Registration Statement Also Disclosed Regulation Risk .............................11

        C.      Plaintiff Fails to Allege Any Regulatory Response to Waterdrop's IPO .............12

LEGAL STANDARD ........................................................................................13

ARGUMENT ...................................................................................................14

I.      PLAINTIFF FAILS TO PLEAD MATERIAL MISSTATEMENTS ABOUT
        MUTUAL AID ......................................................................................14

        A.      Plaintiff Fails to Plead Material Misstatements About Mutual Aid ....................14

                1.      Plaintiff Fails to Plead the Stated *Reasons* for Discontinuing
                        Mutual Aid Were Materially False ..........................................14

                2.      Plaintiff Fails to Plead Material Falsity Based Upon the Alleged
                        Economic Impact of Discontinuing Mutual Aid .........................16

        B.      Plaintiff's Confidential Witnesses Are No Help .........................................17

II.     PLAINTIFF FAILS TO PLEAD ACTIONABLE MISSTATEMENTS ABOUT
        WATERDROP'S GENERAL EXPENSE INCREASES ................................18

III.    PLAINTIFF FAILS TO PLEAD FALSE STATEMENTS CONCERNING
        WATERDROP'S REGULATORY ENVIRONMENT ...................................24

CONCLUSION ................................................................................................25

i

JA-066

# TABLE OF AUTHORITIES

**Page**

<u>**Cases**</u>

*Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*,
    771 F. App'x 51 (2d Cir. 2019) ............................................................................................ 22

*Asay v. Pinduoduo Inc.*,
    2021 WL 3871269 (2d Cir. Aug. 31, 2021) ......................................................................... 20

*Asay v. Pinduoduo, Inc.*,
    2020 WL 1530745 (S.D.N.Y. Mar. 30, 2020) ........................................................... 4, 19, 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................ 13

*Barrios v. Bello*,
    2021 WL 1630594 (S.D.N.Y. Apr. 27, 2021) ..................................................................... 16

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................ 13

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173, 185 (2d Cir. 2014) ................................................................................. 21, 25

*City of Riviera Beach Gen. Emps. Ret. Sys. v. Macquarie Infrastructure Corp.*,
    2021 WL 4084572 (S.D.N.Y. Sept. 7, 2021) ..................................................................... 13

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ............................................................................................... 14

*Francisco v. Abengoa, S.A.*,
    481 F. Supp. 3d 179 (S.D.N.Y. 2020) ............................................................................... 21

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010) ............................................................................... 16

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ............................................................................... 18

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002) ............................................................................................... 22

*In re Aegon N.V. Sec. Litig.*,
    2004 WL 1415973 (S.D.N.Y. June 23, 2004) .................................................................... 22

JA-067

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017) ............................................................... 25

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013) ................................................. 5, 16, 24, 25

*In re Fairway, Grp. Hldgs. Corp. Secs. Litig.*,
   2015 WL 4931357 (S.D.N.Y. Sept. 9, 2015) ..................................................... 21

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005) ............................................................... 13

*In re Lehman Bros. Mort.-Backed Sec. Litig.*,
   650 F.3d 167 (2d Cir. 2011) .............................................................................. 25

*In re Noah Educ. Hldgs., Ltd. Secs. Litig.*,
   2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) .................................................. 23

*In re Qudian Inc. Sec. Litig.*,
   2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) ........................................ 5, 13, 16, 24

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*,
   202 F. Supp. 2d 8 (S.D.N.Y. 2001) .................................................................. 19

*Lin v. Interactive Brokers Grp.*,
   574 F. Supp. 2d 408 (S.D.N.Y. 2008) ......................................................... 19, 23

*Nadoff v. Duane Reade, Inc.*,
   107 F. App'x 250 (2d Cir. 2004) ...................................................................... 19

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) .............................................................................. 18

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
   300 F. Supp. 3d 551 (S.D.N.Y. 2018) ............................................................... 22

*Shemian v. Rsch. In Motion Ltd.*,
   2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) .................................................. 16

*Stadnick v. Vivint Solar Inc.*,
   861 F.3d 31 (2d Cir. 2017) ................................................................................ 20

*Willard v. UP Fintech Holding Ltd.*,
   527 F. Supp. 3d 609 (S.D.N.Y. 2021) ..................................................... 3, 20, 21, 24

**<u>Federal Cases</u>**

Federal Rule of Civil Procedure 12(b)(6) .................................................................. 1

Waterdrop Inc. ("Waterdrop" or the "Company"), Cogency Global, Inc. ("Cogency"), Colleen DeVries, and the Underwriter Defendants[1] respectfully submit this memorandum of law in support of their Motion to Dismiss the Amended Class Action Complaint ("Amended Complaint" or "AC") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

## PRELIMINARY STATEMENT

This action is one of many recent, thinly-pleaded Section 11 cases in which a young company launches an IPO, experiences a decline in the price of its securities, and then faces putative class representatives who feign shock that their investments were vulnerable to the very risks about which they were told. Unwilling in hindsight to accept downside, Plaintiff here pored over hundreds of pages of IPO offering materials, identified a handful of unremarkable statements, and now claims she was misled. But, as in many of these cases, the supposed misstatements are accurate or immaterial (or both). Plaintiff nonetheless asserts them in the hope that, should the case survive a motion to dismiss, the threat of class exposure and the defense burden will leverage a quick settlement. Plaintiff's action should be dismissed.

Waterdrop is a Beijing-based, online provider of insurance products and services. The Company launched an IPO in May 2021, accompanied by a May 6, 2021 Registration Statement and May 7, 2021 final Prospectus.[2] The price of Waterdrop's securities allegedly declined after the Company disclosed first- ("1Q21") and second-quarter 2021 ("2Q21") results. Plaintiff

---

[1] For purposes of the motion, the Underwriter Defendants are Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC, and BofA Securities, Inc. The other underwriters—China Merchants Securities (HK) Co., Limited, CLSA Limited, and Haitong International Securities Company Limited—have not been served and have not appeared in this case, including on this motion. We are not aware that any individual defendant, apart from Colleen DeVries, has been served.

[2] For ease of reference, the Registration Statement and Prospectus are cited as "Pr. __". *See* Declaration of Michael B. Carlinsky, Apr. 22, 2022 ("Carlinsky Decl.") Ex. A (Prospectus).

purports to have purchased the Company's American Depositary Shares ("ADS") pursuant or traceable to the May 2021 IPO, and seeks recovery because the ADS price went down and not up. Plaintiff identifies a handful of topics about which the Registration Statement made supposed misrepresentations, none of which is actionable.

*First*, Plaintiff asserts misrepresentations about closing a non-core business. Plaintiff claims that, before the IPO, Waterdrop operated an insurance brokerage, a medical crowdfunding platform, and a mutual aid platform ("Mutual Aid"). Mutual Aid was a "collective where participants help each other to ease the medical cost burden of over 100 types of critical illness." Pr. at 139; *see also* AC ¶ 2. Plaintiff alleges that, on March 26, 2021—six weeks **before** the IPO— Waterdrop announced it would discontinue Mutual Aid, effective March 31, 2021. AC ¶ 50.

Unable to claim that Waterdrop concealed this decision, Plaintiff falls back on asserting that the Company (i) falsely stated that the ***reason*** for discontinuing Mutual Aid was "recent industry environment changes" and to "focus on our core business," when in reality Waterdrop supposedly bowed to "scrutiny" from the China Banking and Insurance Regulatory Commission ("CBIRC"), *see* AC ¶¶ 5, 52, and (ii) failed to disclose that ceasing Mutual Aid—purportedly an inexpensive customer acquisition tool—would greatly increase marketing costs.

Plaintiff fails to plead that the Company's stated reasons were false. Plaintiff supports its claim with the assertion that other operators ceased mutual aid due to CBIRC pressure. But Plaintiff actually ***alleges***, at most, that other operators closed their platforms because they were unprofitable and economically unsustainable—due both to the inherently poor economics of the business and increasing compliance costs in a previously unregulated area.[3] Plaintiff's allegations

---

[3] *See, e.g.*, AC ¶¶ 56 ("Baidu ceased operating its mutual aid program . . . because . . . dues were not enough to cover claims"); *id.* ¶ 61 ("[L]ess profitable products like mutual aids are being discarded as the market retrenches to focus on higher-profit opportunities").

JA-070

are thus *consistent* with Waterdrop's public statements. And Plaintiff's pair of confidential witnesses ("CWs") add only conclusory assertions from individuals who are not alleged to have been anywhere near Waterdrop's top-level, strategic decision-making.

Plaintiff likewise does not explain how Waterdrop's stated *reasons* for discontinuing Mutual Aid are material (much less false). Plaintiff does not dispute that Waterdrop disclosed the discontinuance *weeks* before the IPO, but argues that the Company's stated reasons "downplay[ed] the effects that the hostile regulatory environment in China was having and would continue to have on the Company." AC ¶ 5. Even if the Amended Complaint supported that assertion, Plaintiff alleges that, in the months before the IPO, the CBIRC made various regulatory pronouncements— including a September 3, 2020 express announcement of a "crackdown"—and that the press and analysts discussed the evolving regulatory environment. Plaintiff also alleges that, *before* the IPO, most major mutual aid operators discontinued their platforms due to CBIRC pressure. Plaintiff's own allegations thus make clear that Waterdrop's supposedly misstated reason for discontinuing Mutual Aid was a drop in the ocean of public information available to investors as of the IPO, and therefore could not "*significantly* alter[] the total mix of information already made available." *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 621 (S.D.N.Y. 2021) (quotation omitted).

Plaintiff also fails to plead that Waterdrop concealed the alleged economic impact of its decision. The Registration Statement expressly disclosed that Mutual Aid steered customers to the Company's other products, and that the main marketing alternative—"third-party traffic channels"—was significantly more expensive. The Company's public discontinuance thus made clear that this lower-cost customer generator no longer existed. The Company also disclosed that, between 2018 and 2020, Mutual Aid went from accounting for 38.6% of the Company's "first year premiums" ("FYP")—a key operating metric relating to Company revenue—to just 3.6%, while

3

during the same period third-party traffic channels increased from 1.9% to **44.9%**. Pr. at 93. During the same period, sales and marketing expense increased **ten-fold**. *See* Pr. at 16. In other words, the supposedly "undisclosed" increase in marketing costs from ceasing Mutual Aid was not only disclosed, but had **already happened** as of the IPO.

*Second*, Plaintiff claims the Registration Statement concealed a 75% year-over-year ("YoY") increase in total expenses during 1Q21, which was not disclosed until the Company reported 1Q21 financials on June 17, 2021, about six weeks after the IPO. But the Registration Statement left no doubt that Waterdrop's expenses would continue to rise. It disclosed that the Company's YoY increase in total expenses for each quarter of 2020 was as high as **266%** in 1Q20—dwarfing the 75% YoY increase in 1Q21—and a comparable 58% in 4Q20. *See* Pr. at 102. Further, it made clear that every major expense category increased dramatically between 2018 and 2020, including sales and marketing expenses (**ten-fold**) and operating costs (**15-fold**). *See* Pr. at 16. And the Registration Statement warned that the Company expected expenses to **continue** to rise and profitability to remain elusive. Furthermore, Plaintiff pleads no facts indicating that, by May 7, 2021—about a month-and-a-half **before** the Company reported 1Q21 results—the Company even **could** have disclosed expenses across its entire business. *See Asay v. Pinduoduo, Inc.*, 2020 WL 1530745, at *9 (S.D.N.Y. Mar. 30, 2020) (China-based issuer was not obligated to disclose quarterly expenses in IPO offering materials one month **after** the prior quarter had closed).

*Third*, Plaintiff claims that the Company failed fully to disclose the "increasing pressure from Chinese regulators," AC ¶ 9, and so failed to prepare investors for the regulator's "crackdown" on China's tech and online insurance sectors that began in August 2021. But Plaintiff fails abjectly to plead that Waterdrop concealed material information about the regulatory landscape. In fact, Waterdrop warned, *inter alia*, that the Company "operate[s] in a highly regulated industry in

4

China," that the CBIRC would promulgate "new laws, regulations and regulatory requirements," Pr. at 21, 22, that Waterdrop "may not be able to stay in constant compliance with the rapidly evolving regulations," Pr. at 23, and that Waterdrop "[is] likely again in the future to be subject to PRC regulatory inquiries, inspections and investigations." Pr. at 24.

Plaintiff also pleads that supposedly omitted CBIRC pronouncements in the months leading up to the IPO were **public**, including the CBIRC's September 3, 2020 "Study" in which it announced a likely "crackdown." AC ¶ 55. It is well-settled that "the securities laws do not require disclosure of information that is publicly known . . . or which constitutes **generally applicable laws and regulations**." *In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *7 (S.D.N.Y. Sept. 27, 2019) (emphasis added) (quotation omitted); *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013) (where "allegedly undisclosed material information is in fact readily accessible in the public domain, . . . a defendant may not be held liable for failing to disclose this information.") (quotation omitted), *aff'd,* 566 F. App'x 93 (2d Cir. 2014).

The Court should therefore dismiss the Amended Complaint, with prejudice.

## BACKGROUND[4]

### I. PARTIES

Waterdrop is a Cayman Islands corporation headquartered in Beijing, China. *See* AC ¶ 15.

Cogency is Waterdrop's authorized U.S. representative, and Ms. DeVries signed the Registration Statement in her capacity as Senior Vice-President of Cogency. AC ¶ 25.

The Underwriter Defendants served as underwriters for the IPO. AC ¶¶ 27-33.

Lead Plaintiff Qi Mi claims to have purchased Waterdrop ADS pursuant or traceable to the Registration Statement issued in connection with Waterdrop's May 7, 2021 IPO. AC ¶ 14.

---

[4] The facts here are from the Amended Complaint, and the Registration Statement and other exhibits attached to the Carlinsky Declaration.

## II.     WATERDROP'S IPO

On April 16, 2021, Waterdrop filed the Registration Statement for its IPO that became effective on May 6, 2021.  AC ¶ 68.  On May 7, 2021, Waterdrop filed its final Prospectus.  *Id.* Waterdrop launched its IPO that day, selling 30 million ADS.  Pr. (Cover).  Plaintiff alleges that the Registration Statement contained certain misstatements, which are enumerated in the attached Appendix and referenced herein as "**Statement #__**" or "**(#_)**".

## III.    ALLEGATIONS AND DISCLOSURES REGARDING MUTUAL AID

Mutual Aid was a "collective where participants help each other to ease the medical cost burden of over 100 types of critical illness."  Pr. at 139.  On March 26, 2021—over a month before the IPO—Waterdrop announced it would discontinue Mutual Aid as of March 31, 2021.  AC ¶ 50.

### A.     Plaintiff Alleges Operators Ceased Mutual Aid for Economic Reasons

Plaintiff asserts that Waterdrop closed its Mutual Aid platform due to regulatory "scrutiny" or "pressure," *see, e.g.,* AC ¶¶ 4, 6, 9, 52, 112, and so the reasons offered in the Registration Statement—to "'focus on our core business' in light of 'increased recognition of our brand,' 'latest market development,' and 'recent industry environment changes,'" *see* AC ¶ 5—were false.  But Plaintiff's factual allegations indicate mutual aid operators stopped due to difficulty and expense:

- "[S]everal 'collapsed mutual aid programs [] had more claims than healthy members remaining'" and lacked a "legal basis on how to resolve claim disputes," *id.* ¶ 54;

- Chinese tech giant Baidu ceased mutual aid "because it had only been able to attract about 500,000 users, so dues were not enough to cover claims," *id.* ¶ 56;

- Regulations in the December 7, 2020 Circular would necessitate "adjustments" that would be "costly to make for the relatively low-revenue business," *id.* ¶ 57;

- Meituan Mutual Aid, had, per the CBIRC, stopped "due to increasing risks," *id.* ¶ 60; and

- "Tech industry news site *Protocol*" reported that "China's financial regulators have largely caught up with technological change, and less profitable products like mutual aids are being discarded ***as the market retrenches to focus on higher-profit opportunities***."  *Id.* ¶ 61 (quoting article) (emphasis added).

6

Indeed, the alleged CBIRC pronouncements called for regulation—not termination.  *See, e.g.*, AC ¶¶ 55, 57-59.  Economic reasons, as discussed below, are consistent with Waterdrop's statements.

**B.**     **Investors Were Aware of the Potential Economic Impact of Waterdrop's Pre-IPO Decision to Discontinue Mutual Aid**

The Company, and alleged public sources, informed investors that sales and marketing expenses in particular would rise as a result of discontinuing Mutual Aid.  On April 20, 2021, well before the IPO, Plaintiff alleges that the director of a leading Chinese business school stated that discontinuing Mutual Aid would mean "the originally profitable insurance business ***will lose its referral traffic*** and ***become uncompetitive***" and that "a purely philanthropic Waterdrop Crowdfunding platform isn't likely to survive, either."  AC ¶ 47 (emphasis added).

The Registration Statement disclosed that moving away from Mutual Aid would increase reliance on significantly more expensive marketing alternatives, ***and*** that this shift had largely already occurred.  The Registration Statement explained that the Company had been "provid[ing] customized insurance and healthcare solutions ***to users acquired from our crowdfunding and mutual aid platforms***."  AC ¶ 48 (emphasis added); *see* Pr. at 9 (Mutual Aid "historically served as a scenario for educating and familiarizing millions of users with the importance of insurance coverage.").  Waterdrop also disclosed that "third-party user acquisition channels"—the primary alternative to Mutual Aid for customer acquisition—resulted in "significant expenses," but that Waterdrop nonetheless "expect[s] third-party traffic channels to play an important role in the future to support the rapid growth of our business."  Pr. at 33, 93.  The Company also disclosed that, in 4Q20, it "greatly expanded our sales and marketing force . . . which affected our net profitability of that quarter."  Pr. at 102.

The Registration Statement also made clear that the shift from Mutual Aid to more expensive third-party traffic channels for acquiring customers was already far along.  For example,

7

the below chart from the Registration Statement disclosed that the percentage of FYP (defined above) obtained through Mutual Aid declined from just under 40% in 2018 to *just 3.6%* in 2020, while the percentage of FYP obtained through more expensive third-party traffic channels increased from 1.9% in 2018 *to 44.9%* in 2020:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2019 | | 2020 | |
| | (RMB million) | (%) | (RMB million) | (%) | (RMB million) | (%) |
| **Internal traffic** | | | | | | |
| Medical Crowdfunding | 452 | 46.5 | 1,533 | 23.0 | 1,872 | 13.0 |
| Mutual Aid | 376 | 38.6 | 829 | 12.4 | 521 | 3.6 |
| Third-party traffic channels | 18 | 1.9 | 2,321 | 34.8 | 6,474 | 44.9 |
| Natural traffic and repeat purchase | 126 | 13.0 | 1,985 | 29.8 | 5,559 | 38.5 |
| **Total** | **972** | **100.0** | **6,668** | **100.0** | **14,426** | **100.0** |

Pr. at 93. Correspondingly, as detailed below, sales and marketing expense increased ten-fold during the same 2018-2020 period. Investors were thus informed that the Company's increased reliance on third-party channels had already caused a substantial increase in expenses and would continue to do so.

## IV. THE REGISTRATION STATEMENT DISCLOSED INCREASING EXPENSES

### A. Waterdrop's Financials Disclosed Losses and Increasing Expenses

The Registration Statement disclosed that the Company had never been profitable, and that its "limited operating history" consisted of "net losses and negative cash flows" that "may continue in the future." Pr. at 20-21; *see also id.* at 21 ("net losses and negative cash flows . . . each year since our inception."). The Company also warned that it "***anticipate[d] that our operating costs and expenses will increase*** in the foreseeable future as we continue to grow our business, acquire new users . . . and increase brand recognition." *Id.* at 21 (emphasis added).

The Company disclosed that net losses in 2018, 2019, and 2020 were RMB209.2 million, RMB321.5 million, and RMB663.9 million, respectively. *See id.* at 16. ***Every*** major expense category increased substantially during this period: sales and marketing expense, for instance,

8

increased more than **ten-fold**, while operating costs increased more than **15-fold**:

| | Year-End (RMB, in thousands) | | |
|---|---|---|---|
| | **2018** | **2019** | **2020** |
| Operating Costs | 45,932 | 291,310 | 742,258 |
| Sales and Marketing | 184,943 | 1,056,494 | 2,130,535 |
| General and Admin | 126,242 | 142,995 | 407,171 |
| Research and Development | 69,196 | 214,646 | 244,230 |
| **Totals** | **426,313** | **1,705,445** | **3,524,194** |

*See id.* at 16.[5]  As indicated in the next chart, the annual percentage increases between 2018 and 2019 (first column); 2019 and 2020 (second column); and the overall increase between 2018 and 2020 (third column), tell the same story:

| | Year-Over-Year Percentage Increase | | |
|---|---|---|---|
| | **2018 – 2019** | **2019 – 2020** | **2018 – 2020** |
| Operating Costs | 534% | 155% | 1,516% |
| Sales and Marketing | 471% | 102% | 1,052% |
| General and Admin | 13% | 185% | 223% |
| Research and Development | 210% | 14% | 253% |
| **Totals** | **300%** | **107%** | **727%** |

*See id.*  YoY quarterly expenses in 2020 showed sharp increases:

| YoY Increase In Total Expenses (RMB, in thousands) | | |
|---|---|---|
| **1Q19** | **1Q20** | **YoY** |
| 209,144 | 764,864 | 266% |
| **2Q19** | **2Q20** | **YoY** |
| 299,569 | 673,636 | 125% |
| **3Q19** | **3Q20** | **YoY** |
| 499,326 | 982,601 | 97% |
| **4Q19** | **4Q20** | **YoY** |
| 697,406 | 1,103,093 | 58% |

*See* Pr. at 102.

---

[5] Unless stated otherwise, charts herein were compiled from the cited sources in connection with preparing the memo of law.

JA-077

**B.**  **Waterdrop's Post-IPO Results Indicated Strong Growth, and Expenses That Were Consistent with Its Registration Statement Disclosures**

The post-IPO results included substantial increases in revenue and growth.  In particular, 1Q and 2Q21 saw substantial YoY increases in revenue and FYP[6]:

| YoY Change Over 1Q and 2Q 2020 | | |
|---|---|---|
| | **1Q21** | **2Q21** |
| Net Operating Revenue | 35% | 38% |
| First-Year Premiums | 43% | 94% |

As indicated, 1Q21 saw a ***35% increase*** in YoY revenue and ***43% increase*** in YoY FYP; and 2Q21 had a ***38% increase*** in YoY revenue and ***94% increase*** in YoY FYP.[7]

The 75% 1Q21 YoY expense increase, AC ¶ 77, was consistent with historical YoY percentage disclosures (third column):

| YoY Increase In Total Expenses (RMB, in thousands) | | |
|---|---|---|
| **1Q19** | **1Q20** | **YoY** |
| 209,144 | 764,864 | 266% |
| **2Q19** | **2Q20** | **YoY** |
| 299,569 | 673,636 | 125% |
| **3Q19** | **3Q20** | **YoY** |
| 499,326 | 982,601 | 97% |
| **4Q19** | **4Q20** | **YoY** |
| 697,406 | 1,103,093 | 58% |
| **1Q20** | **1Q21** | **YoY** |
| **764,864** | **1,343,923** | **75%** |

*See* Pr. 102.[8]  Far from "skyrocket[ing]," AC ¶ 73, the 75% YoY increase in 1Q21 was ***smaller*** than the YoY increase for three of four quarters in 2020.  And the 160% YoY increase, AC ¶ 74, in 2Q21 was in line with 1Q and 2Q20, and reflects the same, disclosed, increasing expenses.

---

[6] *See* Carlinsky Decl. Exs. B (Waterdrop 1Q21 release) and C (Waterdrop 2Q21 release).

[7] *See id.*

[8] *See* Pr. at 102; *see also* Carlinsky Decl. Ex. B (Waterdrop 1Q21 release).

10

JA-078

## V.    THE AMENDED COMPLAINT AND REGISTRATION STATEMENT INCLUDE MYRIAD DISCLOSURES ABOUT THE REGULATORY ENVIRONMENT

### A.    Plaintiff Pleads That The Regulatory Environment Was Well-Known

Plaintiff pleads a steady drumbeat of public CBIRC pronouncements in the months preceding the IPO that made it difficult and expensive to operate mutual aid.  On September 3, 2020, the CBIRC published a study titled "Analysis of Illegal Commercial Insurance Activities and Countermeasures and Suggestions," that mentioned Waterdrop *by name* and concluded that the CBIRC would have to "*crack down* on illegal commercial insurance activities in a timely and accurate manner."  AC ¶ 55 (emphasis added).  On December 7, 2020, the CBIRC issued "Regulatory Measures for the Supervision of Internet Insurance Business" that were "meant to regulate many different aspects of insurance companies" and would result in the oversight of "all financial activities" by the CBIRC.  *Id.* ¶ 57.  On December 18, 2020, the CBIRC announced in a circular titled "Cases of Infringement of Consumer Rights and Interests" that it was *investigating Waterdrop* in connection with Waterdrop's premiums.  *Id.* ¶ 58.  And on January 11, 2021, the CBIRC issued a "Draft Circular on Further Regulating Online Life Insurance Business" that proposed more guidelines and penalties for failing to observe them.  *Id.* ¶ 59.  Plaintiff fails to plead regulatory information that Waterdrop possessed but investors did not.

### B.    The Registration Statement Also Disclosed Regulation Risk

The Registration Statement included detailed warnings about regulation.  Waterdrop warned that the Company "operate[s] in a highly regulated industry in China," that the CBIRC "has been enhancing its supervision over this industry in recent years," that "new laws, regulations and regulatory requirements have been promulgated and implemented from time to time," and that Waterdrop faces "significant uncertainties in the interpretation and application thereof."  Pr. at 21, 22; *see also* Pr. at 7 ("We face uncertainties relating to the change of regulatory regime.").

In light of these uncertainties, Waterdrop warned that it "may not be able to stay in constant compliance with the rapidly evolving regulations," given CBIRC's "wide discretion" and "authority to impose regulatory sanctions on industry participants." Pr. at 23, 24. Waterdrop also pointed to the CBIRC's December 14, 2020 publication (which Plaintiff pleads only by reference to the Registration Statement, AC ¶ 123), and informed investors that it "significantly changes [the] regulatory regime for online insurance" and that Waterdrop "cannot assure you that we can timely adjust our current business operations to achieve and maintain full compliance." *Id.* at 22. As to the January 2021 CBIRC draft circular, Waterdrop explained that "it remains uncertain when and how [it] would come into effect," but that "our business and results of operations might be materially and adversely affected." *Id.* at 23. And Waterdrop warned that it had "*from time to time been subject, and [is] likely again in the future to be subject to PRC regulatory inquiries, inspections and investigations*." Pr. at 24 (emphasis added). Any reasonable investor understood that, with little notice, the CBIRC could revise regulations and impair Waterdrop's business.

### C. Plaintiff Fails to Allege Any Regulatory Response to Waterdrop's IPO

Plaintiff asserts that a regulatory "crackdown" beginning in August 2021—months after the IPO—on Chinese tech and online insurance companies, drove down Waterdrop's stock price, *e.g.* AC ¶ 79, but fails to plead any regulatory response to the IPO. Plaintiff identifies a single, *public*, *Reuters* item dated April 12, 2021—weeks before the IPO—that an unnamed source reported that the CBIRC "told founder Shen Peng this month that it would not suggest that Waterdrop go public at this point." *See* AC ¶ 66. Plaintiff offers no context, does not claim the report rendered any statement false or misleading, and alleges no other warnings, no sanctions, and no adverse action by the CBIRC arising from the IPO. The same *Reuters* item also reported that Waterdrop denied that regulators opposed the IPO. *See id.*

Rather, Plaintiff pleads a general "'crack down' on tech companies *across various sectors*,

especially targeted at companies that had completed IPOs in the United States." AC ¶ 79 (emphasis added). Plaintiff also alleges that the CBIRC "cited offenses including some internet platforms illegally operating in insurance, mispricing risks or illicitly using client information." *Id.* at 81 (quoting *Bloomberg*). But Plaintiff nowhere alleges that Waterdrop was accused of these practices or specifically targeted by the CBIRC "crackdown." And Plaintiff fails to plead that Waterdrop possessed non-public information in May 2021 about a CBIRC "crackdown" that would begin in August 2021. *See also id.* ¶ 88 (October 11, 2021 article on "crackdown" does not claim targeting of Waterdrop). Indeed, the only alleged information about a CBIRC "crackdown" was the CBIRC's own public September 3, 2020 statement.

## LEGAL STANDARD

"To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *City of Riviera Beach Gen. Emps. Ret. Sys. v. Macquarie Infrastructure Corp.*, 2021 WL 4084572, at *5 (S.D.N.Y. Sept. 7, 2021) (Broderick, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plaintiff cannot meet this standard by pleading only "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Where, as here, Plaintiff fails to "'nudge[] [her] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Qudian*, 2019 WL 4735376, at *4 (S.D.N.Y. Sept. 27, 2019) (quoting *Twombly*, 550 U.S. at 570).

To plead a Section 11 claim, Plaintiff must allege that Defendants made a material misstatement or omission in a registration statement. *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005). "[F]or the misstatement to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"

13

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quotation omitted). "[T]he determination of whether an alleged misrepresentation is material necessarily depends on all relevant circumstances." *Id.*

## ARGUMENT

Plaintiff alleges misstatements arising from three areas: (i) Mutual Aid; (ii) Waterdrop's expenses; and (iii) regulation. None of these supports a Section 11 claim.

## I.    PLAINTIFF FAILS TO PLEAD MATERIAL MISSTATEMENTS ABOUT MUTUAL AID

Plaintiff asserts that **Statements #4, #5, #6, #7, #8** are false because the Company misrepresented (i) the *reason* for discontinuing Mutual Aid, and (ii) that discontinuance would increase customer acquisition costs. AC ¶¶ 112, 116.

### A.    Plaintiff Fails to Plead Material Misstatements About Mutual Aid

#### 1.    Plaintiff Fails to Plead the Stated *Reasons* for Discontinuing Mutual Aid Were Materially False

Plaintiff fails to plead Waterdrop's stated reasons for discontinuing Mutual Aid—"recent industry environment changes" and "focus on our core business"—were false. Plaintiff argues the *real* reason was that Waterdrop bowed to unspecified CBIRC "pressure" or "scrutiny," as evidenced by the allegation that "almost every other Chinese mutual aid platform shut down in response" to such pressure. *See* AC ¶¶ 112-114, 124.[9] But the facts Plaintiff alleges indicate that the industry largely discontinued mutual aid for economic and business reasons, *see supra*

---

[9] Plaintiff quotes a September 7, 2021 article from the website *Seeking Alpha* that claims Waterdrop was "[s]ensing imminent regulatory scrutiny" and that discontinuance was "widely seen as pre-emptive to avoid any uncertainty ahead of its IPO plans." AC ¶ 86. This is contrary to Plaintiff's allegations that companies discontinued mutual aid for economic reasons.

Background § III.A.[10]   In fact, the Amended Complaint fails to identify a ***single*** mutual aid platform that closed due to CBIRC "pressure" or "scrutiny."  *See, e.g.*, AC ¶¶ 61, 113, 124.[11] Plaintiff does not even plead what "pressure" or "scrutiny" might mean—beyond that regulation made mutual aid economically unattractive in a previously unregulated space.  Significantly, the Amended Complaint sometimes retreats from "pressure" allegations to attribute Waterdrop's discontinuance merely to "the CBIRC's new regulatory requirements," *see, e.g.*, AC ¶¶ 40, 41— which Plaintiff alleges were disclosed ***before*** the IPO.  Plaintiff's allegations are thus completely consistent with the stated reasons for discontinuing Mutual Aid: "recent industry environment changes" and focusing on core businesses.  Plaintiff fails to plead Waterdrop's reasons were false.

Plaintiff also fails to allege that the stated reasons for discontinuing Mutual Aid were ***material***.  It is undisputed that investors were aware of the cessation weeks before the IPO. Plaintiff nonetheless claims the supposedly false reasons were material because, had the Company identified CBIRC "pressure" or "scrutiny" as the true reasons—and more generally if the Registration Statement had "accurately described" the "regulatory environment"—then "investors would not have been surprised by further regulatory crackdowns in the summer of 2021."  AC ¶ 131.  This claim is frivolous.  Plaintiff alleges multiple, public CBIRC actions—including the September 3, 2020 "crackdown" announcement—press reports about fintech and online insurance regulation, *e.g.* AC ¶¶ 61-62, analyst discussions about Mutual Aid, AC ¶ 47, and that "almost all

---

[10] Plaintiff claims **Statement #5** was false for omitting that "Waterdrop was attempting to add as many customers as possible in advance of regulatory crackdowns in China."  AC ¶ 110. Plaintiff pleads no factual support for the claim that Waterdrop was taking these actions—much less concealing them—but rather pleads only that Waterdrop sought to add customers, which is the goal of every business that has customers.

[11] Plaintiff cites a *Protocol* article for this proposition.  AC ¶ 61.  The same article indicates that "an unnamed Waterdrop employee told *China Business Journal* that the company's mutual aid product didn't make any money at all."  *See* Carlinsky Decl. Ex. D at 4.

15

other Chinese mutual aid platforms" had bowed to regulatory pressure, *see* AC ¶¶ 113. Plaintiff cannot claim that this public information failed to alert investors about potential regulatory action, but that investors **would** have been prepared if Waterdrop's reference to "recent industry environment changes" on the 295th page (F-54) of its Prospectus had been less "vague," and if Waterdrop had **re-disclosed** already-public CBIRC actions. *See* AC ¶¶ 114, 131. Plaintiff's claim is not "plausible on its face." *Barrios v. Bello*, 2021 WL 1630594, at *2 (S.D.N.Y. Apr. 27, 2021) (quotation omitted). "The securities laws do not require that investors be treated like children . . . ." *Gissin v. Endres*, 739 F. Supp. 2d 488, 510 (S.D.N.Y. 2010) (quotation omitted).

Plaintiff also asserts that a section of the Registration Statement addressed regulations on Mutual Aid, but "made no mention" of CBIRC actions, and "neglected to mention that Waterdrop was not the only Chinese company to discontinue its mutual aid program." AC ¶ 113. But Plaintiff alleges that both of these were publicly-known prior to the IPO, *see* AC ¶¶ 2-3; *supra* Background § III.A., V.A., and Waterdrop had no obligation to disclose public facts. *See Shemian v. Rsch. In Motion Ltd.*, 2013 WL 1285779, at *21 (S.D.N.Y. Mar. 29, 2013) (no material omission where information was "reported in articles cited by the Plaintiff" in the complaint); *In re Bank of Am.*, 980 F. Supp. 2d at 576; *Qudian*, 2019 WL 4735376, at *7; *see also DeMaria v. Anderson*, 318 F.3d 170, 180 (2d Cir. 2003) (registration statement should be read "as a whole"). And Plaintiff fails to plead that Waterdrop was obligated to state that other mutual aid operators had discontinued their programs.

### 2. Plaintiff Fails to Plead Material Falsity Based Upon the Alleged Economic Impact of Discontinuing Mutual Aid

Plaintiff's claim that Waterdrop failed to disclose the economic repercussions of its decision is belied by the Registration Statement and Amended Complaint. As detailed above, Waterdrop fully disclosed (and commentators noted) that Mutual Aid was a low-cost way to steer

customers to the Company's insurance products; that alternative marketing—third-party traffic channels—was much more expensive; and that the shift from Mutual Aid to third-party traffic channels had already occurred ***and*** driven up marketing expenses. *See supra* Background § III.B. Plaintiff's additional assertion that **Statement #8**, concerning certain impacts of ceasing Mutual Aid, was false for not *also* mentioning marketing expenses fails in light of the Registration Statement's detailed disclosures as a whole.

Plaintiff also claims that **Statement #4**—"[h]istorically, our mutual aid operation also directed traffic to our insurance marketplace," AC ¶ 107 (quoting Pr. at 93)—was misleading because it "implied that the traffic derived from the mutual aid platform was minimal" and omitted the "percentage of FYP generated through the [Mutual Aid] platform." AC ¶ 108. But ***the same page*** of the Prospectus provides a chart that includes ***precisely*** this data:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2019 | | 2020 | |
| | (RMB million) | (%) | (RMB million) | (%) | (RMB million) | (%) |
| **Internal traffic** | | | | | | |
| Medical Crowdfunding | 452 | 46.5 | 1,533 | 23.0 | 1,872 | 13.0 |
| Mutual Aid | 376 | 38.6 | 829 | 12.4 | 521 | 3.6 |
| Third-party traffic channels | 18 | 1.9 | 2,321 | 34.8 | 6,474 | 44.9 |
| Natural traffic and repeat purchase | 126 | 13.0 | 1,985 | 29.8 | 5,559 | 38.5 |
| **Total** | **972** | **100.0** | **6,668** | **100.0** | **14,426** | **100.0** |

Pr. at 93 (highlight added). As described above, the chart states specifically the "percentage of FYP generated" by Mutual Aid ***and*** notifies investors that third-party channels had already replaced Mutual Aid as the primary source of FYP. *See supra* Background § III.B.

## B. Plaintiff's Confidential Witnesses Are No Help

The Court need not accept CW-based allegations where, as here, a plaintiff does not "describe[]" them "with sufficient particularity to support the probability that a person in the position occupied by [the CW] would possess the information alleged." *Novak v. Kasaks*, 216

17

F.3d 300, 314 (2d Cir. 2000).  Plaintiff here pleads only that CW1 was a "customer service staff member," and that CW2 was a "Finance Business Partner"—allegedly an unspecified "managerial financial planning and analysis position."  AC ¶¶ 40-41.  Plaintiff does not plead the CWs' position in the Company hierarchy or to whom they reported, much less facts showing that they were privy to the top-level decision-making necessary to discontinue Mutual Aid.  *See id.*

Regardless, they offer only unexplained conclusions that the Company ceased Mutual Aid due to CBIRC (public) regulations, *see id.*, which even if true is consistent with the Company's publicly-stated reasons.  *See supra* Argument § I.A.1.; *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011) (CWs cannot simply "parrot[ ] . . . conclusory allegations contained in the complaint.").  CW1 reports an internal Company letter in which Waterdrop's CEO ***does not say*** the Company discontinued Mutual Aid due to regulation, but that the change "was an 'upgrade.'"  AC ¶ 40.  And CW2 reports that "a few senior staff and the company's executives discussed a cessation plan for the mutual aid platform" in February 2021, but omits what was said, by whom, or when, or if CW2 was even present (the lack of detail suggests no).  *See id.* ¶ 41.

## II.  PLAINTIFF FAILS TO PLEAD ACTIONABLE MISSTATEMENTS ABOUT WATERDROP'S GENERAL EXPENSE INCREASES

Plaintiff claims certain statements were false because Waterdrop failed to disclose that its expenses had increased in 1Q21.  For instance, Plaintiff takes issue with **Statement #1**:

> We have achieved a solid business growth in the first quarter of 2021. The FYP generated through Waterdrop Insurance Marketplace reached RMB4,469 million for the first quarter of 2021, demonstrating a 14.4% increase from the fourth quarter of 2020 or a 42.7% increase from the same period of 2020.

Pr. at 8; AC ¶ 96.  Plaintiff claims this statement was false because it cited a positive FYP figure for 1Q21 while omitting that Company expenses rose in 1Q21.  AC ¶¶ 97-99.  This assertion fails.

18

JA-086

*First*, Plaintiff does not allege that the FYP figures are misstated, and it is well-settled that "[a]ccurate statements about past performance are self-evidently not actionable under the securities laws." *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004).

*Second*, Plaintiff fails to plead that "solid business growth" was inaccurate. Plaintiff claims that the Company "had already experienced a substantial operating loss – not growth" during 1Q21. AC ¶ 97. Plaintiff's premise—that a business cannot have "growth" while sustaining net losses—is inconsistent with the routine operations of growing companies, which frequently incur net losses while expanding operations and increasing revenues. Waterdrop's ongoing increases in vital metrics—including a YoY FYP increase in 1Q21 of **RMB1.3 billion** and consistent revenue increases, *see supra* Background § IV.B.—also demonstrate Plaintiff's failure to allege that growth and net losses are mutually exclusive. No reasonable investor would take "growth" as synonymous with "profit," particularly given the Company's historical losses. *See supra id.* § IV.A.

*Third*, Plaintiff fails to plead any facts showing that 1Q21 expenses "were known or knowable[] at the time of the offering," *Lin v. Interactive Brokers Grp.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008) (quotation omitted), which here was **six weeks** before the Company's June 17, 2021 release of 1Q21 results. Courts recognize that companies are often unable to make reliable disclosures until well after the close of a quarter, and that compelling them to do so could be "unworkable and potentially misleading." *In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001). Indeed, the court in *Pinduoduo* rejected an omission claim against a Chinese issuer for failing to disclose quarterly results in its IPO offering materials—even though the IPO took place a month **after** the quarter closed—because the quarterly results could *still* be "audited or . . . subject to significant revision." 2020 WL 1530745, at *9 ("Plaintiffs cite no SEC requirement or guidance that quarterly results for the second quarter should have been

reflected in the registration statement."); *see also UP Fintech*, 527 F. Supp. 3d at 620 (rejecting "real-time" disclosure requirement under Item 303). Plaintiff also fails to plead that Waterdrop's ability to report in the Registration Statement its 1Q21 FYP—a single operating data figure— meant that the Company could reliably report expense figures for its entire business.

*Fourth*, Plaintiff fails to plead any duty to include expense information—even if known— in every instance where revenue-related information is also mentioned. Indeed, a duty to accelerate reporting (even if possible) arises only where a "'reasonable investor would view the omission as 'significantly alter[ing] the 'total mix' of information made available.'" *Stadnick v. Vivint Solar Inc.*, 861 F.3d 31, 36 (2d Cir. 2017) (quoting *DeMaria*, 318 F.3d at 180). This inquiry requires reviewing the Registration Statement "as a whole," *DeMaria*, 318 F.3d at 180, which here made any purported omission immaterial. Expenses in every major category increased substantially between 2018 and 2020—including a ***ten-fold*** increase in sales and marketing costs and a ***15-fold*** increase in operating costs—and the Company disclosed its expectation that these increases, and the lack of profitability, would continue. *See supra* Background § IV.A. Plaintiff alleges no statements or other facts suggesting expense increases were likely to slow down, much less ***reverse***, in 1Q21. Notably, total YoY expenses in 1Q21 increased by ***less*** than in three of four prior quarters, *see supra id.* § IV.B.; Plaintiff's rhetorical flourish that 1Q21 YoY increase was "exponential" is thus historically (and mathematically) incorrect. Any omission about expenses from **Statement #1** was immaterial in the context of the Registration Statement "as a whole." *See Asay v. Pinduoduo Inc.*, 2021 WL 3871269, at *4 (2d Cir. Aug. 31, 2021) ("[G]iven the disclosures regarding the significant increase in marketing costs in prior reporting periods, the doubling of user acquisition costs in the second quarter of 2018 would not have significantly altered the "total

20

mix" of information."); *UP Fintech*, 527 F. Supp. 3d at 623 ("omitted interim financial information" immaterial where pre- and post-IPO financial performance were consistent).

*Finally*, "solid business growth" is inactionable puffery. Alleged misstatements must be "sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014). "Solid business growth," by contrast, is a textbook example of vague, non-specific, and inactionable corporate optimism. *See Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 211 (S.D.N.Y. 2020) ("healthy growth" was puffery); *In re Fairway*, *Grp. Hldgs. Corp. Secs. Litig.*, 2015 WL 4931357, at *13 (S.D.N.Y. Aug. 19, 2015) ("well positioned to support growth" was puffery) (S.D.N.Y. Sept. 9, 2015).

**Statement #2** comprises two similar statements to the effect that "we expect our operating costs and expenses to decrease as a proportion of our revenues as we improve the operating efficiency of our platform and achieve more economies of scale." AC ¶ 102 (quoting Pr. at 94); *see also* Pr. at 97 ("we expect our operating costs as a percentage of our net operating revenue will decrease in the foreseeable future."). Plaintiff claims these statements were false because expenses increased as a proportion of revenues in 1Q and 2Q21, and because Waterdrop's expenses increased after discontinuing Mutual Aid. *See* AC ¶ 103. These statements are inactionable.

*First*, they are not false: they do not claim that expenses will decline as a proportion of revenues in 1Q or 2Q21 (even if such a forward-looking statement could be actionable). The opposite, in fact: they inform investors that any such decline will occur only ***after*** the Company improves "operating efficiency" and achieves "economies of scale." But Plaintiff alleges no statements in which Waterdrop represents that it had satisfied those conditions. The Registration Statement thus informed investors that they cannot expect such a decline until the Company

satisfies conditions *that had not yet occurred*. Similarly, "foreseeable future" cannot be read, as of May 7, 2021, to promise such a decline in 1Q21—which was already complete—or in 2Q21, which was ongoing.

*Second*, **Statement #2** is forward-looking and accompanied by meaningful cautionary language, and therefore protected by the bespeaks caution doctrine. *See, e.g.*, *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("[A]lleged misrepresentations in a stock offering are immaterial as a matter of law [where] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."). **Statement #2** relays the Company's "expectation," which is by definition forward-looking. *See Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 578 (S.D.N.Y. 2018) ("statements articulating the expectation" that business would turn profitable were "forward-looking statements"), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019); *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *12 (S.D.N.Y. June 23, 2004) ("statements of future economic performance" accompanied by cautionary language are protected by bespeaks caution doctrine). And the Registration Statement included cautionary language indicating that results might vary considerably from expectations, including disclosure of the current and likely future lack of profitability and increasing expenses, and that regulations could materially affect results. *See supra* Background § IV. Plaintiff herself alleges the Registration Statement disclosed historical operating expenses that, as a proportion of revenues, were consistently near or well above 100% in 2019 and 2020. *See* AC ¶ 104 (chart).

Plaintiff asserts that **Statement #3** was false because its two warnings indicate that "net losses and negative cash flows . . . *may* continue in the future," that the Company "*anticipate[s]* that our operating costs and expenses will increase in the foreseeable future" and that "grow[ing]

our business . . . *may* incur significant capital investment and recurring costs, have different revenue and cost structures, and take time to achieve profitability," even though the Company supposedly knew that those risks had come to pass. *See* AC ¶ 105 (emphasis is Plaintiff's).

To start, as discussed above, Plaintiff fails to plead that the Company knew, as of May 7, 2021, what its final 1Q21 expenses (much less 2Q21) would be at the time it issued its June 17, 2021 6-K. *See supra* at 19-20; *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) ("There was no way that Defendants could have known, in early May, that they would end up losing money for the quarter that would not end until seven weeks later."). Further, Plaintiff cannot argue coherently that the risk that expenses would rise in the "foreseeable future" had materialized in the present, and, in any case, fails to plead information about the future, final, quarterly expenses that Waterdrop possessed that investors did not. *See Pinduoduo*, 2020 WL 1530745, at *9 ("The Complaint does not reveal by whom second quarter figures were compiled nor to whom they were communicated. It does not reveal whether these figures were audited or were later subject to significant revision."). Indeed, Plaintiff can "hardly" say that, "by having not been explicitly told of the company's actual first quarter losses"—even if Waterdrop could have done so—that "a reasonable investor would have been misled about the nature of [the issuer's] securities," because the Prospectus is "replete with warnings and explanations of risks associated with the company's past financial history and future expectations." *DeMaria*, 318 F.3d at 182. Indeed, particularly in light of Waterdrop's expense disclosures, there is no plausible claim that an investor could have interpreted language anticipating expense *increases* as suggesting expenses were *not* increasing. *See supra* Background § IV.; *see also In re Noah Educ. Hldgs., Ltd. Secs. Litig.*, 2010 WL 1372709, at *7 (S.D.N.Y. Mar. 31, 2010) (robust warnings about business,

23

JA-091

including potential increases in the cost of raw materials, "cannot reasonably be read to imply that [the issuer's] cost of raw materials had not increased, to some extent, in the current quarter.").

## III. PLAINTIFF FAILS TO PLEAD FALSE STATEMENTS CONCERNING WATERDROP'S REGULATORY ENVIRONMENT

Plaintiff claims that **Statements #9, #10,** and **#11** were false because Waterdrop failed fully to disclose the "pressure" applied to Waterdrop and its industry by the CBIRC. But Plaintiff's factual support for the state of the regulatory landscape consists entirely of ***public*** CBIRC acts and other public information that Waterdrop had no duty to re-disclose. *See Qudian*, 2019 WL 4735376, at *7 (securities laws do not require disclosure of regulations).

Plaintiff claims that Waterdrop's statement concerning China's support for the health insurance industry (**#9**) was false in light of the alleged regulatory actions. AC ¶ 118. But the CBIRC regulatory actions were well-known to investors, and Plaintiff thus pleads no information about China's health insurance sector that Waterdrop knew but investors did not. *See UP Fintech*, 527 F. Supp. 3d at 621 (omission inactionable where it did not "*significantly* alter the total mix of information already made available."); *In re Bank of Am.*, 980 F. Supp. 2d at 576 (no liability for failing to disclose public information). Further, the statement concerns the "health insurance sector" generally while Plaintiff's allegations are about the ***online*** industry; Plaintiff does not plead that the alleged regulations would hamper that overall sector or that China did not support that sector.

Plaintiff asserts that **Statements #10** and **#11**, which are lengthy risk disclosures about the regulatory environment, were false and misleading for failing to disclose (i) the ***reason*** the Company discontinued Mutual Aid, (ii) certain aspects of the CBIRC's September 3, 2020 Study and January 11, 2021 Draft Circular, and (iii) that the December 18, 2020 Circular identified Waterdrop as an investigation target. *See* AC ¶¶ 123-129. None of these pleads an actionable falsehood. The purported misstatements or omissions around Mutual Aid are addressed above.

24

JA-092

*See supra* Argument § A. And, again, Plaintiff concedes that the CBIRC issuances were public documents. *See supra* Background § V.A.; s*ee also In re Bank of Am.*, 980 F. Supp. 2d at 576.

Regardless, Waterdrop would have had no obligation to disclose the investigation described in the December 18, 2020 Circular even if it were not already public. An issuer need not disclose "uncharged, unadjudicated wrongdoings or mismanagement." *UBS AG Sec. Litig.*, 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom.*, *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 173. Likewise, Waterdrop's risk warnings, including that the Company had been, and was "likely again in the future to be subject to PRC regulatory inquiries, inspections and investigations" (**#11**), would not be actionable even if the investigation were not already public because the well-established limits on a company's disclosure obligations "would be entirely meaningless if every reporting company were required to disclose uncharged, unadjudicated conduct in the risk-factors sections of its filings." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 651 (S.D.N.Y. 2017). Finally, the investigation was immaterial: Plaintiff pleads that it resulted in total fines of RMB1.1 million, AC ¶ 126, or approximately USD $173,000.[12] By contrast, 1Q21 revenue alone was ***RMB883 million*** and the IPO raised ***USD $360 million***. *See* AC ¶¶ 5, 103.[13]

## CONCLUSION

For the foregoing reasons, Defendants Waterdrop, Cogency, Ms. DeVries, and the Underwriter Defendants respectfully request dismissal of the Amended Complaint with prejudice.

---

[12] *See* https://www.exchangerates.org.uk/USD-CNY-09_11_2021-exchange-rate-history.html (last visited on April 22, 2022).

[13] Plaintiff's failure to plead a Section 11 claim dooms any Section 15 claim. *In re Lehman Bros. Mort.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) (Section 15 requires "a primary violation of § 11 and control of the primary violator by defendants.") (internal citation omitted).

25

Dated: April 22, 2022
      New York, New York

**O'MELVENY & MYERS LLP**

By: _/s/ Jonathan Rosenberg_
      Jonathan Rosenberg
      Abby F. Rudzin
      7 Times Square
      New York, NY 10036
      Telephone: 212/408-2409
      jrosenberg@omm.com
      arudzin@omm.com

_Attorneys for Goldman Sachs (Asia) L.L.C.,_
_Morgan Stanley & Co. LLC, and BofA_
_Securities, Inc._

Respectfully submitted,

**QUINN EMANUEL URQUHART**
**& SULLIVAN, LLP**

By: _/s/ Michael B. Carlinsky_
      Michael B. Carlinsky
      Xiao Liu
      Jacob J. Waldman
      Jianjian Ye
      51 Madison Avenue, 22nd Floor
      New York, NY 10010
      Telephone: (212) 849-7000
      michaelcarlinsky@quinnemanuel.com
      xiaoliu@quinnemanuel.com
      jacobwaldman@quinnemanuel.com
      jianjianye@quinnemanuel.com

_Attorneys for Waterdrop, Cogency_
_Global Inc., and Colleen DeVries_

JA-094

***Sandoz v. Waterdrop Inc. et al.***, Case No. 1:21-cv-07683-VSB

**Appendix to Moving Defendants' Motion to Dismiss the
Amended Complaint Pursuant to F.R.C.P. 12(b)(6)**

**<u>Chart of Alleged Misstatements</u>**[1]

| # | ¶ | Statement |
|---|---|---|
| 1 | 96 | The Registration contained only positive details about the Q1:21 financial results. For example, it stated:<br><br>We have achieved a solid business growth in the first quarter of 2021. The FYP generated through Waterdrop Insurance Marketplace reached RMB4,469 million for the first quarter of 2021, demonstrating a 14.4% increase from the fourth quarter of 2020 or a 42.7% increase from the same period of 2020. (pp. 8, 112). |
| 2 | 102 | The Registration Statement stated:<br><br>• We have incurred significant costs and expenses in building our platform, growing our consumer base and developing capabilities in data analysis and technology. Our business model is highly scalable and our platform is built to support our continued growth. ***We expect our operating costs and expenses to decrease as a proportion of our revenues*** as we improve the operating efficiency of our platform and achieve more economies of scale. (p. 94).<br><br>• We ***expect*** our operating costs to increase in absolute terms as our scale of business grows. However, as we improve the operating efficiency of our platform and achieve more economies of scale, ***we expect our operating costs as a percentage of our net operating revenue will decrease in the foreseeable future***. (p. 97). |
| 3 | 105 | Additionally, the Registration Statement stated:<br><br>• We have a history of net losses and negative cash flows from operating activities, which ***may*** continue in the future. (pp. 7, 21).<br><br>• We ***anticipate*** that our operating costs and expenses will increase in the foreseeable future as we continue to grow our business . . . these efforts ***may*** incur significant capital investment and recurring costs, have different revenue and cost structures, and take time to achieve profitability. (p. 21). |

---

[1] Paragraph references are to the Amended Complaint. All text in the "Statement" column is taken directly from the Amended Complaint, including any bolding or italics.

1

| # | ¶ | Statement |
|---|---|-----------|
| 4 | 107 | Under the heading "Expansion of Customer Base," the Registration Statement said:<br><br>[O]ur medical crowdfunding operation direct [sic] substantial traffic to our insurance marketplace. Approximately 46.5%, 23.0% and 13.0% of the FYP generated through Waterdrop Insurance Marketplace for 2018, 2019 and 2020, respectively, was sourced from traffic from our medical crowdfunding platform. Historically, our mutual aid operation also directed traffic to our insurance marketplace. We see the internal source of consumer traffic as an important and unique consumer acquisition resource to us. (p. 93). |
| 5 | 109 | The statement continued:<br><br>In order to continuously diversify our consumer acquisition channels, we also cooperate with other third-party traffic channels to grow our insurance consumer base. In 2018, 2019 and 2020, approximately 1.9%, 34.8% and 44.9% of the FYP generated through Waterdrop Insurance Marketplace was sourced from third-party traffic channels, respectively. We expect third-party traffic channels to play an important role in the future to support the rapid growth of our business. (p. 93). |
| 6 | 111 | The Registration Statement also contained multiple misleading statements about the discontinuation of Waterdrop's mutual aid program:<br><br>• In light of our expanded business and prospect, the increased recognition of our brand, and the latest market development, we have decided to focus on our core businesses and offer enhanced protection to our users. (p. 9).<br><br>• In March 2021, we ceased the operation of our Waterdrop Mutual Aid platform in order to focus on our core businesses and offer enhanced protection to our users. (p. 25).<br><br>• In light of our expanded business and prospect, the increased recognition of our brand, and the latest market development, we have decided to focus on our core businesses and offer enhanced protection to our users. (p. 83). |
| 7 | 114 | In the indexes at the end of the Registration Statement, Waterdrop said:<br><br>The Group has assessed and concluded that the cessation of the mutual aid platform operation is a nonrecognized subsequent event given the cessation decision is made in 2021 following recent industry environment changes. (p. F-54). |

JA-096

| # | ¶ | Statement |
|---|---|-----------|
| 8 | 115 | Moreover, the Registration Statement contains several other misleading statements regarding the financial effects of the discontinuation of the mutual aid platform:<br><br>• We operated Waterdrop Mutual Aid between May 2016 and March 2021, under which we generated management fee income as an operator. (p. 92).<br><br>• Starting from March 2021, with the cessation of the Waterdrop Mutual Aid operation, the corresponding management fee income which accounted for 3.6% of total operating revenue in 2020, will no longer be a revenue stream for us in 2021. (p. 96).<br><br>• In connection with this business adjustment, we voluntarily undertook to cover mutual aid participants' medical expenses arising from medical conditions diagnosed by March 31, 2021 that would have been covered by the ceased mutual aid plan, subject to certain procedural requirements and eligibility criteria. In addition, we also offered a one-year complementary health insurance policy to each participant with a similar coverage as the participant's original mutual aid plan… The estimated cost of medical expense coverage is RMB15.0 million (US$2.3 million) and the estimated cost of one-year health insurance coverage is RMB81.7 million (US$12.5 million). RMB19.9 million (US$ 3.0 million) will be accounted for as a reduction of management fee revenue previously recognized for each participant to the extent of the cumulative amount earned until March 26, 2021. RMB76.8 million (US$11.8 million) will be recorded as an expense. (p. 96, similar statements on pp. 25, 83, F-54). |
| 9 | 118 | For example, it said: "the growth of health insurance sector has been supported by the Chinese government in recent years" and "recent regulatory developments are expected to have positive impacts on China's health insurance industry" including "[a]ccelerating the growth of the health insurance industry, and encouraging the growth of charitable medical donations and medical mutual aid." (p. 122). |

JA-097

| # | ¶ | Statement |
|---|---|-----------|
| 10 | 123 125 | The Registration Statement did contain several risk statements regarding the regulatory regime in China; however, these statements omitted material information necessary to make them not misleading. One risk statement, under the subheading "We face uncertainties relating to the change of regulatory regime," stated, in pertinent part: |
| | | We operate in a highly regulated industry in China, and the regulatory regime continues to evolve. The China Banking and Insurance Regulatory Commission, or the CBIRC, has extensive authority to supervise and regulate the insurance industry in China. Since the online insurance industry in China is evolving rapidly, the CBIRC has been enhancing its supervision over this industry in recent years, and new laws, regulations and regulatory requirements have been promulgated and implemented from time to time. We face challenges brought by these new laws, regulations and regulatory requirements, as well as significant uncertainties in the interpretation and application thereof. Moreover, there exist uncertainties as to how the regulatory environment might change. On December 14, 2020, the CBIRC published the Regulatory Measures for Online Insurance Business, or the Regulatory Measures, which became effective on February 1, 2021. Shuidi Insurance Brokerage conducts online insurance brokerage business in the PRC and is subject to the Regulatory Measures. The Regulatory Measures significantly changes regulatory regime for online insurance business in various aspects. . . . It might be costly for us to stay in compliance with the heightened requirements and standards in the Regulatory Measures. The Regulatory Measures sets out a ramp-up process allowing market participants to achieve full compliance in phases until February 1, 2022; we, however, cannot assure you that we can timely adjust our current business operations to achieve and maintain full compliance. (p. 21-22). … The risk statement continued: The regulatory framework in China's insurance industry is evolving and undergoing significant changes. Further development of regulations applicable to us may result in additional restrictions on our business operations. We may have to adjust our business practice and operations to comply with the continuously changing regulatory requirements. For example, in January 2021, the CBIRC published the draft Circular on Further Regulating Certain Issues on Internet Life Insurance Business, or the Draft Circular, for comment among insurance industry participants. The Draft Circular requires that each installment of premium of certain insurance products less than one year term, such as accident insurance and health insurance shall be equal. We provide our consumers the option of monthly payments and the first month payment of premium of certain insurance products is typically lower than subsequent installments. We may be required to change such payment regime to comply with the Draft Circular, if the Draft Circular is enacted. (p. 22-23). |

4

| # | ¶ | Statement |
|---|---|---|
| 11 | 128 | The next risk statement, under the heading "The administration, interpretation and enforcement of the regulations applicable to us are evolving and involve uncertainties. We may not be able to stay in constant compliance with the rapidly evolving regulations," stated:<br><br>[W]e have from time to time been subject, and are likely again in the future to be subject to PRC regulatory inquiries, inspections and investigations. If any noncompliance incidents in our business operation are identified, we may be required to take certain rectification measures in accordance with applicable laws and regulations, or we may be subject to other regulatory actions such as administrative penalties. (p. 24). |

JA-099

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SIDNEY SANDOZ, Individually And On Behalf of All Others Similarly Situated, | Case No. 1:21-cv-07683-VSB |
| Plaintiff, | |
| v. | |
| WATERDROP INC., PENG SHEN, KANGPING SHI, NINA ZHOU, KAI HUANG, HAIYANG YU, YAO HU, GUANG YANG, COLLEEN A. DE VRIES, COGENCY GLOBAL INC., GOLDMAN SACKS (ASIA) L.L.C., MORGAN STANLEY & CO. LLC, BOFA SECURITIES, INC., CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, CLSA LIMITED and HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED. | <u>CLASS ACTION</u> |
| Defendants. | |

**DECLARATION OF MICHAEL B. CARLINSKY IN SUPPORT OF**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**
**ON BEHALF OF WATERDROP INC., COGENCY GLOBAL, INC.,**
**COLLEEN DEVRIES, AND THE UNDERWRITER DEFENDANTS**

MICHAEL B. CARLINSKY, an attorney duly admitted to practice law before this Court, hereby states:

1.     I am a partner at Quinn Emanuel Urquhart & Sullivan, LLP, counsel in the above action for Waterdrop Inc. ("Waterdrop" or the "Company"), Cogency Global, Inc. ("Cogency"), and Colleen DeVries, who along with the Underwriter Defendants (as defined in the accompanying Memorandum of Law) are the "Moving Defendants."  I am familiar with the matters discussed herein.  I respectfully submit this Declaration in support of the Moving Defendants' Motion to Dismiss the Amended Class Action Complaint and to put certain documents before the Court.

1

2.      Attached hereto as Exhibit A is a true and correct copy of excerpts of the Prospectus filed by Waterdrop on Form 424(b)4 and dated May 6, 2021 (highlighting added).

3.      Attached hereto as Exhibit B is a true and correct copy of a press release issued by Waterdrop announcing its 1Q21 financial results and dated June 17, 2021 (highlighting added).

4.      Attached hereto as Exhibit C is a true and correct copy of a press release issued by Waterdrop announcing its 2Q21 financial results and dated September 8, 2021 (highlighting added).

5.      Attached hereto as Exhibit D is a true and correct copy of an article titled "How Chinese big tech (tried to) rethink health insurance" published by *Protocol* and dated April 16, 2021 (highlighting added), available at https://www.https://www.protocol.com/china/china-health-insurance.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 22, 2022 in the State of New York.

/s/ *Michael B. Carlinsky*
Michael B. Carlinsky

JA-101

# EXHIBIT A

424B4 1 d95574d424b4.htm 424(B)(4)

Table of Contents

**Filed Pursuant to Rule 424(b)(4)**
**Registration No. 333-255298**

## 30,000,000 American Depositary Shares



# Waterdrop Inc.

### Representing 300,000,000 Class A ordinary shares

———————

We are offering 30,000,000 American depositary shares, or ADSs. This is our initial public offering and no public market currently exists for our ADSs or Class A ordinary shares. Each ADS represents ten of our Class A ordinary shares, par value US$0.000005 per share.

Our ADSs have been approved for listing on the New York Stock Exchange under the symbol "WDH."

We are an "emerging growth company" under applicable U.S. federal securities laws and are eligible for reduced public company reporting requirements.

*Immediately prior to the completion of this offering, our issued and outstanding share capital will consist of Class A ordinary shares and Class B ordinary shares, and Mr. Peng Shen, the chairman of our board of directors and chief executive officer, will beneficially own all of our issued and outstanding Class B ordinary shares. These Class B ordinary shares will constitute approximately 20.3% of our total issued and outstanding share capital immediately after the completion of this offering and 69.7% of the aggregate voting power of our total issued and outstanding share capital immediately after the completion of this offering, assuming that the underwriters do not exercise their option to purchase additional ADSs. Holders of Class A ordinary shares and Class B ordinary shares have the same rights except for voting and conversion rights. Each Class A ordinary share is entitled to one vote, and each Class B ordinary share is entitled to nine votes and is convertible into one Class A ordinary share at any time by the holder thereof. In addition, the Class B ordinary shares held by Mr. Peng Shen or his affiliated entities shall be automatically immediately converted into the same number of Class A ordinary shares in the event that Mr. Shen ceases to be employed by and ceases to act as a director of our Company. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances.*

A number of investors, including certain existing shareholders and their affiliates and third-party investors, have subscribed for, and been allocated by the underwriters, an aggregate of 7,730,000 ADSs in this offering, including (i) 3,650,000 ADSs to an entity affiliated with Boyu Capital, (ii) 3,230,000 ADSs to an entity affiliated with HOPU Investments, and (iii) 850,000 ADSs to Kevin Sunny Holding Limited. The subscriptions for ADSs are at the initial public offering price and on the same terms as the other ADSs being offered in this offering. The number of ADSs subscribed by these investors representing approximately 25.8% of the ADSs being offered in this offering, assuming the underwriters do not exercise their option to purchase additional ADSs.

### Investing in the ADSs involves risks. See "Risk Factors" beginning on page 20.

———————

### PRICE US$12.00 PER ADS

———————

|  | Price to Public | Underwriting Discounts and Commissions(1) | Proceeds to Us |
|---|---|---|---|
| Per ADS | US$ 12.00 | US$ 0.84 | US$ 11.16 |
| Total | US$360,000,000 | US$25,200,000 | US$334,800,000 |

———————

(1)　　*For additional underwriting compensation information, see "Underwriting."*

We have granted the underwriters the right to purchase up to an additional 4,500,000 ADSs to cover over-allotments.

Neither the United States Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities, or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

The underwriters expect to deliver the ADSs against payment in U.S. dollars to purchasers on or about May 11, 2021.

———————

**Goldman Sachs (Asia) L.L.C.**　　　　　**Morgan Stanley**　　　　　**BofA Securities**

ABCI　　　China Merchants Securities (HK)　　　China Renaissance　　　CLSA　　　Haitong International

*(in alphabetical order)*

FUTU　　　　　　　　　　　　　　　　　　　　　　　　　　Tiger Brokers

*(in alphabetical order)*

JA-103

Prospectus dated May 6, 2021.

JA-104

**Table of Contents**



## A Leading Technology Platform Dedicated to Insurance and Healthcare Service with a Positive Social Impact

**We at Waterdrop** Aspire to Bring Insurance and Healthcare Service to Billions through Technology



**WATERDROP INSURANCE MARKETPLACE**

Largest Independent Third-party Insurance Distribution Platform in China [1]

**79.4** MM
cumulative insurance consumers insured [3]

RMB**14.4** BN FYP [4]



**WATERDROP MEDICAL CROWDFUNDING**

Largest Medical Crowdfunding Platform in China [2]

**340** MM
cumulative donors [3]

RMB**37** BN+
donated to

**1.7** MM+
patients [3]



*2018 Corporate Social Responsibility Company of the Year - China CSR Company Awards*

(1) According to iResearch, in terms of life and health insurance FYP distributed in 2020
(2) According to iResearch, in terms of amount of fund raised in 2020
(3) As of December 31, 2020
(4) In the twelve months ended December 31, 2020



JA-105

[Table of Contents](#)

## TABLE OF CONTENTS

| | |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 20 |
| Special Note Regarding Forward-Looking Statements | 73 |
| Use of Proceeds | 75 |
| Dividend Policy | 76 |
| Capitalization | 77 |
| Dilution | 79 |
| Enforceability of Civil Liabilities | 81 |
| Corporate History and Structure | 83 |
| Selected Consolidated Financial Data | 88 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 92 |
| Industry | 119 |
| Business | 127 |
| Regulation | 148 |
| Management | 172 |
| Principal Shareholders | 181 |
| Related Party Transactions | 184 |
| Description of Share Capital | 185 |
| Description of American Depositary Shares | 199 |
| Shares Eligible for Future Sale | 211 |
| Taxation | 213 |
| Underwriting | 221 |
| Expenses Related to this Offering | 235 |
| Legal Matters | 236 |
| Experts | 237 |
| Where You Can Find Additional Information | 238 |
| Index to the Consolidated Financial Statements | F-1 |

You should rely only on the information contained in this prospectus or in any related free writing prospectus. We have not authorized anyone to provide you with information different from that contained in this prospectus or in any related free writing prospectus. We are offering to sell, and seeking offers to buy, the ADSs, only in jurisdictions where offers and sales are permitted. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or any sale of the ADSs.

Neither we nor any of the underwriters has taken any action to permit a public offering of the ADSs outside the United States or to permit the possession or distribution of this prospectus or any filed free writing prospectus outside the United States. Persons outside the United States who come into possession of this prospectus or any filed free writing prospectus must inform themselves about and observe any restrictions relating to the offering of the ADSs and the distribution of the prospectus or any filed free writing prospectus outside the United States.

**Until May 31, 2021 (the 25th day after the date of this prospectus), all dealers that buy, sell or trade ADSs, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the obligation of dealers to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.**

i

JA-106

**Table of Contents**

- invest in data analysis and technology infrastructure; and

- deepen partnership with healthcare institutions to build up health ecosystem.

**Summary of Risk Factors**

    An investment in our ADSs is subject to a number of risks, including risks related to our business and industry, risks related to our corporate structure, risks related to doing business in China and risks related to our ADSs and this offering. You should carefully consider all of the information in this prospectus before making an investment in our ADSs. The following list summarizes some, but not all, of these risks. Please read the information in the section entitled "Risk Factors" for a more thorough description of these and other risks.

***Risks Related to Our Business and Industry***

- Our business and growth are significantly affected by the future prospects of third-party insurance brokerage and agency and medical crowdfunding industries, which are rapidly evolving;

- Our limited operating history and evolving business model make it difficult to evaluate our business and future prospects and the risks and challenges we may encounter;

- We face intense competition and could lose market share, which could adversely affect our results of operations;

- We have a history of net losses and negative cash flows from operating activities, which may continue in the future;

- We face uncertainties relating to the change of regulatory regime;

- The administration, interpretation and enforcement of the regulations applicable to us are evolving and involve uncertainties. We may not be able to stay in constant compliance with the rapidly evolving regulations;

- Any lack of requisite approvals, licenses or permits applicable to our business operation may have a material and adverse impact on our business and results of operations;

- We may be subject to penalties against us for failure to manage our personnel engaging in insurance brokerage activities;

- We face reputational, monetary, and legal risk in relation to our decision to discontinue our Waterdrop Mutual Aid business;

- Our historical growth rate may not be indicative of our future performance and if we fail to effectively manage our growth, our business, financial condition and results of operations could be adversely affected; and

- Any harm to our brand or reputation may materially and adversely affect our business.

***Risks Related to Our Corporate Structure***

- If the PRC government finds that the agreements that establish the structure for operating some of our operations in China do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations;

7

Table of Contents

- The contractual arrangements with our VIEs and their shareholders may not be as effective as direct ownership in providing operational control; and

- Any failure by our VIEs or their shareholders to perform their obligations under our contractual arrangements with them would have a material and adverse effect on our business.

- Our Chairman and CEO, Mr. Peng Shen, is subject to a potential lawsuit, and there is uncertainty as to the outcome of the claim and its impact on us.

### Risks Related to Doing Business in China

- Changes in China's economic, political or social conditions or government policies could have a material adverse effect on our business and operations;

- Uncertainties with respect to the PRC legal system could adversely affect us;

- It may be difficult for overseas regulators to conduct investigation or collect evidence within China;

- Our ADSs may be delisted under the Holding Foreign Companies Accountable Act if the Public Company Accounting Oversight Board, or the PCAOB, is unable to inspect auditors who are located in China. The delisting of our ADSs, or the threat of their being delisted, may materially and adversely affect the value of your investment. Additionally, the inability of the PCAOB to conduct inspections deprives our investors with the benefits of such inspections; and

- Proceedings instituted by the SEC against PRC-based "big four" accounting firms, including our independent registered public accounting firm, could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act.

### Risks Related to Our ADSs and This Offering

- The trading price of the ADSs is likely to be volatile, which could result in substantial losses to investors;

- If securities or industry analysts cease to publish research or reports about our business, or if they adversely change their recommendations regarding the ADSs, the market price for the ADSs and trading volume could decline;

- The voting rights of holders of ADSs are limited by the terms of the deposit agreement, and you may not be able to exercise your right to direct the voting of the underlying Class A ordinary shares represented by your ADSs.

### Recent Development

We have achieved a solid business growth in the first quarter of 2021. The FYP generated through Waterdrop Insurance Marketplace reached RMB4,469 million for the first quarter of 2021, demonstrating a 14.4% increase from the fourth quarter of 2020 or a 42.7% increase from the same period of 2020.

We continued to diversify our consumer acquisition channels. In the first quarter of 2021, 54.5% of the FYP generated via Waterdrop Insurance Marketplace was sourced from third-party traffic channels, while 34.5% and 11.0% of the FYP generated via Waterdrop Insurance Marketplace was sourced from natural traffic and repeat purchase, and internal traffic, respectively.

8

JA-108

Table of Contents

In terms of product offerings, 85.3% and 14.7% of the FYP generated through Waterdrop Insurance Marketplace in the first quarter of 2021 was from short-term health insurance, and long-term health and life insurance, respectively.

**Corporate History and Structure**

We commenced our operation through Beijing Zongqing Xiangqian Technology Co., Ltd. (formerly known as Beijing Weizhong Culture Technology Co., Ltd.), or Zongqing Xiangqian, in 2016. We launched Waterdrop Mutual Aid platform in May 2016 and then launched Waterdrop Medical Crowdfunding platform in July 2016. Beijing Shuidi Hubao Technology Co., Ltd., or Shuidi Hubao, was established in December 2016 to operate Waterdrop Medical Crowdfunding platform. Beijing Shuidi Hulian Technology Co., Ltd., or Shuidi Hulian, was established in December 2016 to operate Waterdrop Mutual Aid platform. We acquired Shuidi Insurance Brokerage Co., Ltd. (formerly known as Baoduoduo Insurance Brokerage Co., Ltd.), or Shuidi Insurance Brokerage, in September 2016 to conduct insurance brokerage business and Tairui Insurance Agency Co., Ltd. in June 2020 to conduct insurance agency business and launched our Waterdrop Insurance Marketplace in May 2017. Beijing Zhuiqiu Jizhi Technology Co., Ltd., or Zhuiqiu Jizhi was established in February 2018, which acquired Tianjin Jingbin Internet Technology Co., Ltd. in October 2019 to invest in and incubate new businesses. Miaoyi Hulian (Beijing) Technology Co., Ltd. was established in July 2018 to operate general healthcare and pharmaceutical services.

In May 2018, Waterdrop Inc. was incorporated in the Cayman Islands as an offshore holding company to facilitate our offshore financing activities. Shortly following its incorporation, Waterdrop Inc. established a wholly-owned subsidiary in Hong Kong, Waterdrop Group HK Limited, or Waterdrop HK. In October 2018, Waterdrop HK established its wholly-owned subsidiary in China, Beijing Absolute Health Co., Ltd., or Absolute Health. In July 2019, Absolute Health established its wholly-owned subsidiary, Shanghai Danzheng Health Technology Co., Ltd., or Shanghai Danzheng.

In November 2018, we gained control over Zongqing Xiangqian and Shuidi Hubao, through Absolute Health, by entering into a series of contractual arrangements with Zongqing Xiangqian and Shuidi Hubao and their shareholders. In July 2019, we further restructured and entered into a series of contractual arrangements with Shuidi Hulian and its shareholders and started consolidating Shuidi Hulian as a VIE. Prior to that, Shuidi Hulian was a subsidiary of Zongqing Xiangqian. In October 2019, we gained control over Zhuiqiu Jizhi, through Absolute Health, by entering into a series of contractual arrangements with Zhuiqiu Jizhi and its shareholders.

In light of our expanded business and prospect, the increased recognition of our brand, and the latest market development, we have decided to focus on our core businesses and offer enhanced protection to our users. Our Waterdrop Mutual Aid service historically served as a scenario for educating and familiarizing millions of users with the importance of insurance coverage. In March 2021, we ceased the operation of the Waterdrop Mutual Aid business, offering to migrate all mutual aid participants as insurance policyholders of our Waterdrop Insurance Marketplace service. In connection with this change, we will voluntarily cover mutual aid participants' medical expenses arising from medical conditions diagnosed by March 31, 2021 that would have been covered by the ceased mutual aid plan, subject to certain procedural requirements and eligibility criteria, and in addition offered a one-year complementary health insurance policy to each participant with a similar coverage as the participant's original mutual aid plan. Please also see "Risk Factors — Risks Related to Our Business and Industry — We face reputational, monetary, and legal risks in relation to our discontinuation of the Waterdrop Mutual Aid business." for risks associated with this decision.

9

JA-109

## Summary Consolidated Financial Data

The following consolidated statements of comprehensive loss for the years ended December 31, 2018, 2019 and 2020, consolidated balance sheets data as of December 31, 2019 and 2020, and consolidated statements of cash flow data for the years ended December 31, 2018, 2019 and 2020, have been derived from our audited consolidated financial statements included elsewhere in this prospectus. Our consolidated financial statements are prepared and presented in accordance with U.S. GAAP. You should read this Selected Consolidated Financial Data section together with our consolidated financial statements and the related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this prospectus. Our historical results are not necessarily indicative of results expected for future periods.

The following table sets forth a summary of our consolidated statements of comprehensive loss for the years ended December 31, 2018, 2019 and 2020.

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2018 | 2019 | 2020 | |
| | RMB | RMB | RMB | US$ |
| | (in thousands, except for share and per share data) | | | |
| **Operating revenue, net** | **238,149** | **1,510,965** | **3,027,948** | **464,053** |
| **Operating costs and expenses** | | | | |
| Operating costs | (45,932) | (291,310) | (742,258) | (113,755) |
| Sales and marketing expenses | (184,943) | (1,056,494) | (2,130,535) | (326,519) |
| General and administrative expenses | (126,242) | (142,995) | (407,171) | (62,402) |
| Research and development expenses | (69,196) | (214,646) | (244,230) | (37,430) |
| **Total operating costs and expenses** | **(426,313)** | **(1,705,445)** | **(3,524,194)** | **(540,106)** |
| **Operating loss** | **(188,164)** | **(194,480)** | **(496,246)** | **(76,053)** |
| Other income/(expenses) | | | | |
| Interest income | 2,428 | 10,533 | 26,515 | 4,064 |
| Fair value change of warrant | — | — | (150,685) | (23,093) |
| Foreign currency exchange gain/(loss) | 66 | 4,152 | (1,335) | (205) |
| Others, net | (1,967) | 817 | 8,052 | 1,234 |
| **Loss before income tax, and share of results of equity method investee** | **(187,637)** | **(178,978)** | **(613,699)** | **(94,053)** |
| Income tax expense | (21,503) | (142,528) | (50,155) | (7,687) |
| Share of results of equity method investee | (54) | (29) | (15) | (2) |
| **Net loss attributable to Waterdrop Inc.** | **(209,194)** | **(321,535)** | **(663,869)** | **(101,742)** |
| Deemed dividend on modification on preferred shares | — | — | (67,975) | (10,418) |
| Deemed dividend upon issuance of warrants | — | — | (90,268) | (13,834) |
| Preferred shares redemption value accretion | (22,230) | (136,839) | (285,668) | (43,781) |
| **Net loss attributable to ordinary shareholders** | **(231,424)** | **(458,374)** | **(1,107,780)** | **(169,755)** |
| **Weighted average number of ordinary shares used in computing net loss per share** | | | | |
| Basic and diluted | 839,572,645 | 1,203,526,000 | 1,174,583,516 | 1,174,583,516 |
| **Net loss per share attributable to ordinary shareholders** | | | | |
| Basic and diluted | (0.28) | (0.38) | (0.94) | (0.14) |

16

Table of Contents

## RISK FACTORS

*Investing in our ADSs involves a high degree of risk. You should carefully consider the following risks and uncertainties and all other information contained in this prospectus before investing in our ADSs. Our business, financial condition, results of operations or prospects could also be harmed by risks and uncertainties not currently known to us or that we currently do not believe are material. If any of the risks actually occur, our business, financial condition, results of operations and prospects could be adversely affected. In that event, the market price of our ADSs could decline, and you could lose part or all of your investment.*

**Risks Related to Our Business and Industry**

***Our business and growth are significantly affected by the future prospects of third-party insurance brokerage and agency and medical crowdfunding industries, which are rapidly evolving.***

We operate in two rapidly evolving industries. Our business and growth are highly dependent on the future growth and proliferation of third-party insurance brokerage and agency and medical crowdfunding industries in China, which could be affected by many factors beyond our control.

Firstly, third-party insurance brokerage and agency industry in China could be affected by, from the insurance carrier side, the close integration with and improvements in online infrastructure and technology, efficient access to insurance consumers, consumer base and insights, consumer acquisition costs and the separation of insurance product design and sales; and from the consumer side, by the continued formation of consumers' online insurance policy purchasing habits, the selection, price and popularity of insurance products offered by insurance carriers, the demand for convenience, the reliability and security of third-party insurance brokerage and agency platforms and online insurance policy buying or claim settlement experience. In addition, third-party insurance brokerage and agency industry may also be affected by the overall prosperity of health and life insurance industry.

Secondly, the medical crowdfunding industry in China could be affected by the medical cost borne by patients, development of self-discipline conventions driven by industry leaders, the coverage of China's national social medical insurance provided by the Chinese government and regulatory policies.

Our operation could also be significantly affected by the development of the healthcare industry, an adjacent industry to third-party insurance brokerage and agency and medical crowdfunding industries, in China. Major internet companies or traditional online healthcare service providers in China may start to offer or strengthen their offerings of competing products and services in the healthcare industry, utilizing their large user base and cross-selling advantages. As a result, our business and growth potential could be materially and adversely affected.

***Our limited operating history and evolving business model make it difficult to evaluate our business and future prospects and the risks and challenges we may encounter.***

We commenced our operation in 2016. Our evaluations of the business and prediction about our future performance may not be as accurate as they would be if we had a longer operating history. In the event that actual results differ from our expectation or we adjust our estimates in future periods, the investors' perceptions of our business and future prospects could change materially, which may adversely affect our ADS price.

We have been actively exploring boundaries and synergy values of our business and expanding our services. We started with the mutual aid plan services in May 2016, under which we generated management fee income as an operator of the mutual aid plans, and then launched

20

Table of Contents

Waterdrop Medical Crowdfunding in July 2016. We began to distribute insurance products underwritten by insurance carriers in our Waterdrop Insurance Marketplace in May 2017, through which we earn brokerage income. We may also enter into other healthcare related industries under our mission to bring insurance and healthcare service to billions through technology. Our constantly evolving business model makes it difficult to evaluate the risks and challenges we may encounter.

**We face intense competition and could lose market share, which could adversely affect our results of operations.**

The third-party insurance brokerage and agency industry in China is intensely competitive. Our current or potential competitors include (i) online third-party brokers and agents such as Ant Group and WeSure; and (ii) offline third-party brokers and agents such as Fanhua, Everpro and Datong. New competitors may emerge at any time. We also face competition from traditional insurance intermediaries such as bancassurance, tied agency channel of insurance carriers and direct sales channel of insurance carriers.

We currently mainly compete with Qingsong Crowdfunding for medical crowdfunding. Additional players may also enter into this rapidly evolving space.

Existing or potential competitors may have substantially greater brand recognition and possess more financial, marketing and research resources than we do. Our competitors may introduce platforms with more attractive products, content and features, or services or solutions with competitive pricing or enhanced performance that we cannot match. Some of our competitors may have more resources to develop or acquire new technologies and react quicker to changing requirements of consumers.

In addition, for the online insurance marketplace industry we operate in, our target insurance policy purchasers, PRC residents with potential insurance needs, may seek insurance products and services in well-equipped and developed neighboring insurance markets. We may fail to compete effectively with our competitors and industry participants in neighboring insurance markets.

**We have a history of net losses and negative cash flows from operating activities, which may continue in the future.**

We have incurred net losses and negative cash flows from operating activities each year since our inception and we may not be able to achieve or maintain profitability or positive cash flow in the future. We incurred net losses of RMB209.2 million, RMB321.5 million and RMB663.9 million (US$101.7 million) in 2018, 2019 and 2020, respectively. Net cash used in our operating activities was RMB211.0 million, RMB532.9 million and RMB777.1 million (US$119.1 million) in 2018, 2019 and 2020, respectively.

We anticipate that our operating costs and expenses will increase in the foreseeable future as we continue to grow our business, acquire new users, invest and innovate in our technology infrastructure and further develop our product and service offering and increase brand recognition. Any of these efforts may incur significant capital investment and recurring costs, have different revenue and cost structures, and take time to achieve profitability. With continuing net loss and negative cash flows from operating activities, we may have to finance ourselves with equity or debt financing, which may not be available at price term favorable to us or at all.

**We face uncertainties relating to the change of regulatory regime.**

We operate in a highly regulated industry in China, and the regulatory regime continues to evolve. The China Banking and Insurance Regulatory Commission, or the CBIRC, has extensive authority to supervise and regulate the insurance industry in China. Since the online insurance

21

Table of Contents

industry in China is evolving rapidly, the CBIRC has been enhancing its supervision over this industry in recent years, and new laws, regulations and regulatory requirements have been promulgated and implemented from time to time. We face challenges brought by these new laws, regulations and regulatory requirements, as well as significant uncertainties in the interpretation and application thereof. Moreover, there exist uncertainties as to how the regulatory environment might change.

On December 14, 2020, the CBIRC published the Regulatory Measures for Online Insurance Business, or the Regulatory Measures, which became effective on February 1, 2021. Shuidi Insurance Brokerage conducts online insurance brokerage business in the PRC and is subject to the Regulatory Measures. The Regulatory Measures significantly changes regulatory regime for online insurance business in various aspects. For example, the Regulatory Measures requires insurance institutions (including insurance carriers and insurance intermediary service providers, such as insurance brokerage companies and insurance agency companies) to (i) establish internal policies with regard to personnel management, customer information protection and internal control, (ii) enhance compliance management of promotional materials and marketing activities, (iii) meet certain detailed requirements for sales activities, and (iv) protect the information right of consumers by making appropriate disclosure. In particular, the Regulatory Measures requires online insurance transactions being conducted through online interfaces operated by insurance institutions only, and prohibits insurance institutions to set default option for customer and impose any restriction on the cancellation of automatic payment to affect customer's choice during the sales process of insurance products. The Regulatory Measures prohibits entities which are not insurance institutions from conducting insurance businesses, such as consultation of insurance products, comparison of insurance products, trial calculation of insurance premiums, quotation and comparison of quotations, drafting insurance plans for policyholders, processing insurance application formalities and premium collection. However, the Regulatory Measures does not explicitly allow the entities which are not insurance institutions to conduct marketing activities for online insurance products. We currently engage third party user acquisition channels to attract consumers for the insurance products offered on our platform. If our cooperation with such user acquisition channels is deemed to be in violation of the Regulatory Measures, we may be required to modify our business practice, which may result in reduction in our attraction to consumers. In addition, the Regulatory Measures sets a higher standard for insurance institutions and online industry participants to improve IT infrastructure and cybersecurity protection. For example, insurance institutions engaged in online insurance products sales business shall have IT systems that are certified as Safety Level III Computer Information Systems or above level. It might be costly for us to stay in compliance with the heightened requirements and standards in the Regulatory Measures. The Regulatory Measures sets out a ramp-up process allowing market participants to achieve full compliance in phases until February 1, 2022; we, however, cannot assure you that we can timely adjust our current business operations to achieve and maintain full compliance. For details of the Regulatory Measures, see "Regulations — Regulations on Internet Insurance Business."

The regulatory framework in China's insurance industry is evolving and undergoing significant changes. Further development of regulations applicable to us may result in additional restrictions on our business operations. We may have to adjust our business practice and operations to comply with the continuously changing regulatory requirements. For example, in January 2021, the CBIRC published the draft Circular on Further Regulating Certain Issues on Internet Life Insurance Business, or the Draft Circular, for comment among insurance industry participants. The Draft Circular requires that each installment of premium of certain insurance products less than one year term, such as accident insurance and health insurance shall be equal. We provide our consumers the option of monthly payments and the first month payment of premium of certain insurance products is typically lower than subsequent installments. We may be required to change such payment regime to comply with the Draft Circular, if the Draft Circular is enacted. The adjustment of

22

JA-113

Table of Contents

such payment regime may result in reduction in our attraction to consumers. The Draft Circular also provides the upper limit for the predetermined fee rate and average supplemental fee rate for certain insurance products, which may affect the amount of insurance brokerage commission we charge on the relevant insurance products and adversely affect our financial condition. In addition, pursuant to the Draft Circular, insurance intermediary institutions that conduct the sales of ordinary life insurance products and annuity and pension insurance products longer than ten-year term shall meet certain conditions, including, among others, having not received any administrative penalty or regulatory actions imposed or taken by any governmental authorities over the last twelve months. Shuidi Insurance Brokerage was subject to an administrative penalty imposed by the local counterpart of the CBIRC in July 2020 due to failure to provide legally required disclosure on our platform to our consumers, and inaccurate or incomplete information of insurance products on our platform in our past practice. In April 2021, Shuidi Insurance Brokerage received a notification from the local counterpart of the CBIRC in connection with certain non-compliance incidents identified in its past business operations, including responding to customers' inquiries on insurance products without prior customer consent, conducting insurance brokerage business in areas where it did not have branches, and not completing practice registration for some insurance brokerage personnel, which may subject it to administrative penalties. We may be restricted from selling such insurance products, if the Draft Circular is enacted. As of the date of this prospectus, the Draft Circular is still pending approval and has not come into effect. It remains uncertain when and how the Draft Circular would come into effect, and whether and how CBIRC would promulgate relevant rules related to us. The attention of our management team could be diverted to these efforts to cope with an evolving regulatory or competitive environment. Meanwhile, staying compliant with the restriction may result in limitation to our business scope, limitation to our product and service offerings, and reduction in our attraction to consumers. As a result, our business and results of operations might be materially and adversely affected.

Furthermore, our medical crowdfunding business currently has no specific governing laws and regulations as such industries are relatively nascent and are at their early stages of development, and we expect to experience strengthened regulatory environment along with rapid industry evolution. Regulatory or administrative authorities may impose new requirements relating to, among other things, new and additional licenses, permits and approvals or governance or ownership structures on us for operating medical crowdfunding business in the future. For example, if the competent PRC authorities promulgate new laws or regulations in future which require approvals, licenses or permits to operate our medical crowdfunding business, we may not be able to obtain the required approvals, licenses or permits in a timely manner, or at all. In addition, for the funds contributed by donors in our medical crowdfunding platform, we have entered into agreements with a commercial bank, under which the bank provides fund custodian services. If regulatory authorities in China promulgate new laws or regulations regulating online crowdfunding business, including but not limited to the custodian mechanism, in the future, we may need to amend the relevant agreements or modify our current business practices to comply with new regulatory requirements, the process of which could be costly and uncertain, or even discontinue the relevant business. If any of the foregoing or other changes of the applicable PRC laws and regulations that have any adverse impact on our businesses was to occur, our business and financial condition might be materially and adversely affected.

***The administration, interpretation and enforcement of the regulations applicable to us are evolving and involve uncertainties. We may not be able to stay in constant compliance with the rapidly evolving regulations.***

Our business is subject to governmental supervision and regulation by various PRC governmental authorities, and regulatory bodies may view matters or interpret laws and regulations differently than they have in the past or in a manner adverse to our business. The CBIRC and its local counterparts have wide discretion in administration, interpretation and enforcement of these

23

Table of Contents

laws, regulations and regulatory requirements, as well as the authority to impose regulatory sanctions on industry participants. In certain circumstances it may be difficult to determine which actions or omissions may be deemed to be in violation of applicable laws, regulations or regulatory requirements. For example, historically, we have offered certain insurance consumers free insurance coverage upgrades as part of our sales and marketing activities and the outreaching and conversation by our customer service personnel with such users were considered as conducting telesales of insurance products business by the local regulatory authorities. Pursuant to the relevant PRC laws, insurance companies can operate telesales of insurance products business through establishing call centers or collaborating with insurance agencies. We have implemented various measures in response to the alleged non-compliance. In particular, we examined our practice and set up strict internal control policies to deter our customer service personnel misconduct, including among others, prohibiting our customer service personnel from active calling out without the prior consent of users. However, we cannot assure you that our customer service personnel will not engage in any misconduct, and we are uncertain as to whether our rectification measures will be sufficient to ensure full compliance with the regulatory requirements due to the lack of detailed interpretation and implementation of these requirements. Furthermore, due to the lack of further interpretations, the exact definition and scope of "conducting telesales of insurance products business" under the current regulatory regime is unclear. It is uncertain whether we would be deemed to operate telesales of insurance products business because of the conversation by our customer service personnel. In addition, the current PRC laws and regulations remain unclear as to whether our customer service personnel are required to complete the qualification registration as insurance brokerage practitioners in accordance with the relevant PRC laws and regulations. Given the evolving regulatory environment of the insurance industry, we cannot assure you that we will not be required in the future by the relevant governmental authorities to obtain approval or license to continue our customer services or complete qualification registration for our customer service personnel in a timely manner. If we fail to comply with these laws and regulations, we could be subject to penalties and operational disruption and our financial condition and results of operations could be adversely affected.

Moreover, we have from time to time been subject, and are likely again in the future to be subject to PRC regulatory inquiries, inspections and investigations. If any non-compliance incidents in our business operation are identified, we may be required to take certain rectification measures in accordance with applicable laws and regulations, or we may be subject to other regulatory actions such as administrative penalties. For example, we were identified non-compliance incidents with respect to conducting insurance business in areas where we do not have branches. We are in the process of rectifying relevant non-compliance incidents that we are aware of under the unclear and changing regulatory environment. However, we cannot assure you that we will be able to fully rectify all non-compliance incidents in a timely manner or fully satisfy the regulatory requirements, or we will not be subject to any future regulatory reviews and inspections where other non-compliance incidents might be identified, which might materially and adversely affect our business, financial condition, results of operations and prospects.

In addition, we have been expanding our businesses and may enter into new business areas as we see fit. Due to the complexities and uncertainties of PRC laws and regulations governing the new industries we are going to operate our business in, we cannot assure you that all our new business operations in the future will be in compliance with the relevant laws and regulations applicable to the new industries.

***Any lack of requisite approvals, licenses or permits applicable to our business operation may have a material and adverse impact on our business and results of operations.***

Our business is subject to regulation, and we are required to obtain applicable licenses, permits and approvals from different PRC regulatory authorities in order to conduct or expand our

24

JA-115

Table of Contents

***We leverage third-party user acquisition channels to bring in some of new users to our platforms and may incur significant costs on paying our user acquisition channels service fees.***

In addition to growing our user base organically, we also cooperate with our user acquisition channels to convert their user traffic to user base of our platform. If our user acquisition channels do not renew their agreements with us, choose to work with our competitors, or terminate their cooperation with us, we may lose potential users and our business and results of operations will be negatively affected. In addition, if our user acquisition channels lose influence over their traffic or otherwise fail to effectively convert their users to our users, our business and results of operations may suffer.

Furthermore, we have incurred significant expenses on paying third-party user acquisition channels marketing fees. If certain of existing third-party user acquisition channels require higher rates of marketing fees or we fail to negotiate favorable terms with them or find new third-party user acquisition channels, our cost of user acquisition may increase, and our results of operations may be adversely affected.

***If insurance carriers, user acquisition channel partners, other business partners, outsourced customer service personnel or other ecosystem participants engage in any misconduct or cause errors to occur in our operation, our business could be materially and adversely affected.***

We are exposed to the risk of misconduct by third-party user acquisition channel partners, outsourced customer service personnel or other ecosystem participant and/or business partners to interact with users and provide various services. Misconduct could include making misrepresentations when marketing insurance products to users, recommending mutual aid plans, hiding or falsifying material information in relation to insurance contracts and mutual aid plans terms, colluding with applicants, insureds, or beneficiaries to obtain insurance or mutual aid benefits, failing to disclose legally required information to users, engaging in false claims or otherwise not complying with laws and regulations or our internal policies or procedures. Any of the aforementioned misconduct by parties we cooperate with may cause potential liabilities of us, and further subject us to regulatory actions and penalties. If any third parties that are important to our operations are sanctioned by regulatory actions, our business operations will be disrupted or otherwise negatively affected.

***We are subject to payment processing risk.***

We accept a wide variety of payment methods, including bank transfers and online payments through third-party online payment platforms such as Weixin Pay, UnionPay and Alipay, in order to ensure smooth user experience. For certain payment methods, we pay varying transaction fees, which may increase over time and increase our operating costs and lower our profit margins. We may also be subject to fraud, money laundering and other illegal activities in connection with the various payment methods we accept if we cannot implement risk management measures effectively.

We are also subject to various regulations, rules and requirements, regulatory or otherwise, governing online payment processing and fund transfers, which could change or be reinterpreted to make it difficult or impossible for us to comply with. If we fail to comply with these rules or requirements, we may be subject to fines and higher transaction fees and lose our ability to accept credit and debit card payments from users, process electronic fund transfers or facilitate other types of online payments.

Table of Contents

While our business is influenced by general factors affecting our industry, our results of operations are more directly affected by company-specific factors, including the following major ones:

### Expansion of consumer base

Brokerage income earned from insurance carriers through our Waterdrop Insurance Marketplace is the main source of our revenue, which is significantly affected by the number of insurance consumers on the Waterdrop Insurance Marketplace.

Our insurance consumers mainly come from three sources. Firstly, our medical crowdfunding operation direct substantial traffic to our insurance marketplace. Approximately 46.5%, 23.0% and 13.0% of the FYP generated through Waterdrop Insurance Marketplace for 2018, 2019 and 2020, respectively, was sourced from traffic from our medical crowdfunding platform. Historically, our mutual aid operation also directed traffic to our insurance marketplace. We see the internal source of consumer traffic as an important and unique consumer acquisition resource to us, and in addition we consider this cohort of consumers with stronger awareness of insurance protection and stronger interest in the content and product offerings on our platforms, and more loyal to our services.

In order to continuously diversify our consumer acquisition channels, we also cooperate with other third-party traffic channels to grow our insurance consumer base. In 2018, 2019 and 2020, approximately 1.9%, 34.8% and 44.9% of the FYP generated through Waterdrop Insurance Marketplace was sourced from third-party traffic channels, respectively. We expect third-party traffic channels to play an important role in the future to support the rapid growth of our business. We have faith in our competitive advantages in consumer acquisition cost, as a result of our brand recognition, data insights into insurance consumers, and deep cooperation with major traffic providers in China's internet business.

Last but not the least, consumers attracted to our Waterdrop Insurance Marketplace through natural traffic also contributed to our consumer growth. We will continue to strengthen our brand to attract more insurance consumers. The repeat purchase of a short-term insurance product by a returning consumer after his or her existing short-term policy expires or a new purchase of another insurance product with additional or different coverage by a returning consumer also contributed to FYP growth. In 2020, 31.9% of short-term policy FYP and 86.1% of long-term policy FYP were contributed by returning consumers, compared to 26.5% and 83.6% respectively in 2019.

The table below sets forth the sources of FYPs for the periods presented:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2019 | | 2020 | |
| | (RMB million) | (%) | (RMB million) | (%) | (RMB million) | (%) |
| **Internal traffic** | | | | | | |
|   Medical Crowdfunding | 452 | 46.5 | 1,533 | 23.0 | 1,872 | 13.0 |
|   Mutual Aid | 376 | 38.6 | 829 | 12.4 | 521 | 3.6 |
| Third-party traffic channels | 18 | 1.9 | 2,321 | 34.8 | 6,474 | 44.9 |
| Natural traffic and repeat purchase | 126 | 13.0 | 1,985 | 29.8 | 5,559 | 38.5 |
| **Total** | **972** | **100.0** | **6,668** | **100.0** | **14,426** | **100.0** |

As a result, our consumer base experienced rapid growth in our track record period. The number of consumers on our Waterdrop Insurance Marketplace increased approximately from 1.6 million in 2018 to 7.8 million in 2019 and further to 12.6 million in 2020. Aside from these consumers, we also had 3.6 million, 14.0 million and 51.2 million gift insurance policyholders in

93

JA-117

2018, 2019 and 2020 who subscribed to insurance policies through us for free as a result of our promotional activities. These policyholders form a promising base of potential insurance consumers from a user conversion perspective.

*First year premium per consumer*

As the consumers' awareness for health protection and insurance products in China were still substantially lower than in developed countries, many insurance consumers on our platform start with purchases of short-term products. We began to offer long-term health and life insurance products at the end of 2018, and we have been endeavoring to raise consumer awareness, and demonstrate the value and importance of long-term health and life insurance through our interactions with them. We soon won the trust of insurance consumers with their important purchases — the FYP per policy of long-term health and life insurance products generated through us in 2020 reached RMB4,149.5. Long-term health and life insurance products accounted for 8.3% and 17.4% of the FYP generated through us in 2019 and 2020, and consequently the FYP per policy increased from RMB442.6 in 2018 to RMB619.9 in 2019 and further to RMB819.1 in 2020.

In addition to premium per policy, the growth in the number of policy per consumer, from 1.3 in 2018 to 1.4 in 2019 and 2020, also contributed to the increase in premium per consumer. We believe that consumers stick to our services and repeat their purchases on our platform most importantly because of the attractive product price and the consumer-friendly features of products offered at our platform. Our large consumer base and strong business growth allow us to negotiate favorable terms in our business cooperation with insurance carriers. We work with insurance carriers, our customers, to design and develop tailor-made insurance products for consumers leveraging our cutting-edge technology such as big data analysis. All of the top five insurance products in terms of FYP generated through us in 2019 and 2020 are tailor-made insurance products.

As a result of the above, the FYP per consumer increased from RMB590.1 in 2018 to RMB859.1 in 2019 and further to RMB1,143.2 in 2020.

*Cooperation with insurance carriers*

We cooperate with insurance carriers to offer their standard insurance products or to design and develop tailor-made insurance products, and our relationship with insurance carriers is crucial to our success. As of December 31, 2020, we had established business cooperation with 62 insurance carriers. We need to keep the growth of our business, brand influence, value-added technology service capabilities and risk management capabilities so as to strengthen and deepen the cooperation with our existing insurance carriers. We also plan to expand our claim review service to cover the long-term insurance products and deepen the cooperation with long-term insurance product suppliers.

*Operating efficiency and leverage*

We have incurred significant costs and expenses in building our platform, growing our consumer base and developing capabilities in data analysis and technology. Our business model is highly scalable and our platform is built to support our continued growth. We expect our operating costs and expenses to decrease as a proportion of our revenues as we improve the operating efficiency of our platform and achieve more economies of scale.

Our total operating costs and expenses as a percentage of net operating revenue decreased from 179.0% in 2018 to 112.9% in 2019 and changed to 116.4% in 2020, within which general and administrative expenses as a percentage of net operating revenue changed from 53.0% in 2018 to 9.5% in 2019 and 13.4% in 2020. Our general and administrative expenses for year 2018, 2019 and

94

Table of Contents

and apps. We also provide technical service, and further refer potential users to certain insurance brokerage or agency companies. We are exploring to broaden our technical service offerings and diversify our technical service income sources.

*Other revenues.*    We derive other revenues mainly from commission revenue from online sales of agricultural produce and health products, and other service revenues on behalf of third-party merchants. We act as agent in this scenario and charge a commission fee at a certain percentage of the revenue achieved by the third-party merchants through our platforms.

### Operating costs and expenses

Our operating costs and expenses consist of operating costs, sales and marketing expenses, general and administrative expenses, research and development expenses. The following table sets forth the breakdown of our total operating costs and expenses, in amounts and as percentages of net operating revenue for each of the years presented:

| | For the Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2018 | | 2019 | | 2020 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | (in thousands, except for percentage data) | | | | | | |
| **Operating costs and expenses:** | | | | | | | |
| Operating costs | 45,932 | 19.3 | 291,310 | 19.3 | 742,258 | 113,755 | 24.5 |
| Sales and marketing expenses | 184,943 | 77.7 | 1,056,494 | 69.9 | 2,130,535 | 326,519 | 70.4 |
| General and administrative expenses | 126,242 | 53.0 | 142,995 | 9.5 | 407,171 | 62,402 | 13.4 |
| Research and development expenses | 69,196 | 29.0 | 214,646 | 14.2 | 244,230 | 37,430 | 8.1 |
| **Total operating costs and expenses:** | 426,313 | 179.0 | 1,705,445 | 112.9 | 3,524,194 | 540,106 | 116.4 |

*Operating costs.*    Operating costs primarily consists of (i) payroll and related expenses for insurance agents and consultants, employees involved in payout investigation function for mutual aid plans, and customer service personnel, (ii) payout investigation cost of mutual aid plans, which is in the form of service fee paid to third-party investigation companies only for approved cases; (iii) transaction fees charged by third-party payment platforms relating to insurance brokerage services and management of mutual aid plans, and (iv) charges for the usage of the server and cloud service incurred for operational support of the platforms, and the expenses of facilities and equipment, such as depreciation expenses, rental and others, attributed to our principal operations. We expect our operating costs to increase in absolute terms as our scale of business grows. However, as we improve the operating efficiency of our platform and achieve more economies of scale, we expect our operating costs as a percentage of our net operating revenue will decrease in the foreseeable future.

*Sales and marketing expenses.*    Our sales and marketing expenses primarily consist of (i) marketing expenses for user acquisition and brand building, (ii) payroll and related expenses for employees involved in sales and marketing functions, (iii) the associated expenses of facilities and equipment, such as depreciation expenses, rental and others, and (iv) promotional rewards to our users, which mainly include gift insurance products and gift physical examination, etc.

*General and administrative expenses.*    Our general and administrative expenses mainly consist of (i) payroll and related expenses for employees engaging in general corporate functions, including the share-based compensation expenses, (ii) transaction fees charged for medical crowdfunding operation and other general corporate purposes, and (iii) expenses associated with

97

[Table of Contents](#)

adjustments, consisting only of normal and recurring adjustments, that our management considered necessary for a fair statement of our financial position and results of operation for the quarters presented.

| | For the Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | March 31, 2019 | June 30, 2019 | September 30, 2019 | December 31, 2019 | March 31, 2020 | June 30, 2020 | September 30, 2020 | December 31, 2020 |
| | | | | (Unaudited) (in RMB thousands) | | | | |
| Operating revenue, net | 140,760 | 330,383 | 502,075 | 537,747 | 653,795 | 680,839 | 862,971 | 830,343 |
| Total operating costs and expenses | (209,144) | (299,569) | (499,326) | (697,406) | (764,864) | (673,636) | (982,601) | (1,103,093) |
| Operating profit/(loss) | (68,384) | 30,814 | 2,749 | (159,659) | (111,069) | 7,203 | (119,630) | (272,750) |
| Interest income/(expense) | (45) | 3,370 | 3,480 | 3,728 | 5,312 | 5,525 | 6,845 | 8,833 |
| Fair value change of warrant | — | — | — | — | — | — | (441) | (150,244) |
| Foreign currency exchange gain/(loss) | 343 | (2,554) | (28) | 6,391 | 5,235 | 941 | (5,204) | (2,307) |
| Others, net | (216) | 281 | (735) | 1,487 | 1,632 | 2,889 | 4,432 | (901) |
| Profit/(loss) before income tax, and share of results of equity method investee | (68,302) | 31,911 | 5,466 | (148,053) | (98,890) | 16,558 | (113,998) | (417,369) |
| Income tax benefit/(expense) | (16,155) | (40,302) | (54,183) | (31,888) | (21,838) | (16,575) | (25,313) | 13,571 |
| Share of results of equity method investee. | 8 | (26) | (4) | (7) | (3) | (2) | (10) | — |
| Net loss attributable to Waterdrop Inc. | (84,449) | (8,417) | (48,721) | (179,948) | (120,731) | (19) | (139,321) | (403,798) |

We do not consider our results of operation subject to strong seasonality, as insurance consumers make their purchase of healthcare protection insurance policy throughout the year. The fluctuation presented above in the eight quarters are the combined result of our continuing growth of scale as well as certain one-off factors and specific business decisions. We also greatly expanded our sales and marketing force to promote sales of long-term health and life insurances in the fourth quarter of 2020, which affected our net profitability of that quarter.

## Non-GAAP Financial Measures

We use two non-GAAP financial measures, adjusted net loss and adjusted EBITDA, in evaluating our operating results and for financial and operational decision-making purposes. Adjusted net loss represents net loss excluding share-based compensation expense, foreign currency exchange gain or losses, fair value change of warrant and share of results of equity method investee. Such adjustments have no impact on income tax. Adjusted EBITDA represents adjusted net loss excluding depreciation and amortization, interest income and income tax expense.

We present the non-GAAP financial measures because they are used by our management to evaluate our operating performance and formulate business plans. Adjusted net loss and adjusted EBITDA enable our management to assess our operating results without considering the impact of share-based compensation expense, foreign currency exchange gain or losses, fair value change of warrant, share of results of equity method investee, depreciation, interest income and income tax expense. We believe that adjusted net loss and adjusted EBITDA help identify underlying trends in our business that could otherwise be distorted by the effect of certain expenses that are included in net loss. We also believe that the use of the non-GAAP measures facilitate investors' assessment of our operating performance. We believe that adjusted net loss and adjusted EBITDA provide useful

**Table of Contents**

Convention, we have established a blacklist of dishonest patients who committed fabricating medical records, exaggerating medical conditions, or embezzling medical funds for other use. We publish the blacklist on our platforms and update it on a continuous basis. Internet platforms subject to the Self-Discipline Convention will not provide services to patients on such blacklist.

### Dedicated Crowdfunding Consultants Team

We contracted a crowdfunding consultant team dedicated to serve patients offline. As of December 31, 2020, our contracted offline crowdfunding consultants cover hospitals and medical service personnel across 31 provinces and 297 cities nationwide. We also maintain an online crowdfunding consultant team standing by for direct online users or patients not covered by our offline personnel. Our crowdfunding consultants answer general enquires, conduct initial patient identify verification and campaign review. Our crowdfunding consultants receive specialized training on standard service process and common medical knowledge, and are evaluated and incentivized not based on sheer quantity but on successful crowdfunding campaigns they have served, their service quality, and compliance with regulations and our internal policies.

## Waterdrop Mutual Aid

### A Mutual Aid Collective to Ease Medical Cost Burden

We operated Waterdrop Mutual Aid between May 2016 and March 2021, a mutual aid collective where participants help each other to ease the medical cost burden of over 100 types of critical illness. It served not only as an alternative medical cost coverage for participants, but also as a scenario for educating and familiarizing them the importance of insurance coverage.

Shared cost, calculated by dividing the payout amount and management fee by the number of active plan participants, would be borne by a participant only when another participant within the same plan received a payout. Our mutual aid plans provided affordable health protection, with a participant's average annual shared cost for a mutual aid plan generally ranging from RMB20 to RMB100 depending on the specific plan.

After joining a mutual aid plan, the participant was required to make payment into his or her plan account for future shared costs deduction, either by setting up automatic payment or manually paying into the account. If the participant chose the former, an automatic payment would be made the day following the activation, and automatic payments to the account would be made each month to maintain a certain level of balance. If the participant chose the latter, he or she will have discretion over the amount and timing of prepayment into the account. If the participant's account balance fell below a certain level, he or she would become ineligible for the mutual aid plan benefits.

### Role of Waterdrop Mutual Aid

We designed and managed mutual aid plans. All payments were equally borne by every participant. We did not have obligations of paying or compensating under our mutual aid plans. For each payout, we charged an additional plan management fee at a fixed rate of the respective amount. We started to charge the fee in 2019, and recognized management fee income of RMB56.5 million in 2019 and RMB40.2 million (US$6.2 million) in 2020.

The process of designing a mutual aid plan included establishing targeted participants, setting scope and extent of protection, and predicting the shared cost. Catering for different participant needs and acceptable shared cost, we had developed and offered layered mutual aid plans, primarily including Children's Health Mutual, Youth Critical Disease Mutual, Elderly Cancer Mutual, and Comprehensive Accident Mutual.

139

Table of Contents

**WATERDROP INC.**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(All amounts in thousands, except for share and per share data, or otherwise noted)**

**21. Statutory Reserves and Restricted Net Asset (Continued)**

expansion reserve, and staff welfare and bonus reserve, all of which are appropriated from net profit as reported in their PRC statutory accounts. The Group's PRC subsidiaries and VIEs are required to appropriate at least 10% of their after-tax profits to the general reserve until such reserve has reached 50% of their respective registered capital.

Appropriations to the enterprise expansion reserve and the staff welfare and bonus reserve are to be made at the discretion of the board of directors of each of the Group's PRC subsidiaries and VIEs. There were no appropriations to these reserves by the Group's PRC entities for the years ended December 31, 2018, 2019 and 2020.

As a result of PRC laws and regulations and the requirement that distributions by the PRC entity can only be paid out of distributable profits computed in accordance with the PRC GAAP, the PRC entity is restricted from transferring a portion of their net assets to the Company. Amounts restricted include paid-in capital and statutory reserves of the Group's subsidiaries and VIEs. As of December 31, 2020, the aggregate amounts of paid-in capital and statutory reserves represented the amount of net assets of the relevant entity in the Group not available for distribution amounted to RMB 888,895.

**22. Subsequent Event**

The Group has evaluated events subsequent to the balance sheet date of December 31, 2020 through April 2, 2021, which is the date the consolidated financial statements were available to be issued.

On March 26, 2021, the Group announced that it will cease the operation of its Waterdrop Mutual Aid platform effective immediately. As part of the transition, the Group voluntarily offers to cover participants' eligible medical expense during the transition period using its own cash. To further attract mutual aid participants to migrate as potential insurance policyholders to its insurance marketplace, the Group also voluntarily offered a one-year complementary health insurance policy for each participant with a similar coverage enjoyed under the original mutual aid plan. The Group has assessed and concluded that the cessation of the mutual aid platform operation is a non-recognized subsequent event given the cessation decision is made in 2021 following recent industry environment changes. The additional medical expense coverage payout made by the Group and the premium cost of the one-year insurance will be accounted for as a reduction of management fee revenue previously recognized for each participant to the extent of the cumulative amount earned until March 26, 2021. Any portion in excess will be recorded as an expense. The Group is in the process of quantifying the amount.

F-54

# EXHIBIT B

**Waterdrop Inc. Announces First Quarter 2021 Unaudited Financial Results**

BEIJING, June 17, 2021 – Waterdrop Inc. ("Waterdrop", the "Company" or "we") (NYSE: WDH), a leading technology platform dedicated to insurance and healthcare service with a positive social impact, today announced its unaudited financial results for the first quarter ended March 31, 2021.

**Financial and Operational Highlights for the First Quarter of 2021**

- We achieved solid business growth in the first quarter of 2021. The first-year premiums ("FYP") generated through our Waterdrop Insurance Marketplace reached RMB4,469 million (US$682.1 million), representing an increase of 42.7% year-over-year.
- The number of insurance customers and FYP per customer both grew rapidly. Our cumulative paying insurance customers reached 21.9 million as of March 31, 2021. The FYP per customer increased to RMB1,165, or by 32.1% year-over-year.
- We continued to expand our product offerings. As of March 31, 2021, we offered 240 insurance products on our platform, as compared with 200 as of December 31, 2020. Over 90% of our FYP was contributed by our exclusive customized insurance products. In terms of product mix, the FYP of critical illness insurance, increased by 131.8% in the first quarter of 2021, primarily contributed by the design and sales of products under the new regulatory definition of critical illness.
- Our consumer acquisition channels achieved a balanced growth. The FYP generated from internal traffic (excluding mutual aid channel), third-party traffic, and natural traffic and repeat purchases increased by 65.2%, 51.6% and 48.4% year-over-year, respectively.
- Net operating revenue increased by 35.1% to RMB883.4 million (US$134.8 million) year-over-year. Excluding the impact from the cessation of our mutual aid business in March 2021, the adjusted net operating revenue increased by 43.2% year-over-year.
- As of March 31, 2021, approximately 360 million people donated an aggregate of over RMB40 billion to nearly 1.9 million patients through our Waterdrop Medical Crowdfunding. Waterdrop Medical Crowdfunding charges zero service fees and we do not generate any revenues from Waterdrop Medical Crowdfunding.

Mr. Peng Shen, Founder, Chairman and Chief Executive Officer of Waterdrop, commented, "We are pleased to report strong financial and operational growth for the first quarter of 2021 in our first earnings release as a public company. Since our inception in 2016, we have benefited from robust industry development and achieved above-industry growth, and our unique business model has allowed us to become a leading integrated technology platform for insurance and healthcare service in China. Our business model, strong data insights, and technical capabilities have contributed to improving the overall efficiencies of the broader industry, while also empowering our insurance carrier partners. Moving forward, we are going to continue playing a positive role in advancing the diversified medical payment system in China and partake in the rapid growth of the massive Chinese insurance and healthcare market."

Mr. Guang Yang, Co-founder, Director and General Manager of Insurance Marketplace, commented, "On the product side, we continued to develop customized products through deeper collaborations with our partner insurance companies. Among all products we offer to customers and by FYP contribution, over 90% are customized and co-designed by us and insurance carriers. In light of the introduction of the new regulatory definition of critical illness, we shifted our product offerings to adapt to the new definition and requirements to better cater to customer needs, and ensure our sustainable growth. In addition, we consistently diversify our customer acquisition channels, and the contribution from natural traffic and repeat purchases as a percentage of total FYP continued its upward trend."

Mr. Kangping Shi, Chief Financial Officer of Waterdrop, added, "We had a solid first quarter starting the year with both FYP and net operating revenues up 42.7% and 35.1%, respectively, from the same period of last year. The increase in operating costs and expenses were mainly attributable to expenses related with the cessation of mutual aid business. For 2021, we expect our FYP and top line to grow rapidly, and we will continue to improve our unit economics performance by optimizing our customer acquisition strategy."

**Financial Results for the First Quarter of 2021**

JA-124

*Operating revenue, net*

Net operating revenue for the first quarter of 2021 increased by 35.1% to RMB883.4 million (US$134.8 million) from RMB653.8 million for the same period of 2020, which was primarily due to the growth of insurance brokerage income and technical service income.

- Net operating revenue from management fee income decreased from RMB38.9 million for the first quarter of 2020 to RMB2.7 million (US$0.4 million) for the first quarter of 2021, which was mainly due to the cessation of the mutual aid business at the end of March 2021. Excluding management fee income from mutual aid business, the Company generated adjusted net operating revenue of RMB880.6 million (US$134.4 million) for the first quarter of 2021, representing an increase of 43.2% compared with the same period of 2020.

- On March 26, 2021, the Company announced the cessation of the Waterdrop Mutual Aid business by the end of March 2021. In connection with this, the Company voluntarily covered mutual aid participants' medical expenses arising from medical conditions diagnosed before March 31, 2021 that would have formerly been covered by the ceased mutual aid plan, subject to certain procedural requirements and eligibility criteria. Following this adjustment, the Company upgraded its services and offered a one-year complementary health insurance policy to each participant with a similar coverage as the participant's original mutual aid plan. Starting from the end of March 2021, with the cessation of the Waterdrop Mutual Aid operation, the corresponding management fee income is no longer a revenue stream for the Company. The estimated cost of medical expense coverage is RMB15.0 million (US$2.3 million) and the estimated cost of one-year health insurance coverage is RMB81.7 million (US$12.5 million). RMB19.9 million (US$3.0 million) was accounted for as a reduction of management fee revenue previously recognized for each participant to the extent of the cumulative amount earned until March 26, 2021. RMB76.8 million (US$11.8 million) was recorded as operating costs.

*Operating costs and expenses*

Operating costs and expenses increased by RMB579.1 million, or 75.7%, to RMB1,343.9 million (US$205.1 million) for the first quarter of 2021 from RMB764.9 million for the same period of 2020.

- Operating costs increased by 125.5% year-over-year to RMB300.6 million (US$45.9 million) for the first quarter of 2021, compared with RMB133.3 million for the first quarter of 2020, which was mainly due to (i) the cost of RMB76.8 million that incurred in relation to the cessation of the Waterdrop Mutual Aid business, (ii) RMB30.8 million increase in personnel cost as our consultants and insurance agents team rapidly expanded to support the business growth, and (iii) RMB44.3 million increase in professional and outsourced customer service fees.

- Sales and marketing expenses increased by 67.7% year-over-year to RMB837.2 million (US$127.8 million) for the first quarter of 2021, compared with RMB499.2 million for the first quarter of 2020. The increase was primarily due to (i) a RMB247.8 million increase in marketing expenses to third-party traffic channels as a result of our business expansion and branding promotions, and (ii) a RMB100.7 million increase in outsourced sales and marketing service fees to third parties.

- General and administrative expenses increased by 87.2% year-over-year to RMB121.3 million (US$18.5 million) for the first quarter of 2021, compared with RMB64.8 million for the first quarter of 2020. The increase was primarily due to (i) a RMB44.6 million increase in share-based compensation expenses, and (ii) an increase of RMB11.5 million in professional fees and personnel cost.

- Research and development expenses increased by 25.6% year-over-year to RMB84.9 million (US$13.0 million) for the first quarter of 2021, compared with RMB67.6 million for the first quarter of 2020. The increase was primarily due to a RMB16.2 million increase in research and development personnel cost and related expenses, as our research and development team continued to expand to enhance our competitive capabilities in technology.

*Operating loss* for the first quarter of 2021 was RMB460.6 million (US$70.3 million), compared with operating loss of RMB111.1 million for the same period of 2020.

JA-125

*Interest income* for the first quarter of 2021 was RMB13.2 million (US$2.0 million), compared with RMB5.3 million for the same period of 2020. The increase was primarily due to the increase in cash balance as a result of the receipt of proceeds from private equity financings and interest income from short-term investment. The Company does not generate interest income from the crowdfunding business.

*Income tax benefit* for the first quarter of 2021 was RMB74.3 million (US$11.3 million), compared with income tax expense of RMB21.8 million for the same period of 2020.

*Net loss attributable to Waterdrop* for the first quarter of 2021 was RMB370.2 million (US$56.5 million), compared with net loss of RMB120.7 million for the same period of 2020.

*Adjusted net loss attributable to Waterdrop* for the first quarter of 2021 was RMB203.1 million (US$31.0 million), compared with RMB106.5 million for the same period of 2020. Adjusted net margin was negative 23.0% for the first quarter of 2021, compared with negative 16.3% for the first quarter of 2020.

### Cash and cash equivalents and restricted cash

As of March 31, 2021, the Company had combined cash and cash equivalents and restricted cash of RMB1,705.4 million (US$260.3 million), as compared with RMB1,323.3 million as of December 31, 2020.

### Business Outlook

The Company expects the FYP generated through Waterdrop Insurance Marketplace to grow more than 50% year-over-year for the second quarter of 2021. This forecast is based on the current market conditions and reflects the Company's preliminary view and estimates, which are all subject to changes.

### Exchange Rate

This announcement contains translations of certain RMB amounts into U.S. dollars ("USD") at specified rates solely for the convenience of the reader. Unless otherwise stated, all translations from RMB to USD were made at the rate of RMB6.5518 to US$1.00, the noon buying rate in effect on March 31, 2021 in the H.10 statistical release of the Federal Reserve Board. The Company makes no representation that the RMB or USD amounts referred could be converted into USD or RMB, as the case may be, at any particular rate or at all. For analytical presentation, all percentages are calculated using the numbers presented in the financial statements contained in this earnings release.

### Non-GAAP Financial Measures

The Company use non-GAAP financial measures, such as adjusted net operating revenue and adjusted net loss, in evaluating the Company's operating results and for financial and operational decision-making purposes. Adjusted net operating revenue represents net operating revenue excluding management fee income from mutual aid business. Adjusted net loss represents net loss excluding share-based compensation expense, impact of terminating the mutual aid plan, foreign currency exchange gain or losses, and share of results of equity method investee. Such adjustments have no impact on income tax.

These non-GAAP financial measures should not be considered in isolation or construed as an alternative to net loss or any other measure of performance or as an indicator of our operating performance. Investors are encouraged to review the Company's historical non-GAAP financial measures to the most directly comparable GAAP measures. Adjusted net operating revenue and adjusted net loss presented here may not be comparable to similarly titled measures presented by other companies. Other companies may calculate similarly titled measures differently, limiting their usefulness as comparative measures to our data. The Company encourage investors and others to review its financial information in its entirety and not rely on a single financial measure.

### Safe Harbor Statement

This press release contains statements that may constitute "forward-looking" statements pursuant to the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. These forward-looking statements can be identified by terminology such as "will," "expects," "anticipates," "aims," "future," "intends," "plans," "believes," "estimates," "likely to" and similar

JA-126

statements. Among other things, quotations in this announcement, contain forward-looking statements. Waterdrop may also make written or oral forward-looking statements in its periodic reports to the U.S. Securities and Exchange Commission (the "SEC"), in its annual report to shareholders, in press releases and other written materials and in oral statements made by its officers, directors or employees to third parties. Statements that are not historical facts, including statements about Waterdrop's beliefs, plans and expectations, are forward-looking statements. Forward-looking statements involve inherent risks and uncertainties. A number of factors could cause actual results to differ materially from those contained in any forward-looking statement, including but not limited to the following: Waterdrop's mission, goals and strategies; Waterdrop's future business development, financial condition and results of operations; the expected growth of the insurance and online healthcare industry in China; Waterdrop's expectations regarding demand for and market acceptance of our products and services; Waterdrop's expectations regarding its relationships with consumers, insurance carriers and other partners; competition in the industry and relevant government policies and regulations relating to insurance and online healthcare industry. Further information regarding these and other risks is included in Waterdrop's filings with the SEC. All information provided in this press release is as of the date of this press release, and Waterdrop does not undertake any obligation to update any forward-looking statement, except as required under applicable law.

**Conference Call Information**

Waterdrop's management team will hold a conference call on June 17, 2021 at 8:00 AM U.S. Eastern Time (8:00 PM Beijing/Hong Kong Time on the same day) to discuss the financial results. Dial-in details for the earnings conference call are as follows:

| | |
|---|---|
| United States: | 1-888-317-6003 |
| Hong Kong: | 852-580-81995 |
| Mainland China: | 4001-206115 |
| International: | 1-412-317-6061 |
| Elite Entry Number: | 8371404 # |

Please dial in 15 minutes before the call is scheduled to begin and provide the Elite Entry Number to join the call.

A telephone replay will be accessible through June 24, 2021 by dialing the following numbers:

| | |
|---|---|
| United States: | 1- 877-344-7529 |
| International: | 1-412-317-0088 |
| Access Code: | 10157332 # |

A live and archived webcast of the conference call will also be available at the Company's investor relations website at http://ir.waterdrop-inc.com/.

**About Waterdrop Inc.**

Waterdrop Inc. (NYSE: WDH) is a leading technology platform dedicated to insurance and healthcare service with a positive social impact. Founded in 2016, with the comprehensive coverage of Waterdrop Insurance Marketplace and Medical Crowdfunding, Waterdrop aims to bring insurance and healthcare service to billions through technology. For more information, please visit www.waterdrop-inc.com.

**For investor inquiries, please contact**

Waterdrop Inc.
Xiaojiao Cui
IR@shuidi-inc.com

Christensen

In China
Mr. Eric Yuan
Phone: +86-1380-111-0739

4

JA-127

E-mail: Eyuan@christensenir.com

In US
Ms. Linda Bergkamp
Phone: +1-480-614-3004
Email: lbergkamp@christensenir.com

JA-128

**WATERDROP INC.**
**Unaudited Condensed Consolidated Balance Sheets**
**(All amounts in thousands, unless otherwise noted)**

| | As of | | |
|---|---|---|---|
| | December 31, 2020 | March 31, 2021 | |
| | RMB | RMB | USD |
| **Assets** | | | |
| **Current assets** | | | |
| Cash and cash equivalents | 1,061,962 | 1,107,394 | 169,021 |
| Restricted cash | 261,387 | 598,027 | 91,277 |
| Short-term investments | 1,193,160 | 519,661 | 79,316 |
| Accounts receivable | 539,791 | 645,463 | 98,517 |
| Current contract assets | 824,544 | 820,264 | 125,197 |
| Amount due from related parties | 813 | 439 | 67 |
| Prepaid expense and other assets | 651,080 | 499,674 | 76,263 |
| **Total current assets** | **4,532,737** | **4,190,922** | **639,658** |
| **Non-current assets** | | | |
| Non-current contract assets | 24,006 | 24,215 | 3,696 |
| Property, equipment and software, net | 28,724 | 36,873 | 5,628 |
| Intangible assets, net | 53,034 | 56,806 | 8,670 |
| Long-term investments | 2,741 | 2,749 | 420 |
| Right of use assets, net | 60,694 | 57,001 | 8,700 |
| Goodwill | 3,119 | 3,119 | 476 |
| **Total non-current assets** | **172,318** | **180,763** | **27,590** |
| **Total assets** | **4,705,055** | **4,371,685** | **667,248** |
| **Liabilities, Mezzanine Equity and Shareholders' Deficit** | | | |
| **Current liabilities** | | | |
| Amount due to related parties | 9,789 | 12,295 | 1,877 |
| Insurance premium payables | 607,326 | 602,608 | 91,976 |
| Deferred revenue | 22,017 | 11,374 | 1,736 |
| Accrued expenses and other current liabilities | 595,606 | 702,597 | 107,237 |
| Current lease liabilities | 36,551 | 37,497 | 5,723 |
| **Total current liabilities** | **1,271,289** | **1,366,371** | **208,549** |
| **Non-current liabilities** | | | |
| Non-current lease liabilities | 27,709 | 23,150 | 3,533 |
| Deferred tax liabilities | 225,745 | 151,969 | 23,195 |
| **Total non-current liabilities** | **253,454** | **175,119** | **26,728** |
| **Total liabilities** | **1,524,743** | **1,541,490** | **235,277** |
| **Total mezzanine equity** | **4,837,336** | **4,947,623** | **755,154** |
| **Shareholders' deficit** | | | |
| Ordinary shares | 41 | 41 | 6 |
| Additional paid-in capital | - | - | - |
| Accumulated other comprehensive income | 14,956 | 13,241 | 2,021 |
| Accumulated deficit | (1,672,021) | (2,130,710) | (325,210) |
| **Total shareholders' deficit** | **(1,657,024)** | **(2,117,428)** | **(323,183)** |
| **Total liabilities, mezzanine equity and shareholders' deficit** | **4,705,055** | **4,371,685** | **667,248** |

JA-129

**WATERDROP INC.**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**
**(All amounts in thousands, except for share and per share data, or otherwise noted)**

| | For the Three Months Ended March 31, | | |
|---|---|---|---|
| | 2020 | 2021 | |
| | RMB | RMB | USD |
| Operating revenue, net | 653,795 | 883,367 | 134,828 |
| Operating costs and expenses[(i)] | | | |
|    Operating costs | (133,288) | (300,608) | (45,882) |
|    Sales and marketing expenses | (499,201) | (837,153) | (127,775) |
|    General and administrative expenses | (64,765) | (121,287) | (18,512) |
|    Research and development expenses | (67,610) | (84,875) | (12,954) |
| Total operating costs and expenses | (764,864) | (1,343,923) | (205,123) |
| Operating loss | (111,069) | (460,556) | (70,295) |
| Other income | | | |
|    Interest income | 5,312 | 13,215 | 2,017 |
|    Foreign currency exchange gain | 5,235 | 784 | 120 |
|    Others, net | 1,632 | 2,101 | 321 |
| Loss before income tax, and share of loss in equity method investee | (98,890) | (444,456) | (67,837) |
|    Income tax (expense)/benefit | (21,838) | 74,300 | 11,340 |
|    Share of loss in equity method investee | (3) | - | - |
| Net loss attributable to Waterdrop Inc. | (120,731) | (370,156) | (56,497) |
|    Preferred shares redemption value accretion | (53,636) | (110,287) | (16,833) |
| Net loss attributable to ordinary shareholders | (174,367) | (480,443) | (73,330) |
| Net loss | (120,731) | (370,156) | (56,497) |
| Other comprehensive (income)/loss: | | | |
|    Foreign currency translation adjustment, net of tax | 61 | (2,782) | (425) |
|    Unrealized gains on available for sale investments, net of tax | 25 | 1,067 | 163 |
| Comprehensive loss | (120,645) | (371,871) | (56,759) |
| Weighted average number of ordinary shares used in computing net loss per share | | | |
|    Basic and diluted | 1,193,727,557 | 1,191,599,014 | 1,191,599,014 |
| Net loss per share attributable to ordinary shareholders | | | |
|    Basic and diluted | (0.15) | (0.40) | (0.06) |

(i)     Share-based compensation expenses are included in the operating costs and expenses as follows:

| | For the Three Months Ended March 31, | | |
|---|---|---|---|
| | 2020 | 2021 | |
| | RMB | RMB | USD |
| Sales and marketing expenses | (322) | (2,981) | (455) |
| General and administrative expenses | (17,389) | (62,021) | (9,466) |
| Research and development expenses | (1,722) | (6,176) | (943) |
| Total | (19,433) | (71,178) | (10,864) |

7

JA-130

**WATERDROP INC.**
**Reconciliations of GAAP and Non-GAAP Results**
**(All amounts in thousands, unless otherwise noted)**

| | For the Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2021** | |
| | **RMB** | **RMB** | **USD** |
| **Net operating revenue** | **653,795** | **883,367** | **134,828** |
| **Less:** | | | |
| Management fee income | 38,886 | 2,745[(ii)] | 419 |
| **Adjusted net operating revenue** | **614,909** | **880,622** | **134,409** |

| | For the Three Months Ended March 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2021** | |
| | **RMB** | **RMB** | **USD** |
| **Net loss** | **(120,731)** | **(370,156)** | **(56,497)** |
| **Add:** | | | |
| Share-based compensation expense | 19,433 | 71,178 | 10,864 |
| Foreign currency exchange gain | (5,235) | (784) | (120) |
| Impact of terminating the mutual aid plan [(iii)] | - | 96,697 | 14,759 |
| Share of results of equity method investee | 3 | - | - |
| **Adjusted net loss** | **(106,530)** | **(203,065)** | **(30,994)** |

(ii)    This represents management fee revenue related to the mutual aid business for the first quarter of 2021 after recording the RMB19.9 million reduction of management fee revenue previously recognized for each participant to the extent of the cumulative amount earned until March 26, 2021.

(iii)    This represents the estimated cost of medical expenses and cost of one-year health insurance coverage. RMB19.9 million (US$3.0 million) was accounted for as a reduction of management fee revenue previously recognized for each participant to the extent of the cumulative amount earned until March 26, 2021. RMB76.8 million (US$11.8 million) was recorded as operating costs.

JA-131

# EXHIBIT C

**Waterdrop Inc. Announces Second Quarter 2021 Unaudited Financial Results**

BEIJING, September 8, 2021 - Waterdrop Inc. ("Waterdrop", the "Company" or "we") (NYSE: WDH), a leading technology platform dedicated to insurance and healthcare service with a positive social impact, today announced its unaudited financial results for the second quarter ended June 30, 2021.

**Financial and Operational Highlights for the Second Quarter of 2021**

- We achieved outstanding business growth in the second quarter of 2021. The first-year premiums ("FYP") generated through our Waterdrop Insurance Marketplace for the second quarter reached RMB5,357 million (US$829.6 million), representing an increase of 94.1% year over year.
- The number of insurance customers and FYP per customer both grew rapidly. A total of 4.2 million customers purchased insurance policies from Waterdrop during the second quarter of 2021, an increase of 53.0% year over year. The number of cumulative insurance customers reached 102.1 million and cumulative paying insurance customers reached 24.9 million as of June 30, 2021. The FYP per customer increased to RMB1,267, or 26.9% year over year.
- We continued to expand and enrich our product offerings. As of June 30, 2021, we offered 275 insurance products on our platform. Over 90% of our FYP was contributed by our exclusive customized insurance products. In terms of product mix, the FYP of critical illness insurance increased by 120% in the second quarter of 2021, continuing our strong performance seen in the first quarter after the changes in the regulatory definition of critical illness.
- Net operating revenue increased by 38.0% to RMB939.4 million (US$145.5 million) year over year. Excluding the impact from the cessation of our mutual aid business in March 2021, the adjusted net operating revenue[1] increased by 44.4% year over year.
- As of June 30, 2021, approximately 372 million people donated an aggregate of over RMB42.8 billion to nearly 2.1 million patients through our Waterdrop Medical Crowdfunding. Waterdrop Medical Crowdfunding charges zero service fees and we do not generate any revenues from medical crowdfunding business.

Mr. Peng Shen, Founder, Chairman and Chief Executive Officer of Waterdrop, commented, "Waterdrop's listing on the NYSE in the second quarter of 2021 marked an important milestone since our inception. Recently, the capital markets have witnessed an increase in volatility and the insurance industry in China has entered a period of transformation, which has affected the overall investment sentiment. We believe our well-established business infrastructure, organizational capabilities, and competitive advantages will allow us to efficiently adapt to the new trends and challenges. To demonstrate our confidence in the long-term sustainable development and consistent commitment to generating shareholder value, we have decided to launch a share repurchase program and have obtained the Board approval."

Mr. Guang Yang, Co-founder, Director and General Manager of Insurance Marketplace, commented, "We strive to serve a broader range of users with better customer experience, to develop products and services tailored for different groups, and to contribute to new innovations on the supply side. During the second quarter, we have made some encouraging progress in offering new products that go beyond our existing portfolio, including but not limited to cancer insurance, outpatient medical insurance, and critical illness insurance for substandard groups. In terms of channel development, we have been evaluating the market window for appropriate opportunities to invest in external traffic and build vast customer base. To improve our efficiency in external traffic channels, we have also increased the use of technological applications and automatic service tools. We believe recent regulatory initiatives will benefit the long-term development of the industry. We will remain fully compliant with regulatory requirements and take the lead in upgrading and optimizing business model for online insurance."

Mr. Kangping Shi, Chief Financial Officer of Waterdrop, added, "Although the overall industry growth decelerated in the second quarter, we managed to achieve strong growth of 44.4% year over year in adjusted net revenue on a comparable basis. This performance has demonstrated our proven success in customer acquisition, aptitude in customer service, as well as the strong demand from our targeted markets. In light of the latest regulatory trends and industry competition dynamics, we would gradually focus more on quality enhancement than volume growth. Going forward, we will further improve our cost structure and adjust our budget plan through more refined operational management and stricter cost controls. In the third quarter, we expect to materially reduce our sales and marketing expenses."

JA-133

**Financial Results for the Second Quarter of 2021**

*Operating revenue, net*

Net operating revenue for the second quarter of 2021 increased by 38.0% year over year to RMB939.4 million (US$145.5 million) from RMB680.8 million for the same period of 2020, which was primarily due to the growth of insurance related income.

- Insurance related income includes insurance brokerage income and technical service income. Insurance brokerage income represents brokerage commissions earned from insurance companies. Technical service income is derived from providing technical services to insurance companies, insurance brokerage and agency companies, including customer relationship maintenance, customer complaint management, claim review, and user referral services, etc. Our insurance related income amounted to RMB899.1 million (US$139.2 million) in the second quarter of 2021, representing an increase of 38.3% year over year compared to RMB650.0 million for the second quarter of 2020, which was mainly driven by the strong FYP growth.
- Net operating revenue from management fee income was nil for the second quarter of 2021, compared to RMB30.4 million for the second quarter of 2020, which was mainly due to the cessation of the mutual aid business at the end of March 2021. Following this adjustment, the corresponding management fee income from mutual aid business is no longer a revenue stream for the Company in the second quarter of 2021 and onwards. Excluding such management fee income, the adjusted net operating revenue[1] for the second quarter of 2021 increased by 44.4% compared with the same period of 2020.

*Operating costs and expenses*

Operating costs and expenses increased by RMB1,081.1 million, or 160.5% year over year, to RMB1,754.7 million (US$271.8 million) for the second quarter of 2021 from RMB673.6 million for the same period of 2020.

- Operating costs increased by 63.3% year over year to RMB260.4 million (US$40.3 million) for the second quarter of 2021, compared with RMB159.4 million for the second quarter of 2020, which was mainly due to (i) RMB38.0 million increase in personnel cost as our consultants and insurance agents team rapidly expanded to support the business growth, and (ii) RMB56.4 million increase in professional and outsourced customer service fees.
- Sales and marketing expenses increased by 270.3% year over year to RMB1,244.9 million (US$192.8 million) for the second quarter of 2021, compared with RMB336.2 million for the second quarter of 2020. The increase was primarily due to (i) RMB734.6 million increase in marketing expenses to third-party traffic channels as a result of our accelerated business expansion and branding promotions in the favorable market window, and (ii) RMB153.4 million increase in outsourced sales and marketing service fees to third parties.
- General and administrative expenses increased by 21.8% year over year to RMB149.1 million (US$23.1 million) for the second quarter of 2021, compared with RMB122.4 million for the second quarter of 2020. The increase was primarily due to an increase of RMB29.7 million in professional service fees and personnel cost, partially offset by a RMB13.0 million decrease in share-based compensation expenses.
- Research and development expenses increased by 80.4% year over year to RMB100.3 million (US$15.5 million) for the second quarter of 2021, compared with RMB55.6 million for the second quarter of 2020. The increase was primarily due to a RMB44.1 million increase in research and development personnel cost and share-based compensation expenses, as our research and development team continued to expand to enhance our competitive capabilities in technology.

*Operating loss* for the second quarter of 2021 was RMB815.4 million (US$126.3 million), compared with operating profit of RMB7.2 million for the same period of 2020.

*Interest income* for the second quarter of 2021 was RMB11.3 million (US$1.8 million), compared with RMB5.5 million for the same period of 2020. The increase was primarily due to the increase in our bank balance and short-term investments as a result of the receipt of net proceeds from the completion of our initial public offering in May 2021. The Company does not generate interest income from the medical crowdfunding business.

*Income tax benefit* for the second quarter of 2021 was RMB143.5 million (US$22.2 million), compared with income tax expense of RMB16.6 million for the same period of 2020.

JA-134

*Net loss attributable to Waterdrop* for the second quarter of 2021 was RMB655.8 million (US$101.6 million), compared with net loss of RMB19 thousand for the same period of 2020.

*Adjusted net loss attributable to Waterdrop* for the second quarter of 2021 was RMB570.1 million (US$88.3 million), compared with adjusted net profit RMB89.8 million for the same period of 2020. Adjusted net loss margin was negative 60.7% for the second quarter of 2021, compared with positive margin of 13.2% for the second quarter of 2020.

### Cash and cash equivalents and restricted cash

As of June 30, 2021, the Company had combined cash and cash equivalents and restricted cash of RMB1,487.8 million (US$230.4 million), as compared with RMB1,323.3 million as of December 31, 2020.

_____

*Note:* (1) See the sections entitled "Non-GAAP Financial Measures" for more information.

### Share Repurchase Plan

The Board of the Company has approved a share repurchase program whereby the Company is authorized to repurchase its own ordinary shares in the form of American depository shares with an aggregate value of up to US$50 million during the 12-month period. The Company expects to fund the repurchase out of its existing cash balance. The Company's proposed repurchase may be made from time to time in the open market at prevailing market prices, in privately negotiated transactions, in block trades and/or through other legally permissible means, depending on market conditions and in accordance with applicable rules and regulations. The timing and dollar amount of repurchase transactions will be subject to the Securities and Exchange Commission (the "SEC") Rule 10b-18 and/or Rule 10b5-1 requirements. The Board will review the share repurchase program periodically, and may authorize adjustment of its terms and size or suspend or discontinue the program.

### Business Outlook

The Company expects the FYP generated through Waterdrop Insurance Marketplace to be in the range of RMB4.3 to RMB4.6 billion for the third quarter of 2021. Also the Company expects to materially reduce the sales and marketing expenses compared to the second quarter of 2021. This forecast is based on the current market conditions and reflects the Company's preliminary view and estimates, which are all subject to changes.

### Exchange Rate

This announcement contains translations of certain RMB amounts into U.S. dollars ("USD") at specified rates solely for the convenience of the reader. Unless otherwise stated, all translations from RMB to USD were made at the rate of RMB6.4566 to US$1.00, the noon buying rate in effect on June 30, 2021 in the H.10 statistical release of the Federal Reserve Board. The Company makes no representation that the RMB or USD amounts referred could be converted into USD or RMB, as the case may be, at any particular rate or at all. For analytical presentation, all percentages are calculated using the numbers presented in the financial statements contained in this earnings release.

### Non-GAAP Financial Measures

The Company uses non-GAAP financial measures, such as adjusted net operating revenue and adjusted net loss, in evaluating the Company's operating results and for financial and operational decision-making purposes. Adjusted net operating revenue represents net operating revenue excluding management fee income from mutual aid business. Adjusted net loss represents net loss excluding share-based compensation expense, impact of terminating the mutual aid plan, foreign currency exchange gain or losses, and share of results of equity method investee. Such adjustments have no impact on income tax.

These non-GAAP financial measures should not be considered in isolation or construed as an alternative to net loss or any other measure of performance or as an indicator of our operating performance. Investors are encouraged to review the Company's historical non-GAAP financial measures to the most directly comparable GAAP measures. Adjusted net operating revenue and adjusted net loss presented here may not be comparable to similarly titled measures presented by other companies. Other companies may calculate similarly titled measures differently, limiting their usefulness as comparative measures to our data. The Company encourage investors and others to review its financial information in its entirety and not rely on a single financial measure.

JA-135

**Safe Harbor Statement**

This press release contains statements that may constitute "forward-looking" statements pursuant to the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. These forward-looking statements can be identified by terminology such as "will," "expects," "anticipates," "aims," "future," "intends," "plans," "believes," "estimates," "likely to" and similar statements. Among other things, quotations in this announcement, contain forward-looking statements. Waterdrop may also make written or oral forward-looking statements in its periodic reports to the SEC, in its annual report to shareholders, in press releases and other written materials and in oral statements made by its officers, directors or employees to third parties. Statements that are not historical facts, including statements about Waterdrop's beliefs, plans and expectations, are forward-looking statements. Forward-looking statements involve inherent risks and uncertainties. A number of factors could cause actual results to differ materially from those contained in any forward-looking statement, including but not limited to the following: Waterdrop's mission, goals and strategies; Waterdrop's future business development, financial condition and results of operations; the expected growth of the insurance and online healthcare industry in China; Waterdrop's expectations regarding demand for and market acceptance of our products and services; Waterdrop's expectations regarding its relationships with consumers, insurance carriers and other partners; competition in the industry and relevant government policies and regulations relating to insurance and online healthcare industry. Further information regarding these and other risks is included in Waterdrop's filings with the SEC. All information provided in this press release is as of the date of this press release, and Waterdrop does not undertake any obligation to update any forward-looking statement, except as required under applicable law.

**Conference Call Information**

Waterdrop's management team will hold a conference call on September 8, 2021 at 8:00 AM U.S. Eastern Time (8:00 PM Beijing/Hong Kong Time on the same day) to discuss the financial results. Dial-in details for the earnings conference call are as follows:

| | |
|---|---|
| United States: | 1-888-317-6003 |
| Hong Kong: | 852-580-81995 |
| Mainland China: | 4001-206115 |
| International: | 1-412-317-6061 |
| Elite Entry Number: | 5215739 # |

Please dial in 15 minutes before the call is scheduled to begin and provide the Elite Entry Number to join the call.
A telephone replay will be accessible through September 15, 2021 by dialing the following numbers:

| | |
|---|---|
| United States: | 1-877-344-7529 |
| International: | 1-412-317-0088 |
| Access Code: | 10160009 # |

A live and archived webcast of the conference call will also be available at the Company's investor relations website at http://ir.waterdrop-inc.com/.

**About Waterdrop Inc.**
Waterdrop Inc. (NYSE: WDH) is a leading technology platform dedicated to insurance and healthcare service with a positive social impact. Founded in 2016, with the comprehensive coverage of Waterdrop Insurance Marketplace and Waterdrop Medical Crowdfunding, Waterdrop aims to bring insurance and healthcare service to billions through technology. For more information, please visit www.waterdrop-inc.com.

**For investor inquiries, please contact**
Waterdrop Inc.
Xiaojiao Cui
IR@shuidi-inc.com

Christensen

In China
Mr. Eric Yuan
Phone: +86-1380-111-0739
E-mail: Eyuan@christensenir.com

In US
Ms. Linda Bergkamp
Phone: +1-480-614-3004
Email: lbergkamp@christensenir.com

JA-136

**WATERDROP INC.**
**Unaudited Condensed Consolidated Balance Sheets**
**(All amounts in thousands, unless otherwise noted)**

| | As of | | |
|---|---|---|---|
| | December 31, 2020 | June 30, 2021 | |
| | RMB | RMB | USD |
| **Assets** | | | |
| **Current assets** | | | |
| Cash and cash equivalents | 1,061,962 | 893,361 | 138,364 |
| Restricted cash | 261,387 | 594,395 | 92,060 |
| Short-term investments | 1,193,160 | 2,342,975 | 362,881 |
| Accounts receivable | 539,791 | 626,107 | 96,972 |
| Current contract assets | 824,544 | 893,226 | 138,343 |
| Amount due from related parties | 813 | 906 | 140 |
| Prepaid expense and other assets | 651,080 | 474,825 | 73,541 |
| **Total current assets** | **4,532,737** | **5,825,795** | **902,301** |
| **Non-current assets** | | | |
| Non-current contract assets | 24,006 | 23,541 | 3,646 |
| Property, equipment and software, net | 28,724 | 42,917 | 6,647 |
| Intangible assets, net | 53,034 | 56,822 | 8,801 |
| Long-term investments | 2,741 | 2,721 | 421 |
| Right of use assets, net | 60,694 | 70,160 | 10,866 |
| Deferred tax assets | - | 6,012 | 931 |
| Goodwill | 3,119 | 3,119 | 483 |
| **Total non-current assets** | **172,318** | **205,292** | **31,795** |
| **Total assets** | **4,705,055** | **6,031,087** | **934,096** |
| | | | |
| **Liabilities, Mezzanine Equity and Shareholders' (Deficit)/Equity** | | | |
| **Current liabilities** | | | |
| Amount due to related parties | 9,789 | 14,616 | 2,264 |
| Insurance premium payables | 607,326 | 604,700 | 93,656 |
| Deferred revenue | 22,017 | 3,783 | 586 |
| Accrued expenses and other current liabilities | 595,606 | 834,440 | 129,238 |
| Current lease liabilities | 36,551 | 42,867 | 6,639 |
| **Total current liabilities** | **1,271,289** | **1,500,406** | **232,383** |
| **Non-current liabilities** | | | |
| Non-current lease liabilities | 27,709 | 25,441 | 3,940 |
| Deferred tax liabilities | 225,745 | 13,551 | 2,099 |
| **Total non-current liabilities** | **253,454** | **38,992** | **6,039** |
| **Total liabilities** | **1,524,743** | **1,539,398** | **238,422** |
| | | | |
| **Total mezzanine equity** | **4,837,336** | **-** | **-** |
| **Shareholders' (deficit)/equity** | | | |
| Ordinary shares | 41 | - | - |
| Class A ordinary shares | - | 107 | 17 |
| Class B ordinary shares | - | 27 | 4 |
| Additional paid-in capital | - | 7,274,877 | 1,126,735 |
| Accumulated other comprehensive income | 14,956 | 3,140 | 486 |
| Accumulated deficit | (1,672,021) | (2,786,462) | (431,568) |
| **Total shareholders' (deficit)/equity** | **(1,657,024)** | **4,491,689** | **695,674** |
| **Total liabilities, mezzanine equity and shareholders' (deficit)/equity** | **4,705,055** | **6,031,087** | **934,096** |

JA-137

**WATERDROP INC.**
**UNAUDITED CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**
**(All amounts in thousands, except for share and per share data, or otherwise noted)**

| | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2020 | 2021 | | 2020 | 2021 | |
| | RMB | RMB | USD | RMB | RMB | USD |
| Operating revenue, net | 680,839 | 939,354 | 145,487 | 1,334,634 | 1,822,721 | 282,304 |
| Operating costs and expenses[i] | | | | | | |
| Operating costs | (159,440) | (260,417) | (40,333) | (292,728) | (561,025) | (86,892) |
| Sales and marketing expenses | (336,182) | (1,244,935) | (192,816) | (835,383) | (2,082,088) | (322,474) |
| General and administrative expenses | (122,424) | (149,101) | (23,093) | (187,189) | (270,388) | (41,878) |
| Research and development expenses | (55,590) | (100,259) | (15,528) | (123,200) | (185,134) | (28,674) |
| Total operating costs and expenses | (673,636) | (1,754,712) | (271,770) | (1,438,500) | (3,098,635) | (479,918) |
| Operating profit/(loss) | 7,203 | (815,358) | (126,283) | (103,866) | (1,275,914) | (197,614) |
| Other income | | | | | | |
| Interest income | 5,525 | 11,327 | 1,754 | 10,837 | 24,542 | 3,801 |
| Foreign currency exchange gain | 941 | 1,473 | 228 | 6,176 | 2,257 | 350 |
| Others, net | 2,889 | 3,332 | 516 | 4,521 | 5,433 | 841 |
| Profit/(loss) before income tax, and share of loss of equity method investee | 16,558 | (799,226) | (123,785) | (82,332) | (1,243,682) | (192,622) |
| Income tax (expense)/benefit | (16,575) | 143,474 | 22,221 | (38,413) | 217,774 | 33,729 |
| Share of loss in equity method investee | (2) | - | - | (5) | - | - |
| Net loss attributable to Waterdrop Inc. | (19) | (655,752) | (101,564) | (120,750) | (1,025,908) | (158,893) |
| Deemed dividend on modification on preferred shares | (67,975) | - | - | (67,975) | | - |
| Deemed dividend upon issuance of warrants | (90,268) | - | - | (90,268) | | - |
| Preferred shares redemption value accretion | (61,328) | (42,000) | (6,505) | (114,964) | (152,287) | (23,586) |
| Net loss attributable to ordinary shareholders | (219,590) | (697,752) | (108,069) | (393,957) | (1,178,195) | (182,479) |
| Net loss | (19) | (655,752) | (101,564) | (120,750) | (1,025,908) | (158,893) |
| Other comprehensive income/(loss): | | | | | | |
| Foreign currency translation adjustment, net of tax | 3,529 | (9,253) | (1,433) | 3,590 | (12,035) | (1,864) |
| Unrealized gains/(loss) on available for sale investments, net of tax | 368 | (848) | (131) | 393 | 219 | 34 |
| Comprehensive income/(loss) | 3,878 | (665,853) | (103,128) | (116,767) | (1,037,724) | (160,723) |
| Weighted average number of ordinary shares used in computing net loss per share | | | | | | |
| Basic and diluted | 1,153,883,893 | 2,854,023,284 | 2,854,023,284 | 1,173,805,725 | 2,027,403,481 | 2,027,403,481 |
| Net loss per share attributable to ordinary shareholders | | | | | | |
| Basic and diluted | (0.19) | (0.24) | (0.04) | (0.34) | (0.58) | (0.09) |

(i)    Share-based compensation expenses are included in the operating costs and expenses as follows. As of June 30, 2021, there are 286,740,404 outstanding share options under 2018 Share Incentive Plan, and nil Class A ordinary shares of the Company have been issued as a result of the exercise of any option under the 2018 Plan.

| | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2020 | 2021 | | 2020 | 2021 | |
| | RMB | RMB | USD | RMB | RMB | USD |
| Sales and marketing expenses | (979) | (3,633) | (563) | (1,301) | (6,614) | (1,024) |
| General and administrative expenses | (86,893) | (73,939) | (11,452) | (104,282) | (135,960) | (21,058) |
| Research and development expenses | (2,919) | (9,597) | (1,486) | (4,641) | (15,773) | (2,443) |
| Total | (90,791) | (87,169) | (13,501) | (110,224) | (158,347) | (24,525) |

JA-138

**WATERDROP INC.**
**Reconciliations of GAAP and Non-GAAP Results**
**(All amounts in thousands, unless otherwise noted)**

| | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | **2020** | **2021** | | **2020** | **2021** | |
| | **RMB** | **RMB** | **USD** | **RMB** | **RMB** | **USD** |
| **Net operating revenue** | 680,839 | 939,354 | 145,487 | 1,334,634 | 1,822,721 | 282,304 |
| **Less:** | | | | | | |
| Management fee income | 30,352 | - | - | 69,238 | 2,745[(ii)] | 425 |
| **Adjusted net operating revenue** | 650,487 | 939,354 | 145,487 | 1,265,396 | 1,819,976 | 281,879 |

| | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | **2020** | **2021** | | **2020** | **2021** | |
| | **RMB** | **RMB** | **USD** | **RMB** | **RMB** | **USD** |
| **Net loss** | (19) | (655,752) | (101,564) | (120,750) | (1,025,908) | (158,893) |
| **Add:** | | | | | | |
| Share-based compensation expense | 90,791 | 87,169 | 13,501 | 110,224 | 158,347 | 24,525 |
| Foreign currency exchange gain | (941) | (1,473) | (228) | (6,176) | (2,257) | (350) |
| Impact of terminating the mutual aid plan [(iii)] | - | - | - | - | 96,697 | 14,976 |
| Share of results of equity method investee | 2 | - | - | 5 | - | - |
| **Adjusted net profit/(loss)** | 89,833 | (570,056) | (88,291) | (16,697) | (773,121) | (119,742) |

(ii)   This represents management fee revenue related to the mutual aid business for the first half year of 2021 after recording the RMB19.9 million reduction of management fee revenue previously recognized for each participant to the extent of the cumulative amount earned until March 26, 2021.

(iii)   This represents the estimated cost of medical expenses and cost of one-year health insurance coverage. RMB19.9 million (US$3.0 million) was accounted for as a reduction of management fee revenue previously recognized for each participant to the extent of the cumulative amount earned until March 26, 2021. RMB76.8 million (US$11.8 million) was recorded as operating costs.

JA-139

# EXHIBIT D

Case 1:21-cv-07533-VSB Document 35-4 Filed 04/22/22 Page 2 of 6

# How Chinese big tech (tried to) rethink health insurance

Mutual aid platforms promised big payouts for hundreds of millions of uninsured. But they never turned a profit.

[Zeyi Yang](#)   April 16, 2021



In just one year, "online mutual aid," or China's answer to private medical insurance, has gone from industry darling to doghouse.

It was May 2020 when the Alibaba-affiliated fintech firm Ant Group released its [Online Mutual Aid White Paper](#). It predicted that mutual aid, a new digital form of informal medical insurance, would cover over 30% of China's population by 2025 and take in nearly $7 billion in premiums that same year.

JA-141

At the time, many Chinese tech giants — including Alibaba, Baidu, JD, Meituan, DiDi and Xiaomi — had introduced mutual aid products. The top player, Alibaba's Xiang Hu Bao (meaning "mutual protection" in Chinese), had over 100 million users paying less than $1 per month with the ability to claim up to roughly $43,000 if they got seriously ill. Mutual aid looked like a promising new direction for fintech, turning low-income users into insurance consumers.

But less than a year later, Xiang Hu Bao is the only major mutual aid platform still standing. Five others, including some with over 10 million regular users, have closed.

Online mutual aid started during the golden years of Chinese fintech, when regulations were loose and venture capitalists were placing big bets on digital transformation. But those days are over. China's financial regulators have largely caught up with technological change, and less profitable products like mutual aids are being discarded as the market retrenches to focus on higher-profit opportunities.

## A low-cost substitute

About 95% of China's population is covered by basic public health insurance, but patients still face large out-of-pocket costs. Private commercial insurance is still in its early stages and only serves a small percentage of the market. Mutual aid promised a low-cost substitute.

Tencent-backed unicorn Waterdrop, which reportedly plans to go public this year, is now known for its GoFundMe-style fundraising platform. But it started in 2016 as a mutual aid group. Within just 100 days of launch, Waterdrop attracted a million users. Wang, a 40-year-old worker at a shopping mall in the northeastern city of Tianjin, was one of them.

JA-142

She joined in summer 2016 because commercial health insurance was too costly. Waterdrop boasted an ideal cost-benefit ratio for poorer users: In April 2020, as an example, 14 million people pitched in about $1 so that 566 beneficiaries among them could be given $24,000 on average to pay their medical bills. Like its peers, the company heavily promoted stories where poor families received vital help all because they'd paid in tiny premiums.

"I primarily did it for myself. It's important for an ordinary person like me to get a sum of money when I fall ill," Wang, who only wanted to use her surname in this story, told Protocol. "If I don't get sick, I can help a lot of people. It can give me a sense of accomplishment."

The majority of mutual aid participants, like Wang, can't afford commercial health insurance, which costs about $100 a year and provides about the same coverage as mutual aid. According to the Ant Group whitepaper, nearly 80% of all online mutual aid members have an annual salary lower than $15,000, and 72% are from rural areas, small towns or "third tier" cities. For them, mutual aid is the only affordable and accessible insurance alternative. And it can be life-changing for the group of beneficiaries who need, and receive, payouts.

Wang later joined two more similar platforms, Alibaba's Xiang Hu Bao and DiDi's Diandi Shouhu, because she feared the maximum payout on one mutual aid platform would not be enough to pay serious medical bills.

On March 26, Waterdrop announced it would soon close its 5-year-old mutual aid platform, once the core of its business. Like all participants, Wang was offered free one-year commercial medical insurance as compensation, which she doesn't intend to renew.

## A failing business

JA-143

Tech giants are less and less interested in mutual aid because the profit margins turn out to be narrow or even nonexistent.

In theory, big internet platforms are eminently capable of pulling off mutual aid, a business that requires large scale to work. The success of the fintech revolution in China in recent years means companies like Alibaba and Meituan can easily reach the wallet of hundreds of millions of people. The large amount of data they collect also helps them reduce risk: In the absence of a national credit system, Alibaba is using its own personal credit database, Zhima Credit, to determine the eligibility of every Xiang Hu Bao applicant.

There's just one problem: Compared to other more lucrative businesses like micro-lending, mutual aid offers tiny profits.

After its service closed, an unnamed Waterdrop employee told China Business Journal that the company's mutual aid product didn't make any money at all. "It would be good enough if it didn't lose money," the employee said. In Xiang Hu Bao's 2020 annual report, the industry leader also said it had never turned an annual net profit.

"They wanted to explore first, and find the profitability model later on, but that has failed," He Xiaowei, a Beijing-based associate professor at the University of International Business and Economics, told Protocol.

The future looks even darker: Members are quitting services like Xiang Hu Bao in droves as monthly premiums rise to levels they aren't comfortable paying. Without enough members paying in, costs could rise further, pushing mutual aid into a death spiral.

## Regulation looms

When Waterdrop closed its mutual aid service in March, CEO Shen Peng

JA-144

published an open letter. "Ultimately, online mutual aid is not insurance," he wrote. "Its future remains uncertain."

Shen's letter hinted at the murky regulatory status of mutual aid. Even today, online mutual aid platforms are not being explicitly regulated in China as an insurance product or any other sort of financial activity.

This used to be the norm for Chinese fintech innovations. For years, tech companies stayed ahead of regulators, combining technology and finance in ways that don't fit into any traditional category. Regulators have also been cautious to act, reluctant to stand in the way of innovation.

That has all changed, with Chinese financial regulators taking a much more active role. Mutual aid is one of the products under scrutiny, even though its systemic risks are low.

In September 2020, the China Banking and Insurance Regulatory Commission published an article on illegal commercial insurance activities widely seen as signalling more forthcoming regulation. "The online mutual aid platforms that have been growing unchecked recently have the characteristics of commercial insurance," the article says, "but currently there are no dedicated oversight entities or regulatory standards, so it's in an awkward situation with no supervision."

He Xiaowei, the insurance studies professor, expects the mutual aid market to worsen further. "There's no evidence indicating the market will grow," he said.

JA-145

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |
|---|---|
| SIDNEY SANDOZ, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| WATERDROP INC., PENG SHEN, KANGPING SHI, NINA ZHOU, KAI HUANG, HAIYANG YU, YAO HU, GUANG YANG, COLLEEN A. DE VRIES, COGENCY GLOBAL INC., GOLDMAN SACHS (ASIA) L.L.C., MORGAN STANLEY & CO. LLC, BOFA SECURITIES, INC., CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, CLSA LIMITED and HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No. 1:21-cv-07683-VSB

_____

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

JA-146

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   FACTUAL BACKGROUND .................................................................................. 2

III.  LAW & ARGUMENT ............................................................................................. 6

  A.  Rule 12(b)(6) Legal Standard .......................................................................... 6

  B.  Plaintiff Faces a Minimal Pleading Burden under Section 11 ........................... 7

  C.  The Complaint Sufficiently Alleges Material Misstatements and Omissions Regarding
Waterdrop's Financial Condition ..................................................................... 8

     1.  Waterdrop's First Quarter 2021 Financial Results (Statement #1) .................. 8

     2.  Waterdrop's Operating Costs and Expenses (Statements ## 2-3) ................... 15

  D.  The Registration Statement Contained Material Misstatements and Omissions Regarding
the Cessation of the Mutual Aid Platform (Statements ## 4-8) ..................... 18

  E.  The Confidential Witness are Described with Sufficient Particularity ............. 20

  F.  The Registration Statement Contained Material Misstatements and Omissions regarding
the Regulatory Environment in China (Statements ## 9-11) ......................... 21

  G.  The Complaint Establishes Control Person Liability ....................................... 24

  H.  Leave to Amend ............................................................................................. 25

IV.  CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Asay v. Pinduoduo Inc.*,
   No. 18-cv-7625-PKC, 2020 U.S. Dist. LEXIS 56179 (S.D.N.Y. Mar. 30, 2020) .................. 11

*Asay v. Pinduoduo Inc.*,
   No. 20-1423, 2021 U.S. App. LEXIS 26176 (2d Cir. Aug. 31, 2021) .................................... 11

*Campbell v. Transgenomic, Inc.*,
   916 F.3d 1121 (8th Cir. 2019) ............................................................................................... 14

*Christine Asia Co. v. Yun Ma*,
   718 F. App'x 20 (2d Cir. 2017) ....................................................................................... 13, 19

*Degulis v. LXR Biotechnology*,
   No. 95-cv-4204-RWS, 1997 U.S. Dist. LEXIS 381 (S.D.N.Y. Jan. 16, 1997) ...................... 10

*Demaria v. Andersen*,
   318 F.3d 170 (2d Cir. 2003) ................................................................................................... 12

*Freudenberg v. E*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) .................................................................................... 15

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) ............................................................................................. 19, 22

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) .............................................................................. 20, 21

*Gross v. GFI Grp., Inc.*,
   310 F. Supp. 3d 384 (S.D.N.Y. 2018) .................................................................................... 18

*Herman & Maclean v. Huddleston*,
   459 U.S. 375 (1983) ........................................................................................................... 7, 10

*Hutchison v. CBRE Realty Fin., Inc.*,
   638 F. Supp. 2d 265 (D. Conn. 2009) .................................................................................... 10

*In re Avon Sec. Litig.*,
   No. 19-cv-01420-CM, 2019 U.S. Dist. LEXIS 200816 (S.D.N.Y. Nov. 18, 2019) ................ 22

*In re Barclays Bank PLC Sec. Ltig.*,
   756 F. App'x 41 (2d Cir. 2018) .............................................................................................. 14

*In re Coty Inc. Sec. Litig.*,
   No. 14-cv-919, 2016 U.S. Dist. LEXIS 41484 (S.D.N.Y. Mar. 29, 2016) ............................. 10

*In re Enzymotec Sec. Litig.*,
   No. 14-cv-5556-JLL, 2015 U.S. Dist. LEXIS 167403 (D.N.J. Dec. 14, 2015) ...................... 22

JA-148

*In re Francesca's Holdings Corp. Sec. Litig.*,
  No. 13-cv-6882, 2015 U.S. Dist. LEXIS 50726 (S.D.N.Y. Mar. 31, 2015) ........................... 10

*In re Fuwei Films Sec. Litig.*,
  634 F. Supp. 2d 419 (S.D.N.Y. 2009) ................................................................................. 22

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  No. 12-cv-8557-CM, 2013 U.S. Dist. LEXIS 171110 (S.D.N.Y. Dec. 2, 2013) ..................... 14

*In re Insys Therapeutics, Inc. Sec. Litig.*,
  No. 17-cv-1954-PAC, 2018 U.S. Dist. LEXIS 100000 (S.D.N.Y. June 12, 2018) ................. 13

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010) ................................................................................................. 7

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015) ................................................................................. 14

*In re Qudian Inc. Sec. Litig.*,
  No. 17-cv-9741-JMF, 2019 U.S. Dist. LEXIS 167072 (S.D.N.Y. Sep. 27, 2019) ................. 23

*In re STEC Inc. Sec. Litig.*,
  No. 09-cv-1304-JVS, 2011 U.S. Dist. LEXIS 75093 (C.D. Cal. June 17, 2011) ..................... 9

*In re Tufin Software Techs. Ltd. Sec. Litig.*,
  No. 1:20-cv-5646-GHW, 2022 U.S. Dist. LEXIS 34053 (S.D.N.Y. Feb. 25, 2022) .............. 24

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*,
  202 F. Supp. 2d 8 (S.D.N.Y. 2001) ..................................................................................... 11

*In re Virtus Inv. Partners, Inc.*,
  195 F. Supp. 3d 528 (S.D.N.Y. 2016) ................................................................................. 15

*In re Vivendi Universal, S.A. Sec. Litig.*, 3
  81 F. Supp. 2d 158 (S.D.N.Y. 2003) ................................................................................... 14

*Lea v. TAL Educ. Grp.*,
  837 F. App'x 20 (2d Cir. 2020) ........................................................................................... 22

*Lin v. Interactive Brokers Grp.*,
  574 F. Supp. 2d 408 (S.D.N.Y. 2008) ......................................................................... 9, 10, 12

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ......................................................................................... passim

*Longhi v. Lombard Risk Sys.*,
  No. 18-cv-8077, 2019 U.S. Dist. LEXIS 170188 (S.D.N.Y. Sep. 30, 2019) ......................... 25

*Meyer v. JinkoSolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ........................................................................................... 14, 24

*N. Shore-Long Island Jewish Health Sys. v. Multiplan, Inc.*,
  325 F.R.D. 36 (E.D.N.Y. 2018) ........................................................................................... 14

iii

JA-149

*Northumberland Cty. Ret. Sys. v. Kenworthy*,
  No. 11-cv-520, 2013 U.S. Dist. LEXIS 131655 (W.D. Okla. Sep. 16, 2013) ........................ 10

*Novak v. Kosaks*,
  216 F.3d 300 (2d Cir. 2000) ................................................................................................ 20

*Plumbers' & Pipefitters' Local #562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp.*,
  No. 08-cv-1713-ERK, 2012 U.S. Dist. LEXIS 24106 (E.D.N.Y. Feb. 23, 2012) .................. 20

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ........................................................................................ 7, 9, 17

*Stadnick v. Lima*,
  861 F.3d 31 (2d Cir. 2017) .......................................................................................... 11, 12

*Willard v. UP Fintech Holding Ltd.*,
  527 F. Supp. 3d 609 (S.D.N.Y. 2021) .................................................................................. 11

**Statutes**

15 U.S.C. § 77k ............................................................................................................................ 7
17 C.F.R. § 229.303 ................................................................................................................... 10
Fed. R. Civ. P. 15 ....................................................................................................................... 25
Fed. R. Civ. P. 8 ...................................................................................................................... 7, 8

Lead Plaintiff Qi Mi ("Plaintiff"), individually and on behalf of the Class, respectfully submits this memorandum in opposition to Defendants' Motion to Dismiss (ECF No. 53).[1]

## I.  INTRODUCTION

Public companies cannot speak in half-truths, disclosing positive news while omitting to disclose related negative news. Yet this is exactly what Waterdrop did in the Registration Statement filed in connection with its IPO. Waterdrop touted growth in the Company's first year premiums ("FYP"), a key metric relating to revenue, for the first quarter of 2021 ("Q1:21"), but omitted that the growth in FYP was undercut by soaring costs and expenses, which had increased at an unexpected rate in Q1:21 and continued into Q2:21, resulting in massive operating losses. In that same Registration Statement, Waterdrop had also assured investors that it expected the Company's operating costs as a percentage of net operating revenue to *decrease* "in the foreseeable future" as Waterdrop improved operating efficiency and achieved more economies of scale. But far from decreasing, Waterdrop's costs as a percentage of revenue had already increased at a higher percentage than anything disclosed in the Registration Statement. None of this information (that was known or knowable to Waterdrop) was disclosed, leaving both financial analysts and investors surprised by the Company's unexpected Q1:21 financial results, which cratered Waterdrop's stock price. By disclosing the good about revenue-related information but omitting the bad about related costs and expenses, the Registration Statement painted an incomplete and misleading picture concerning Waterdrop's true financial condition at the time of the IPO.

Critically, these undisclosed expenses were of heightened importance to investors, because, shortly before the IPO, the Company had shut down one of its three core businesses, a mutual aid program, which acted as a cost-efficient source of customer leads, due to increasingly

---

[1] All undefined capitalized terms herein have the same meaning as in the Amended Class Action Complaint (the "Complaint") (ECF No. 52). Likewise, unless otherwise noted, all "¶__" references herein are to the Complaint.

strict regulations on Chinese internet-based insurance companies. As a result, investors were closely monitoring information from the Company regarding the ongoing and future financial impact of the shutdown. Unknown to investors, however, that financial impact had already manifested itself prior to the IPO in the form of costs and expenses increasing at an unexpected rate in Q1:21 — a quarter which had ended more than a month before the IPO.

Defendants' motion, based largely on a series of inconsistent factual and legal arguments, fails. In one breath they argue that "the Registration Statement disclosed increasing expenses" from Q1:21, in the next they argue Q1:21 expenses were not "known or knowable" at the time of the offering. Then, they switch gears once again, blaming the victims of their misconduct for not guessing that expenses would increase at the rate they did, for "feign[ing] shock that their investments were vulnerable" to risks, and for being "[u]nwilling in hindsight to accept downside." But this case is not about risks and hindsight; it's about Defendants' failure to adequately disclose Waterdrop's financial condition as it existed at the time of the IPO as required by the Securities Act of 1933. And investors aren't required to guess the negative facts a company conceals. In the end, far from being "thinly-pleaded," the Complaint plausibly alleges that the Registration Statement contained material misstatements and omitted material facts necessary to prevent existing Waterdrop's disclosures from being misleading. Defendants' motion should be denied.

## II.  FACTUAL BACKGROUND

Based in China, Waterdrop operates an insurance technology platform that historically had three interdependent business segments: 1) a mutual aid platform, where individuals paid small amounts and the collective fund would be used to pay the medical expenses of eligible beneficiaries; 2) a medical crowd-funding platform, like the U.S. site "GoFundMe"; and 3) an insurance platform that matches consumers with insurance products. ¶¶ 2, 42, 45, 46.

Waterdrop earns most of its revenues from commissions received from insurance companies for insurance products sold on the Waterdrop platform. ¶¶ 2, 46. The Company did not derive significant profits from its crowdfunding and mutual aid platforms; rather, these segments provided free advertising and data collection, significantly lowering Waterdrop's customer acquisition costs. ¶¶ 2, 44-45. As one Chinese tech columnist explained: "After users have experienced crowdfunding and mutual aid, they will have more knowledge about and a stronger desire for insurance products… This is **fundamental** to Waterdrop's ecosystem and a high barrier to entry for other players in the industry." ¶ 47 (emphasis added).

In late 2020, the China Banking and Insurance Regulatory Commission ("CBIRC") began closely scrutinizing internet-based insurance companies, including online mutual aid platforms. ¶¶ 3, 50-64. The CBIRC determined these platforms had a high risk for fraud and began implementing regulations that essentially forced most online mutual aid programs to shut down in late 2020 and early 2021. ¶ 3. The regulatory environment was so hostile to internet-based insurance companies that industry experts predicted most small and medium-sized companies would not survive to see the end of 2022. ¶¶ 3, 62.

In response to the regulatory scrutiny, Waterdrop announced on March 26, 2021, that it would cease operating its mutual aid segment on March 31, 2021, the last day of Q1:21. ¶¶ 4, 50. While Waterdrop's CEO attempted to frame the cessation as an "upgrade" to users, the Confidential Witnesses in this case, as well as several media reports, confirm that the true reason was increasing regulations and pressure from the CBIRC. ¶¶ 51-54, 81. Defendants even admit that one of the driving forces of the cessation of the mutual aid program was "increasing compliance costs in a previously unregulated area." Br. at 2.[2] The CBIRC also publicly criticized

---

[2] References to "Br. at __" refer to the Memorandum of Law in Support of Motion to Dismiss (ECF No. 54).

3

and began investigating other aspects of Waterdrop's insurance business, such as a policy that fraudulently advertised "3 yuan for the first month" but did not disclose the costs of the remaining 11 months of the policy. ¶¶ 4, 58.

On May 7, 2021, more than a month after the close of Q1:21, about halfway into Q2:21, and about a month after the cessation of its mutual aid platform, Waterdrop went public on the NYSE at $12 per American Depository Shares ("ADSs") and raised $360 million USD. ¶¶ 5, 65-76. The Registration Statement discussed the discontinuation of Waterdrop's mutual aid platform but obscured the true reasoning behind the cessation, thus downplaying the effects that the hostile regulatory environment was having and would continue to have on the Company. ¶ 5. Instead, Waterdrop vaguely stated that the purpose of the discontinuation was "to focus on our core business" in light of "increased recognition of our brand," "latest market development," and "recent industry environment changes." ¶¶ 5, 69, 111, 114. Nowhere in the Registration Statement did Waterdrop mention that the main reason behind the cessation of the mutual aid platform was regulatory pressure. ¶ 6.

Further, even though the CBIRC was closely monitoring the insurance industry and was actively investigating Waterdrop, the Registration Statement contained only a few hypothetical and generic risk statements regarding increased regulatory scrutiny in China. ¶ 6. The Registration Statement did not indicate that such risks were materializing or already had materialized. ¶ 6. For example, the Registration Statement stated that "[f]urther development of regulations applicable to us *may* result in additional restrictions on our business operations," yet it did not mention that increased regulatory scrutiny was the reason Waterdrop ceased its mutual aid program. ¶¶ 6, 125. In fact, the Registration Statement stated the opposite—that "the growth of health insurance sector

4

has been supported by the Chinese government in recent years" and "recent regulatory developments are expected to have positive impacts on China's health insurance industry." ¶ 118.

As a result of these tightening regulations, Waterdrop was forced to spend more and more on expensive third-party marketing services to attract customers to their platform—services that became critical after the Company shuttered its mutual aid platform, which could no longer generate low-cost customer leads. ¶ 7. Instead of disclosing these accelerating costs and expenses, the Registration Statement disclosed only positive aspects of the Q1:21 financial results, such as "solid business growth in the first quarter of 2021" and that FYP "reached RMB4,469 million for the first quarter of 2021, demonstrating a 14.4% increase from the fourth quarter of 2020 or a 42.7% increase from the same period of 2020." ¶¶ 8, 72, 96.

When the Company later filed its Q1:21 results on June 17, 2021, investors learned for the first time that generating "solid business growth in [Q1:21]" and increased FYP came with a significant price tag: Waterdrop's expenses had increased at a higher-than-expected rate (more than 75% year over year), mainly due to an increase in third-party marketing expenses. ¶¶ 7-8, 77, 96-99. Shareholders and analysts alike were surprised by the rate at which these expenses increased, and Waterdrop's share price began to steadily decline. ¶¶ 78, 85-86, 96, 102. It currently sits at $1.34/ADS[3]—an approximately 89% drop in value from the time of the IPO.

Subsequently, in August 2021, the media began reporting on a regulatory crack-down in China, specifically targeting tech companies that had completed IPOs in the United States. ¶¶ 79-92. Bloomberg reported that this crack-down presented "multiple challenges for Waterdrop," who had already been required to discontinue its mutual aid platform due to CBIRC regulations. ¶ 81. On September 15, 2021, Seeking Alpha reported that Waterdrop's "shares are down ***more than***

---

[3] As of market close on June 21, 2022.

*75%* since their April IPO due to a ***combination of widening losses and regulatory concerns***." ¶ 86 (emphasis added). A number of other media articles and financial analysts agreed with Seeking Alpha's assessment, noting that the main factors which led to the massive decline in the price of Waterdrop's ADSs were the elements not adequately disclosed in the Registration Statement: 1) the increase in unexpected costs and expenses, particularly third-party marketing expenses, which led the Company to recognize significant net losses in Q1:21 and Q2:21; and 2) uncertainty surrounding the Company due to increasing regulatory scrutiny of internet-based insurance companies in China. ¶ 93.

**Timeline of Key Events**



## III.    LAW & ARGUMENT

### A.  Rule 12(b)(6) Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Rupnow v. E*TRADE Sec., LLC*, No. 19-CV-10942 (VSB), 2021 U.S. Dist. LEXIS 235975, at *6-7 (S.D.N.Y. Dec. 9, 2021) (Broderick, J.) (citation omitted). "In considering a motion to dismiss, a court must

JA-156

accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor." *Id.* at *7.

### B. Plaintiff Faces a Minimal Pleading Burden under Section 11

"Fraud is not an element or a requisite to a claim under Section 11." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). And, because Plaintiff's claims do not allege fraud or sound in fraud, *see* ¶ 140, "plaintiffs' claims are not subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b)." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). Defendants don't argue otherwise either. Thus, "this is an ordinary notice pleading case, subject only to the 'short and plain statement' requirements of Federal Rule of Civil Procedure 8(a)." *Id.*

"Section 11 of the Securities Act imposes liability on issuers and other signatories of a registration statement that, upon becoming effective, 'contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Litwin*, 634 F.3d at 715 (quoting 15 U.S.C. § 77k(a)). "So long as a plaintiff establishes one of the three bases for liability under these provisions—(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading, *see In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)—then, in a Section 11 case, 'the general rule [is] that an issuer's liability . . . is absolute.'" *Id.* at 715-16; *see also Herman & Maclean v. Huddleston*, 459 U.S. 375, 382 (1983) ("Liability against the issuer of a security is virtually absolute, even for innocent misstatements. Other defendants bear the burden of demonstrating due diligence."). In fact, the nature of liability created by Section 11 has been described by the Second Circuit as "*in terrorem*." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359.

7

### C. The Complaint Sufficiently Alleges Material Misstatements and Omissions Regarding Waterdrop's Financial Condition

#### 1. Waterdrop's First Quarter 2021 Financial Results (Statement #1)[4]

The Complaint plausibly alleges that Waterdrop's Registration Statement contains misleading statements and omissions concerning Waterdrop's financial results. ¶¶ 96-110. Under the heading "Recent Development" in the Registration Statement, Waterdrop disclosed *only* positive aspects of the recently ended Q1:21 financial results but neglected to disclose *any* related negative results for that same quarter. *See* ¶ 96; *see also* ECF No. 55-1 at 7. Specifically, the Registration Statement hyped that Waterdrop achieved "solid business growth in the first quarter of 2021," and that "FYP … reached RMB4,469 million for the first quarter of 2021, demonstrating a 14.4% increase from the fourth quarter of 2020 or a 42.7% increase from the same period of 2020." ¶ 96. The Registration Statement, however, did not disclose that generating this increased FYP and solid business growth came at a significant price: Waterdrop's operating costs and expenses increased by more than 75% year over year, higher than expected by analysts and shareholders, leading to a significant net operating loss for the quarter. ¶ 97.[5] By disclosing only the positive news about the Company's FYP growth for Q1:21 and by failing to disclose the unexpected cost of this growth, the Registration Statement omitted half of the truth, creating a materially misleading impression of Waterdrop's actual financial condition. Thus, the Complaint plausibly alleges the Registration Statement contained a material misrepresentation or omission. Nothing more is required under Rule 8(a) for a Section 11 claim.[6] *See* FED. R. CIV. P. 8(a).

---

[4] Plaintiff uses the same "Statement #s" Defendants use in their "Chart of Alleged Misstatements" (ECF No. 54-1).

[5] The Complaint alleges the increase in costs was due, in large part, to the Company's spending on third-party marketing expenses, which increased 67% year over year in the first quarter. ¶¶ 7, 97. Sales and marketing expenses increased a further 52% quarter over quarter in Q2:21 (or 160.5% year over year), after Waterdrop's mutual aid program closed and could no longer be used as a source for cheap customer leads and data. ¶¶ 7, 84.

[6] Although Plaintiff does not allege scienter or fraud and expressly disclaims both (¶ 140), it is not difficult to imagine how the disclosure of only positive information on the eve of an IPO (while concealing related negative information), could help promote investor interest in the offering and more positively spin the offering price.

Having no answer for why Waterdrop didn't simply disclose the related Q1:21 negative information along with its positive Q1:21 financial results, Defendants attempt to escape liability by putting forth a series of inapposite legal and factual arguments. First, Defendants contend that their statements about "FYP figures" and "solid business growth" were, in isolation, literally true. Br. at 19. But the proper test for whether a statement is misleading is not literal truth; it is "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Rombach*, 355 F.3d at 172 n.7 (citation omitted).

Here, the Complaint plausibly alleges that a reasonable investor would have been misled as to Waterdrop's expenses and its true financial condition when Waterdrop disclosed its "solid business growth in the first quarter of 2021" and positive revenue-related figures but omitted material facts about the rate of increasing operating costs and expenses and the significant resulting net operating loss. Importantly, the Court need not simply take Plaintiff's word for it here because, as discussed below, financial analysts were surprised by the rate at which Waterdrop's expenses increased in Q1:21 (¶ 78), and these analyst statements "underscore the plausibility and reasonableness of the false impression that Plaintiffs allege Defendants' statements conveyed." *In re STEC Inc. Sec. Litig.*, No. 09-cv-1304-JVS, 2011 U.S. Dist. LEXIS 75093, at *24 (C.D. Cal. June 17, 2011).[7]

Second, Defendants argue that Plaintiff did not plead facts "showing that 1Q21 expenses 'were known or knowable[] at the time of the offering.'" Br. at 19 (citing *Lin v. Interactive Brokers Grp.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008)). But there is no such pleading requirement in

---

[7] Even if the proper test was literal truth, the Complaint would pass that test as well. Defendants argue in conclusory fashion that no reasonable investor would understand "growth" and "profit" to be synonymous, and that the "growth" referenced in Registration Statement effectively refers to only top-line growth, which would be consistent with Waterdrop's "expanding operations and increasing revenues." Br. at 19. But, at this stage, it is equally reasonable to draw an inference, in Plaintiff's favor, that an investor would interpret "solid business growth [in Q1:21]" to refer to bottom-line growth or "profit." And, because Waterdrop had already incurred a substantial, undisclosed operating loss—not growth—in Q1:21, a reasonable jury could also find the statement to be literally false. ¶ 97.

this Section 11 case, because securities issuers are "subject to strict liability with regard to material misstatements and omissions, regardless of whether the material omitted facts were known or knowable or not." *Hutchison v. CBRE Realty Fin., Inc.*, 638 F. Supp. 2d 265, 273-75 (D. Conn. 2009) (citing *Herman & Maclean*, 459 U.S. 375 at 382); *see also Northumberland Cty. Ret. Sys. v. Kenworthy*, No. 11-cv-520, 2013 U.S. Dist. LEXIS 131655, at *24 (W.D. Okla. Sep. 16, 2013) (applying *Hutchison*); *Degulis v. LXR Biotechnology*, 1997 U.S. Dist. LEXIS 381, at *10 (S.D.N.Y. Jan. 16, 1997) ("Neither knowledge nor reason to know is an element in a plaintiff's *prima facie* [Section 11] case."); *In re Francesca's Holdings Corp. Sec. Litig.*, No. 13-cv-6882, 2015 U.S. Dist. LEXIS 50726, at *65 (S.D.N.Y. Mar. 31, 2015) (same); *In re Coty Inc. Sec. Litig.*, No. 14-cv-919, 2016 U.S. Dist. LEXIS 41484, at *14 (S.D.N.Y. Mar. 29, 2016) (same). And even if there is a "known or knowable" standard, the argument that the Q1:21 expenses were not "known or knowable" can hardly be taken seriously considering Q1:21 had ended over a month before the IPO and considering Waterdrop was able to and did disclose related positive aspects of the Q1:21 financial results in the Registration Statement. ¶ 96. As a result, it certainly would not be unreasonable to infer (in Plaintiff's favor) that Defendants at the very least could have known the amount of Waterdrop's related expenses for that same quarter at the time of the IPO. So, even if there is a "known or knowable" pleading requirement, Plaintiff easily satisfies it.

Next, Defendants try to sidestep the easier half of their purported "known or knowable" pleading requirement by pointing this Court to only a handful of cases involving claims under Item 303 (17 C.F.R. § 229.303(b)(2)(ii)) without highlighting that the language of Item 303 itself requires a plaintiff to identify "***known*** trends or uncertainties," as opposed to "known ***or*** knowable" ones, and without noting that Plaintiff does not allege any Item 303 claims in this case. *See* Br. at 19 (citing *Lin*, 574 F. Supp. 2d at 416 (Item 303 "appl[ies] generally to the instant

matter"); *In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (discussing Item 303); *Asay v. Pinduoduo Inc.*, No. 18-cv-7625-PKC, 2020 U.S. Dist. LEXIS 56179, at *24-25 (S.D.N.Y. Mar. 30, 2020) (discussing increasing expenses as a trend in the context of Item 303); *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 618 (S.D.N.Y. 2021) ("Plaintiffs' principal contention is that Item 303 … required Defendants to disclose the Q1 2019 declines in trading volume and commissions[.]")). For this reason alone, these Item 303 cases are of little to no persuasive value here.

Nor do any of these cases involve allegations that a company chose to disclose, like here, only positive results for a quarter that had ended prior to the IPO, while simultaneously obscuring related negative results for that same quarter. Indeed, in *Turkcell* and *Pinduoduo*, the defendants did not disclose any portion of their interim results in their respective registration statements, and the allegations were simply that the defendants should have accelerated disclosure of negative results for a quarter that recently closed. *See Turkcell*, 202 F. Supp. 2d at 12 and *Pinduoduo*, 2020 U.S. Dist. LEXIS 56179 at *27; *see also Asay v. Pinduoduo Inc.*, No. 20-1423, 2021 U.S. App. LEXIS 26176, at *12 (2d Cir. 2021) (noting that the complaint alleged that the company "avoided mentioning or reporting the Q2 financial results in the Registration Statement."). That's not the case here, as Waterdrop admittedly did disclose positive Q1:21 results. Furthermore, *Turkcell*'s holding is infected with a disclosure analysis viewed through the lens of a First Circuit test (from *Shaw*) that has been roundly rejected by the Second Circuit, rendering *Turkcell*'s value altogether suspect. *See Stadnick v. Lima*, 861 F.3d 31, 37 (2d Cir. 2017) ("We use this occasion to re-affirm that the 'extreme departure' [*Shaw*] test is not the operative test in this Circuit."). And in *Lin*, which also cites *Shaw*, the Court considered whether a company had a duty to *amend* its offering documents to disclose a major loss that occurred the same day as the company filed its prospectus.

574 F. Supp. 2d at 421. Again, not the case here. Thus, none of these cases is factually analogous to the case at hand.

Defendants then assert that, even if Waterdrop's expense information was known, the omission is immaterial when the Registration Statement is viewed "as a whole." Br. at 20 (citing *Demaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)). In essence, Defendants argue that because Waterdrop did disclose its historical expenses from 2018 through 2020 in the Registration Statement, and purportedly "disclosed its expectation that these increases, and the lack of profitability, would continue," the undisclosed expenses and losses from Q1:21 would not have significantly altered the total mix of information available to investors (and thus no duty to disclose arose). Br. at 20 (citing *Stadnick*, 861 F.3d at 36). "Plaintiff alleges no statements or other facts suggesting expense increases were likely to slow down, much less reverse, in 1Q21." Br. at 20.

But Plaintiff does supply these very facts; Defendants just don't address them. The Complaint alleges that at least two sophisticated financial analysts were surprised by the rate of increased costs in Q1:21. For example, a Morgan Stanley analyst wrote that, as a result of "operating costs (up 68% even excl. one-off shutdown costs of mutual aid platform) and sales & marketing costs (up 67% excl. SBC)[,]…net losses for 1Q were slightly ***higher than our expectation*.**" ¶ 78 (emphasis added). And an analyst from BofA wrote, "The growth of the most costly third party traffic continued to outgrow natural traffic, leading to the increase of its sales and marketing expenses by 68% YoY, ***faster than our FY21 forecast*** at 49%." ¶ 78 (emphasis added). Likewise, analysts were surprised by the rate at which operating costs continued to rapidly increase in the second quarter, with several analysts significantly dropping their price targets after the Company published its Q2:21 results. ¶ 85. About a week after the Company released its Q2:21 results, Seeking Alpha reported that Waterdrop's "shares are down more than 75% since their

April IPO" due in part to the fact that, after the shuttering of the mutual aid program, marketing expenses "more than tripled during the quarter, as the company spent heavily on third-party channels to acquire new users." ¶ 86. These allegations alone are fatal to Defendants' argument because they demonstrate that a (less sophisticated) reasonable investor would not have understood, or been able to predict, that Waterdrop's costs and expenses would increase at the rate they did using only the incomplete information provided in the Registration Statement. ¶ 78.[8]

Once this unexpected information was disclosed to investors when Waterdrop released its Q1:21 results, the price of Waterdrop's ADSs fell 11% from $7.84 at closing on June 16, 2021, to $6.95 at closing on June 17, 2021, on unusually heavy trading volume. This price drop, on unusually heavy trading volume, combined with the allegations that analysts were surprised by the Q1:21 expenses and loss, is proof that the omitted information was not only unexpected, but also material to investors. *See Christine Asia Co. v. Yun Ma*, 718 F. App'x 20, 22 (2d Cir. 2017) ("The importance of this information to investors is illustrated by the fact that, when it was revealed . . . Alibaba's stock dropped 13% in two days."); *In re Insys Therapeutics, Inc. Sec. Litig.*, 2018 U.S. Dist. LEXIS 100000, at *13 (S.D.N.Y. June 12, 2018) (finding investor reaction with "heavy trading volume" to be "empirical evidence of materiality"). At the very least, the price drop, heavy trading volume, and analyst reactions are strong evidence that the omitted information was not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Litwin*, 634 F.3d at 717 (citation omitted). Either way, the omitted information cannot be dismissed as immaterial as a matter of law at this early stage.

Furthermore, even if there was "no existing independent duty to disclose information,"

---

[8] Defendants also claim that "the Registration Statement left no doubt that Waterdrop's expenses would continue to rise." Br. at 4, 7-8; *see also* ¶ 40. If the Registration Statement truly left no doubt, it would have either disclosed the related Q1:21 expense information or stated explicitly that expenses would continue to rise. It did neither.

once Waterdrop chose to speak about the positive aspects of its Q1:21 results, it had a "duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014); *see also In re Barclays Bank PLC Sec. Ltig.*, 756 F. App'x 41, 47 (2d Cir. 2018). By providing only part of the revenue-related information, as Defendants did here, while not disclosing that generating that FYP came at an unexpected cost, Defendants painted an incomplete and misleading picture that did not satisfy the duty to tell the *whole* truth. *Cf. In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 U.S. Dist. LEXIS 171110, at *62 (S.D.N.Y. Dec. 2, 2013) ("A corporation's duty to disclose is especially obvious … where the corporation chooses to selectively reveal positive information on a specific topic while concealing closely-related negative information."); *see also Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1124-26 (8th Cir. 2019) ("By omitting the (allegedly) significantly lower projections for Precipio's net income/loss, the proxy statement may have presented Precipio in a false light that was materially misleading."); *N. Shore-Long Island Jewish Health Sys. v. Multiplan, Inc.*, 325 F.R.D. 36, 47 (E.D.N.Y. 2018) ("concepts of revenue, expenses, and profit are inexorably intertwined").

Finally, Defendants isolate the phrase "solid business growth," and claim, divorced from its context, that it constitutes "inactionable puffery." Br. at 21. But "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made," *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015), and Defendants "cannot escape liability merely because the opinions on which liability [is] predicated did not express a reason in dollars and cents." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) (internal quotation marks omitted). Unlike the "textbook examples" of puffery cited by Defendants (Br. at 21), the context of Waterdrop's statements regarding the Company's growth and revenue made them both material and misleading. *See In re Virtus Inv. Partners, Inc.*, 195 F. Supp. 3d 528, 538 (S.D.N.Y.

14

2016) (while some words "might be meaningless in the abstract, materiality depends upon the context in which the statement was made."). By only disclosing positive revenue-related information and that the Company "achieved a solid business growth in the first quarter of 2021," the Registration Statement masked that Waterdrop's expenses were increasing at an unexpected rate and created a materially misleading impression that the Company's financial position was improving or was better than it was. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 191 (S.D.N.Y. 2010) (rejecting puffery argument for statements regarding business "growth."). As discussed below, the omission also camouflaged the true impact that the shutdown of the mutual aid platform was having and would have on the Company.

### 2. Waterdrop's Operating Costs and Expenses (Statements ## 2-3)

The Complaint also plausibly alleges that the Registration Statement contained additional misleading statements and omissions concerning Waterdrop's operating costs, expenses, and net losses. ¶¶ 100-106. In addition to revealing that Waterdrop experienced "solid business growth in the first quarter of 2021" and providing only positive revenue-related information for Q1:21, Defendants also assured investors that the Company "expect[s] our operating costs as a percentage of our net operating revenue will decrease in the foreseeable future," and that Waterdrop "expect[s] our operating costs and expenses to decrease as a proportion of our revenues as we improve the operating efficiency of our platform and achieve more economies of scale." ¶ 102. But far from decreasing in the already completed Q1:21 or even in the half-completed next quarter, Waterdrop's costs as a percentage of revenue *increased* from 133% in Q4:20 to 152% in Q1:21 and then even further to 186% in Q2:21—higher than any other quarter disclosed in the Registration Statement. ¶ 104. These statements created a misleading impression of Waterdrop's true financial condition and prevented investors from learning the true rate at which Waterdrop's expenses were increasing and the true impact of the shutdown of mutual aid due to regulatory pressure. *See* ¶¶ 103-04, 116.

15

In response, Defendants initially argue that these statements are also literally true, because "they inform investors that any such decline will occur only ***after*** the Company improves "operating efficiency" and achieves "economies of scale." Br. at 21. Yet the words "only after" appear nowhere in the Registration Statement. Instead, the Registration Statement says the percentages will decrease "in the foreseeable future" and "***as*** we improve the operating efficiency of our platform" and ***as*** Waterdrop "achieve[s] economies of scale," thus suggesting such improvement was currently happening. ¶ 102 (emphasis added). And, contrary to Defendants' conclusory argument otherwise (Br. at 22), it is certainly plausible that a reasonable investor would have interpreted "in the foreseeable future" to include Q1:21 and Q2:21. In fact, Merriam-Webster defines "in the foreseeable future" as "at a time that is not long from now: soon."[9]

Next, Defendants argue their statements are protected by the bespeaks caution doctrine because they were forward-looking and accompanied by meaningful cautionary language. Br. at 22. While these statements are admittedly forward-looking, they are not accompanied by meaningful cautionary language. As an example of purported "cautionary language," Defendants resurrect the argument that because "the Registration Statement disclosed historical operating expenses that, as a proportion of revenues, were consistently near or well above 100% in 2019 and 2020," investors were adequately warned that such expenses would continue in the future. Br. at 22. These historical results offer no words of caution at all. In fact, they do the exact opposite, as Defendants' misleading statement explained to investors that operating costs as a percentage of net operating revenue would *decrease* in the foreseeable future (*i.e.*, future results will buck this historical trend). The argument also ignores that at least two analysts were surprised by the rate at which such expenses increased—thus evidencing that investors were not adequately warned.

---

[9] https://www.merriam-webster.com/dictionary/in%2Ffor%20the%20foreseeable%20future#:~:text=Definition%20of%20in%2Ffor%20the,in%2Ffor%20the%20foreseeable%20future (Last accessed June 20, 2022).

Moreover, while Waterdrop also "warned" that the Company had a "history of net losses and negative cash flows from operating activities," these purported risk factors were similarly boilerplate and misleading in and of themselves, because the Registration Statement told investors, for example, that net losses "*may* continue in the future," while omitting the material information that Waterdrop *had* already incurred a substantial loss during Q1:21 (and that the unexpectedly high rate at which expenses were increasing was accelerating even faster in the first half of Q2:21). ¶¶ 105-06. Thus, even if Defendants' cautionary words are anything more than mere boilerplate risk disclosures, Defendants cannot legally be insulated from liability because the future risk warned about had already transpired. *See Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

With respect to these boilerplate risk factors (¶ 105), Defendants argue, like before, that these statements cannot be actionable, because "Plaintiff fails to plead that the Company knew, as of May 7, 2021, what its final 1Q21 expenses (much less 2Q21) would be at the time it issued its June 17, 2021 6-K." Br. at 23. Again, even if there is a "known or knowable" requirement under Section 11, the reasonable inference that should be drawn in Plaintiff's favor here is that Defendants knew or could have known Waterdrop's related operating costs and expenses for Q1:21 the time of the IPO, as Q1:21 ended over a month before the IPO, and the Company was able to disclose related aspects of its financial results for that same quarter. *See* § III.C.1, *supra*.

In the end, when all the statements are viewed together and in context, combined with the fact that analysts were surprised by the amount of Waterdrop's Q1:21 expenses and loss, the Complaint plausibly alleges that (or at the very least creates a jury question about whether) a reasonable investor would have been misled about the rate at which Waterdrop's expenses were increasing and the Company's true financial condition at the time of the IPO. *See Gross v. GFI*

17

JA-167

*Grp., Inc.*, 310 F. Supp. 3d 384, 392 (S.D.N.Y. 2018) (whether statements are misleading in context is a "quintessential jury question").

### D. The Registration Statement Contained Material Misstatements and Omissions Regarding the Cessation of the Mutual Aid Platform (Statements ## 4-8)

The Complaint plausibly alleges that the Registration Statement contained misleading statements and omissions about the discontinuation of Waterdrop's mutual aid platform and its resulting economic impact. ¶¶ 69, 107-116. With respect to the cessation of this platform, the Registration Statement vaguely stated that the Company ceased its mutual aid platform "in order to focus on our core businesses and offer enhanced protection to our users," and that contributing factors to the decision were "increased recognition of our brand," "latest market development," and "recent industry environment changes." ¶ 69. These statements created the misleading impression that the discontinuation was a voluntary choice made only in the interests of strengthening Waterdrop's business, when in truth, the shutdown was due to increased regulatory pressure from the Chinese government. ¶¶ 112-16. Thus, although the shutdown itself was disclosed prior to IPO, the true reason for the shutdown and the unexpected impacts it was having and would have on Waterdrop were not disclosed. These allegations, which must be accepted as true at this stage, more than suffice under the liberal pleading standard of Rule 8.

Defendants advance several arguments about whether these statements were misleading or material. First, Defendants claim that the true reason Waterdrop and other Chinese companies ceased operating their mutual aid platforms was "for economic and business reasons" because "regulation made mutual aid economically unattractive in a previously unregulated space." Br. at 14. But even assuming this conclusory statement to be true, it proves Plaintiff's point. Waterdrop did not disclose to investors that it discontinued its mutual aid due to economic reasons, nor did it disclose that the increasingly strict regulations had any effect on the decision at all. Instead,

JA-168

Waterdrop disclosed that the reasons for discontinuing mutual aid were, for example, due to "recent industry environment changes" and "latest market development." Br. at 15. Contrary to Defendants' argument that Plaintiff's allegations are "thus completely consistent" with these stated reasons (Br. at 15), the phrases "recent industry environment changes" and "latest market development" are so vague that they could have meant literally anything, and certainly didn't alert investors that the CBIRC had anything at all to do with Waterdrop's cessation of one of its three core business segments.

Unable to deny that the Registration Statement did not disclose the true reason behind the cessation, Defendants next argue that the omitted information would not have been material. Br. at 3. A reasonable jury could find, however, that Defendants' omission about increased regulatory pressure and its ongoing and potential future impacts, which led to Waterdrop shutting down one of its three core segments and to unexpected increased expenses, to be something "that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). In any event, at this stage, the alleged omissions are not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Litwin*, 634 F.3d at 717.

Notably, a September 15, 2021 Seeking Alpha article linked the severe price decline of Waterdrop's ADSs in part to the increasing regulatory scrutiny described in the Complaint, further evidencing the materiality of this omitted information (*see Yun Ma*, 718 F. App'x at 22):

> Sensing imminent regulatory scrutiny, Waterdrop shut down its mutual aid platform at the end of March, a move widely seen as pre-emptive to avoid any uncertainty ahead of its IPO plans that were already underway. Media reports even hinted that the insurance regulator wanted the listing postponed, but Waterdrop went ahead anyway. Thus Waterdrop was forced to jettison one of its biggest referral sources for new insurance business, which may partly explain its current heavy reliance on costly third-party channels as a source for finding new customers.

¶ 86 ("Waterdrop's 'shares are down more than 75% since their April IPO due to a combination of widening losses and regulatory concerns.'"). If the Registration Statement had adequately disclosed the reason behind Waterdrop's cessation of its mutual aid program, namely increased regulatory pressure from the CBIRC, the ongoing effects of CBIRC regulation on Waterdrop's business would not have come as such a surprise to investors and led to such a severe price decline.

### E.  The Confidential Witness are Described with Sufficient Particularity

Initially, Defendants' argument that Plaintiff does not describe the CWs "with sufficient particularity" relies on case law dealing with the heightened pleading standard required for fraud. *See* Br. at 17-18 (citing *Novak v. Kosaks*, 216 F.3d 300, 314 (2d Cir. 2000) and *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011)). That pleading standard does not apply here, so it's questionable whether a plaintiff is still required to describe a CW with "particularity" in a case governed by Rule 8(a). *Cf. Plumbers' & Pipefitters' Local #562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp.*, No. 08-cv-1713-ERK, 2012 U.S. Dist. LEXIS 24106, at *42 n.12 (E.D.N.Y. Feb. 23, 2012) ("[Defendants' CW argument] largely relies on case law dealing with the heightened pleading standard required for fraud claims under Section 10…. This pleading standard does not apply to pleading Sections 11 and 12 claims."). But the Court need not bog itself down with such distinctions, as the CW allegations here readily meet the heightened pleading standard regardless.

In addition to CW1's position and dates of employment, the Complaint describes several particular facts that someone unfamiliar with the Company would not have known, for example, that mutual aid customer's information was stored in Waterdrop's centralized database and could be accessed by Waterdrop's other business teams. ¶ 40. Similarly, the Complaint describes CW2's

position, a Financial Business Partner,[10] dates of employment, and particular details about the cessation of Waterdrop's mutual aid, a subject central to the allegations in the Complaint. ¶ 41. Both CWs confirm that Waterdrop's mutual aid platform was shut down in response to regulatory pressure from the CBIRC and not, as Defendants claim, because it was no longer economically viable, or, as stated in the Registration Statement, because Waterdrop wished to focus on its "core business." ¶¶ 40-41. These insider statements fully corroborate the analyst reports and media articles that later revealed the true reason why Waterdrop shuttered its mutual aid program. *See* ¶¶ 54, 61-62; *see also Glaser*, 772 F. Supp. 2d at 590 ("[W]hen 'independent [adequately plead] factual allegations' corroborate a confidential source's statements, the requirement of a description of the source's job is loosened.") (internal citation omitted).

### F. The Registration Statement Contained Material Misstatements and Omissions regarding the Regulatory Environment in China (Statements ## 9-11)

The Complaint adequately alleges that the Registration Statement contained misleading statements and omissions about the regulatory environment in China and that it severely downplayed the impact that this environment was having and would have on the Company. *See* ¶¶ 117-131. For example, contrary to Waterdrop's representations that "the growth of health insurance sector has been supported by the Chinese government in recent years" and "recent regulatory developments are expected to have positive impacts on China's health insurance industry," including "[a]ccelerating the growth of the health insurance industry, and encouraging the growth of charitable medical donations and medical mutual aid[,]" (¶ 118), various publications indicated that the CBIRC was actually increasing its regulatory scrutiny of the insurance industry, which would inhibit, not support, the growth of the industry. ¶¶ 119-122.

---

[10] While Defendants claim this description is vague, *see* Br. at 18, a Finance Business Partner, or "BP," is a common position in Chinese companies. Nevertheless, as the term is not common in American companies, Plaintiff explained that it is a "managerial financial planning and analysis position." ¶ 41.

Because these sources, which contradicted Waterdrop's statements, were publicly available, Defendants argue that there was no duty to disclose such information because that information cannot be material if it was already part of the "total mix" of information available to investors. Br. at 24. "It is true that, as a general matter, the 'total mix' of information may . . . include information already in the public domain and facts known or reasonably available to [potential investors] . . . But case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." *Litwin*, 634 F.3d at 718 (internal citations omitted). This is especially true when the public sources, such as here (*see* ¶¶ 55, 57-58, 60), are published in a foreign language, thus making the information "not readily accessible to investors." *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020) (holding "different language and Chinese court judgments, was not readily accessible to investors" and were insufficient to constitute adequate disclosure); *see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009) (Publication of articles in Chinese "does not transform the information contained within the articles into 'matters of general public knowledge' that may properly be imputed to Fuwei's stockholders.").

Moreover, this type of "truth on the market" defense is rarely appropriate at this stage, because "[t]hose inquiries present fact questions that cannot be resolved in Defendants' favor on a motion to dismiss." *In re Avon Sec. Litig.*, 2019 U.S. Dist. LEXIS 200816, at *43 (S.D.N.Y. Nov. 18, 2019); *see also Ganino*, 228 F.3d at 167 ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality"); *In re Enzymotec Sec. Litig.*, No. 14-cv-5556-JLL-MAH, 2015 U.S. Dist. LEXIS 167403, at *50-52 (D.N.J. Dec. 14, 2015) ("Defendants contend that because the new Chinese regulations were publicly known—as evidenced by news articles, government reports,

and analyst reports subject to judicial notice—Plaintiffs cannot show a misstatement or an omission of material fact . . . Again, the Court is guided by its duty to accept all factual allegations as true and to construe the Amended Complaint in a light most favorable to Lead Plaintiffs. Given the strong inferences in favor of Lead Plaintiffs, the Court finds that it is inappropriate to rule at this stage whether the truth on the market defense applies.").

Nevertheless, in this case, Plaintiff is not seeking the mere disclosure of public regulations or other publicly available information. Rather, the key information that should have been disclosed to make the Registration Statement not misleading, so investors could truly comprehend the scope of the risks involved, was the "the impact that this [regulatory] environment was having and would have on the Company." ¶ 117; *see also* ¶¶ 118-131. With respect to Waterdrop's undisclosed Q1:21 expenses resulting from the shutdown of mutual aid, this impact was certainly not public knowledge. *Cf. Litwin*, 634 F.3d at 719 ("And this potential *future impact* was certainly not public knowledge…."); *see also* ¶ 78 (analysts expressing surprise by the rate at which Waterdrop's expenses increased).[11] And, of course, nor did Waterdrop disclose that the mutual aid platform was effectively forced to shut down due to increased regulatory pressure. ¶ 124.

Defendants also argue that the Registration Statement "included detailed warnings about regulation," and thus, a "reasonable investor understood that, with little notice, the CBIRC could revise regulations and impair Waterdrop's business." Br. at 11-12. While the Registration Statement did contain generic risk statements regarding the regulatory environment in China, "[a]

---

[11] Defendants also claim that the securities laws unequivocally "do not require disclosure of regulations." Br. at 24 (citing *In re Qudian Inc. Sec. Litig.*, 2019 U.S. Dist. LEXIS 167072, at *23 (S.D.N.Y. Sep. 27, 2019)). But the holding in *Qudian* was not nearly so broad; rather, in dicta, the Court rejected the idea that "every indicia of the modern regulatory state needed to be compiled, catalogued, and explained to potential investors." 2019 U.S. Dist. LEXIS 167072 at *23. And unlike in this case, the defendant in *Qudian* "summarized the applicable regulations," "explicitly identified" a regulation it may have been in violation of, and disclosed that, pursuant to the regulation, the interest rate it was charging certain customers "might be found unenforceable." *Id.* at *22-23. Defendants made no such disclosure here, relying instead on vague and generalized risk statements that did not adequately warn investors of the threat of these regulations to Waterdrop's business. ¶¶ 123-130.

generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Meyer*, 761 F.3d at 251 (reversing dismissal of complaint where the company explained in its prospectus that it was subject to China's harsh environmental regulations but did not disclose that it was in violation of those regulations, which ultimately led to major fines). Like in *Meyer*, Waterdrop made generic disclosures regarding possible risks of increasing regulatory scrutiny of the insurance industry in China, but the Company failed to disclose the actual impact it was having and would have on Waterdrop's business, and it failed to disclose that some Defendants were currently being investigated for fraudulent practices, which ultimately resulted in fines leveraged against both the Company and Defendant Yang. ¶¶ 123-131.[12] And, not to mention, Waterdrop neutralized their generic warnings by telling investors that "the growth of health insurance section has been supported by the Chinese government in recent years" and that "recent regulatory developments are expected to have positive impacts on China's health insurance industry." ¶ 118. Without adequate disclosures or warnings, investors were left blissfully unaware about how heavy a regulatory hand the Chinese government was actually raining down on Waterdrop.

### G. The Complaint Establishes Control Person Liability

Where Plaintiff adequately pleads Section 11 claims, and Defendants do not contest that Defendants are control persons, Section 15 claims are adequately pled. *See In re Tufin Software Techs. Ltd. Sec. Litig.*, No. 1:20-cv-5646-GHW, 2022 U.S. Dist. LEXIS 34053, at *30-31 (S.D.N.Y. Feb. 25, 2022). Here, both of those condition are satisfied, so the Complaint adequately pleads Section 15 claims.

---

[12] Defendants argue that the size of the fines imposed negates their significance. Br. at 25. Not true. The fact that the investigation of Waterdrop resulted in fines, regardless of the size, confirms that media stories about a "crackdown" were not mere rumors.

### H. Leave to Amend

In the event the Court grants Defendants' Motion, Plaintiff respectfully requests leave to amend the Complaint, and leave to amend should be "liberally granted" "'when justice so requires.'" *Longhi v. Lombard Risk Sys.*, No. 18-cv-8077, 2019 U.S. Dist. LEXIS 170188, at *8 (S.D.N.Y. Sep. 30, 2019) (Broderick, J.) (citing FED. R. CIV. P. 15(a)(2)).

## IV.    CONCLUSION

At its core, this case boils down to whether Defendants should be allowed to speak in half-truths—at the expense of unknowing investors—disclosing only positive quarterly news relating to revenue while concealing related materially negative news, such as the massive increase in third-party marketing expenses made necessary by the forced discontinuation of the Waterdrop's mutual aid program. As explained above, the federal securities laws answer this question with a resounding "no." Accordingly, Defendants' Motion to Dismiss should be denied in full.

DATED: June 21, 2022                    Respectfully Submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ Kim E. Miller*
Kim E. Miller (KM-6996)
J. Ryan Lopatka
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498
Email: kim.miller@ksfcounsel.com
Email: j.lopatka@ksfcounsel.com

-and-

Lewis S. Kahn
Craig J. Geraci, Jr.
1100 Poydras Street, Suite 3200
New Orleans, LA 70163

25

JA-175

Telephone: (504) 455-1400
Fax: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com
Email: craig.geraci@ksfcounsel.com

*Lead Counsel for Lead Plaintiff Qi Mi
and the Class*

JA-176

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SIDNEY SANDOZ, Individually And On
Behalf of All Others Similarly Situated,

           Plaintiffs,

vs.

WATERDROP INC., PENG SHEN,
KANGPING SHI, NINA ZHOU, KAI
HUANG, HAIYANG YU, YAO HU, GUANG
YANG, COLLEEN A. DE VRIES, COGENCY
GLOBAL INC., GOLDMAN SACKS (ASIA)
L.L.C., MORGAN STANLEY & CO. LLC,
BOFA SECURITIES, INC., CHINA
MERCHANTS SECURITIES (HK) CO.,
LIMITED, CLSA LIMITED and HAITONG
INTERNATIONAL SECURITIES COMPANY
LIMITED,

           Defendants.

Case No. 1:21-cv-07683-VSB

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT
## ON BEHALF OF WATERDROP INC., THE UNDERWRITER DEFENDANTS,
## COGENCY GLOBAL, INC., AND COLLEEN DEVRIES

JA-177

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT....................................................................................................... 2

    I.    PLAINTIFF FAILS TO PLEAD MISSTATEMENTS ABOUT
        EXPENSES ................................................................................. 2

    II.   PLAINTIFF FAILS TO PLEAD MISSTATEMENTS ABOUT MUTUAL
        AID................................................................................................ 7

    III.  PLAINTIFF FAILS TO PLEAD MISSTATEMENTS ABOUT
        REGULATION ............................................................................. 9

CONCLUSION.................................................................................................... 10

i

# TABLE OF AUTHORITIES

**Page**

*In re Aegon N.V. Sec. Litig.*,
   2004 WL 1415973 (S.D.N.Y. June 23, 2004)........................................................................ 7

*In re Align Tech., Inc. Sec. Litig.*,
   2021 WL 1176642 (N.D. Cal Mar. 29, 2021) ....................................................................... 5

*Asay v. Pinduoduo*,
   2021 WL 3871269 (2d Cir. Aug. 31, 2021)..................................................................3, 5, 7

*Auctus Fund, LLC v. NuGene Int'l, Inc.*,
   2021 WL 1069462 (D. Mass. Mar. 19, 2021) ...................................................................... 5

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017) .............................................................................. 10

*Campbell v. Transgenomic, Inc.*,
   916 F.3d 1121 (8th Cir. 2019) ........................................................................................... 4

*Freudenberg v. E*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................................................... 6

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009) .............................................................................. 10

*In re HEXO Corp. Secs. Litig.*,
   524 F. Supp. 3d 283 (S.D.N.Y. 2021) ............................................................................... 2

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 U.S. Dist. LEXIS 171110 (S.D.N.Y. Dec. 2, 2013) .................................................. 4

*Lea v. TAL Educ. Grp.*,
   837 F. App'x 20 (2d Cir. 2020) ....................................................................................... 10

*Luo v. Sogou, Inc.*,
   465 F. Supp. 3d 393 (S.D.N.Y. 2020) ............................................................................... 2

*N. Shore-Long Island Jewish Health System v. Multiplan, Inc.*,
   325 F.R.D. 36 (E.D.N.Y. 2018) ........................................................................................ 4

*In re Petrobras Secs. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015) ............................................................................... 6

*In re Progress Energy, Inc.*,
   371 F. Supp. 2d 548 (S.D.N.Y. 2005) ............................................................................... 9

JA-179

*In re Qudian Inc. Secs. Litig.*,
  2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) ........................................................ 9

*Scott v. Gen'l. Motors Co.*,
  46 F. Supp. 3d 387 (S.D.N.Y. 2014) ........................................................ 3

*Singh v. Schikan*,
  106 F. Supp. 3d 439 (S.D.N.Y. 2015) ........................................................ 3

*In re STEC Inc. Sec. Litig.*,
  2011 WL 2669217 (C.D. Cal. June 17, 2011) ........................................................ 5

*In re Vivendi Univ., S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. Nov. 4, 2003) ........................................................ 6

*Wandel v. Gao*,
  2022 WL 768975 (S.D.N.Y. Mar. 14, 2022) ........................................................ 1, 2

*Willard v. UP Fintech Holding, Inc.*,
  527 F. Supp. 3d 609 (S.D.N.Y. 2021) ........................................................ 5, 7

*Xu v. Gridsum Holding Inc.*,
  2021 WL 773002 (S.D.N.Y. Feb. 23, 2021) ........................................................ 2

JA-180

Waterdrop Inc. ("Waterdrop" or the "Company"), Cogency Global, Inc., Colleen DeVries, and the Underwriter Defendants[1] respectfully submit this memorandum of law in support of their Motion to Dismiss the Amended Class Action Complaint ("Amended Complaint" or "AC"):

## PRELIMINARY STATEMENT

The Opposition relies on misstating law, unsupported inferences, and wordplay to obscure the Prospectus' full and candid disclosures of the risks about which Plaintiff now complains.

*First*, Plaintiff claims that Waterdrop was obligated to disclose, in the Prospectus, 1Q21 expenses along with its disclosure of 1Q21 First Year Premiums ("FYP"). But contrary to its burden under well-settled law, Plaintiff fails to plead that 1Q21 expenses were "known or knowable" as of the IPO. *See, e.g.*, *Wandel v. Gao*, 2022 WL 768975, at *7 (S.D.N.Y. Mar. 14, 2022) (dismissing Section 11 claim where omitted facts were neither "known nor knowable" as of the IPO). Plaintiff speculates that Waterdrop *must* have been able to disclose 1Q21 expenses in the Prospectus because it disclosed FYP, a single, separate metric, by contrast to the many calculations the Company aggregates across its entire business to accurately determine total expenses. And Plaintiff concedes that Company statements that expenses would decline as a proportion of revenues were forward-looking, but fails to show that the Company's fulsome disclosures concerning historical and rising expenses were not "adequate cautionary language."

*Second*, Plaintiff fails to plead misstatements about Mutual Aid. Plaintiff's allegations indicate that economic factors spurred the industry-wide cessation, and not alleged, but unspecified, regulatory "scrutiny." Regardless, Plaintiff fails to allege that the *reasons* for ceasing Mutual Aid were material. Plaintiff claims that disclosing the "true" reason would have alerted investors to an

---

[1] Capitalized terms have the same meaning as in Defendants' Moving Brief. The Moving Brief is cited herein as "Mot. __"; the Opposition as "Opp. __."

upcoming "crackdown," but fails to plead there ever was a "crackdown" on Waterdrop, whether or not related to the IPO. And Plaintiff's assertion that the cessation of Mutual Aid increased expenses is unrelated to the *reasons* for ceasing Mutual Aid; and that increase was *disclosed*.

*Finally*, Plaintiff fails to plead misstatements or omissions about the regulatory environment. Plaintiff claims the Company failed to disclose the CBIRC's pre-IPO regulatory actions—in fact the Prospectus specifically addressed the January 2021 CBIRC pronouncement, the last one before the IPO—but *pleads* that all such actions were public. Further, the CBIRC is Waterdrop's *main regulator*, and was mentioned repeatedly in the Prospectus, and none of Plaintiffs' authority suggests that such information is unavailable to Company investors.

Plaintiff's thinly-pleaded allegations should be fully and finally dismissed with prejudice.

## ARGUMENT

## I.  PLAINTIFF FAILS TO PLEAD MISSTATEMENTS ABOUT EXPENSES

**Statement #1**. This Statement, about Waterdrop's 1Q21 FYP and "solid business growth," is inactionable because Plaintiff fails to plead that 1Q21 expenses were "known or knowable" as of the IPO. Mot. 19. Plaintiff responds with non-sequiturs that scienter is not an element under Section 11 and that only undisclosed trends alleged under Item 303 must be "known." Opp. 9-11. Plaintiff misstates the law. "While Section 11 claims do not require an allegation of scienter, Plaintiffs must still raise an inference that a statement or omission was materially misleading *at the time it was made*." *Xu v. Gridsum Holding Inc.*, 2021 WL 773002, at *10 (S.D.N.Y. Feb. 23, 2021) (dismissing Section 11 claim for failing to allege how "accounting irregularities" were "known or knowable" as of the IPO) (emphasis in original); *see also Gao*, 2022 WL 768975, at *7 (dismissing Section 11 claim when alleged omitted facts were "neither known nor knowable"); *In re HEXO Corp. Secs. Litig.*, 524 F. Supp. 3d 283, 300 (S.D.N.Y. 2021) (dismissing Section 11 claim and noting "known or knowable" requirement); *Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393,

406 (S.D.N.Y. 2020) (same); *Singh v. Schikan*, 106 F. Supp. 3d 439, 446 (S.D.N.Y. 2015) (same); *Scott v. Gen'l. Motors Co.*, 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014) (same).

Plaintiff offers no facts, such as internal documents, statements, or confidential witnesses suggesting that 1Q21 expenses were "known or knowable" as of the IPO.   Plaintiff claims only that the Prospectus post-dates the close of 1Q21, and that Waterdrop disclosed 1Q21 FYP—a single discrete metric. *See* Opp. 10.   Waterdrop's knowledge of FYP does not support speculation that Waterdrop had (or could have) compiled, reviewed, and vetted all expenses across its business as of the IPO.   Indeed, courts recognize—in authority to which Plaintiff has no response—that companies are often unable to make accurate financial disclosures until well after the close of a quarter. *See* Mot. 19-20.   This pleading failure disposes of allegations relating to **Statement #1**.

Plaintiff argues that Waterdrop disclosed "only positive results" while "obscuring related negative results."   Opp. 11.   Plaintiff's "obscuring" assertion fails in light of the failure to plead omission of "known or knowable" facts.   Further, any reasonable investor knew the single 1Q21 FYP figure was not a complete picture of 1Q21.   And all *available* data suggested a large increase in expenses *and* net losses for 1Q21: the Company had never been profitable; it *told* investors that "*operating costs and expenses will increase* in the foreseeable future"; and annual net losses had more than *tripled* over the past three years to *RMB663 million*. *See* Mot. 8-10.

It was also clear prior to the IPO that Waterdrop was increasing its FYP through the use of more expensive third-party channels rather than Mutual Aid.   The Prospectus disclosed that Mutual Aid was a significant user acquisition tool, that third-party channels were more expensive, *and* that, by the IPO, third-party channels had all but *replaced* Mutual Aid for FYP generation.   Mot. 7-8.   Defendants' authority dismissing Section 11 expense disclosure claims thus applies here with equal force. *See, e.g.*, *Asay v. Pinduoduo*, 2021 WL 3871269, at \*4 (2d Cir. Aug. 31, 2021)

("significant increase in marketing costs in prior reporting periods" meant that "doubling of user acquisition costs in the second quarter of 2018 would not have significantly altered the 'total mix' of information."). By contrast, Plaintiff's authority does not suggest that a Company must disclose rising expenses whenever it speaks about one other operating metric, such as FYP (particularly where, as here, purported omissions were not "known or knowable"). *See In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 U.S. Dist. LEXIS 171110, at *64-65 (S.D.N.Y. Dec. 2, 2013) (misleading to tout relationships with major customers without disclosing that one had repudiated its contract); *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1124-26 (8th Cir. 2019) (misleading to disclose gross profit projection but not "significantly lower projections for . . . net income/loss").[2]

Plaintiff also claims that post-IPO analyst reports and stock price declines suggest the market was surprised by 1Q21 expenses and the omission was material. Opp. 12. Analyst reports cannot absolve Plaintiff of the burden to plead that 1Q21 expenses were "known or knowable." Further, Plaintiff identifies no statements *by Defendants* suggesting expenses would not follow historical experience by increasing substantially. And the analysts were not surprised: the cited report from Morgan Stanley says "net losses for 1Q were *slightly* higher than our expectation," *id.* (emphases added and removed), and does not even say that the slight discrepancy resulted from an unexpected increase in expenses—net losses are necessarily also a function of revenues. Relatedly, BofA's analyst said that 1Q21 expenses increased faster than BofA's prediction for all of 2021—which means only that BofA had (thus far) failed to predict expenses a year in advance. Regardless, Plaintiff offers no authority for the claim that a company is liable under the Securities

---

[2] The statement in *N. Shore-Long Island Jewish Health System v. Multiplan, Inc.*, 325 F.R.D. 36 (E.D.N.Y. 2018) that "concepts of revenue, expenses, and profit are inexorably intertwined," *id.* at 47, illustrates Defendants' point that any reasonable investor understood the Company's 1Q21 FYP disclosure was not a full picture of 1Q21.

Act where equity analyst predictions fail precisely to materialize.  *See In re STEC Inc. Sec. Litig.*, 2011 U.S. Dist. LEXIS 75093 (C.D. Cal. June 17, 2011) (cited by Plaintiff).  And investor disappointment purportedly reflected by the stock price does not show the Company's robust, candid disclosures were inadequate.  *See also Pinduoduo Inc.*, 2021 WL 3871269, at *4, *Willard v. UP Fintech Holding, Inc.*, 527 F. Supp. 3d 609, 623 (S.D.N.Y. 2021) (disclosures rendered alleged omissions immaterial, despite stock price declines).

Plaintiff also fails to show that "solid business growth" is a misstatement.  Plaintiff does not dispute that (i) "growth" routinely occurs alongside net losses in a Company's early stages, and (ii) the Company's undisputed revenue and FYP increases comprised such growth.  Mot. 19.  Plaintiff claims the phrase "masked" the "unexpected rate" of expense increases.  Opp. 15.  Setting aside the failure to plead that such increase was "known or knowable" as of the IPO, Plaintiff offers no reason that "solid business growth" cannot accompany increased expenses.  Further, Plaintiff fails to plead what the "expected" rate was, much less that the Company was responsible for setting that expectation in the market.  Indeed, Plaintiff does not dispute that the YoY expense increase for 1Q21 was *lower* than for three of the previous four quarters.  Mot. 10.[3]

Further, the phrase "solid business growth" is puffery.  Mot. 21 (citing unanswered authority).[4]  Plaintiff argues "solid business growth" is misleading in the context of omitting 1Q21 expense information, but offers no authority that general puffery loses its character because a defendant allegedly omits information (which a plaintiff almost always alleges).  And Plaintiff's

---

[3] Plaintiff claims an investor might have interpreted "growth" to mean "profit."  Opp. 9, n.7.  Defendants are not responsible for an investor's misunderstanding of common terms or lack of common knowledge that nascent companies routinely "grow" before they are profitable.  And Plaintiff pleads no facts suggesting anyone expected Waterdrop to be profitable in 1Q21.

[4] *See also In re Align Tech., Inc. Sec. Litig.*, 2021 WL 1176642, at *3 (N.D. Cal Mar. 29, 2021) ("seeing tremendous growth" was puffery); *Auctus Fund, LLC v. NuGene Int'l, Inc.*, 2021 WL 1069462, at *6 (D. Mass. Mar. 19, 2021) ("growth potential is limitless" was puffery).

own authority reenforces that the "context" in which puffery becomes an actionable misstatement is absent here.  *See In re Petrobras Secs. Litig.*, 116 F. Supp. 3d 368, 374-75, 381 (S.D.N.Y. 2015) (statements about Petrobras' integrity were "made repeatedly," over three years, "to reassure the investing public" while Petrobras participated in the largest bribery scandal in Brazilian history); *In re Vivendi Univ., S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. Nov. 4, 2003) (financial solidity claims were not puffing given undisclosed "financial precipice" where company's "debt rating was almost downgraded, and the possibility that it would need to declare bankruptcy soon."); *see also Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190 (S.D.N.Y. 2010) (highly-specific statement about "significant organic growth in case, assets and credit" was not puffery where "vast majority of E\*TRADE's loans were purchased from questionable outside lenders").

**Statements #2** and **#3**.  The Motion established that **Statement #2**, which projected that costs would decline as a proportion of revenues in the "foreseeable future," is inactionable because it (i) did not state the decrease would occur in the 1Q or 2Q of 2021, and (ii) noted preconditions to this decline that Plaintiff nowhere alleges occurred.  Mot. 21-22.  Plaintiff fails to address item (i), arguing instead that reasonable investors could somehow have understood "foreseeable ***future***" to mean either the ***past*** (1Q21) or the ***present*** (2Q21)—neither of which satisfies Plaintiff's preferred (and unpleaded) definition of "foreseeable future": "a time that is not long from now: soon."  Opp. 16 (quoting Merriam-Webster).  And Plaintiff plays word games, arguing Waterdrop actually meant that "improvement[] was currently happening" when the Company stated that expenses would decline "***as*** we improve the operating efficiency," and "***as*** Waterdrop 'achieve[s] economies of scale." *Id.*  It is clear that the Company is speaking about the future—which Plaintiff ***concedes*** in the next paragraph by noting these statements are "admittedly forward-looking." *Id.*

In addition to being "admittedly forward-looking," **Statements #2** and **#3** are accompanied

by "adequate cautionary language." Mot. 22 (quoting authority). Plaintiff's response that "historical results offer no words of caution" is frivolous: the Company warned about historical "net losses and negative cash flows" that "*may continue into the future*," Mot. 8 (quoting Pr. 20-21). Plaintiff also argues that such cautionary language was contrary to **Statement #2**'s prediction that operating expenses as a proportion of revenues would decline in the future. Opp. 16. But that is precisely the function of cautionary language: to "bespeak caution" about a projection with factors that might cause results to differ.[5] The assertion that the Company knew expense-related risks for 1Q21 had already come to pass fails because, as discussed above, Plaintiff fails to plead that 1Q21 expenses were "known or knowable" as of the IPO. And Plaintiff's claim that a jury is necessary to determine whether a statement is misleading is belied by this Court's routine dismissal of Section 11 claims at the motion stage. *See, e.g.*, *Willard v. UP Fintech*, *Asay v. Pinduoduo*.

## II.   PLAINTIFF FAILS TO PLEAD MISSTATEMENTS ABOUT MUTUAL AID

**Statements #4, #5, #6, #7, #8**.[6] As the Motion explains, Waterdrop accurately disclosed that it ceased Mutual Aid due to economic factors, and that, regardless, the *reason* was immaterial. Mot. 6-7 (Plaintiff pleads economic reasons for industry shutdown of Mutual Aid); Mot. 14-16. Plaintiff argues that Waterdrop's statements concerning the cessation "created the misleading impression" that cessation was an economic decision, and not "due to increased regulatory

---

[5] Plaintiff makes the novel claim that cautionary language was inadequate because analysts were "surprised." This would eliminate the intended protection for nearly every missed projection. *Cf. In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *6 (S.D.N.Y. June 23, 2004) (PSLRA Safe Harbor intended to "loosen the 'muzzling effect' of potential liability for forward-looking statements") (quotation omitted).

[6] Plaintiff does not deny that the CWs lacked access to upper-level decision-making, and so fails to plead their opinions are based on anything besides *post hoc* public information. And Plaintiff claims only to have pleaded sufficient facts to show they worked at Waterdrop. Further, because Plaintiff's allegations show that economic reasons precipitated the industry-wide Mutual Aid cessation, Mot. 6-7, the CWs do not "corroborate" Plaintiff's allegations. Opp. 21.

pressure." Opp. 18. But, like the Amended Complaint, the Opposition fails to show that tightening regulations had any impact beyond affecting the economics of operating Mutual Aid, which is entirely consistent with Waterdrop's public statements, and Plaintiff fails to articulate any other "regulatory pressure" to which he might be referring.

Indeed, the Opposition reiterates the Amended Complaint's core speculation that, had Waterdrop disclosed that it ceased Mutual Aid due to "regulatory scrutiny," investors would have somehow been prepared for an August 2021 crackdown that depressed securities prices. Opp. 19. As established in the Motion, however, Plaintiff simply fails to plead any sanction or adverse actions by the CBIRC against Waterdrop (beyond the unrelated, immaterial and **public** investigation, addressed *infra*), arising either from the IPO or any other aspect of its business, asserting instead a general crackdown in August 2021 across multiple businesses and sectors. In other words, there was nothing that disclosure of "regulatory scrutiny" (even if true) would have done to prepare investors for actions that took place months later and did not target Waterdrop. Plaintiff's additional failure to plead that Waterdrop possessed non-public information, as of the May 2021 IPO, about CBIRC actions in August 2021 is therefore not surprising. Mot. 12-13.[7]

Plaintiff deliberately blurs the distinction between the **cause** and **impact** of ceasing Mutual Aid, arguing the failure to disclose purported CBIRC pressure concealed the "unexpected impacts" the cessation "was having and would have on Waterdrop," including "unexpected increased expenses." Opp. 18-19. As discussed, Plaintiff fails to plead any regulatory impact specific to Waterdrop. Further, purported regulatory pressure is unrelated to the economic impact of ceasing Mutual Aid—which Waterdrop disclosed—and so Plaintiff still fails to articulate why the **reasons**

---

[7] Plaintiff argues that Waterdrop's statements "did not disclose to investors that it discontinued Mutual Aid due to economic reasons." Opp. 18. This theory is unpleaded and should be rejected. Regardless, Waterdrop's statements concern exclusively economic reasons.

for ceasing Mutual Aid were material. Lastly, Plaintiff fails to plead Mutual Aid was a "core" business—in fact, by the IPO, Mutual Aid accounted for a tiny fraction of FYP. Mot. 8.[8]

## III.  PLAINTIFF FAILS TO PLEAD MISSTATEMENTS ABOUT REGULATION

**Statements #9, #10**, and **#11**. The Motion makes clear that Waterdrop made lengthy, detailed disclosures about the regulatory environment, including express warning that the impact of the January 2021 CBIRC draft circular was unknown, and that the CBIRC investigation was unrelated, immaterial, and *public*. Mot. 12, 24-25. Indeed, the Motion demonstrates (and Plaintiff pleads) that CBIRC actions were public, and so need not be re-disclosed. *Id.* 5, 11.[9]

Plaintiff fails to show that Company disclosures were inadequate. Plaintiff claims the Prospectus' detailed regulatory disclosures were "generic" and failed to "disclose" their "actual impact." Opp. 24. In fact, the disclosures were detailed explanations that regulations could have immediate and significant impacts, that the Company might not be able timely to comply with them, and that the Company could not predict the effect of the January 2021 draft circular. Mot. 4-5, 11-12. Plaintiff also suggests the "actual impact[s]" were (i) increased expenses due to ceasing Mutual Aid, which the Company disclosed, (ii) a "crackdown," which Plaintiff fails to plead, *see supra* Argument § II, and (iii) the *public* investigation, which need not be disclosed.

Plaintiff acknowledges there is no obligation to disclose public information, but claims that CBIRC actions are an exception because they were issued in Chinese. Opp. 22. Plaintiff's

---

[8] Plaintiff cites a September 15, 2021 article on the *Seeking Alpha* website, but fails to identify the author or plead any credentials. And, like the Amended Complaint, the quotation fails to specify what "ongoing effects of CBIRC regulation" drove down the stock price. Opp. 12, 19.

[9] Plaintiff fails to distinguish *In re Qudian Inc. Securities Litigation*, 2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019), *see* Opp. 23 n.11, given Waterdrop described the December 14, 2020 and January 2021 CBIRC releases. *See also In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552-53 (S.D.N.Y. 2005) (no need to disclose "generally applicable laws and regulations")

authorities [10] are easily distinguished, given the pronouncements here were issued by the Company's **main regulator**, not noted in passing by a third party. (AC ¶¶ 120-21 ("CBIRC published the Regulatory Measures"; "CBIRC published the Dec. 18, 2020 Circular")). And Plaintiff offers neither authority nor logic suggesting that Waterdrop's investors should not be aware of the promulgation of policies by the Company's chief regulator.[11]

Finally, Plaintiff asserts that the separate investigation of Waterdrop "confirms that media stories about a 'crackdown' were not mere rumors." Opp. 24 n.12. If Plaintiff is correct, then the purported "crackdown" was public knowledge, because the CBIRC disclosed that investigation. Further, Plaintiff has no response to the well-settled principle that a Company has no obligation to disclose "uncharged, unadjudicated conduct," even where the Prospectus includes warnings about investigations and regulatory actions. Mot. 25 (quoting *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 651 (S.D.N.Y. 2017)). Regardless, total fines of $173,000, a miniscule 0.05% of the IPO proceeds, are immaterial and do not constitute a "crackdown."[12]

## CONCLUSION

Defendants Waterdrop, Cogency, Ms. DeVries, and the Underwriter Defendants respectfully request dismissal of the Amended Complaint with prejudice.

---

[10] *See Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020) (Chinese court judgments); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009) (Chinese news articles).

[11] Plaintiff cannot plead that the CBIRC's actions were public, then assert that "truth on the market" cannot be determined on a motion to dismiss. As called for in *Enzymotic*, Defendants need only "establish that defense as a matter of law on the basis of the allegations of the Amended Complaint." 2015 U.S. Dist. LEXIS 167403, at *51 (quotation omitted). They have done so.

[12] Plaintiff assails general statements about the Chinese government's support for the health insurance industry, but does not address Motion arguments that (i) the alleged statements concerned that industry in general; (ii) Plaintiff pleads no facts that China **does not** support its own health insurance industry; and (iii) Plaintiffs allege no information about the general health insurance industry that Waterdrop possessed but investors did not. Mot. 24.

JA-190

Dated: July 21, 2022
  New York, New York

Respectfully submitted,

**O'MELVENY & MYERS LLP**

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: */s/ Jonathan Rosenberg*
  Jonathan Rosenberg
  Abby F. Rudzin
  7 Times Square
  New York, NY 10036
  Telephone: 212/408-2409
  jrosenberg@omm.com
  arudzin@omm.com

*Attorneys for Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co. LLC, and BofA Securities, Inc.*

By: */s/ Michael B. Carlinsky*
  Michael B. Carlinsky
  Xiao Liu
  Jacob J. Waldman
  Jianjian Ye
  51 Madison Avenue, 22nd Floor
  New York, NY 10010
  Telephone:  (212) 849-7000
  michaelcarlinsky@quinnemanuel.com
  xiaoliu@quinnemanuel.com
  jacobwaldman@quinnemanuel.com
  jianjianye@quinnemanuel.com

*Attorneys for Waterdrop, Cogency Global Inc., and Colleen DeVries*

JA-191

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                    :        21cv7683 (DLC)
SIDNEY SANDOZ, individually and on  :
behalf of all others similarly      :
situated,                           :
                                    :        OPINION AND ORDER
                Plaintiff,          :        _____
                                    :
            -v-                     :
                                    :
WATERDROP INC. et al.,              :
                                    :
                Defendants.         :
                                    :
------------------------------------ X

APPEARANCES:

For Lead Plaintiff:
Kahn Swick & Foti, LLC
Kim Elaine Miller
250 Park Avenue
Suite 2040
New York, NY 10177

For the defendants Waterdrop Inc., Cogency Global Inc., and
Colleen A. DeVries:
Quinn Emanuel
Michael Barry Carlinsky
51 Madison Avenue, 22nd Floor
New York, NY 10010

For defendants Goldman Sachs (Asia) L.L.C., Morgan Stanley & Co
LLC, and BofA Securities, Inc.:
O'Melveny & Myers LLP
Jonathan Rosenberg
Abby F. Rudzin
7 Times Square
New York, NY 10036

DENISE COTE, District Judge:

    In this putative securities class action, investors in

Waterdrop Inc. ("Waterdrop"), a Chinese insurance company,

allege that there were material omissions in Waterdrop's registration statement and prospectus (collectively, the "Registration Statement") associated with its initial public offering in May 2021 ("IPO").  The crux of the plaintiff's claims are that Waterdrop failed to warn investors of the risks associated with the regulatory environment in China, disclose the extent of the costs and expenses Waterdrop was incurring at the time of its IPO, and disclose certain information about its decision to close a segment of its business.

The defendants who have appeared have moved to dismiss the complaint under Rule 12(b)(6), Fed. R. Civ. P.  The motion is granted.

## Background

The following facts are drawn from the first amended complaint ("FAC") and documents on which it relies.  For the purposes of deciding this motion, the Lead Plaintiff's factual allegations are accepted as true, and all reasonable inferences are drawn in the Lead Plaintiff's favor.

I.    Waterdrop

Waterdrop -- "Shuidi" in Chinese -- is a Chinese insurance technology platform.  Prior to the events giving rise to this action, Waterdrop consisted of three different segments: a mutual aid platform ("Mutual Aid"), a medical crowdfunding platform, and an insurance marketplace.

2

JA-193

Waterdrop launched Mutual Aid in 2016.  Through the Mutual Aid platform, individuals would contribute small amounts of money to Mutual Aid monthly.  The Mutual Aid fund would pay medical expenses of eligible beneficiaries.  Mutual Aid did not generate significant revenue for Waterdrop, but it allowed Waterdrop to educate its users about health insurance and to market insurance products to them.

Later in 2016, Waterdrop started a crowdfunding platform and acquired a commercial insurance company.  The crowdfunding platform allowed users to make donations to cover others' medical expenses.  Like Mutual Aid, this platform did not generate much revenue for Waterdrop, but it generated customer leads for its marketing of commercial insurance.

Through its commercial insurance company, Waterdrop sold insurance to consumers and earned revenue through commissions on the products it sold.  The interaction of the three segments of Waterdrop was critical to its business model: it used Mutual Aid and the crowdfunding platform to drive customers to its commercial insurance company.

China has regulated online insurance companies such as Waterdrop more heavily in recent years.  They are regulated by the China Banking and Insurance Regulatory Commission ("CBIRC").  On September 3, 2020, the CBRIC published a study that raised concerns about online mutual aid platforms and concluded that

3

JA-194

the CBIRC had to "crack down on illegal insurance activities." The study specifically cited Waterdrop as an example. On December 7, the CBIRC issued Regulatory Measures for the Supervision of Internet Insurance Business ("Regulatory Measures"). The Regulatory Measures included a license requirement for insurance businesses.

Some days later, on December 18, the CBIRC published a circular on Cases of Infringement of Consumer Rights and Interests ("December Circular"). The December Circular announced a CBIRC investigation of online insurance companies that advertised discounted first month premiums when that premium's cost was actually distributed over later premiums. The December Circular identified Waterdrop as a company that employed this practice.

On January 11, 2021, the CBIRC published the Draft Circular on Further Regulating Online Life Insurance Business ("January Draft Circular"). If enacted, the January Draft Circular would have imposed more requirements on online insurance companies. Violations of those requirements were to be investigated and pursued through enforcement actions by the CBIRC.

Following these regulatory changes, in March 2021, Waterdrop discontinued the Mutual Aid platform. Almost all other mutual aid platforms in China also ceased operations. Two confidential witnesses ("CW") employed at Waterdrop stated that

4

JA-195

the cessation of Mutual Aid was due to the increased regulatory scrutiny.  CW1 was a customer service staff member from November 2019 to October 2021, and CW2 was a Finance Business Partner from April 2020 to March 2021.

Around the same time, Waterdrop was preparing its IPO.  It was reported in the media that the CBIRC opposed Waterdrop going public and that this had delayed Waterdrop's IPO.  Waterdrop denied those claims.

On April 16, 2021, Waterdrop filed its registration statement on Form F-1, which was amended and declared effective on May 6.  On May 7, Waterdrop filed a prospectus on Form 424B4, which incorporated and formed part of the registration statement.  The documents are referred to collectively as the Registration Statement.  Waterdrop sold 30 million American Depository Shares ("ADS") at $12 per ADS in its IPO.

On June 17, 2021, Waterdrop issued a press release reporting its financial results for the first quarter of 2021 ("1Q21").  Waterdrop reported that costs and expenses had increased 75% year to year and that the company had suffered an operating loss.  Later, in August, media reported a regulatory "crack down" on Chinese technology companies across a variety of sectors, especially those that had completed U.S. IPOs. Waterdrop was expected to be a target of the crackdown.

JA-196

On September 8, Waterdrop announced its financial results for the second quarter of 2021, which stated that operating costs continued to accelerate.  On September 13, the price of Waterdrop's ADSs decreased to $3 per share.  When this action was commenced on September 14, Waterdrop's ASDs were priced at $1.54 per share.

On November 3, the CBIRC announced that Waterdrop was being fined RMB1 million[1] for the advertising activities detailed in the December Circular.  Later that month, Waterdrop announced its financial results from the third quarter of 2021.  Thereafter, analysts lowered the price targets for Waterdrop ADSs and noted the impact that increased regulatory scrutiny and higher marketing expenses were having on Waterdrop.

## II.   The Registration Statement

The claims rest on the adequacy of the disclosures in the Registration Statement.  Pertinent material from the Registration Statement is quoted below.  The statements upon which the plaintiff relies are highlighted in bold.[2]  Any emphasis from the FAC is indicated by underlining.  The statements principally appear in the following sections of the Registration Statement: Prospectus Summary; Risk Factors; and

---

[1] Renminbi ("RMB") is the official currency of China.

[2] When the same statement is repeated within the Registration Statement, the statement is recited only once in this Opinion.

Management's Discussion and Analysis of Financial Condition and Results of Operations ("Analysis of Financial Condition"). The statements upon which the plaintiff relies that appear in other sections are indicated accordingly.

A.    Prospectus Summary

The Registration Statement begins with a summary of Waterdrop's business model, risks associated with the IPO, and recent developments in Waterdrop's finances. Waterdrop notes that it "face[d] uncertainties relating to the change of regulatory regime."

The Registration Statement also describes certain 1Q21 results. It states:

> **We have achieved a solid business growth in the first quarter of 2021. The [first year premium ("FYP")] generated through Waterdrop Insurance Marketplace reached RMB4,469 million for the first quarter of 2021, demonstrating a 14.4% increase from the fourth quarter of 2020 or a 42.7% increase from the same period of 2020.**

> We continued to diversify our customer acquisition channels. In the first quarter of 2021, 54.5% of the FYP generated via Waterdrop Insurance Marketplace was sourced from third-party traffic channels, while 34.4% and 11.0% of the FYP generated via Waterdrop Insurance Marketplace was sourced from natural traffic and repeat purchase, and internal traffic, respectively.

The Registration Statement's summary also refers to the end of Mutual Aid:

> **In light of our expanded business and prospect [sic], the increased recognition of our brand, and the latest market development, we have decided to focus on our**

**core businesses and offer enhanced protection to our users.** Our Waterdrop Mutual Aid service historically served as a scenario for educating and familiarizing millions of users with the importance of insurance coverage. In March 2021, we ceased the operation of the Waterdrop Mutual Aid business, offering to migrate all mutual aid participants as insurance policyholders of our Waterdrop Insurance Marketplace service.

Lastly, the summary includes financial data that explained that operating costs and expenses had increased from RMB426,313 in 2018, to RMB1,705,445 in 2019, to RMB3,524,194 in 2020. A significant portion of the increased costs and expenses came from increases in sales and marketing expenses, which increased from RMB184,943 in 2018, to RMB1,056,494 in 2019, to RMB2,130,535 in 2020.

B.   Risk Factors

Waterdrop details several risks in the Registration Statement. First, it addresses risks related to its operating losses:

> **We have a history of net losses and negative cash flows from operating activities, which <u>may</u> continue in the future.**
>
> **. . . We <u>anticipate</u> that our operating costs and expenses will increase in the foreseeable future as we continue to grow our business,** acquire new users, invest and innovate in our technology infrastructure and further develop our product and service offering and increase brand recognition. Any of **these efforts <u>may</u> incur significant capital investment and recurring costs, have different revenue and costs structures, and take time to achieve profitability.**

(Underlining reflects emphasis added by plaintiff.)

8

JA-199

The Registration Statement then explains the risks stemming
from the regulatory environment in China[3]:

> **We face uncertainties relating to the change in
> regulatory regime.**
>
> **We operate in a highly regulated industry in China,
> and the regulatory regime continues to evolve.  The
> China Banking and Insurance Regulatory Commission, or
> the CBIRC, has extensive authority to supervise and
> regulate the insurance industry in China.  Since the
> online insurance industry in China is evolving
> rapidly, the CBIRC has been enhancing its supervision
> over this industry in recent years, and new laws,
> regulations and regulatory requirements have been
> promulgated and implemented from time to time.  We
> face challenges brought by these new laws, regulations
> and regulatory requirements, as well as significant
> uncertainties in the interpretation and application
> thereof.  Moreover, there exist uncertainties as to
> how the regulatory environment might change.**
>
> **On December 14, 2020, the CBIRC published the
> Regulatory Measures for Online Insurance Business, or
> the Regulatory Measures, which became effective on
> February 1, 2021.  Shuidi Insurance Brokerage conducts
> online insurance brokerage business in the [People's**

---

[3] A separate section of the Registration Statement titled
Industry discusses the health insurance sector in China:

> **[The] growth of health insurance sector has been
> supported by the Chinese government in recent years.**
> In an announcement made in January 2020, the CBIRC has
> set the 2025 total health insurance premium target of
> RMB2 trillion (compared with RMB707 billion in 2019).
> A series of regulatory policies have been introduced
> since 2014, aiming to promote the commercial health
> insurance development from multiple dimensions.
> According to the iResearch report, the following
> **recent regulatory developments are expected to have
> positive impacts on China's health insurance
> industry[, including a]ccelerating the growth of the
> health insurance industry, and encouraging the growth
> of charitable medical donations and medical mutual
> aid.**

JA-200

Republic of China ("PRC")] and is subject to the
Regulatory Measures.  The Regulatory Measures
significantly changes regulatory regime for online
insurance business in various aspects.

After detailing the requirements in the Regulatory
Measures, the Registration Statement continues:

It might be costly for us to stay in compliance with
the heightened requirements and standards in the
Regulatory Measures.  The Regulatory Measures sets out
a ramp-up process allowing market participants to
achieve full compliance in phases until February 1,
2022; we, however, cannot assure you that we can
timely adjust our current business operations to
achieve and maintain full compliance. . . .

The regulatory framework in China's insurance industry
is evolving and undergoing significant changes.
Further development of regulations applicable to us
may result in additional restrictions on our business
operations.  We may have to adjust our business
practice and operations to comply with the
continuously changing regulatory requirements.  For
example, in January 2021, the CBIRC published the
draft Circular on Further Regulating Certain Issues on
Internet Life Insurance Business, or the Draft
Circular, for comment among insurance industry
participants.  The Draft Circular requires that each
installment of premium of certain insurance products
less than one year term, such as accident insurance
and health insurance shall be equal.  We provide our
consumers the option of monthly payments and the first
month payment of premium of certain insurance products
is typically lower than subsequent installments.  We
may be required to change such payment regime to
comply with the Draft Circular, if the Draft Circular
is enacted.

The Registration Statement goes on to say:

As of the date of this prospectus, the Draft Circular
is still pending approval and has not come into
effect.  It remains uncertain when and how the Draft
Circular would come into effect, and whether and how
CBIRC would promulgate relevant rules related to us.

10

JA-201

The attention of our management team could be diverted
to these efforts to cope with an evolving regulatory
or competitive environment.  Meanwhile, staying
compliant with the restriction may result in
limitation to our business scope, limitation to our
product and service offerings, and reduction in our
attraction to consumers.  As a result, our business
and results of operations might be materially and
adversely affected.

Expanding on the regulatory environment, the Registration

Statement cautions:

**The administration, interpretation and enforcement of
the regulations applicable to us are evolving and
involve uncertainties.  We may not be able to stay in
constant compliance with the rapidly evolving
regulations.**

**. . .  [W]e have from time to time been subject, and
are likely again in the future to be subject to PRC
regulatory inquiries, inspections and investigations.
If any non-compliance incidents in our business
operation are identified, we may be required to take
certain rectification measures in accordance with
applicable laws and regulations, or we may be subject
to other regulatory actions such as administrative
penalties.**

Under a different subheading in the Risk Factors section,

the Registration Statement explains the risks associated with

ending Mutual Aid:

We face reputational, monetary, and legal risks in
relation to our discontinuation of the Waterdrop
Mutual Aid business.

**In March 2021, we ceased the operation of our
Waterdrop Mutual Aid platform in order to focus on our
core businesses and offer enhanced protection to our
users.**  We have offered to migrate all mutual aid
participants as insurance policyholders of our
Waterdrop Insurance Marketplace service. . . .
Despite our good intention, our mutual aid

JA-202

participants or general public may view our action as
adversely affecting the actual or expected interests
of mutual aid participants, which may in turn harm our
reputation.  In the worst scenario, participants may
choose to bring complaints and lawsuits against us.
Although we were contractually permitted to terminate
the mutual aid plans any time in our discretion,
lawsuits may nevertheless be time consuming and
costly, and distract our management's attention.

The Registration Statement also warns of risks relating to

rising third-party advertising costs:

We leverage third-party user acquisition channels to
bring in some of new users to our platforms and may
incur significant costs on paying our user acquisition
channels service fees.

. . .  [W]e have incurred significant expenses on
paying third-party user acquisition channels marketing
fees.  If certain of existing third-party user
acquisition channels require higher rates of marketing
fees or we fail to negotiate favorable terms with them
or find new third-party user acquisition channels, our
cost of user acquisition may increase, and our results
of operations may be adversely affected.

C.    Analysis of Financial Condition

Under the subheading titled Expansion of Consumer Base, the

Registration Statement speaks to Waterdrop's history of consumer

acquisition:

Our insurance consumers mainly come from three
sources.  Firstly, **our medical crowdfunding operation
direct [sic] substantial traffic to our insurance
marketplace.  Approximately 46.5%, 23.0% and 13.0% of
the FYP generated through Waterdrop Insurance
Marketplace for 2018, 2019 and 2020, respectively, was
sourced from traffic from our medical crowdfunding
platform.  Historically, our mutual aid operation also
directed traffic to our insurance marketplace.  We see
the internal source of consumer traffic as an
important and unique consumer acquisition resource to**

**us,** and in addition we consider this cohort of consumers with stronger awareness of insurance protection and stronger interest in the content and product offerings on our platforms, and more loyal to our services.

**In order to continuously diversify our consumer acquisition channels, we also cooperate with other third-party traffic channels to grow our insurance consumer base. In 2018, 2019 and 2020, approximately 1.9%, 34.8% and 44.9% of the FYP generated through Waterdrop Insurance Marketplace was sourced from third-party traffic channels, respectively. We expect third-party traffic channels to play an important role in the future to support the rapid growth of our business.**

The Registration Statement also addresses Waterdrop's

operating costs:

**We have incurred significant costs and expenses in building our platform, growing our consumer base and developing capabilities in data analysis and technology. Our business model is highly scalable and our platform is built to support our continued growth. We expect our operating costs and expenses to decrease as a proportion of our revenues as we improve the operating efficiency of our platform and achieve more economies of scale. . . .**

**We expect our operating costs to increase in absolute terms as our scale of business grows. However, as we improve the operating efficiency of our platform and achieve more economies of scale, we expect our operating costs as a percentage of our net operating revenue will decrease in the foreseeable future.**

(Underlining reflects emphasis added by plaintiff.)

Lastly, the Registration Statement elaborates on

Waterdrop's decision to terminate Mutual Aid.[4]  It states, "**We**

---

[4] With respect to Mutual Aid, the index attached to the Registration Statement also states, "**The Group has assessed and**

operated Waterdrop Mutual Aid between May 2016 and March 2021,
under which we generated management fee income as an operator."

Discussing this management fee income, it continues:

> Starting from March 2021, with the cessation of the
> Waterdrop Mutual Aid operation, the corresponding
> management fee income which accounted for 3.6% of
> total operating revenue in 2020, will no longer be a
> revenue stream for us in 2021.
>
> On March 26, 2021, we announced the termination of the
> Waterdrop Mutual Aid business by the end of March
> 2021. In connection with this business adjustment, we
> voluntarily undertook to cover mutual aid
> participants' medical expenses arising from medical
> conditions diagnosed by March 31, 2021 that would have
> been covered by the ceased mutual aid plan, subject to
> certain procedural requirements and eligibility
> criteria. In addition, we also offered a one-year
> complementary health insurance policy to each
> participant with a similar coverage as the
> participant's original mutual aid plan. . . .
>
> The estimated cost of medical expense coverage is
> RMB15.0 million (US$2.3 million) and the estimated
> cost of one-year health insurance coverage is RMB81.7
> million (US$12.5 million). RMB19.9 million (US$3.0
> million) will be accounted for as a reduction of
> management fee revenue previously recognized for each
> participant to the extent of the cumulative amount
> earned until March 26, 2021.RMB76.8 million (US$11.8
> million) will be recorded as an expense.

III. Procedural History

This action was filed on September 14, 2021, as a putative
class action. It brought securities fraud claims against

---

concluded that the cessation of the mutual aid platform
operation is a non-recognized subsequent event given the
cessation decision is made in 2021 following recent industry
environment changes."

14

Waterdrop and certain of its officers and directors[5]; Cogency
Global Inc. ("Cogency"), Waterdrop's authorized U.S.
representative at the time of the IPO; Colleen DeVries, a senior
vice president at Cogency; and six underwriters of Waterdrop's
IPO: Goldman Sachs (Asia) LLC, Morgan Stanley & Co LLC, BofA
Securities, Inc., China Merchants Securities (HK) Co. Limited,
CLSA Limited, and Haitong International Securities Company
Limited (the "Underwriter Defendants"). The putative class is
composed of investors who purchased Waterdrop ADSs pursuant to
the Registration Statement.

On December 8, Qi Mi was appointed Lead Plaintiff pursuant
to the Private Securities Litigation Reform Act of 1995
("PLSRA"), 15 U.S.C. § 78u-4(a)(3). The Lead Plaintiff filed
the FAC on February 21, 2022. The FAC alleges that (1) the
defendants violated § 11 of the Securities Act of 1933
("Securities Act"), id. § 77k, and (2) all defendants except the
Underwriter Defendants and DeVries violated § 15 of the
Securities Act, id. § 77o. The defendants who have been served
moved to dismiss the FAC on April 22.[6] The motion became fully

---

[5] The individual defendants include Peng Chen, Waterdrop's CEO
and Chairman; Kangping Shi, Waterdrop's CFO; and Waterdrop
directors Nina Zhou, Kai Huang, Haiyang Yu, Yao Hu, and Guang
Yang.

[6] As of the date of this Opinion, defendants China Merchants
Securities (HK) Co. Limited, CLSA Limited, and Haitong

submitted on July 21.  This case was reassigned to this Court on August 17.

### Discussion

To survive a motion to dismiss for failure to state a claim, the complaint "must plead enough facts to state a claim to relief that is plausible on its face." Green v. Dep't of Educ. of the City of New York, 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In securities fraud actions, a court may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted).

"Section 11 imposes absolute liability on the issuer of a registration statement if: (1) the statement contained an untrue statement of a material fact, (2) the statement omitted to state a material fact required to be stated therein, or (3) the omitted information was necessary to make the statements therein not misleading." Set Capital LLC v. Credit Suisse Group AG, 996 F.3d 64, 84 (2d Cir. 2021) (citation omitted).  "[A] plaintiff

International Securities Company Limited and the individual defendants except for DeVries have not been served.

JA-207

bringing a claim under Section 11 need not allege scienter, reliance, or loss causation." Id. (citation omitted). "Section 15, in turn, creates liability for individuals or entities that control any person liable" under § 11. In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010) (citation omitted). "[T]he success of a claim under [S]ection 15 relies, in part, on a plaintiff's ability to demonstrate primary liability" under § 11. Id.

A statement or omission "is material if a reasonable investor would view it as significantly altering the total mix of information made available." Set Capital LLC, 996 F.3d at 84 (citation omitted). This is an "objective, totality-of-the-circumstances inquiry." Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85, 146 (2d Cir. 2017). Courts must read registration statements "cover-to-cover" and "consider whether the disclosures and representations, taken together and in context, would have misled a reasonable investor about the nature of the securities." In re ProShares Trust Sec. Litig., 728 F.3d 96, 103 (2d Cir. 2013) (citation omitted). The context "includes, for example, all facts related to the statement or omission, its surrounding text, the offering documents, the securities, the structure of the transaction, and the market in which the transaction occurs." Nomura Holding Am., Inc., 873 F.3d at 151.

"[W]hen a registration statement warns of the exact risk that later materialized, a Section 11 claim will not lie as a matter of law." In re Proshares, 728 F.3d at 102 (citation omitted). "Under the bespeaks caution doctrine, alleged misrepresentations in a stock offering are immaterial as a matter of law if it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004) (citation omitted).

The FAC alleges that the Registration Statement was misleading for failing to disclose (1) the extent of Waterdrop's expected operating losses in 2021, (2) the impact of the Chinese regulatory environment on Waterdrop's business, and (3) the motivation behind and financial consequences of Waterdrop's decision to close Mutual Aid. Each category of omissions will be discussed in turn. The defendants contend that the statements to which the Lead Plaintiff points are accurate and that the Registration Statement accurately discloses the risks of investing in Waterdrop and the company's financial condition.

Read in context, the Registration Statement adequately warned investors of the risks associated with Waterdrop and its IPO, including the increase in operating costs, the regulatory regime, and the closure of Mutual Aid. The FAC has failed to plead that any of the statements in the Registration Statement

were materially misleading or that there were material omissions from the Registration Statement.

I.   Operating Losses in 2021

The FAC alleges that the Registration Statement omitted material information about Waterdrop's operating losses.  It alleges that the Registration Statement failed to adequately disclose the increase in operating costs and expenses and that the increases were in large part due to the discontinuation of Mutual Aid and the rise in third-party marketing expenses.  The FAC alleges that the Registration Statement was also misleading for failing to disclose the operating costs and losses from 1Q21.  Each claim will be discussed in turn.

A.   Operating Expenses

The Lead Plaintiff alleges that the Registration Statement's stated expectation that operating costs would decrease as a percentage of Waterdrop's net operating revenue "in the foreseeable future" as Waterdrop improved its "operating efficiency," was misleading because costs and expenses had already increased in 1Q21 and continued to increase in the second quarter.  The FAC further alleges that the Registration Statement's statements that a "history of net losses and negative cash flows from operating activities . . . may continue in the future" and that Waterdrop "anticipate[s] that [its]

19

operating costs and expenses will increase in the foreseeable future" were misleading for the same reason.

The claim that Waterdrop failed to accurately describe its increase in operating expenses fails. Repeatedly, the Registration Statement states that operating costs and expenses had increased and were expected to continue to increase "in the foreseeable future" as Waterdrop worked to expand its business. The Registration Statement did not say nor suggest that operating costs would decrease in 2021 either absolutely or as a percentage of net operating revenue.

The Registration Statement also included a section entitled Special Note Regarding Forward-Looking Statements in which it noted:

> This prospectus contains forward-looking statements that reflect our current expectations and views of future events. . . . Known and unknown risks, uncertainties and other factors, including those listed under "Risk Factors," may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements. . . . These forward-looking statements involve various risks and uncertainties. Although we believe that our expectations expressed in these forward-looking statements are reasonable, our expectations may later be found to be incorrect. Our actual results could be materially different from our expectations.

This warning regarding forward-looking statements specifically identified "financial conditions, and results of operations." This meaningful cautionary language

20

renders immaterial the statements about expectations for the future to which the FAC points.

In opposing this motion, the Lead Plaintiff concedes that these statements are forward-looking but argues that they were not accompanied by meaningful cautionary language.  This argument fails.  Explicitly stating that the company anticipated operating costs to increase in the foreseeable future along with the warnings about forward-looking statements were more than enough to caution investors about Waterdrop's financial condition.

B.    Increase in Third-Party Marketing Expenses

The FAC alleges that the Registration Statement failed to warn investors that Waterdrop had increased spending on third-party marketing.  It points to statements about Mutual Aid's historical role in "direct[ing] traffic to [the] insurance marketplace" and its expectation that "third-party traffic channels" would "play an important role in the future to support the rapid growth of our business" and alleges that these statements are misleading for omitting that Waterdrop needed to increase its spending on third-party marketing because of the closure of Mutual Aid.

The Registration Statement specifically advises investors of the increase in third-party marketing expenses.  Under Risk Factors, the Registration Statement explains that Waterdrop

21

"leverage[s] third-party user acquisition channels to bring in some of new users [sic] to our platforms and may incur significant costs on paying our user acquisition channels service fees." The Registration Statement adds that Waterdrop had "incurred significant expenses on paying third-party user acquisition channels marketing fees" and warns that these costs "may increase."

The financial data recited in the Registration Statement for the years 2018, 2019, and 2020 demonstrated the dramatic growth in third-party marketing expenses each year. Additionally, the Registration Statement data also showed how internal traffic to the insurance marketplace had been driven by third-party channels in recent years rather than Mutual Aid.

In opposition to this motion, the Lead Plaintiff ignores these ample disclosures in the Registration Statement. Instead, the Lead Plaintiff maintains that the statements about third-party marketing were materially misleading because they did not include a discussion of the economic impact of Waterdrop's closure of Mutual Aid. This argument ignores the description of Mutual Aid in the Registration Statement, including the description of its historical role in educating millions of Chinese consumers about the importance of insurance coverage. The Registration Statement explained that Waterdrop had closed Mutual Aid and that an increase in third-party marketing

22

JA-213

expenses was well underway even before it closed Mutual Aid in March 2021.  In sum, investors were sufficiently warned about the increase in third-party marketing expenses and their potential impact on Waterdrop's financial condition.

    C.    1Q21 Financial Results

    Finally, the FAC alleges that the Registration Statement was materially misleading for failing to disclose Waterdrop's first quarter financial results, specifically its operating losses in 1Q21.  The FAC alleges that because the Registration Statement included some information about the 1Q21 -- specifically, that Waterdrop had "achieved a solid business growth in the first quarter of 2021" -- it was a material omission for the Registration Statement to omit that in 1Q21, operating costs and expenses had increased more than 75%, when measured year over year, and that the company experienced an operating loss.  The FAC points to financial analysts' reports and the drop in Waterdrop's share price after the announcement of the 1Q21 financial results to demonstrate the impact this omission had on investors.

    This claim fails.  First, a company has no obligation to report its quarterly financial results before they have been finalized.  The first quarter ended on March 31, 2021, and the

JA-214

Registration Statement was effective May 6, 2021.[7]  Waterdrop's
1Q21 financial results were announced five weeks later, on June
17, 2021.  While the Lead Plaintiff notes that Waterdrop
included some general statements about the growth in Waterdrop's
business in 1Q21, the FAC has not plausibly alleged that the
1Q21 financial results were finalized by the date of the IPO.

Significantly, as already described, the Registration
Statement made robust disclosures about its operating expenses.
The Registration Statement made no promises about Waterdrop's
1Q21 financial condition, stated that operating costs had been
increasing over the past three years, and warned that they were
likely to increase.  The FAC has not plausibly alleged that a
reasonable investor would be misled about Waterdrop's financial
condition given these disclosures.

II.  Regulatory Environment in China

The FAC alleges that Registration Statement contained
misleading statements and omissions regarding China's regulatory
environment for companies like Waterdrop.  The FAC points to
statements in the Registration Statement that "the growth of the
health care insurance sector has been supported by the Chinese
government" and that "recent regulatory developments are

---

[7] The Registration Statement includes the prospectus, which was
filed on May 7, 2021 and incorporated into the registration
statement.

expected to have positive impacts on China's health insurance industry." The FAC alleges that these statements painted a misleadingly positive picture of the regulatory environment. Additionally, the FAC asserts that the Registration Statement's description of the regulatory regime was misleading for failing to mention the December Circular; to give a more detailed discussion of the January Circular; and to explain that Waterdrop was being investigated pursuant to the December Circular at the time of the IPO.

These claims fail. The statement about the health insurance regulations to which the FAC points is a description of the health insurance sector generally, and not a description of the online insurance industry in which Waterdrop operates. The Registration Statement repeatedly advises investors of the risks to Waterdrop's business posed by the Chinese regulatory regime. For example, it states, "We face uncertainties relating to the change in regulatory regime." It describes the Regulatory Measures and the January Draft Circular in detail and warns that Waterdrop cannot ensure that it will be able to comply with new regulations in a timely manner. As to potential regulatory investigations into Waterdrop, the Registration Statement also discloses that Waterdrop has been and expects to be subject to regulatory action, which could result in penalties. These disclosures notified investors of the risks

25

JA-216

stemming from the regulatory environment.  The FAC fails to plead that these statements are false, misleading, or that more needed to be said to adequately warn of the regulatory challenges to Waterdrop's business.

The Lead Plaintiff argues that it was a material omission for the Registration Statement to fail to disclose that Waterdrop was under investigation pursuant to the December Circular, which ultimately led to Waterdrop being fined in November 2021.  This argument fails.  First, the Registration Statement explicitly warned investors that Waterdrop had been under investigation by CBIRC and likely would be again. Furthermore, "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."  Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 98 (2d Cir. 2021) (citation omitted).

In further support of this argument, the Lead Plaintiff relies on Meyer v. Jinkosolar Holdings Co., Ltd., 761 F.3d 245 (2d Cir. 2014).  In Meyer, the Second Circuit held that, on a motion to dismiss, a reasonable investor may find a company's assertion in a registration statement that it was taking steps to comply with environment regulations misleading when, less than a month later, the company submitted a report to the regulatory body detailing its existing problems and deficiencies in complying with the relevant regulations.  761 F.3d at 251.

26

JA-217

Meyer is distinguishable.  The FAC fails to plead that Waterdrop knew in May 2021 that its advertising practices would result in it being fined in November 2021, six months after its IPO.

## III. Termination of Mutual Aid

In a final category of claims, the FAC alleges that the Registration Statement failed to disclose that the closure of Mutual Aid was due to the Chinese regulatory regime.  The FAC also alleges that the Registration Statement included misleading statements about the financial impact on Waterdrop of terminating Mutual Aid.  Neither allegation succeeds in stating a claim.

### A.    Motivation Behind Termination of Mutual Aid

The FAC alleges that the Registration Statement failed to disclose that Waterdrop terminated Mutual Aid because of the increasingly strict regulatory environment in China.  It cites a September 15, 2021 article in the publication Seeking Alpha that connects the heightened regulatory scrutiny to Waterdrop's decision to end Mutual Aid ("September 2021 Article").  The FAC also asserts that the Registration Statement's descriptions of Waterdrop's reasons for discontinuing Mutual Aid were materially misleading in light of this omission.  It points to the Registration Statement linking the closure of Mutual Aid to Waterdrop wanting to "focus on [its] core businesses," the

JA-218

"latest market development," and "recent industry environment changes."

This claim fails.  To begin with, the Registration Statement describes the regulatory environment in China in considerable detail and warns investors of the risks to Waterdrop's business stemming from that environment.  It explains that the online insurance industry is highly regulated in China and describes the enhanced supervision of the CBIRC. It adds that it already had been subject to regulatory investigations and may be subject to penalties.

Of course, information about the government regulations was publicly available to investors.  The FAC fails to plead how any omission from the Registration Statement of a further explanation of Waterdrop's reasons for closing Mutual Aid significantly altered the mix of information available to a reasonable investor.

B.   Financial Impact of Termination of Mutual Aid

The FAC also alleges that the Registration Statement included misleading statements about the financial impact of Mutual Aid's closure.  The Lead Plaintiff alleges that the Registration Statement's description of the consequences from the termination of Mutual Aid should have included a discussion of customer leads and data.  The FAC alleges that Waterdrop had

28

JA-219

to increase its spending on third-party marketing because of this loss.

This claim fails. It is interwoven with several of the claims that have already been dismissed. It is noteworthy that the Registration Statement warns specifically that "We face reputational, monetary, and legal risk in relation to our decision to discontinue" Mutual Aid. It also noted that the Mutual had "historically served as a scenario for educating and familiarizing millions of users with the importance of insurance coverage" and that Mutual Aid had "directed traffic to [the] insurance marketplace." Furthermore, as previously described, the Registration Statement describes its increases in third-party marketing expenses. Read as a whole, the Registration Statement adequately warns of the impact that ending Mutual Aid had on the business of Waterdrop.

In sum, the FAC has failed to plead that the defendants violated § 11 of the Securities Act. Because there was no § 11 violation, the FAC's § 15 claims also fail.

IV. Request for Leave to Amend

The Lead Plaintiff requests that, if the defendants' motion to dismiss is granted, he be given leave to amend the FAC. In general, leave to amend should be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend may be denied, however, "for good reason, including futility, bad

29

JA-220

faith, undue delay, or undue prejudice to the opposing party."
Eastman Kodak Co. v. Henry Bath LLC, 936 F.3d 86, 98 (2d Cir.
2019) (citation omitted). Additionally, a plaintiff "need not
be given leave to amend if it fails to specify . . . how
amendment would cure the pleading deficiencies in its
complaint." TechnoMarine SA v. Giftports, Inc., 758 F.3d 493,
505 (2d Cir. 2014).

The Lead Plaintiff's request for leave to amend is denied.
The Lead Plaintiff has not identified how further amendment
would address the deficiencies in the FAC. The statements
included in the FAC fail to state a claim under the Securities
Act, and as such, amendment would be futile.

### Conclusion

The defendants' April 22 motion to dismiss is granted. The
claims against the remaining defendants will also be dismissed.
There is no basis to find that the claims against the remaining
defendants, who have yet to be served, are distinguishable and
would survive. The Clerk of Court shall close the case.

Dated:     New York, New York
           February 3, 2023

                                        _____
                                              DENISE COTE
                                        United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
SIDNEY SANDOZ, individually and on behalf
of all others similarly situated,

                     Plaintiff,

       -against-                              21 **CIVIL** 7683 (DLC)

                                               **<u>JUDGMENT</u>**

WATERDROP INC. et al.,

                     Defendants.
------------------------------------------------------------X

      It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated February 3, 2023, the defendants' April 22 motion

to dismiss is granted. The claims against the remaining defendants will also be dismissed. There

is no basis to find that the claims against the remaining defendants, who have yet to be served,

are distinguishable and would survive; accordingly, the case is closed.

**Dated:** New York, New York

      February 3, 2023

                                      **RUBY J. KRAJICK**

                            _____
                                   **Clerk of Court**

            **BY:**      K. Mango

                                    _____
                                    **Deputy Clerk**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SIDNEY SANDOZ, Individually And On Behalf of All Others Similarly Situated, | ) ) ) |
| | ) Case No. 1:21-cv-07683-SLC-DLC |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| WATERDROP INC., PENG SHEN, KANGPING SHI, NINA ZHOU, KAI HUANG, HAIYANG YU, YAO HU, GUANG YANG, COLLEEN A. DE VRIES, COGENCY GLOBAL INC., GOLDMAN SACKS (ASIA) L.L.C., MORGAN STANLEY & CO. LLC, BOFA SECURITIES, INC., CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, CLSA LIMITED and HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## PLAINTIFF'S NOTICE OF APPEAL

Notice is hereby given that Lead Plaintiff Qi Mi, Individually and On Behalf of All Others Similarly Situated, appeals to the United States Court of Appeals for the Second Circuit from the Opinion and Order dated February 3, 2023 (ECF No. 58) and Judgement entered on February 3, 2023 (ECF No. 59) granting Defendants' Motion to Dismiss the Amended Class Action Complaint in its entirety, denying Lead Plaintiff's request for leave to amend, and dismissing the case with prejudice.

JA-223

DATED: March 6, 2023

Respectfully Submitted,

**KAHN SWICK & FOTI, LLC**

*/s/ Kim E. Miller*
Kim E. Miller (KM-6996)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
E-Mail: kim.miller@ksfcounsel.com

-and-

Lewis S. Kahn
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
E-Mail: lewis.kahn@ksfcounsel.com

*Lead Counsel for Lead Plaintiff Qi Mi
and the Class*

JA-224